UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

IMEN GHARBI and HATTAB (BEN):   
GHARBI, as Co-Administrators of the:    NO.   1:19-CV-01943-JEJ
Estate of E.G., deceased and IMEN    :
GHARBI and HATTAB (BEN)    :
GHARBI, Individually and in their    :    PROFESSIONAL MEDICAL
own right,    :    NEGLIGENCE
         Plaintiffs    :
   :
   v.    :
   :    HON. JOHN E. JONES, III
THE UNITED STATES,    :
   :
         Defendant    :

## **<u>PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S</u>**
## **<u>MOTION FOR SUMMARY JUDGMENT</u>**

Respectfully submitted,

**NAVITSKY, OLSON & WISNESKI LLP**

Nijole C. Olson, Esquire
PA55287
Joseph M. Melillo, Esquire
PA26211
2040 Linglestown Road, Suite 303
Harrisburg, PA  17110
717/541-9205
nolson@nowllp.com
jmelillo@nowllp.com
Counsel for Plaintiffs

Date:  January 15, 2021

# TABLE OF CONTENTS

I.  Factual Background..................................................................................1

II. Statement of Questions Presented....................................................5
    A. Do Genuine Issues of Material Fact Regarding Cause of Death
       Exist, Which Preclude the Granting of Summary Judgment?...................5
III. Argument.................................................................................6
    A.  Summary of the Law.......................................................6
    B.  Summary of the Evidence Identifying Geniuine Issues of
       Material Fact...............................................................11

IV. Conclusion................................................................................18

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Anderson v. Liberty Lobby, Inc.*
    *477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* .................... 6, 7

*A.W. v. Jersey City Pub. Sch.*
    *486 F.3d 791, 794 (3d Cir. 2007)* ................................................................. 7

*Berckeley Inv. Group. Ltd. v. Colkitt*
    455 F.3d 195, 201 (3d Cir. 2006); <u>accord</u>, Celotex Corp. v. Catrett, 477
    U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .......................... 6, 7

*Conoshenti v. Pub. Serv. Elec. & Gas Co.*
    364 F.3d 135, 145-46 (3d Cir. 2004) ............................................................ 6

*Flinchbaugh v. Oleg Leontiev, M.D., et. al.*
    No. 2017-00847 (slip op) (C.P. Lebn., May 18, 2020) attached hereto

*Mitzelfelt v. Kamrin,*
    526 Pa. 54, 584 A.2d 888 (1990) ........................................................ 7, 8, 13

*Stimmler v. Chestnut Hill Hosp.*
    *981 A.2d 145 (Pa. 2009)* ...................................................................... 10, 11

**Statutes**

Fed. R. Civ. P. 56(c) ..................................................................................... 6

## I.    **<u>FACTUAL BACKGROUND</u>**

This case involves the alleged failure of ob/gyn physician, Dr. Potacia Francis, a public health service (PHS) employee, to timely and safely deliver the Gharbis' first baby following arrest of labor, with fetal distress apparent on the fetal monitoring strips demonstrating hypoxia-induced late decelerations and acidosis during prolonged labor induction that directly resulted in death.

Following Mrs. Gharbi's admission to the hospital on December 16, 2017, her then attending ob/gyns, Dr. Gerald Maenner and Dr. Megan Klamerus, attempted to induce labor, first with Cytotec and later with Pitocin at 11:29 p.m.  No sooner had Pitocin induction been administered , than it had to be abruptly stopped at 1:00 a.m. on December 17, 2017 and was not restarted due to fetal distress evidenced by late decelerations and minimal fetal heart rate variability on fetal monitoring strips.  At 8:00 a.m., Dr. Potacia Francis assumed care of Mrs. Gharbi and her unborn baby as the on-call ob/gyn physician. She was made aware that Pitocin had to be stopped overnight and not restarted due to late decelerations on fetal monitor strips.   Though she understood that stopping Pitocin because of late decelerations was not a normal course, and that in such circumstance the plan of care would have been to deliver by C-section, Dr. Francis did not expedite delivery with a C-section when she assumed care at 8:00 a.m.  <u>See</u>, deposition transcript of Dr. Francis (**Exhibit B**) at p. 112,

lines 18-25 and p. 113, lines 1-20 attached to Plaintiffs' Reply in Opposition to Defendant's Motion for Summary Judgment.

Mrs. Gharbi's labor course was protracted. By 7:00 p.m., she had no change in cervical dilation for over 4 hours (despite resumed Pitocin induction at 4-6 milli units and contractions every 2-4 minutes) indicating arrest of active labor and the need for delivery that Dr. Francis still did not initiate. Thereafter, at 7:24 p.m., a 14-minute acute and sentinel event occurred with fetal bradycardia and prolonged decelerations on fetal strips necessitating fetal resuscitation efforts. This sentinel event was followed by recurrent late decelerations and minimal fetal heart rate variability with more than 50% of mom's contractions, indicating fetal oxygen deprivation, hypoxia and acidosis. Urgent C-section was required by no later than 8:00 p.m. following the sentinel 14-minute acute bradycardic event, but again, was not initiated by Dr. Francis. See, Plaintiffs' maternal fetal medicine and ob/gyn expert, Dr. Jill Mauldin's, reports (**Exhibit G**) attached to Plaintiffs' Reply in Opposition to Defendant's Motion for Summary Judgment. See also, Plaintiffs' clinical, anatomic and forensic pathology expert, Dr. Jennifer Hammers' reports (**Exhibit I**) attached to Plaintiffs' Reply in Opposition to Defendant's Motion for Summary Judgment. Dr. Francis took no measures to deliver the Gharbis' baby until 1:41 a.m. on December 18, 2017, an additional six hours following the sentinel event, during which time the fetus had "6 hours of continued hypoxia where he

wasn't tolerating those contractions." <u>See</u>, Dr. Jill Mauldin's discovery deposition (**Exhibit H**) at p. 90, lines 13-14 attached to Plaintiffs' Reply in Opposition to Defendant's Motion for Summary Judgment.

The Gharbis' baby boy was delivered by cesarean at 1:41 a.m. with no heartbeat, without breathing, without any signs of life, with pale skin color and petechiae, poor perfusion, and an Apgar score of zero. He was non-responsive to cardiopulmonary resuscitation which lasted approximately 10 minutes, after which he was officially pronounced deceased at 2:00 a.m. on December 18, 2017.

It is Plaintiffs' contention that the cause of the Gharbis' baby's death was intrauterine demise due to hypoxia-induced decelerations and acidosis during prolonged labor induction and delivery. The Gharbis' baby's death from hypoxia and acidosis was preventable had Dr. Francis met the standard of care by timely delivering the Gharbis' baby when arrest of labor became evident and expedited delivery should have occurred no later than 8:00 p.m. given the acute 14-minute fetal bradycardic sentinel event with prolonged decelerations followed by recurrent late decelerations and minimal variability on fetal tracings demonstrating hypoxia and acidosis. In support of this contention, Plaintiffs have supplied expert reports from maternal fetal medicine and ob/gyn expert, Jill Mauldin, M.D., and a clinical, anatomic and forensic pathologist, Jennifer Hammers, D.O. Their discovery

deposition testimonies and experts' reports are attached to Plaintiffs' Reply in Opposition to Defendant's Motion for Summary Judgment as **Exhibits G, H, I, and J**.

Defendant claims that Plaintiffs' expert opinions do not meet the legal standard to show a cause of death in a medical negligence case.  It is Plaintiffs' response that the opinions of Plaintiffs' experts, both of whom definitely and without hesitation, state, to a reasonable degree of medical certainty, that fetal distress apparent on fetal monitoring strips is demonstrative evidence of hypoxia and acidosis that directly resulted in the baby's death.  The opinions of Dr. Mauldin and Dr. Hammers as set forth in their expert reports and discovery deposition testimonies easily rise to the level of certainty necessary to prove causation under Pennsylvania law.

The Defendant premises its Summary Judgment Motion upon Plaintiffs' inability to produce an abnormal cord gas blood study.  The only value found in the medical record is within the normal acid/base range, however, the test was delayed rendering all values of pH, pO2, O2, pCO2, and base deficit as invalid, inaccurate and unreliable.  Since the existence of acidosis is a key component of causation, Defendant argues that Plaintiffs cannot identify a genuine issue of material fact respecting this element of their claim.  Defendant also points to speculative opinions from its witnesses, citing the possible role of genetic defects in causing death.

4

Plaintiffs' experts strongly disagree that there is no evidence of acidosis. Rather, they infer its existence during critical moments from information taken from the fetal monitoring strips. Moreover, their opinions are stated with the degree of certainty to which Pennsylvania's substantive law requires in a medical negligence case.

Defendant's Dispositive Motion must fail because it ultimately rests on a misapprehension of Pennsylvania law. Plaintiffs will summarize the relevant principles and discuss how, and why, they apply to the causation question this case.

## II. STATEMENT OF QUESTIONS PRESENTED

A. Do Genuine Issues of Material Fact Regarding Cause of Death Exist, Which Preclude the Granting of Summary Judgment?

**SUGGESTED ANSWER: YES**

## III. ARGUMENT

**There are Genuine Issues of Material Fact Which Preclude Summary Judgment**

### A. SUMMARY OF THE LAW

The standard for reviewing a Motion for Summary Judgment is long-standing and clear. The parties moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. Rule 56(c) of the Federal Rules of Civil Procedure, provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 206); accord, Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden at trial," summary judgment is

appropriate. <u>Celotex</u>, 477 U.S. at 322.  "Summary Judgment is also appropriate if the non-moving provides merely colorable, conclusory, or speculative evidence." <u>Anderson</u>, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. <u>Id</u>. at 252; <u>See also,</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Sch.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

The Pennsylvania Supreme Court has rendered a number of major decisions on causation in medical negligence cases: <u>Hamil v. Bashline</u>, 481 Pa. 256, 392 A.2d 1280 (1978); <u>Gradel v. Inouye</u>, 491 Pa. 534, 421 A.2d 674 (1980); <u>Jones v. Montefiore Hosp.</u>, 494 Pa. 410, 431 A.2d 920 (1981); and <u>Mitzelfelt v. Kamrin</u>, 526 Pa. 54, 584 A.2d 888 (1990).  The Supreme Court, in <u>Mitzelfelt</u>, both approved the doctrines enunciated in its earlier Opinions, and clearly and simply distills the essence of the governing rule of law:

> In analyzing this case under the <u>Bashline</u> standard, we employ a two part test. The first step is to determine whether the expert witness for the appellants could testify to a reasonable degree of medical certainty that the acts or omissions complained of could cause the type of harm that the appellant suffered. In this case, Dr. Shenkin testified that a thirty point drop in blood pressure was significant enough to compromise the blood pressure to the spinal

cord. Further, a compromise of the blood pressure to the spinal cord can cause paraparesis. As such, Dr. Shenkin's testimony rose to the level required by the first prong of the analysis.

The second step is to determine whether the acts complained of caused the actual harm suffered by the appellant. This is where we apply the relaxed standard. As the experts all testified, twenty percent of patients do poorly after this surgery. As such, it would have been impossible for any physician to state with a reasonable degree of medical certainty that the negligence actually caused the condition from which Mrs. Mitzelfelt suffered. The most any physician could say was that he believed, to a reasonable degree of medical certainty that it *could have* caused the harm. Once Dr. Shenkin rendered this opinion, it then became a question for the jury whether they believed it caused the harm in this case.

Mitzelfelt at 67 and 894 (emphasis in original).

Thus, Plaintiff's state a *prima facie* case of causation once the expert testifies that one or more deviations from the standard of care increased the risk of the type of harm which Plaintiff suffered. The question of whether that increased risk was a real causative factor for a particular plaintiff is for the fact finder to answer. Jurors are not required to find cause in fact, but a verdict derived from testimony concerning the increased risk of harm will be sustained. For example, in Mitzelfelt, the plaintiff's expert opined, within a reasonable degree of medical certainty, that a nurse-anesthetist's permitting a patient's blood pressure to drop below a critical level could have caused paralysis. The Supreme Court decided a plaintiff's verdict founded on this opinion should not have been overturned, because the expert had

essentially stated within a reasonable degree of medical certainty that negligence increased the plaintiff's risk. While the expert could not state, within a reasonable degree of medical certainty, that this increased risk actually caused plaintiff's paralysis, it was still within the jury's province to make that determination.

Conversely, in Clayton v. Sabeh, 406 Pa. Super. 335, 594 A.2d 365 (1991), the Superior Court affirmed a verdict in favor of the defendant, although the plaintiff's expert had testified within a reasonable degree of medical certainty that the physician's conduct increased the risk of the harm which occurred. The Court decided that it was properly within the jury's province to find that defendant's negligence was not a substantial factor in causing plaintiff's ultimate harm.

In Clark v. Hoerner, 362 Pa. Super. 588, 525 A.2d 377 (1987), the plaintiff's expert testified that failure to render proper treatment could have resulted in his death, but could not state with reasonable certainty that proper treatment would have saved the patient. The Superior Court judged this opinion sufficient, as a matter of law, to state a *prima facie* case for the jury, and that it was for the jurors to determine whether cause in fact existed. Id., at 592-594 and 379-380.

Since the Supreme Court's decision in Mitzelfelt, the Pennsylvania Courts have continued to apply and confirm these principles. See, for example, Vicari v. Spiegel, 936 A.2d 503 (Pa. 2007); Stimmler v. Chestnut Hill Hosp., 981 A.2d 145 (Pa. 2009); Winschel v. Jain, 925 A.2d 782 (Pa. 2007).

In addition to supporting the proposition that causation is proven once a qualified expert witness opines, within a reasonable degree of medical certainty, that the risk of harm increased, the cited authorities identify several associated principles helpful in evaluating this case. These include that an expert in a medical negligence need not rule out all other alternative causes in order for the issue to reach a jury. The defense has the burden of showing, through admissible evidence, that some competing cause is so probable as to vitiate the plaintiff's position. See, Winschel, at 793-798 and Stimmler, at 555 and 154-155. The Court also reiterates long-standing principles that there are "no magic words" that experts must use when expressing their opinions. Rather, the substance of the expert's testimony taken in its entirety is reviewed to determine whether an opinion is provided with sufficient certainty. The Supreme Court, in Stimmler, made this crystal clear:

> An expert witness proffered by a plaintiff in a medical malpractice action is required to testify "to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." Welsh v. Bulger, 548 Pa. 504, 698 A.2d 581, 585 (1997); see also Mitzelfelt v. Kamrin, 526 Pa. 54, 584 A.2d 888, 892 (1990). However, expert witnesses are not required to use "magic words" when expressing their opinions; rather, **the substance of their testimony must be examined to determine whether the expert has met the requisite standard**. Welsh, *supra* at 585-86. Moreover, "in establishing a *prima facie* case, the plaintiff [in a medical malpractice case] need not exclude every possible explanation of the accident; it is enough that reasonable minds are able to conclude that the

preponderance of the evidence shows the defendant's conduct to have been a substantial cause of the harm to [the] plaintiff." Mitzelfelt, *supra* at 892 (citation omitted).

Stimmler, at 981 A.2d 555 (emphasis in original)

The question here is whether the opinions of Plaintiffs' expert physicians are stated with the required medical certainty. In examining their written opinions and discovery deposition testimonies, the entirety of the record should be reviewed. It is Plaintiffs' position that the testimony of their experts is strong, and more than sufficient to carry Plaintiffs' burden of proof on the issue of causation.

**B.    SUMMARY OF THE EVIDENCE IDENTIFYING GENIUINE ISSUES OF MATERIAL FACT**

In Answer to Defendant's Motion for Summary Judgment and Statement of Undisputed Material Facts, Plaintiffs have set forth a body of evidence supporting their contentions. In particular, the following matters stand out:

As an authority on labor curves and labor patterns, Plaintiffs' maternal fetal medicine and ob/gyn expert, Dr. Jill Mauldin, opines without hesitation and to a reasonable degree of medical certainty, that fetal distress is apparent on the fetal monitoring strips demonstrating hypoxia-induced late decelerations, loss of fetal heart rate variability and acidosis during prolonged labor induction and delivery resulting in death. Hypoxia and acidosis can be ascertained before delivery three (3) ways: by observing recurrent late decelerations on fetal monitoring, by observing minimal fetal heart rate variability on fetal monitoring strips, or by observing a

combination of both recurrent late decelerations and minimal variability on fetal strips. In this case, fetal hypoxia and acidosis were demonstrated on monitor strips that showed a combination of both recurrent late decelerations and minimal fetal heart rate variability. In particular, Dr. Mauldin states that the fetal strips beginning at 7:24 p.m. demonstrate a dramatic acute fetal bradycardic sentinel event with a very slow return to baseline followed by recurrent late decelerations and minimal fetal heart rate variability in more than 50% of Mrs. Gharbi's contractions indicating fetal hypoxia and acidosis. Dr. Mauldin explains that this sentinel event of fetal hypoxia and acidosis caused the Gharbis' baby's demise, and further opines to a reasonable degree of medical certainty that urgent delivery should have occurred by no later than 8:00 p.m. to prevent death from hypoxic and acidotic injury. Unfortunately, Dr. Francis took no measures to deliver the baby until 1:41 a.m., an additional six (6) hours after the sentinel acute 14-minute fetal bradycardic event, resulting in his untimely and preventable death from hypoxic and acidotic injury.

Likewise, Plaintiffs' clinical, anatomic and forensic pathology expert, Dr. Jennifer Hammers, opines without hesitation and to a reasonable degree of medical certainty, that the fetal decelerations and minimal heart rate variability seen on the fetal monitoring strips were demonstrative of fetal hypoxia and acidosis and caused the baby's death. As the hypoxic and acidotic injury continued during the prolonged

labor induction and delivery, Dr. Hammers further opines that it reached the point to where the baby's heart stopped beating and was not able to be resuscitated.

Both Plaintiffs' experts' opinions satisfy the first prong of the Mitzelfelt test, which requires that Plaintiffs' expert witnesses opine, to a reasonable degree of medical certainty that the acts or omissions complained of could cause the type of harm suffered.

Moreover, Plaintiffs' experts are clear that not only can this happen, but described the mechanism which led to the Gharbi baby's death from hypoxia induced decelerations and acidosis during prolonged labor induction and delivery. These are the same considerations set forth in Mitzelfelt, in which the Supreme Court of Pennsylvania concludes, "[o]nce Dr. Shankin had rendered this opinion, it then became a question for the jury whether they believed, it caused the harm in this case." Mitzelfelt, 526 Pa. 54, 67 (1990).   As in Mitzelfelt, Plaintiffs satisfied both prongs of the causation inquiry, i.e. they believe that negligence increased the risk of hypoxia and acidosis, and that in this case the risk certainly could have caused the baby's death, and did, to a reasonable degree of medical certainty.

The defense attempts to minimize the impact of Plaintiffs' expert testimony by referencing inappropriate authority.   For example, Defendant cites to State Farm Fire & Casualty Co. v. Cohen, Civil No. 19-1947, 2021 W.L. 5369626, (E.D. Pa. December 21, 2020), in support of the proposition that Plaintiffs' expert testimony

will not pass muster (See, Defendant's Brief at p. 5).   This case deserves closer examination.

In State Farm v. Cohen, a fire loss case, the subrogating insurer's claim was subject to summary judgment because:   1.  the plaintiff offered no evidence of Defendant Cohen's alleged negligence in maintaining a microwave oven which allegedly caught on fire and 2. State Farm offered no expert evidence that the microwave caused a fire.   State Farm attempted to satisfy its causation burden (which required expert opinion) by seeking an adverse inference for Cohen's alleged spoliation of the microwave unit.  However, the right to request such an inference depended on proof of Cohen's intentional misbehavior, and none was forthcoming. Further, State Farm ignored court orders to produce an inspector's report and analysis, nor did State Farm produce any other expert material. In other words, State Farm provided no legally sufficient proof that the microwave caused a fire.  In State Farm v. Cohen, summary judgment was appropriate because the party with the burden of proof did not offer expert opinion about the fire's cause.  In contrast, Gharbi is a case with opposing expert opinion concerning the existence and cause of hypoxia and acidosis, followed by death.  It is not a case where Plaintiffs failed to offer essential expert opinion.

In support of its Motion, Defendant contends that Plaintiffs must prove with 100% certainty that their theory on causation is incorrect.   However, and as

discovered above, this view violates controlling authority. Since Defendant's Motion is premised upon legal error, its conclusions are similarly tainted.

Defendant argues that Plaintiffs' experts cannot say with sufficient confidence that acidosis is ascertainable on fetal monitoring strips and could have caused the baby's death. The Defendant again assumes that Plaintiffs must prove, without question, that an acidotic pH did exist. An acidotic pH certainly could have existed, but cannot be established because of the Defendant's failure to test the cord gas blood quickly enough to render a reliable, valid and accurate result. Plaintiffs, of course, had nothing to do with obtaining important evidence at the best possible time. That decision would have been made by the Defendant. Dr. Francis confirmed that the cord gas blood sample was taken one (1) hour after the delivery. The hour delay in testing rendered the complete panel of pH, $pO_2$, $O_2$, $pCO_2$, and base deficit results as invalid, inaccurate and unreliable. The remaining evidence of fetal distress with hypoxia and acidosis were the hours of category two fetal monitor tracings that showed late decelerations and minimal variability, especially marked by the sentinel 14-minute acute fetal bradycardic event with prolonged decelerations beginning at 7:24 p.m., followed thereafter with recurrent late decelerations and minimal variability that went on for an additional six (6) hours before cesarean delivery was finally initiated.

A case more on point than <u>State Farm v. Cohen</u>, *supra*, and recently subject to a Motion for Summary Judgment, is <u>Flinchbaugh v. Oleg Leontiev, M.D., et al.,</u> No. 2017-00847 (slip op) (C.P. Lebn., May 18, 2020) attached hereto. The Court of Common Pleas of Lebanon County applied causation principles in a similar situation, in which a key medical finding was unavailable. In <u>Flinchbaugh</u>, the plaintiff contended that her decedent had suffered from a dangerously large aneurysm, not treated in a timely fashion. As a result, Mr. Flinchbaugh became critically ill, presented to the Good Samaritan Hospital in Lebanon, but succumbed to a burst aneurysm, causing death.

The defense took the position that, based upon clinical findings, he could have suffered a heart attack first, which was the direct cause of death; the burst aneurysm could, the defense contended, have been caused by CPR in response to the heart attack, so that the burst aneurysm was only an incidental factor.

The coroner and ER doctor did not feel that there was a need for an autopsy and so none was done. The autopsy would have been the only way to establish conclusively whether a heart attack had occurred.

The Honorable Bradford Charles denied Summary Judgment, noting the impact of rules regarding causation in medical negligence cases, as set forth in <u>Hamil v. Bashline</u> and <u>Mitzelfelt v. Kamrin</u>, and that there was more than enough evidence for the Estate to meet its two-prong causation burden. The court ruled that plaintiff's

experts did not need to conclusively rule out heart attack as the primary cause of death. Rather, plaintiff's burden of proof was satisfied by evidence that the risk of demise from rupturing aneurysm was increased because of the defendants' inaction, and certainly could have caused plaintiff's decedent's death. In so holding, the court reviewed the entire record to determine whether sufficient expert opinion existed on this point.

Finally, Defendant asserts, at least implicitly, that Plaintiffs are obliged to rule out alternative theories of causation which defense experts raise. Defendant's experts, Drs. Pettker, Polin, Golen, and Chung all speculatively claim that the baby must have died from some unspecified genetic, congenital or other objective or substantiating evidence. See, Defendant's expert reports of Christian Pettker, M.D., Richard Polin, M.D., Toni Golen, M.D., and Wendy Chung, M.D. attached as Exhibits **O, P, Q, and R** to Plaintiffs' Reply in Opposition to Defendant's Motion for Summary Judgment. As the only clinical, anatomic and forensic pathology expert in this case, Plaintiffs' expert, Dr. Hammers, opines, to a reasonable degree of medical certainty, that there is no such evidence, and based on the record and evidence, it was not possible for the Gharbis' baby to have died from any genetic, congenital, neurologic, heart, lung, or other anomaly.

Defendant's experts' speculations are ill founded, best characterized as conjecture and potentially inadmissible. Moreover, Defendant's experts'

conjectures are not part of Plaintiffs' obligation in establishing a prima facie case, given the Supreme Court's holding in cases like <u>Mitzelfelt</u>.

In addition, the Gharbis' baby, and his parents, Hattab (Ben) and Imen Gharbi, all underwent genetic testing which revealed normal karyotype with no chromosome abnormalities. <u>See</u>, genetic test results of E.G., Deceased, Hattab (Ben) Gharbi and Imen Gharbi attached collectively as **Exhibit S** to Plaintiffs' Reply in Opposition to Defendant's Motion for Summary Judgment.

## IV.   **CONCLUSION**

The Defendant's Motion is premised upon an incorrect understanding of the law.  Pennsylvania courts have held for many years that plaintiffs meet their burden of proof once the deviation from the standard of care is found to have increased the risk of harm.   Controlling authority states that it is not plaintiffs' burden to rule out all causation possibilities.

Only by ignoring these well-set principles of law can the Defendant pursue unfounded and speculative theories of some alternative cause of death and contend further that Plaintiffs' experts, whose opinions are rendered to a reasonable degree of medical certainty are somehow deficient.  They make this contention knowing full well that all manner of ascertaining specific measured values of cord gas blood pH was entirely eliminated by its failure to procure the testing in a timely manner, thereby rendering the cord gas blood panel results as invalid, unreliable and

inaccurate.[1]   Defendant's contention that fetal heart tracings are not demonstrative for hypoxia and acidosis is without any proof and contrary to expert testimony that establishes otherwise.

Taken to its logical conclusion, the Defendant's position is that there can be no medical negligence death claim from hypoxic and acidotic injury without a cord gas blood pH determination.   However, this is not true as hypoxia and acidosis is ascertainable on fetal monitoring strips, and the law simply does not countenance this view.

Fact finders exist for the very reason that they are the deciders of any factual issues in dispute by the parties.    In this case, there is more than enough evidence from which a jury could determine that Baby Gharbi died from hypoxia induced decelerations and acidosis during prolonged labor induction and delivery.

---

[1] Notably, Defendant had ample opportunity to provide supplemental reports from its experts following the discovery deposition testimonies and supplemental reports of Plaintiffs' experts who established, to a reasonable degree of medical certainty, that the late cord gas blood result was invalid, inaccurate, and unreliable.  In failing to do so, Defendant's experts cannot refute the claim against hypoxia at birth based on pH.

For the above-cited reasons, the Defendant's Motion for Summary Judgment should be Denied.

Respectfully submitted,

**NAVITSKY, OLSON & WISNESKI LLP**

*/s/ Nijole C. Olson, Esquire*
Nijole C. Olson, Esquire
PA55287
Joseph M. Melillo, Esquire
PA26211
2040 Linglestown Road, Suite 303
Harrisburg, PA  17110
717/541-9205
nolson@nowllp.com
jmelillo@nowllp.com
Counsel for Plaintiffs

Date:  January 15, 2021

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

IMEN GHARBI and HATTAB (BEN):
GHARBI, as Co-Administrators of the:          NO.   1:19-CV-01943-JEJ
Estate of E.G., deceased and IMEN      :
GHARBI and HATTAB (BEN)                :
GHARBI, Individually and in their      :          PROFESSIONAL MEDICAL
own right,                             :          NEGLIGENCE
                        Plaintiffs     :
                                       :
              v.                       :
                                       :          HON. JOHN E. JONES, III
THE UNITED STATES,                     :
                        Defendant      :

## **CERTIFICATION OF WORD COUNT**

Pursuant to Local Rule of Civil Procedure 7.8(b) (2), the undersigned hereby

certifies that *Plaintiffs' Reply Brief in Opposition to Defendant's Motion for*

*Summary Judgment* is 4,614 words.  This certification is made with reliance upon

the word count feature of the undersigned's word processing system.

**NAVITSKY, OLSON & WISNESKI LLP**

*/s/ Nijole C. Olson, Esquire*
Nijole C. Olson, Esquire
PA55287
Joseph M. Melillo, Esquire
PA26211
2040 Linglestown Road, Suite 303
Harrisburg, PA  17110
717/541-9205
nolson@nowllp.com
jmelillo@nowllp.com
Date:  January 15, 2020                Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I, Nijole C. Olson, an attorney with the law firm of Navitsky, Olson &

Wisneski LLP hereby certify that a true and correct copy of the foregoing

**Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment**

was served upon counsel of record via ECF Filing on January 15, 2021:


Viveca D. Parker
Special Assistant US Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
Viveca.Parker@usdoj.gov
***Counsel for Defendant The United States***


                                        */s/ Nijole C. Olson*
                                        Nijole C. Olson, Esquire