## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IMEN GHARBI, et al.,** | : | **Civil No. 1:19-CV-1943** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Mariani)** |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.  Introduction

This Federal Tort Claims Act case, which comes before us for consideration of a second defense motion for summary judgment, (Doc. 45), arises out of a singularly tragic circumstance, the death of an infant in childbirth while being treated by a physician employed by a federally funded health clinic. The plaintiffs allege that their child died due to the effects of hypoxia after a negligent delay by the attending physician in performing a caesarian section procedure following prolonged labor. The plaintiffs have tendered several medical opinions in support of their claim that the obstetric care provided in this case fell below generally accepted standards of care and was the negligent cause of the infant's demise.

This summary judgment motion, the second such motion filed by the United States in this case, advances an extraordinary claim, arguing based upon the opinions

of the plaintiffs' own experts, who found that the infant's death was caused by the culpable negligence of the defendant's doctor,  that the United States is entitled to a judgment in its favor as a matter of law. According to the government, the opinions expressed by the plaintiffs' own experts are so unreliable and infirm that they reveal as a matter of law that proof of causation is wholly lacking here.

We disagree.  As discussed below, we find that the plaintiffs' expert opinions support the plaintiffs' negligence claim and adequately describe a causal link between the negligence of the treating physician and the death of this child.  Further, the defendant's critiques of the validity and reliability of these opinions do not, in our view, demonstrate that the defendant is entitled to a judgment in its favor as a matter of law. Rather, these critiques of the reliability of these expert opinions simply define a disputed factual issue for resolution either through a Daubert hearing or at trial. Therefore, we recommend that this motion for summary judgment be denied.

## II.   Statement of Facts and of the Case

In December of 2017, Imen and Hattab Gharbi were expecting the birth of a child, E.G. By December 16, 2017, Mrs. Gharbi was overdue to deliver and was 41 weeks pregnant. Accordingly, on December 16, 2017, a decision was made by Mrs. Harbi's treating obstetrician to admit her to the hospital to induce labor. These efforts began at approximately 11:29 p.m. on December 16, 2017. However, by approximately 1:00 a.m., on December 17, 2017, efforts to induce labor through the

2

drug Pitocin halted after fetal heart tracings revealed late decelerations and minimal fetal heart rate variability. These heart rate tracings, while not definitive by themselves, can be indicative of hypoxia, or fetal oxygen deprivation in utero, a potentially serious medical condition.

At 8:00 a.m., on December 17, 2017, Dr. Potacia Francis, an ob/gyn physician employed by a federally funded health clinic, assumed responsibility for the care of Mrs. Gharbi and E.G. At that time, Dr. Francis was informed that staff had attempted to induce labor with Pitocin overnight, but had stopped the use of Pitocin due to the late decelerations and minimal fetal heart rate variability that had been detected.

Mrs. Gharbi remained in the hospital and in labor throughout December 17, 2017. By the late afternoon or early evening, Mrs. Gharbi appeared to be in a state of arrest of her active labor, and it is reported that by 7:30 p.m., she was experiencing late decelerations and minimal fetal heart rate variability in connection with 50% of her contractions. Despite these clinical signs, which were potentially suggestive of hypoxia, Dr. Francis did not endeavor to deliver E.G. for another six hours, until 1:41 a.m. on December 18, 2017. Dr. Francis later justified this decision by stating that she believed throughout this nearly six hour period that Mrs. Gharbi was close to delivery of her baby.

When E.G. was delivered at 1:41 a.m. on December 18, the infant had an Agpar score[1] of zero, no heartbeat or discernable pulse, the child was not breathing, and E.G. displayed poor profusion and was pale. Medical personnel began immediate emergency resuscitation efforts, but to no avail. E.G. was pronounced dead at 2:00 a.m. on December 18, 2017. A subsequent autopsy listed a probable genetic disorder and complications of Hirschsprung's disease as E.G.'s cause of death.

The plaintiffs dispute this cause of death, and have amassed substantial medical expert support for their position that E.G. died due to acidosis caused by hypoxia resulting from the negligent delay in performing a caesarian section once there were persistent signs in E.G.'s fetal heart tracings of late decelerations and minimal fetal heart rate variability. In particular, two medical experts have opined that hypoxia leading to fatal acidosis as a result of negligent obstetric care was the cause of E.G.'s death.

At the outset, Dr. Jennifer Hammers, a board-certified clinical and forensic pathologist, has concluded:

> As a result of my independent review, it is my professional opinion, based upon a reasonable degree of medical certainty, that the cause of death for [E.G.] was Intrauterine fetal demise due to hypoxia induced

---

[1] The Apgar score is a generally accepted medical metric for evaluating the status of a newborn infant and assessing whether emergency resuscitation is needed. The Apgar score ranges from 0 to 10, with lower scores being indicative of severe medical complications requiring immediate intervention.

4

decelerations and acidosis during prolonged labor induction and delivery.

(Doc. 45-1, at 77).

In reaching this conclusion, Dr. Hammer specifically considered, but rejected, genetic abnormalities as the cause of death. (Id., at 77-78). Instead, Dr. Hammer found that:

> Given that [E.G.] presented as an unremarkable 41-week-old male fetus in utero before birth and during induction, there was no indication of any significant genetic abnormality that would have caused sudden death from a cardiac or neurologic cause.
>
> Autopsy identified that [E.G.] had pyloric stenosis and foci of atresia in the small and large intestine likely related to Hirschsprung's Disease. Otherwise, [E.G.] had an unremarkable gastrointestinal system. The autopsy revealed limb contractures, which may occur as a result of various conditions, that would not have caused this clinical presentation nor sudden death during labor and delivery. Furthermore, the autopsy pathologist commented that limb contractures associated with a congenital syndrome are typically much more pronounced than what was seen at autopsy. The autopsy did not reveal any congenital anomaly that would have caused [E.G.]'s death and no further testing was carried out or recommended.
>
> It is my professional and independent opinion as a board certified anatomic and clinical pathologist and forensic pathologist that [E.G.] died as a result of intrauterine fetal demise due to hypoxia induced decelerations during prolonged labor induction and delivery. There was no other sufficient intervening cause of [E.G.]'s death. The hypoxia he experienced caused the decelerations that were identified clinically as well as the acidosis that was present in the venous cord blood gas after birth. Had [E.G.] survived birth, he would have been successfully treated for his Hirschsprung's Disease without complications. There was no evidence of a significant congenital, pathologic, or genetic process that would have caused [E.G.]'s sudden

intrauterine death nor that would have caused him to die from complications after a live birth.

All of the opinions expressed herein are based upon my knowledge, training, education and experience and stated to a reasonable degree of medical certainty.

(Id., at 78).

Dr. Hammer's findings and opinions were buttressed by a second medical expert, Dr. Jill Mauldin, who has opined that Dr. Francis' failure to timely respond to E.G.'s concerning fetal heart tracings deviated from the standard of care in this field and resulted in the infant's untimely death. (Doc. 45-2, at 74). According to Dr. Mauldin, this failure to timely conduct a caesarean section delivery led to E.G.'s death from hypoxia and acidosis, an outcome that Dr. Mauldin insisted was "unfortunate and preventable had Dr. Francis . . . met the standard of care by timely delivering [E. G.]." (Id., at 74). Dr. Mauldin's expert opinion as to negligence and causation was also expressed "to a reasonable degree of medical certainty." (Id., at 75).

In the course of discovery, Dr. Hammer and Dr. Mauldin were both deposed and their medical opinions were subjected to searching scrutiny. (Docs. 45-1, 45-2). As detailed by the government, this deposition testimony revealed that fetal heart tracings are not definitive indicators of hypoxia induced acidosis and indicated that post-mortem pH value testing, which the experts testified was also not a definitive measure of hypoxia induced acidosis, was within normal ranges. Thus, while the

6

plaintiffs' experts remained steadfast in their opinions regarding Dr. Francis' deviation from the standard of care and its causal relationship to E.G.'s death, the deposition revealed that other, countervailing evidence supported an alternate cause of death unrelated to the health care received by mother and infant on December 17-18, 2017.

It is against the backdrop of these conflicting opinions and evidence relating to the cause of E.G.'s death that the plaintiffs have filed this medical malpractice, survivor, wrongful death, and negligent infliction of emotional distress claim against the United States under the FTCA. (Doc. 1). The United States has now filed a second motion for summary judgment in this case. (Doc. 45). This motion rests upon a remarkable proposition, the contention that the plaintiffs' own experts' opinions are so infirm with respect to causation that they actually prove the United States is entitled to judgment in its favor as a matter of law. As the Government insists: "To be clear: this motion is supported solely by the plaintiffs' experts' expertise and testimony." (Doc 45, at 16).

We take a different view. While the Government's attack upon the reliability of these expert opinions may support their factual defenses, and may even provide grounds for a Daubert hearing assessing the reliability of these opinions, it does not entitle the United States to judgment in its favor as a matter of law. Therefore, we recommend that this motion for summary judgment be denied.

### III.   **Discussion**

#### A. **Motion for Summary Judgment – Standard of Review**

The defendant has filed this second motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown

that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne

9

cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." <u>Thimons v. PNC Bank, NA</u>, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." <u>Fireman's Ins. Co. of Newark New Jersey v. DuFresne</u>, 676 F.2d 965, 968 (3d Cir. 1982); <u>see Sunshine Books, Ltd. v. Temple University</u>, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." <u>Lockhart v. Hoenstine</u>, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985) (citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or assess credibility when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. <u>Id.</u> Additionally, the court is not to decide whether the

evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. <u>Anderson</u>, 477 U.S. at 252; <u>see also</u> <u>Big Apple BMW</u>, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

<u>Id.</u> In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal quotation marks omitted); <u>NAACP v. North Hudson Reg'l Fire & Rescue</u>, 665 F.3d

It is against these legal benchmarks that we assess the instant motion for summary judgment.

## B. <u>Pennsylvania Tort Law Principles Governing Causation</u>

As a federal court adjudicating an FTCA claim, we are bound to follow the tort law of Pennsylvania. <u>CNA v. United States</u>, 535 F.3d 132, 141 (3d Cir. 2008) ("The cause of action in an FTCA claim, . . ., must come from state tort law.") Construing this case under settled Pennsylvania tort law, in order to establish a cause

of action for negligence, a plaintiff must prove the following elements: (1) a duty or obligation to the plaintiff recognized by law; (2) a breach of that duty to the plaintiff; (3) a causal connection between the conduct and plaintiff's resulting injury; and (4) actual damages suffered by the plaintiff. Pittsburgh Nat'l Bank v. Perr, 637 A.2d 334, 336 (Pa. Super. Ct. 1994).

By its nature, many of these considerations of negligence and causation are inherently fact-bound determinations which typically are not amenable to resolution through a motion for summary judgment. Notwithstanding the fact-bound nature of these determinations, the United States argues that it is entitled to summary judgment in its favor on this negligence claim. This summary judgment motion, in turn, rests upon an extraordinary proposition: the notion that the plaintiff's own experts have shown as a matter of law that proof of causation is completely lacking here.

This novel argument calls upon us to consider the legal standards defining causation under Pennsylvania tort law. In this regard:

> Under Pennsylvania law, [questions of] causation involves *both* cause in fact (or physical cause) and proximate (or legal) cause. There is much confusion regarding the concept of causation because the term "proximate cause" is often used to embody both cause in fact and legal cause. However, cause in fact and proximate cause are separate and distinct concepts and both must be proved by a plaintiff. Redland Soccer Club, Inc. v. Department of Army, 55 F.3d 827, 851 (3d Cir.1995), cert. denied, 516 U.S. 1071, 116 S.Ct. 772, 133 L.Ed.2d 725 (1996); Estate of Flickinger v. Ritsky, 452 Pa. 69, 305 A.2d 40, 42–43 (1973). Cause in fact, or "but for" causation, requires proof that the

alleged injury would not have occurred but for the negligent conduct of the defendant. Robertson v. Allied Signal, Inc., 914 F.2d 360, 366 (3d Cir. 1990). The question of whether cause in fact has been shown involves "a *de minimis* standard of causation under which even the most remote and insignificant force may be considered the cause of an occurrence." Herman v. Welland Chem., Ltd., 580 F.Supp. 823, 827 (M.D. Pa. 1984) (quoting Takach v. B.M. Root, Co., 279 Pa. Super. 167, 420 A.2d 1084 (1980)).

Proximate cause, on the other hand, assumes the presence of cause in fact and serves as a means by which courts are able to place practical limits on liability as a matter of policy. Wisniewski v. Great Atl. & Pac. Tea Co., 226 Pa. Super. 574, 323 A.2d 744 (1974). It involves a determination that the nexus between a defendant's wrongful acts or omissions and the injury sustained is of such a nature that it is socially and economically desirable to hold that defendant liable. In determining whether a defendant's negligence is the proximate cause of a plaintiff's injury, Pennsylvania has adopted the "substantial factor" test set forth in Section 431 of the Restatement (Second) of Torts (1965). Under this test, a defendant's negligent conduct is not the proximate cause of plaintiff's injury unless "the alleged wrongful acts were a substantial factor in bringing about the plaintiff's harm." E.J. Stewart, Inc. v. Aitken Prods., Inc., 607 F.Supp. 883, 889 (E.D. Pa. 1985), aff'd, 779 F.2d 42 (3d Cir.1986).

Galullo v. Fed. Exp. Corp., 937 F. Supp. 392, 394–95 (E.D. Pa. 1996) (footnotes omitted).

Only in rare instances, where the underlying facts are undisputed, are issues of factual causation like those presented here subject to resolution on summary judgment. "While the question of causation in Pennsylvania is normally [a question of fact for the fact-finder], 'if the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's negligence and the plaintiff's injury clearly appears, the question becomes one of law.' " Pavlik v. Lane Ltd./Tobacco

Exporters Int'l, 135 F.3d 876, 881 (3d Cir. 1998) (quoting Liney v. Chestnut Motors, Inc.*,* 218 A.2d 336, 338 (Pa. 1966)). In contrast, when the relevant facts are disputed, questions of causation present issues of fact for trial which may not be resolved through summary judgment. See Hittle v. Scripto-Tokai Corp., 166 F. Supp. 2d 142, 154 (M.D. Pa. 2001).

These principles apply to wrongful death claims like the claims made here. With respect to such claims:

> [U]nder Pennsylvania tort law: "In order to recover in an action for wrongful death, the plaintiff must prove that the death was caused by violence or negligence of the defendant. See 42 Pa.C.S. § 8301(a). Therefore, liability for wrongful death requires a determination that a defendant's negligence caused the death..... Negligence, however, is only half of the wrongful death equation. A question remains regarding whether the injuries caused by Defendants' negligence eventually caused Decedent's death." Quinby v. Plumsteadville Family Practice, Inc., 589 Pa. 183, 209–10, 907 A.2d 1061, 1077 (2006). Further, to establish causation "plaintiff need not exclude every possible explanation, and 'the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence.' Majors v. Brodhead Hotel, 416 Pa. at 273, 205 A.2d at 878." Jones v. Montefiore Hosp., 494 Pa. 410, 416, 431 A.2d 920, 923 (1981).

Ruehl v. S.N.M. Enterprises, Inc., No. 1:15-CV-168, 2017 WL 1682569, at *7 (M.D. Pa. Jan. 12, 2017), report and recommendation adopted, No. 1:15-CV-168, 2017 WL 1541814 (M.D. Pa. Apr. 28, 2017).

Likewise, these same basic principles guide us in evaluating the legal sufficiency of expert opinions in medical malpractice claims like those made in the instant case. In this regard, Pennsylvania courts acknowledge that:

> Medical malpractice is a form of negligence. Griffin v. University of Pittsburgh Med. Ctr.-Braddock Hosp., 950 A.2d 996, 999 (Pa. Super. 2008), appeal denied, 970 A.2d 431 (Pa. 2009). To make a *prima facie* case a plaintiff must establish that the physician owed the plaintiff a duty and breached it; that the breach was the proximate cause of the plaintiff's harm; and that the alleged damages were a direct result of the harm. Id. at 999-1000 (quoting Quinby v. Plumsteadville Fam. Practice, Inc., 589 Pa. 183, 907 A.2d 1061, 1070-71 (2006)). The plaintiff must present expert testimony "where the circumstances surrounding the malpractice claim are beyond the knowledge of the average layperson." Id. at 1000 (quoting Vogelsberger v. Magee-Womens Hosp. of UPMC Health Sys., 903 A.2d 540, 563 n.11 (Pa. Super. 2006), appeal denied, 917 A.2d 315 (Pa. 2007)).
>
> An expert must testify, to a reasonable degree of medical certainty, that the defendant physician deviated from acceptable standards, and that the deviation was the proximate cause of the plaintiff's harm. Vicari, 936 A.2d at 510. Further, "a medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and the [fact-finder] then must decide whether that conduct was a substantial factor in bringing about the harm." Id. (quoting Smith v. Grab, 705 A.2d 894, 899 (Pa. Super. 1997)).

Rolon v. Davies, 232 A.3d 773, 777 (Pa. Super. 2020), appeal denied, 242 A.3d 906 (Pa. 2020).

## C. **Disputed Issues of Fact Preclude Summary Judgment in This Case**

As we have noted, the United States takes an extraordinary position in this summary judgment motion. It insists that the opinions of the plaintiffs' medical

experts, who have consistently stated to a reasonable degree of medical certainty that E.G.'s death was caused by Dr. Francis' deviation from accepted standards of care, deviations which led to undue delay in delivering this infant and caused fatal hypoxia-induced acidosis, actually prove as a matter of law that this negligence did not cause the baby's death.

We disagree. Instead, we find that this summary judgment motion rests upon a flawed legal foundation and ignores the guiding principles which define Pennsylvania tort law and federal summary judgment practice.

It is axiomatic that when considering a motion for summary judgment, all factual disputes must be resolved in favor of the party opposing summary judgment. Following this bedrock tenet of summary judgment practice, we note that the plaintiffs' experts have opined, consistent with guiding principles of Pennsylvania tort law, to a reasonable degree of medical certainty, that the defendant physician deviated from acceptable standards, and that the deviation was the cause of the plaintiffs' harm.  Construing this evidence in a light most favorable to the plaintiff, as we must at this stage of the litigation, these medical opinions, and the evidence upon which the opinions rest, at a minimum, create a disputed issue of fact for trial.

The Government endeavors to avoid this outcome by arguing that the medical opinions are so factually infirm that they actually demonstrate that causation cannot

be shown here. Whatever the ultimate force of this argument might be, it fails at the summary judgment stage of this litigation for several reasons.

First, as we have noted, the motion rests on a paradoxical proposition. It argues that the Government's position regarding what is plainly a factual dispute regarding causation is so compelling that it obliterates this dispute of fact. This contention ignores the fact that it is emphatically not the province of the court to weigh evidence or assess credibility when passing upon a motion for summary judgment.

Further, this motion misconstrues Pennsylvania tort law as it relates to questions of causation. As we view it, this summary judgment motion attacks what is fundamentally a factual question under Pennsylvania law, the issue of whether Dr. Francis' negligence was the cause in fact of E.G.'s death. On this score, it is well settled that: "The question of causation, which under Pennsylvania law includes 'but for' causation and proximate or legal cause, is . . . one of fact". Hittle v. Scripto-Tokai Corp., 166 F. Supp. 2d 142, 154 (M.D. Pa. 2001). Moreover, the summary judgment motion challenges a factual issue that Pennsylvania law prescribes as involving "a *de minimis* standard of causation under which even the most remote and insignificant force may be considered the cause of an occurrence." Herman v. Welland Chem., Ltd., 580 F.Supp. 823, 827 (M.D. Pa. 1984) (quoting Takach v. B.M. Root, Co., 420 A.2d 1084 (Pa. Super. Ct. 1980)). Here, there are clearly factual

disputes concerning the cause of E.G.'s death. Further, within these factual disputes are a host of other factual contests concerning the reliability and persuasive power of clinical evidence that may support more than one conclusion regarding cause of death. Thus, in this case, causation is an essentially factual question that is shrouded in myriad factual disputes and is, thus, not amenable to summary judgment resolution.

Finally, the Government's motion—which assails the reliability of the plaintiffs' experts' opinions—confuses the respective roles of summary judgment and Daubert motions in federal practice. In a case such as this, where there are competing medical opinions regarding causation, each of which is supported or rebutted to some degree by the available evidence, the question of the reliability of the expert opinions cannot be resolved on summary judgment. Rather, a Daubert motion would be the proper vehicle for determining the admissibility of an expert's opinions that are attacked as unreliable. Further, where the issue before the court involves an attack upon the reliability of an expert's opinions, we are enjoined to refrain from ruling upon such questions without first conducting an evidentiary hearing. Elcock v. Kmart Corp., 233 F.3d 734, 745 (3d Cir. 2000).

In sum, the Government's argument that the plaintiff's own experts have somehow proven the defendant's case, while novel, is unpersuasive in a summary judgment context. Instead, that fact-bound issue of the persuasive power of these

expert opinions, must await another day, and another proceeding, either through a Daubert hearing or at trial. Therefore, mindful of the fact that "[t]he determination of whether the conduct of the defendant was a substantial cause or an insignificant cause of plaintiff's harm should not be taken from the [fact-finder] if the [fact-finder] may reasonably differ as to whether the conduct of the defendant was a substantial cause or an insignificant cause [of the plaintiffs' injuries]", Ford v. Jeffries, 474 Pa. 588, 595, 379 A.2d 111, 114 (1977), it is recommended that this motion for summary judgment be denied.

## IV.   **Recommendation**

Accordingly, for the foregoing reasons, IT IS RECOMMENDED THAT the defendant's second motion for summary judgment (Doc. 45) be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or

where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 18th day of August 2021.

S/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge