IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IMEN GHARBI and HATTAB (Ben) GHARBI, as Co-administrators of the Estate of E.G., Deceased, and IMEN GHARBI and HATTAB (Ben) GHARBI, Individually and in their own right,

Plaintiffs

vs ) 19cv1943

THE UNITED STATES OF AMERICA,

Defendant

TRANSCRIPT OF PROCEEDINGS
NON-JURY TRIAL - *DAY TWO*
BEFORE THE HONORABLE ROBERT D. MARIANI
WEDNESDAY, FEBRUARY 23, 2022; 9:30 A.M.
SCRANTON, PENNSYLVANIA

FOR THE PLAINTIFFS:
*Navitsky, Olson & Wisneski, LLP*
By: Nijole C. Olson, Esq.
2040 Linglestown Road, Suite 303
Harrisburg, Pennsylvania 17110

FOR THE DEFENDANTS:
*United States Attorney's Office*
By: Viveca D. Parker, Esq.
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106

Proceedings recorded by machine shorthand, transcript produced by computer-aided transcription.

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

# I N D E X


| Witnesses For the Government: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Dr. Jennifer Hammers | 3 | 56 | 101 | -- |
| Royal Bunin (Via Zoom) | 104 | 122 | 138 | -- |
| Hattab Ben Gharbi | 141 | -- | -- | -- |
| Imen Gharbi | 173 | -- | -- | -- |


# E X H I B I T I N D E X


| For *Plaintiff*: | Identified | Admitted |
|---|---|---|
| Exhibit No. 5 | 13 | 14 |
| Exhibit Nos. 17&18 | 15 | 16 |
| Exhibit No. 23 | 105 | 105 |
| Exhibit Nos. 20-22 | 109 | 109 |
| Exhibit No. 20.6 | 112 | -- |
| Exhibit No. 20.8 | 113 | -- |
| Exhibit No. 20.12 | 115 | -- |
| Exhibit No. 20.13 | 116 | -- |
| Exhibit No. 21 | 188 | -- |
| Exhibit No. 35.5 | 121 | -- |
| Exhibit No. 20.12 | 138 | -- |
| Exhibit No. 20.15 | 140 | -- |
| *Joint Exhibits*: | | |
| Nos. 1&2 | 12 | 14 |
| Nos. 3-8 | 13,51,91 | 14 |
| Nos. 9-11 | 13,165,166 | -- |
| No. 4.4 | 24 | -- |
| No. 4.17 | 25,88 | -- |
| No. 75 | 35 | -- |
| No. 72 | 37 | -- |
| No. 74 | 38,48 | -- |
| Nos. 9.12, 7.2 | 46 | -- |
| No. 99 | 52 | -- |
| No. 2.138 | 65,77 | -- |
| No. 2.175 | 85 | -- |
| Nos. 2.65, 2.69, 2,75 | 86 | -- |
| Nos. 2.185,4.1 | 87 | -- |
| No. 15.1 | 166 | 166 |

09:40AM THE COURT: Good morning, everyone. Ms. Olson, call your next witness.
09:40AM MS. OLSON: Thank you, Your Honor. At this time, we would like to call Dr. Jennifer Hammers.
09:40AM THE COURT: Very well.
09:40AM J E N N I F E R H A M M E R S, D. O. IS CALLED, AND HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
09:40AM THE CLERK: State and spell your name for the record, please.
09:41AM THE WITNESS: My name is Jennifer Hammers, J-E-N-N-I-F-E-R, H-A-M-M-E-R-S.

DIRECT EXAMINATION

09:41AM BY MS. OLSON:
09:41AM Q. Good morning, Dr. Hammers. Please tell us what your occupation is.
09:41AM A. Sure. I am a Forensic Pathologist.
09:41AM Q. How long have you been in practice?
09:41AM A. Probably 11 or 12 years.
09:41AM Q. Are you Board certified in any special areas?
09:41AM A. Yes, I am.
09:41AM Q. Could you tell us about your Board certifications?
09:41AM A. Sure. So I'm Board certified in Anatomic and Clinical Pathology, as well as Forensic Pathology.
09:41AM Q. Can you tell us what Anatomical and Clinical Pathology encompasses?

09:41AM A. Sure. So Anatomic Pathology is the study of tissues, so, for example, if someone has their gallbladder removed at the hospital, the pathologist would examine that tissue, both grossly with their eyes, as well as microscopically on a slide under the microscope, and would render a diagnosis, give that back to the clinician so that they know if there's any further treatment or if they completely treated their patient.

09:42AM Clinical pathology focuses more on the laboratory side of medicine, and clinical pathologists are in charge of running laboratories. So if a person has blood drawn from them, it goes to the laboratory, the testing is run, and the pathologist is in charge of making sure the testing is done correctly, machines are validated, and the results coming out are correct.

09:42AM Q. Can you tell us what forensic pathology encompasses?

09:42AM A. Sure. So Forensic Pathology is a subspecialty of pathology. I forgot to mention that pathologists at the hospital do sometimes perform autopsies as part of their practice. They perform them on people who pass away at the hospital from known natural causes.

09:43AM Forensic pathologists focus on sudden and unexpected deaths and people who pass away from unnatural causes. So sometimes it's referred to as medical/legal autopsies, where we're looking for people who are dying from unnatural causes or from sudden and unexpected natural causes.

09:43AM Q. Okay, now, I'd like to go over a little bit about your

training and education and experiences that you have had as an Anatomical, Clinical and Forensic Pathologist.

Did you provide us with a copy of your CV, which is marked as P-19?

A. Yes, I did.

Q. That CV of yours, is that an accurate reflection of the training and experience you've had over the years?

A. Yes, it is.

MS. OLSON: Okay, I'd like to reference P-19, which is the CV of Dr. Hammers.

MS. PARKER: No problem, Your Honor.

MS. OLSON: May I move P-19 into evidence?

THE COURT: Without objection, P-19 is admitted.

MS. OLSON: Thank you.

(At this time Plaintiff's Exhibit No. 19 was admitted into evidence.)

BY MS. OLSON:

Q. Doctor, can you tell us where you went to medical school?

A. Sure. I went to medical school at Lake Erie College of Osteopathic Medicine, which is in Erie, Pennsylvania.

Q. After medical school, what did you do?

A. I did my residency in Anatomic and Clinical Pathology at Allegheny General Hospital in Pittsburgh, Pennsylvania.

Q. What did that involve?

A. So it was a four-year residency, where we rotated through

09:44AM all the different areas of Clinical and Anatomic Pathology. So I spent time in what we call the gross room, where I looked at tissue samples like I described with the gallbladder, both grossly and microscopically, I spent time in the laboratory learning about infectious disease, how to test for different bacteria and viruses, I spent time performing autopsies.

09:45AM Q. Did you follow up with what's called a Fellowship?

09:45AM A. Yes, I did.

09:45AM Q. Can you tell us about that?

09:45AM A. Sure. So I went to New York City to the Medical Examiner's Office for my Fellowship in Forensic Pathology. It's a one-year fellowship, so I did that. And I stayed for a second year of Fellowship, specifically, focusing on Neuropathology and Cardiac Pathology, which are processes with the brain and the heart, which tend to be the most common areas that we see involved in sudden unexpected death.

09:45AM So I stayed for that second year of Fellowship, and then once I finished that, I was done with my training.

09:45AM Q. Have you held academic appointments over the course of your career?

09:45AM A. Yes, I have.

09:45AM Q. Can you tell us about those?

09:45AM A. Sure. When I was in New York, both as a Fellow and as an Attending later, I had an appointment at NYU with their medical school. When I spent time in the Brooklyn Office, I had an

appointment with SUNY Downstate. When I worked in Massachusetts, I had an affiliation with Boston University's Medical School and their Anthropology Program. And, currently, in Pittsburgh, I have an affiliation with Duquesne University at their Forensic Science and Law Program, I teach a Forensic Pathology course. And just this year, earlier in January, I was invited back to DU to lecture and give the same course that I had done when I previously had worked there.

Q. Have you also held any research appointments?

A. Yes, I have.

Q. Can you tell us a little bit about those?

A. Sure. So I'm involved with an organization called The Brain Injury Research Institute, we examine brain tissues for evidence of traumatic injury, specifically, chronic traumatic encephalopathy in people who have single or repetitive head injuries.

Q. Tell us a little bit about your employment experiences.

A. Sure. So when I finished in New York City with my training, I got my first job with the Medical Examiner's Office in Massachusetts. I worked out of their Boston office. I worked there for just about three years, and I then went back to New York City to work in the office that I trained in.

So the first two years I was there, I spent in their Manhattan office, which is where I had trained, and I was in charge of their Fellowship Training Program, so the very

programs I had gone through, I was now in charge of the Fellows coming through.

And, then, after those two years, my boss appointed me to the Brooklyn office as the Deputy Chief Coroner there. What that meant was that I ran the day-to-day operations of the office. There were seven other medical examiners that worked in that office and a staff of about 40 or so people. We covered all of the deaths in Brooklyn and Staten Island out of that office.

And so I performed autopsies there, but also performed administrative functions and was part of the executive team for the Medical Examiner's Office. So we made decisions, on the whole, for the office about budget, staffing, things like that.

After my four years there, I was offered a position in the Pittsburgh area with Dr. Cyril Wecht, which I accepted, and I've been working there for about four and a half years, now, with him. So he owns a private practice, so I don't work for the Government anymore, directly. He owns a private practice that contracts with different coroner counties to perform autopsies for those coroners. So I've been with his practice performing autopsies for about four and a half years.

Q. Have you also held any nationally-elected and/or appointed leadership positions over the course of your career?

A. Yes, I have. I've been on some different committees with our national organizations, like, the National Association of

09:49AM Medical Examiners and the American Society of Clinical Pathology, and was recently the Educational Program Chair for The National Association of Medical Examiner's Meeting, which occurred in October of 2021.

09:49AM Basically, what that meant was I reviewed all the abstracts that were submitted, I put together the educational program, made sure that it ran smoothly when we were at the meeting, and that was something that they ask different medical examiners to do, hopefully, once in a lifetime.

09:49AM Q. Do you belong to any professional societies or honorary societies?

09:49AM A. I do. So I belong to a couple of general pathology societies, The American Society of Clinical Pathology and The College of American Pathologists, and I belong to two forensic organizations, The National Association of Medical Examiners and The American Academy of Forensic Scientists.

09:50AM Q. Have you any invited publication activities?

09:50AM A. Yes. So I'm occasionally asked to, in addition to just self-generated research, to participate in different educational activities. One that I've done a few times is for the American Society of Clinical Pathology, and I was recently appointed to the committee for something called Case Reports. It used to be called Check Sample and now it's called Case Reports.

09:50AM So these are educational activities, where you present a

topic, you generate educational questions, and then pathologists or other medical professionals can read them and obtain their continuing educational credits by participating in the activity.

Q. Have you been published in journals, peer-reviewed in other journals?

A. I have, yes.

Q. Have you, also, presented various abstracts, medical abstracts and presentations at various conferences?

A. Yes, I have.

Q. Can you tell us what number of autopsies that you have performed and have been involved with, over the course of your career?

A. So I've probably performed around 4,000 autopsies now, myself, and have been involved in, probably, about three times that many, between working with other pathologists and our residents and fellows.

Q. Have you, on occasion, been asked to review medical cases for your opinion regarding cause of death, given your specialty practice?

A. Yes, I have.

Q. Have you been, previously, qualified in court to testify as an expert?

A. Yes.

Q. Dr. Hammers, with the education and training and

09:51AM experience that you've had in Clinical, Anatomic and Forensic Pathology, are you then familiar with postmortem investigations?
09:51AM A. Yes, I am.
09:51AM Q. Are you familiar with cause of death determinations?
09:52AM A. Yes.
09:52AM Q. Are you familiar with utilizing information from a patient's medical records, lab results and autopsy findings, in order to ascertain cause of death?
09:52AM A. Yes, I am.
09:52AM Q. Are you familiar with autopsies of newborn babies or neonates?
09:52AM A. Yes.
09:52AM Q. When is the last time you performed an autopsy on a baby that died at birth?
09:52AM A. Probably, two to three weeks ago.
09:52AM Q. Are you familiar with the clinical signs of asphyxia, hypoxia and acidosis during labor?
09:52AM A. Yes, I am.
09:52AM Q. Are you familiar with the warning signs of asphyxia, hypoxia and acidosis during labor?
09:52AM A. Yes.
09:52AM Q. Are you familiar with various genetic and congenital conditions and their presentations at autopsy?
09:52AM A. Yes.

09:52AM Q. Are you, also, familiar with evaluating for any cardiopulmonary and/or neurologic problems at autopsy?
09:52AM A. Yes, I am.
09:52AM Q. Are you, also, familiar with Hirschsprung's Disease and its treatment?
09:52AM A. Yes.
09:52AM MS. OLSON: Your Honor, at this time, I'd like to offer Dr. Hammers as an expert in the fields of Clinical, Anatomic and Forensic Pathology.
09:53AM MS. PARKER: No objection, Your Honor.
09:53AM THE COURT: Very well. Without objection, Dr. Hammers is admitted as an expert.
09:53AM BY MS. OLSON:
09:53AM Q. Dr. Hammers, I'll be asking you some questions today, including opinion questions, that, if I don't specifically ask it, I will ask that when you do give opinions, that you answer to a reasonable degree of medical certainty. All right?
09:53AM A. Okay.
09:53AM Q. Now, in general, I just want to start about what materials and items that you reviewed, in preparation for the opinions that you gave in your testimony today.
09:53AM When you reviewed the case, did you look at the prenatal records we have marked as J-1?
09:53AM A. Yes, I did.
09:53AM Q. Did you look at the admission record marked as J-2?

09:53AM A. Yes.
09:53AM Q. Did you also review the fetal strips, J-3?
09:53AM A. Yes, I did.
09:53AM Q. Did you look at the baby records that are marked J-4?
09:53AM A. Yes.
09:53AM Q. Did you also look at the death certificate J-5, the preliminary autopsy J-6 and the final autopsy J-7?
09:53AM A. Yes, I did.
09:53AM Q. Did you also look at the genetic test results of Baby Gharbi J-8?
09:53AM A. Yes.
09:53AM Q. Did you also review the genetic test results of the parents that were P-5?
09:54AM A. Yes, I did.
09:54AM Q. Did you also review photographs of Baby Gharbi that were marked as J-9?
09:54AM A. Yes.
09:54AM Q. Did you also review photographs of the baby's individual foot that has been marked as J-10?
09:54AM A. I'm sorry, I couldn't hear what you said.
09:54AM Q. Did you also review the baby's footprint that was marked as Exhibit J-10?
09:54AM A. Yes, I did.
09:54AM Q. Did you also review J-11, eight inked footprints of the baby?

A. Yes.

MS. OLSON: May I move for admission of those exhibits?

THE COURT: Any objection?

MS. PARKER: No objection, Your Honor.

THE COURT: You may. Do you wish to identify those, please?

MS. OLSON: J-1, 2, 3, 4, 5, 6, 7, 8, P-5, J-9, J-10 and J-11.

THE COURT: The documents, as identified by Ms. Olson, are admitted.

(At this time the above-mentioned exhibits were admitted into evidence.)

BY MS. OLSON:

Q. Dr. Hammers, did you also review various deposition testimonies, including that of Dr. Francis?

A. Yes.

Q. Did you review the deposition of Drs. Maenner and Klamerus?

A. Yes, I did.

Q. Did you review the Plaintiffs' depositions of Imen and Ben Gharbi?

A. Yes, I did.

Q. Did you, also, look at various reports, Dr. Mauldin, Dr. Golen, Dr. Pettker, Dr. Polin and Dr. Chung?

A. Yes, I did.

Q. Dr. Hammers, when you reviewed this case, did you review

09:55AM it in a prospective manner?
09:55AM A. Meaning, that I reviewed the materials before I generated opinions?
09:55AM Q. Yes.
09:55AM A. Yes, I did.
09:55AM Q. Now, after you reviewed these materials, did you then become knowledgeable about what caused Baby Gharbi's death?
09:55AM A. Yes, I did.
09:55AM Q. After you reviewed these materials, did you then inform me as to the cause of the baby's death, to a reasonable degree of medical certainty?
09:56AM A. Yes, I did.
09:56AM Q. And did you state such opinions in two reports to me, one dated August 10, 2020 that we have marked as P-17 and one marked -- one dated November 24, 2020 that we have marked as P-18?
09:56AM A. Yes, I did.
09:56AM MS. OLSON: I'd like to introduce into evidence -- admit into evidence the Doctor's expert reports as P-17 and P-18.
09:56AM MS. PARKER: No objection, Your Honor. Given your practice from yesterday, I believe this witness is testifying to her opinions, but I have no problem with admitting the reports, as well, if she adopts them. Thank you.
09:56AM THE COURT: P-17 and P-18 are admitted.
09:56AM MS. OLSON: Thank you.

09:56AM (At this time Plaintiff's Exhibit Nos. 17&18 were admitted into evidence.)

09:56AM BY MS. OLSON:

09:56AM Q. Dr. Hammers, in your specialized area, in terms of evaluating this case, what was your opinion, then, to a reasonable degree of medical certainty, as to the cause of the baby's death?

09:56AM A. So my opinion, to a reasonable degree of medical certainty, was that Baby Gharbi died from an intrauterine fetal demise, due to hypoxia and acidosis, following prolonged labor and delivery.

09:57AM Q. In forming your opinion, did you take into account Mrs. Gharbi's clinical prenatal course, the history that she had then?

09:57AM A. Yes, I did.

09:57AM Q. Was there anything significant about Mrs. Gharbi's clinical history, prenatally, that impacted your opinion?

09:57AM A. Yes.

09:57AM Q. Can you tell us about that?

09:57AM A. Sure. So Mrs. Gharbi had, basically, an uneventful prenatal course. She was past her due date, at the time that she came to the hospital for a planned induction. She had been followed, during her prenatal course. She had normal ultrasounds, with the exception of one in November that showed some increased fluid around the baby, or polyhydramnios, but it

had not been present before that. The one before that had been slightly increased but didn't meet the criteria for polyhydramnios, and there were three after that one that did not show polyhydramnios.

So, essentially, you know, my opinion on those ultrasounds was that she had a finding of polyhydramnios in one of her ultrasounds, but that it was not present before nor after. So it wasn't a continual problem or a continual finding.

All of the ultrasounds, otherwise, were unremarkable, there were no notations about any restrictions in fetal movement, any congenital issues that were identified, any restrictions or decreased fetal movement, there was nothing abnormal that was identified in her prenatal course, outside of that one finding of the polyhydramnios.

Q. In one of the Defense reports from a Dr. Pettker, he said that Mrs. Gharbi's pregnancy was complicated by polyhydramnios and suggested there may have been intestinal problems preventing the fluid from passing through his intestines or that he had swallowing issues. What's your response to that?

A. So my opinion on that is that this polyhydramnios, on this one ultrasound, was a finding. It didn't indicate any bigger issue or persistent issue with the baby, as it was not present throughout the pregnancy, and it resolved after this one finding.

In my opinion, if there had been an underlying issue that

was causing the polyhydramnios like the doctor had suggested, this would have been something that would have been persistent or, at least, you know, continually shown concerning levels of amniotic fluid.
Q. One of the Defense experts says that the polyhydramnios actually indicated a congenital syndrome as the cause of the baby's death. What's your response to that?
A. So there was no evidence, both at -- during the prenatal course and the ultrasounds, and there was no evidence of any significant congenital defect that would have been significant enough to cause Baby Gharbi's death identified at the time of the autopsy.
So in my opinion, that opinion is not supported by any of the findings of anything that would have been of significance to have led to the baby's death.
Q. Was that your opinion to a reasonable degree of medical certainty?
A. Yes, it is.
Q. Now, in forming your opinion, Dr. Hammers, did you also take into account what was going on during Mrs. Gharbi's labor course?
A. Yes, I did.
Q. Was there anything significant that you saw, in reviewing the case, regarding her labor course, that impacted your opinion?

A. Yes, there was.
Q. Can you tell us what that was?
A. Sure. So Mrs. Gharbi came in to be induced, meaning, to, basically, begin her labor and start her labor along its course. During the treatment, she received medications to help her progress in her delivery and in her progress, and those medications were started and stopped along the course of her treatment.

There were documented episodes of changes in the fetal heart monitoring strips, including decelerations, that were concerning and concerning enough to cause the physicians to actually treat Ms. Gharbi and have her perform different actions and treatments to, basically, alleviate those issues.

So she was given fluid, they had her change positions, and so she had these different episodes of these changes in her fetal strips, particularly, called decelerations. Before she experienced -- the evening before she gave delivery, she experienced a prolonged episode of deceleration/decelerations that, then, resulted in minimal variability of the fetal tracings, which was more prolonged than it had been prior to that point.

So there were noticeable changes that doctors made alterations in their treatment of her to progress her through labor, over the course of the time that she was admitted for her delivery.

Q. Dr. Hammers, how did those changes, specifically, with regard to that 14-minute deceleration you're referring to, how did that impact the fetus, the unborn baby?
A. So the decelerations and the fetal heart tracings are an indication that the baby is experiencing stress and particularly stress that involves the amount of oxygen that the baby is getting to its body.
And in relation to the oxygen, particularly, it can indicate decreases in oxygen, and decreases in oxygen can lead to physiologic changes known as acidosis, which is a rearrangement of the balance of the oxygen and hydrogen and carbon dioxide in the baby's body.
So the clinical signs of these changes in these heart tracings indicates that there is, likely, some other process going on related to the baby not getting enough oxygen.
Q. Can you tell us what is asphyxia?
A. Sure. So asphyxia is a lack of oxygen to the body. We primarily see the effects of that in the brain first, because the brain is most sensitive to it, but asphyxia is, basically, a lack of oxygen.
Q. What is hypoxia?
A. Hypoxia is a decrease in oxygen that can lead to asphyxia if it's prolonged over a period of time, and causes -- or over a short period of time, causing the body to reach a critical level, low level of oxygen that, then, basically, stops the

10:04AM blood supply.

10:04AM So hypoxia is decreased oxygenation to the body, again, 10:05AM the brain is the most sensitive organ, so we notice the changes 10:05AM of that decrease in the brain first, before we see that make 10:05AM changes in the other organs.

10:05AM Q. Did this baby have a critical level of decreased oxygen 10:05AM resulting in his death?

10:05AM A. In my opinion, to a reasonable degree of medical 10:05AM certainty, he did.

10:05AM Q. How can, Dr. Hammers, lower adequate oxygen to the baby in 10:05AM utero for a period of time impact -- increase the risk of death 10:05AM and/or cause death?

10:05AM A. So, primarily, you can have death related to a decrease in 10:05AM oxygen, either, very suddenly or over the course of a period of 10:05AM time. So if blood is -- or if oxygen is completely cut off to 10:05AM the body, the body has some oxygen reserves that it can utilize 10:06AM before suffering the consequences of not having enough oxygen.

10:06AM If decreased levels of oxygenation occur over time, the 10:06AM body depletes its resources, little by little, until it reaches 10:06AM a critical level where damage begins to occur.

10:06AM So you don't have to have a sudden loss of oxygen or a 10:06AM complete loss of oxygen, you can have a slower progression of 10:06AM these depleted levels until the body gets to a critical level 10:06AM where it can't sustain life anymore, once it goes below that 10:06AM level of oxygen.

10:06AM Q. In this case, Dr. Hammers, did the prolonged induction and the decelerations and minimal variability cause this baby to have the critical level of oxygen result -- critical loss of oxygen, resulting in his death?
10:06AM A. In my opinion, yes, it did.
10:06AM Q. As part of your training, Doctor, were you familiar with OB-GYN labor records and fetal strips, in the course of your training?
10:07AM A. Yes. During my medical school training, I spent, I believe, two six-week rotations in OB-GYN, and part of that time was in labor and delivery.
10:07AM Q. When you reviewed this case, did you ascertain whether the fetal heart rate patterns were consistent with a hypoxic and acidotic cause of this baby's death?
10:07AM A. Yes, I did.
10:07AM Q. Now, when the baby was delivered, the medical records from a neonatologist Dr. Sartina indicated there was fetal distress. She was asked to come to this delivery because of fetal distress, with symptoms of variable decelerations. Is that significant and why?
10:08AM A. So it's first significant in the fact that, one, she was even called, at all, right, so the fact that she was even called and asked to come to assist with Baby Gharbi indicates that, you know, something significant was happening with the labor and delivery, it wasn't a normal course of delivery, they

10:08AM were bringing in a specialist to evaluate and treat this baby.

10:08AM The fact that when she arrived and found that the baby was non-responsive and appeared to be deceased and, then, they needed significant medical interventions to try to resuscitate the baby is certainly of significance.

10:08AM Q. Dr. Hammers, was Baby Gharbi's fetal demise intrauterine?

10:08AM A. In my opinion, it was.

10:08AM Q. Can you explain why?

10:08AM A. Sure. So the way that I look at causes of death is I look at the event that started the chain of events that led to person's death.

10:09AM In this case, what was the event that started the chain of events that resulted in Baby Gharbi's death? And when I reviewed the medical records, it was clear that when he was delivered by C-section, he was not responsive, his skin was discolored, indicating that he wasn't receiving oxygen and that he was deceased.

10:09AM When he was evaluated, the record is somewhat -- there's two different takes on the records, so the Doctor, the Neonatologist who showed up said there was no heart rate for the first handful of minutes, and the resuscitation record supports that. The respiratory therapist indicated there was a very slow heartbeat, from the beginning.

10:10AM But my review of the records indicates that had this baby not been resuscitated, he was not going to indicate any signs

of recovery. And that whether the heartbeat was started after CPR, which is what they indicated the Neonatologist and the resuscitation record indicated that it took time, once they started CPR, they got a very slow heart rhythm back, but without CPR, the baby's heart would not have started to beat again, and the baby would have died.

So from my position, as a Forensic Pathologist, when I look at what is the cause of death, it's the event that starts that chain of events. So when you add in resuscitation, it would have been different if the baby had experienced return of circulation, they would have felt pulses, the baby would have regained color and showed signs of life again, but the baby never showed any of those signs of life, outside a very slow heartbeat, which, ultimately, could not be sustained.

Q. Thank you. If we can pull up J-4.4. What I wanted to reference here, this is the Neonatologist's record that you had mentioned, and when you were referencing that the heart was examined by the neonatologist, initially, what did absent, initially, mean -- the significance -- to you?

A. What it means to me is there was no heart rate, initially, and that the heart rate was irregular at the fifth minute, when they checked, and it was around 30 to 40 beats per minute, which is considered bradycardic or very slow, and that this was occurring during the chest compressions.

So the way that I read this and what this means to me is

10:12AM that, because of the chest compressions, and in addition the medications that they gave to the baby, they were able to restart the baby's heart, but it never actually got to a speed where it was effective. It never got to a normal speed, it never was pumping to a point that they could feel pulses, so, essentially, even though they had a very slow rhythm, it was ineffective, it wasn't actually pumping any blood to the baby, including to the baby's brain.

10:12AM Q. If we can look at J-417. You had mentioned what was consistent with your opinion was that the code records actually documented how long it actually took for the heartbeat to become evident.

10:13AM Can you tell us what, according to the code record, was the first time that the baby's heart was actually beating, during the resuscitation efforts?

10:13AM A. Sure. So the baby was born -- was delivered at 1:41 a.m., and on the left-hand side of this record, underneath, Time, in that column, you can see the first entry is 1:44, so that's three minutes after birth, then you have 1:45, and then 1:47 is the first time that anything is documented in that second column as a heart rate. You can see it's documented as 48, the next minute 50, and then, you know, less than 40 at 152.

10:13AM So the first time that anything is actually documented is at 1:47, which is, essentially, six minutes after he was delivered.

10:14AM Q. In the record, the Gharbi's baby was described as pale, unresponsive, with no cry or respiratory effort and non-responsive pupils. Were those significant findings?
10:14AM A. Yes, they were.
10:14AM Q. Do they describe death consistent with hypoxic and acidotic injury and death?
10:14AM A. Yes, they do.
10:14AM Q. What else did you feel significant about those findings?
10:14AM A. So the fact that the pupils weren't responsive indicates that the brain is not responding to that evaluation. The coloration of the skin being pale, that was described, not only by the medical professionals, but, also, the parents described this abnormal coloration that they knew that the baby just didn't look the right color when it was born.
10:14AM So all of these findings are supportive, one, of the baby not being responsive, the baby being deceased, in utero, right before it's born and as it's being born and, also, not able to be resuscitated after it was delivered.
10:15AM Q. And the record, also, indicated that the baby was, they described as pale with petechiae, throughout the face, neck, head, upper torso, with poor perfusion and hypothermic. Were those findings, also, consistent with death from hypoxic and acidotic injury?
10:15AM A. Yes.
10:15AM Q. Can you tell me how else those particular observations

were significant to you, in rendering your opinion?
A. Sure. So the baby being hypothermic means that the baby's temperature is low. This can occur from the baby being deceased. So if the baby is not alive, the temperature of the body is going to start cooling down, again, the coloration of the baby and the petechial hemorrhages identified on the skin indicate that there's some kind of increased pressure that's causing small blood vessels in the skin to break.
So the pressure is reflective of the prolonged period of time that the labor and delivery was ongoing.
Q. The records, also, documented that this baby had an APGAR score of zero at one minute. Was that significant and why?
A. Yes, so an APGAR of zero, basically, means that the baby is not breathing, it's not grimacing or making any kind of movements with its face, there's no heartbeat, and, essentially, it means that the baby is unresponsive, at the time that it was delivered, and that's why they called in the specialist, the neonatologist, to evaluate the baby to start CPR and see if they could revive the baby.
Q. One of the Defense experts Dr. Pettker said;
"It's important to point out that the baby had a heartbeat at birth, and it was not an intrauterine demise", as pointed out by you. Could you respond to that?
A. Sure. For the reasons that I stated before, my opinion is that it's an intrauterine fetal demise. The two records we

looked at shows that the baby did not have a heartbeat when it was born, and through resuscitation, they were able to get a ineffective and very slow heartbeat back, but no other signs of life.

So what that indicates is, through medication and through CPR, you can tell the heart to restart itself, and because the heart is young and healthy, it may actually begin to beat, but in order for someone to sustain life, the beating of the heart has to be effective, it has to be of the correct speed, and it has to actually be able to pump the blood around the body.

And the only reason that they had this heartbeat for a period of time was because of the resuscitation efforts.

Q. It appears that the APGAR at 5 minutes was 1, and then it was -- at 10 minutes it was -- at 15 minutes it was zero, at 20 minutes it was zero. Can you explain if that's significant, at all, and what that means?

A. So an APGAR of 1, basically, means that one of the five findings that they're evaluating had some change to it, and the very slow heartbeat may have been the reason that they gave it a 1.

So, typically, each of those are scaled on 1 to 3, so the heart rate, even that low heart rate could be the reason that the APGAR was 1. But, again, an APGAR of 1, certainly, is not reassuring for life and does not mean that the baby had -- you know, was going to recover, it just meant that, again, there

was a finding, and that there was a very slight change in the APGAR score, but evidenced by the later APGAR scores, that did not persist.

Q. Dr. Hammers, did the six-hour period of time, between the 14-minute deceleration that was noted sometime around 7:30 to 8 p.m. until delivery at 1:41 a.m., did that impact the ability of this baby to be successfully resuscitated from the hypoxic injury that he suffered?

A. In my opinion, yes, it did.

Q. Is that your opinion to a reasonable degree of medical certainty?

A. Yes, it is

Q. Was there any significant intervening cause of this baby's death, other than hypoxic-induced injury to him, during the protracted labor?

A. From my review of the records and of the autopsy and from my training and experience, I was not able to identify any other significant disease process that would have explained why Baby Gharbi died when he died and under the circumstances that he died under, and I was not able to identify any process that would have caused him to die, after he was born, had he been alive whenever he was delivered.

Q. Dr. Hammers, you've testified that, you know, there was no heartbeat at delivery, according to the code and other records, and that he was non-responsive, during the 20 minutes of CPR.

Was he, then, officially pronounced dead at 2:00 in the morning, according to the records?
A. Yes, he was.
Q. During that -- was his hypoxic death, then, something that you could visibly see, at the time of his autopsy?
A. So, unfortunately, when somebody dies from many changes in the body, it takes time for us to pathologically identify those changes, because the body needs time to respond to that damage and to mount a response to try to fix that damage.
So it's not like even if, you know, you have an event, if you have an event and you die suddenly, for example, if somebody has a massive heart attack and they drop dead very suddenly, when we perform an autopsy and we look at the heart and we look under the microscope, we can see why they had a heart attack, because we know that there were blockages of their arteries around their heart, but when we look at the muscle, which we know was affected by this massive event, the muscle looks completely normal.
That's because the person died so quickly that they never had time to mount a reaction to the injury to those heart cells, right, so the body has to be able to respond, mount a reaction, and then start to repair the damage that occurred.
So, similarly, in this case, there was no identified changes to the brain, but that's because a process of a few hours doesn't allow for the body to respond, and to start to

fix the damage. So the decrease in the oxygen occurred over time, as I described, and the body was able to handle those decreases over time until it reached a critical level. Once it reached a critical level, causing the baby to become -- to die, the body did not live long enough and was not able to be resuscitated to sustain life, in order to mount a reaction and show those changes under the microscope.

So based off of the timing, I did not expect that I would see any changes in the brain under the microscope, just like the heart attack example. But looking at the clinical records and the course of what happened with this baby and ruling out other causes that were significant that could cause this baby's death, when you put the whole picture together, we're left with the baby having hypoxia related to this prolonged period of labor and delivery.

Q. One of the Defense experts Dr. Pettker indicated that there was no brain injury, there was no organ -- pathologic changes on exam, he said that that illustrates the fact this baby didn't have hypoxia or acidemia significant enough to cause his death or any kind of dysfunction. Respond to that, if you will.

A. Sure. So I disagree with that, for the reasons that I stated previously. We have a very good explanation for why we would not see those changes. And as I mentioned, I would even expect that we would not see any changes under the microscope,

given the timing and how long it takes for the body to actually start repairing that damage.

But, again, the body needs to be resuscitated and kept alive for a period of many hours, in order to see those changes.

Q. How long would it take for hypoxic acidotic damages to be visible or apparent, pathologically -- what's the time period for those changes, pathologically, to become seen?

A. Yes, so, typically, you need, at least, several hours to a day or two to really be able to see those changes forming in the brain. Certainly, the timing that we have with Baby Gharbi was not enough, because even with CPR, he only had an ineffective heartbeat for 20 to 30 minutes or so -- or even less than that, I'm sorry.

Q. Which of the organs of the body are most immediately affected, when an unborn baby is exposed to a hypoxic and acidotic environment in utero?

A. So the brain is the very most sensitive to any kind of changes with oxygenation, and the brain then feeds back to the heart through the brain stem. So as the brain is affected, the brain stem becomes affected. The brain stem is what, basically, tells the heart to beat and tells it to beat normally.

So those changes from the brain will then directly affect the heart, because the brain is not able to send those signals to keep it beating normally and effectively.

Q. There was a venous cord blood gas that was obtained after the delivery. Did that impact your opinion, in any way?
A. So I did make note of the venous blood gas, the levels, and the fact that Dr. Francis had testified in her deposition that it was collected at some period after the delivery instead of in the immediate period.
In my opinion, if the cord gas values are valid, that is supporting evidence of my opinion. If those are not valid or weren't collected in the right time frame or, you know, it's ideal to collect both venous and arterial, and the arterial was not run in this case, even if those are completely non-existent, which, most of the time, when I perform my evaluations in fetal deaths, we don't have that information, the testing is often not done, I feel like my opinion is still my opinion and doesn't change, based off of whether the cord gas blood is valid or invalid.
Q. Doctor, can a single pH value ascertain or make a difference, in terms of your opinion, whether the baby died of this hypoxic and acidotic injury and death?
A. So, I mean, I don't want to minimize the value of a pH value and what that can mean to clinicians and also to me, but, again, I didn't base my opinion, solely, around that pH level, and my opinion is still the same opinion, regardless of what the validity of that test is and what the results are.
Q. Did you find significant clinical signs, symptoms and

evidence throughout the prenatal course -- I mean, throughout the labor and delivery course -- that substantiated the basis for your opinion that he died of hypoxic and acidotic injury?
A. Yes, I did.
Q. Now, there was a death certificate that was completed by a Deputy Coroner, and they listed complications of Hirschsprung's Disease and probable genetic disorder as the cause of death. I think it was completed a couple months after the death. Do you have an opinion about that?
A. I do.
Q. Can you tell us about that?
A. Sure. So those are not the causes of death that I would have used, if I were signing out the death certificate on this infant. The death certificate was signed by the Coroner's Office and appears to have been gathered from the findings that were listed in the autopsy report.
The autopsy report did not list the cause of death, it just listed, basically, findings that were identified at autopsy. Further, the Autopsy Pathologist indicated in his report that these findings were, either, focal or weren't of the significance that he would expect to have seen, if they were associated with a significant congenital syndrome .
So in reading through the autopsy report alone, basically, the Coroner's Office took some of the findings from the autopsy, which are not of significance to cause sudden and

10:29AM unexpected death and not of significance to cause sudden death in this situation, in the context of the bigger picture of what happened with this infant, and utilize those on the death certificate.

So from a perspective of identifying what is the underlying cause of death, what's the mechanism, what's that physiologic process that's going on with the body that caused this baby to die, Hirschsprung's Disease does not explain why this baby could die when it did and under the circumstances that it did, and there were no significant congenital abnormalities that would have explained why Baby Gharbi died when he did nor were they significant enough to result in his death had he been born alive.

Q. In looking at the autopsy report at J-75, we will put that up. According to the Autopsy Pathologist, he indicated that there were two findings, I think you mentioned there was possible Hirschsprung's Disease and then you also noted there were limb contractures.

Did he then distinguish the limb contractures that are seen with these two conditions of kids that have congenital issues, as opposed to what he saw in the Gharbi baby's case?

A. Yes, he did.

Q. Could you explain that?

A. So, basically, what he said was that there are known congenital syndromes, where both Hirschsprung's and limb

contractures may be seen. However, the abnormalities regarding the limb contractures tend to be much more pronounced than what he identified at the time of the autopsy.

So, meaning, in this syndrome, this amyoplasia congenita syndromes, he would expect that the abnormalities regarding limb contractures would have been much more significant and pronounced, if it was -- if they were actually related to a congenital syndrome that would have been of significance.

Q. Can you tell us, briefly, what is Hirschsprung's Disease?

A. So Hirschsprung's Disease is a congenital condition, meaning, a person is born with it, where neurons or nerve cells in the -- mostly, the large intestine but, occasionally, in the small intestine, also, are absent.

And, basically, what it can do is it can cause problems with the movement of intestinal contents through the body, because those nerves aren't able to appropriately contract to move the contents from the mouth toward the anus.

Q. Did Baby Gharbi's possible Hirschsprung's cause his death?

A. No, it did not.

Q. Can you explain why possible Hirschsprung's had nothing to do with causing this baby's death?

A. Sure. So the pathologist identified grossly with his eyes a few focal areas in the small and large intestine that were constricted, basically, they were narrowed. And just before those areas, the intestines were somewhat dilated or enlarged.

When he examined those under the microscope, some of those areas showed that loss of those neurons or nerve cells.

So those areas were suggestive for Hirschsprung's Disease. Hirschsprung's Disease doesn't cause sudden and unexpected death in utero, it is a treatable condition that's typically identified after birth when babies don't pass feces, essentially, and it can be treated by taking out those areas that are effected, and these children are expected to live, and very often do very well and have long healthy lives.

So the presentation of death in Hirschsprung's, it doesn't -- Hirschsprung's does not cause a sudden unexpected death, it doesn't cause hypoxic injury, it doesn't cause a clinical picture like what we have seen here.

Q. We will pull up J-72. In his autopsy report, under the gross examination of the esophagus and intestines, what was significant about those findings?

A. So the Autopsy Pathologist looked at the entire length of the gastrointestinal tract, from the esophagus all the way to the anus, so, basically, from start to finish or beginning to end. The esophagus was normal, as well as the stomach. The stomach was slightly dilated and the pyloric region, which is the area where the stomach attaches to the small intestines, so where the gastric contents would come out, it was noted to be stenotic or too narrowed.

Again, this is a condition where a surgical procedure can

alleviate that stenosis. This isn't something that people die from. They, typically, present with symptoms and the condition can be fixed, and they, again, live long lives. So they noted some stenosis of that area, and, then, there were some areas he describes as atresia in the small and large bowel. That means they are kind of narrowed, there was some thickened areas, and those are the areas that he sampled under the microscope.

But he did not indicate that the entire large or small intestine or even a significant portion of it was involved with these findings, he described them as focal areas, to the point that he was able to, actually, take sections from those areas that he identified.

Q. Okay. If we can turn to J-74. Is this the microscopic examination under the microscope by the pathologist concerning this baby?

A. Yes, it is.

Q. Okay. Looking at, starting at the small bowel, then, we will go through where he talks up to suggestive of Hirschsprung's. Can you tell us about those findings and if they're significant and why?

A. Sure. So under the microscope, he was able to see those narrowed and dilated areas like he saw with his eyes when he was examining the small intestine. He was able to see some areas where the wall was a little thick, but otherwise it was unremarkable, so there was nothing abnormal with the nerve

10:37AM cells in that area.

10:37AM In the large intestine, there were focal areas where there was constriction and dilation, like I previously described, and when he looked under the microscope and he even used a special stain called Calretinin that highlights the nerve tissues and makes it easier to see how many nerve cells are there. He was able to see some of those areas had an absence of the cells, and he indicated that it was, at least, suggestive of Hirschsprung's Disease.

10:38AM Q. One of the experts indicated that Hirschsprung's Disease, Dr. Polin does, actually, that Hirschsprung's affected his entire GI tract. How do you respond to that?

10:38AM A. So the use of the entire GI tract is not really accurate, so there are segments of the GI tract that aren't involved, at all, and there are focal areas of the GI tract that are involved, and they are described as focal, they're not described as large, it's not described as the majority of the GI tract, so, you know, my interpretation of Dr. Polin's description is that it's inaccurate.

10:38AM Q. In the Autopsy Pathologist's microscopic exam, he actually looked at duodenum. Is that part of the GI tract?

10:39AM A. Yes, it is.

10:39AM Q. What's significant about his finding that sections were otherwise unremarkable, histologically unremarkable, other than thickening?

A. So it's significant in the fact that he examined it microscopically and did not see any of the changes of the loss of those nerve cells in the duodenum, again, indicating that the areas that he did see where there were absence of those nerve cells were focal, as opposed to being diffuse or throughout the entire length of the GI tract.
Q. Where, in relation to the bowel, is the duodenum located?
A. So the duodenum begins just past the pyloric sphincter, it's the very last part of the small intestines after the stomach.
Q. Was there any indication by the Autopsy Pathologist of, either, gross or microscopic evidence of enterocolitis?
A. No, there was no evidence of that.
Q. What is enterocolitis and why is his not finding that significant here?
A. So enterocolitis is, basically, an infection that can occur in the intestines. The reason it's significant is that because, in Hirschsprung's Disease, if somebody has Hirschsprung's or Hirschsprung's changes, if they get an infection and enterocolitis, it could be very significant and life-threatening and needs immediate treatment and kind of changes the outlook of the prognosis of somebody.
So the fact that it's not present is a good thing and indicates that there was no sort of emergent -- any condition, infectious condition associated with the Hirschsprung's, and,

10:40AM again, indicates that this was not a life-threatening condition or a condition that was going to cause sudden and unexpected death.

Q. I want to move on and talk a little bit about the contractures. But before we take the screen off, I wanted to ask you about the pathologist's finding about the musculature in this baby histologically being unremarkable.

What's significant about the musculature being normal?

A. So the musculature in the duodenum is what he's referring to in this, and that it was, somewhat, thickened but otherwise unremarkable. And, again, my understanding of this, when I read through everything, is that he was looking, again, at those nerve cells or for that or any other pathologic process and didn't find anything of significance.

Q. Now, the Autopsy Pathologist did note that the baby did have contractures of the upper and lower extremities. Did contractures play a role in Baby Gharbi's death?

A. So in my opinion, no, they did not. They didn't play a significant role in his death and they would not have caused a sudden or unexpected death or contributed to the events that occurred that did lead to his death.

Q. Are contractures something that can be visible upon the birth of a baby for a variety of reasons?

A. Yes.

Q. Does hypoxia death have anything to do with, potentially,

10:42AM having a baby appear with contractures?
10:42AM A. So hypoxia is definitely a cause of contractures, so that is one of the findings that you can see with a fetus or infant that has been exposed to and experienced hypoxia.
Q. Can you explain how it is that a baby with hypoxic injury and death manifests contractures?
A. So the hypoxia affects the brain, the brain can affect the musculature and the joints, not over the long term, but in a more immediate fashion. Specifically, to this case, you know, there was never any evidence on the ultrasounds and the prenatal examinations that this baby had contractures in utero.
There was never any decreased movement noted, which, also, can be associated with contractures, as well as decrease amounts of amniotic fluid. None of those things were ever noted, and the musculature was actually described as normal. So in babies who have significant limb contractures, typically, on ultrasound but, also, certainly, at autopsy, decreases in muscle bulk and tone and distribution would be able to be identified, and those were never identified, they were described as normal.
And so, you know, the limb contractures, while they were certainly described and identified, were not apparent before this event occurred, and knowing that hypoxia can play a role in limb contractures, you know, this may have played a significant role by the effect of the hypoxia on the brain,

before the baby was delivered.
Q. One of the experts Dr. Polin says that the baby's limb contractures suggested some long standing pre-labor neurological condition that restricted his movements. How do you respond to that?
A. Well, for the reasons that I just explained, you know, I don't see any evidence of that in the medical record. Again, there was no restrictive movement noted in any of the ultrasounds, there was no decrease fluid, there were no contractures or muscle changes noted in any of those. And, again, at autopsy, none of those findings were identified, either.
So my opinion would be that I disagree that there was some kind of long-standing neurologic problem, that also was not identified at autopsy, so there was no long-standing change that would have been present in utero that was identified on the examination of the brain at autopsy.
Q. Similarly, another expert Dr. Chung says that the baby's limb contractures suggested that, maybe, the baby had abnormal neurological development or brain function.
How do you respond to that, similar to what you just told us?
A. Yes, my response would be the same. From my review of the medical records, I don't see anything to support that, over the course of the time and the testing that was done and the

evaluations that were done of Baby Gharbi, through the prenatal course.
Q. Dr. Hammers, are contractures from amyoplasia congenita-type syndromes, are they pretty distinct?
A. Yes, they are.
Q. Are there various atlases of human anatomy that depict what amyoplasia congenita contractures or syndromes look like?
A. Yes.
Q. Are you familiar with Netter's? Is that a familiar atlas of human anatomy that you are aware of?
A. Again, Netter's is basically the book that pretty much every medical student looks at to learn anatomy and to learn different abnormalities with anatomy, so it's something that we learn, we use in medical school, and I, currently, use pretty routinely when I'm going over and refreshing my knowledge of anatomy.
Q. Is it considered an authoritative text?
A. I would say that, yeah, it likely is. I mean, it's used, pretty much, by all physicians.
Q. Did you also find an illustration in Netter's that you felt would be of assistance in describing the types of contractures with that congenital condition?
A. I did.
MS. OLSON: With the Court's permission, I'd like to show the Netter's demonstrative that the Doctor would like to

explain what those contractures look like.

MS. PARKER: I certainly have no objection.

THE COURT: You may.

MS. OLSON: Thank you.

BY MS. OLSON:

Q. Can you tell us what this Netter's diagram illustrates?

A. Sure, so this, basically, illustrates the findings of limb contractures with the muscle abnormalities associated with this arthrogryposis multiplex congenita, which is, sort of, like, if you're on a spectrum of limb contractures and very significant limb contractures, this is at the far end.

What you see is that these limb contractures tend to be the arms and legs are, kind of, stretched out and they're turned, based off the lack of muscle distribution. So these are pretty classic.

But, again, even in these conditions, you can see demonstrated here that, you know, infants grow into children and, then, they will grow into adults, and they'll continue to have these contractures, but it's not something that is necessarily fatal, from a fetal to infant or infant to childhood stage.

Q. Did you have an opportunity to look at photographs of the baby in this case, Baby Gharbi, to look at his physical features and the appearance he had, as distinguished between what we have just seen in this Netter's diagram?

10:48AM A. I did.
10:48AM Q. Was there anything that you would like to point out, in any of the photographs, that would help differentiate the difference between what Baby Gharbi looked like versus what kids with this congenital issue have?
10:48AM A. Sure, I can.
10:48AM Q. Was there any particular that you'd like to reference or?
10:48AM A. Can you tell me where to find them, then, I can tell you which ones.
10:48AM Q. They were Exhibit J-9. If you just call out what you'd like, we can put them up.
10:49AM A. So the joint trial?
10:49AM Q. Yes.
10:49AM A. So if you could bring up J-9.12. So in this photograph you can see that the legs are pulled in toward the abdomen and the hands up toward the face, but they don't -- the extremities don't -- the arms and legs don't have that sort of stretched out appearance to them, and they don't have that uneven distribution of the muscles.
10:50AM Q. Thank you. Did possible Hirschsprung's Disease or limb contractures, either alone or together, break the chain of events that occurred, during the prolonged labor and delivery that resulted in the baby's death?
10:50AM A. In my opinion to a reasonable degree of medical certainty, no, they did not. They were not what we call a sufficient

10:50AM intervening cause or a disease process or event that interrupted that chain of events that began from the hypoxic injury.

10:51AM Q. Dr. Hammers, do you have an opinion to a reasonable degree of medical certainty whether the Gharbi's baby had any congenital or genetic abnormality causing his death?

10:51AM A. I do. So based off of the information that's available, the karyotype testing, the autopsy findings, the prenatal findings, as well as the hospital records and the karyotype testing from the parents, from what is available, there is no indication that there was any significant underlying genetic cause for Baby Gharbi's death.

10:51AM Q. If we can pull up J-72. Did the Autopsy Pathologist describe, specifically, various gross examinations of the baby's heart? Let's start with the heart. Was there anything grossly abnormal about this baby's heart?

10:52AM A. No, there was nothing abnormal. The development was normal, the size was normal, all of the blood vessels coming in and out of the heart were normal. The heart wasn't thickened or dilated. Essentially, this is a completely normal exam. There were no congenital findings, even common congenital findings that we see, from time to time, in fetal and infant deaths.

10:52AM Q. In looking at the respiratory tract, in terms of the gross examination by the pathologist, what was the condition of the lungs? Was there any abnormality?

10:52AM A. So the development of the lungs was normal, the airways coming off of the trachea and going to the lungs were normal, they had a normal weight to them, the positioning and the way that the lobes of the lungs were divided was normal.

10:52AM The comment -- the two comments that the pathologist made were that the lungs were slightly firm, meaning, inconsistency, and that they did not float in water, when he did what we call the water float test.

10:53AM Q. And several of the experts, Dr. Polin and other experts, Dr. Chung, they talk about the autopsy finding that the lungs were abnormally stiff. Is that what the pathologist documented?

10:53AM A. So the pathologist didn't use the words, abnormal or stiff, his term that he used, specifically, was, slightly firm, which does not necessarily mean that the lungs were stiff, in my opinion, and in my use of the word and in reading other people's autopsy reports.

10:53AM Q. If we can go to J-74. In looking at microscopic findings of the heart and lungs, what was significant about the lung sections that he looked at under the microscope, histologically?

10:54AM A. So, microscopically, the lungs showed an unremarkable development, and there was nothing in the lungs or the heart that indicated any abnormality, like, an infectious process or a developmental abnormality or anything that would have been unexpected or outside of the ordinary.

Q. Several of the experts from the Defense side said that because the lungs did not float at autopsy, that could represent a genetic issue.

Could you explain what test is done at autopsy for whether lungs float or not, and what that's in relation to?

A. Sure. So the reason we perform the float test on the lungs is to determine if a baby, when they're born, had a significant inspiratory or breathing-in effort to open up the small spaces in the lungs where the oxygen is exchanged for carbon dioxide.

So when a baby is in utero, it doesn't breathe any air. So its alveolar spaces, which are those spaces that exchange the oxygen, they're, like, little microscopic sacks in the lung, and there's millions of them, they're collapsed, because there's no oxygen. So they don't need to be open, because the baby is getting oxygen and exchanging carbon dioxide through the mother.

So when a baby is born and the baby takes those first breaths in, it, essentially, opens up those airways and they fill with air and become, like, little balloons, like, little sacks. When that happens, when we put those lungs in water, they'll float to the top, because, like a sponge that doesn't have any water in it, it's got those openings, and it's not -- they're not dense, right, they have lots of air, so they float.

If the baby never has a significant breathing in or

inspiratory effort, those alveolar spaces never pop open and never fill with air, so the lungs will float to the bottom or sink. We utilize this test in forensics whenever there's a question of, Was this baby alive or not, because the baby was pounds, right, that is usually why we use it.

We can use it, also, in a hospital type of autopsy to identify, Did this baby ever take breaths in that would have opened up the lungs?

So, in this case, what this indicates is that, even despite resuscitative efforts, where they are pushing air into the baby's lungs, they are intubating and, again, pushing air into the baby's lungs, it's not causing those lungs to open up, but that's because the baby didn't have a significant inspiratory effort, it wasn't breathing when it was delivered, and it never breathed after it was born, so those lungs never opened up and never developed those air sacks, so that they wouldn't float.

My expectation, reading through this and having read the records, knowing that the baby did not breathe, is that the lungs would have sunk and they would not have floated.

Q. Now, autopsy pathologists, you do thorough examinations of the body, head to toe, essentially?

A. Yes.

Q. Do you, specifically, as autopsy pathologists, look at the skin to determine if there's anything remarkable or abnormal

10:57AM about the skin that could fit with a potential determination
10:57AM for cause of death?
10:57AM A. Yes, we do.
10:57AM Q. Now, in the record, after the baby was born, there's an indication of someone indicating that there was, I think, it might have been the neonatologist, dough-like appearance after delivery. Dr. Sartina.
10:57AM Now, the pathologist, actually, looked at the skin, specifically, in terms of whether that skin had any abnormalities. Is that what a pathologist does?
10:58AM A. Yes, that is correct.
10:58AM Q. If we can put up J-7. Can you tell me what the pathologist's findings were, in terms of this baby's skin?
10:58AM A. He described the skin as unremarkable. There was no slipping or necrosis, meaning, there was no breakdown of the skin. The tissues underneath the skin weren't edematous or swollen, so they didn't have fluid in them.
10:58AM So, essentially, he is saying in here that his examination of the skin on the outside of the body is unremarkable and normal.
10:58AM Q. Was there any indication by the pathologist of any dough-like appearance of the baby's skin?
10:59AM A. No, he did not use that term, and he didn't even, you know, describe the skin in any way that would suggest that he had identified that consistency to the skin.

Q. Was there any mention by the Autopsy Pathologist of the texture or the smoothness or not of the baby's foot? Is there any reference to that?
A. So he did not -- there's pictures of the feet, but he did not make note of any abnormal findings on the palms or the soles of the feet.
Q. Now, did you have an opportunity, as well, to look at photographs of the baby's feet?
A. I did.
Q. Let's look at J-99. In looking at J-99, what was significant to you about the appearance of the baby's feet?
A. Of significance, there's 10 toes present, so there's no congenital absence of any toes. The skin is smooth on the bottom of the feet, meaning, there's no thickened or piled up skin, and there are some creases identified on the feet. There's not too many, not too little, they look pretty usual, as far as the soles of babies' feet go, whenever I have looked at them.
Q. Is there any indication, based on the photograph, of any lack of creases or abnormal appearance of the baby's feet?
A. In my experience and in my opinion, no, there's nothing abnormal about the amount of creases.
Q. Did you also -- some of the experts refer to the baby's feet lacking creases. Did you also see that there were eight additional ink prints in this case? Let's pull up J-11.1, for

example. What was significant, in terms of the presence of creases in this baby's footprint?

A. So, again, there are creases that are visible, kind of, on the foot toward the toes. Again, not an extra amount of creases and not really a decreased number of creases. These look like pretty normal foot ink prints and look consistent with the photographs of the feet that I was able to review.

Q. Thank you. Did the Gharbi baby's skin appearance, whether his feet or the texture of his skin, did that have anything to do with causing his death?

A. No, it did not.

Q. Is there any basis in the evidence to indicate that there is -- the baby had a genetic or congenital cause, based on the ink footprints or the photographs of his foot or the description of his skin, based on autopsy?

A. In my opinion, no.

Q. As you have been doing, all of your opinions have been stated to a reasonable degree of medical certainty?

A. That is correct.

Q. Now, there was a genetic test result of the baby that came back as normal. What's the significance about that?

A. So it was a karyotype test, which, basically, means that it looks at the chromosomes, how they're paired, and lines in the chromosomes, which represent genetic material. It came back as a normal male karyotype, which was expected, based off his

physical appearance and genitalia that was identified, and there were no extra chromosomes or rearrangements or absence of chromosomes that could be seen.

This is significant, because there are certain conditions with chromosomes that could be related to Hirschsprung's Disease or limb contractures, and so those not being identified indicate that, again, those are findings, as opposed to significant conditions that would cause sudden and unexpected death.

Q. Dr. Hammers, when you reviewed the genetic test results of the parents, finding them normal, what was the significance about that?

A. So the parents both had karyotype testing, so similar type of testing, and came back with a normal male and normal female karyotype respectively. They did not have any kind of deletions or extra or deleted whole chromosomes, they came back with, essentially, normal male and female karyotype testing.

Q. With negative karyotype testing for the baby, is it usual practice to look for or require additional genetic testing, if the karyotype comes back negative?

A. So, in my experience, genetic testing is targeted toward, either, a certain clinical history or a clinical syndrome or finding that is believed to be of significance, as opposed to just saying, We're going to test every gene in the body and then work backwards. We work toward genetic testing, based off

11:04AM what we find, either, at the time of autopsy or what we find at the time someone is born or when they develop a clinical symptom.

Because genetic testing needs to be targeted so it can be interpreted correctly, and that informed consent can be given to prepare for both a positive or a negative result. So a genetic -- like, further genetic testing would have been something that would have been suggested if the clinicians felt that it was necessary, in my experience, if they felt that it was necessary, based off of something that was identified of significance.

Q. In this case, did anybody, Dr. Francis or the pathologists, recommended any further genetic testing, when the karyotype came back negative for the baby?

A. So from the materials that I reviewed, I did not find anywhere in the record that there was a suggestion or an indication that further genetic, more specific genetic testing would be beneficial.

Q. Dr. Hammers, was there any factual or objective evidence upon your review of the case, whether it's a pathologic, neurologic, genetic or congenital process that resulted in this baby's death?

A. My opinion is that there are none of those things that resulted in Baby Gharbi's death.

Q. Was the hypoxic acidotic injury, over the course of the

11:06AM protracted labor and delivery, the absolute cause of this baby's death?

11:06AM A. So, in my opinion, based off the review of all the materials, taking all of the information into context and identifying what would have -- what event or process started the chain of events that lead to Baby Gharbi's death on the day that he died, that is my opinion, that the hypoxia, during the prolonged labor and delivery, was the reason that he was born with an APGAR of zero and why he wasn't able to be successfully resuscitated.

11:07AM Q. Have you stated all of your opinions to a reasonable degree of medical certainty?

11:07AM A. Yes, I have.

11:07AM MS. OLSON: Thank you. That's all I have, Doctor.

11:07AM THE COURT: Why don't we take a short break?

11:07AM MS. PARKER: Thank you, Your Honor.

11:07AM THE COURT: Fifteen minutes.

11:19AM (At this time a recess was taken.)

11:19AM THE COURT: Ms. Parker, cross-examine.

11:21AM CROSS EXAMINATION

11:21AM BY MS. PARKER:

11:21AM Q. Dr. Hammers, good morning.

11:21AM A. Good morning.

11:21AM Q. You are not here to speak to the standard of care; correct?

11:21AM A. That is correct.
11:21AM Q. You are here to offer your opinion on the cause of death but not on standard of care; is that right?
11:21AM A. Yes, that is correct.
11:21AM Q. Dr. Hammers, you do not deliver babies; correct?
11:21AM A. I do not.
11:21AM Q. You are not an OB-GYN practitioner; right?
11:21AM A. That is correct.
11:21AM Q. You are not Board certified in Obstetrics; correct?
11:21AM A. That is correct.
11:21AM Q. You do not read fetal heart monitoring strips in real time, as part of your daily work, do you?
11:21AM A. I do not.
11:21AM Q. But you do know that, on fetal heart tracings, there is no one specific type of tracing that could only be acidosis. Alterations in the tracing may indicate acidosis, but in your words, may not be specific for only acidosis; correct?
11:21AM A. My words from?
11:21AM Q. From when I took your deposition.
11:22AM A. Okay. Can I read how -- where you are finding that from?
11:22AM Q. Yes, absolutely, Page 77, Line 6.
11:22AM A. In this binder here?
11:22AM Q. Yes, in the white binder we have your deposition transcript. 77, Line 6. Let us know when you're there.
11:22AM A. Is it okay if I take a second to read it?

Q. Absolutely. I'll read it aloud for you and ask you if I read it correctly.
A. I would just like to read the before and after to have the context of our questioning.
Q. Understood. Please do. That's why we have it there for you.
A. Okay.
Q. So 77, Line 6, my question was;
"QUESTION: On a fetal heart tracing, are there any characteristics that definitively diagnose fetal acidemia or acidosis?"
Your answer was;
"ANSWER: As far as definitively, I don't know that there's any one specific type of tracing that could only be acidosis, but, typically, the alterations and the tracings may indicate acidosis, you know, in -- to my experience, can indicate acidosis but may not be specific for only acidosis."
Did I read that correctly?
A. Yes, you did.
Q. All right. You are not a Pediatric Geneticist; correct?
A. I am not.
Q. You're not Board certified in Pediatric Genetics; right?
A. I am not.
Q. You are a Forensic Pathologist engaged in this case to offer an expert opinion on behalf of Plaintiffs; correct?

A. Yes.
Q. But you didn't perform the autopsy in this case; right?
A. That is correct, I did not.
Q. But you disagree with the causes of death determined by the folks who did perform the autopsy and then reported in the autopsy report and then were placed on the death certificate; is that right?
A. So the person -- the doctor who did the autopsy did not determine the cause of death and did not complete the death certificate.
So it was the pathologist at the hospital completed the autopsy, did not render an opinion as to cause of death, and the Coroner's Office determined the cause of death, based off -- I don't know exactly what they utilized to determine that cause of death -- but I presume, in part, it was the autopsy report.
Q. All right, and you disagree with the Medical Examiner's or the Coroner's Office's listing of the causes of death; correct?
A. I disagree with their determination of the cause of death, yes.
Q. All right. In your opinion, the baby died from hypoxia-induced decelerations and acidosis; right?
A. I don't believe that's the entirety of my opinion, as to the cause of death.
Q. All right, well, let's check it. I'm referring to your

11:25AM deposition, we're looking at Page 155 at Line 18.
11:25AM A. Which line did you say?
11:25AM Q. Line 18. And this is Ms. Olson, actually, asking you your opinion. Do you see it? Let us know when you're ready.
11:25AM A. I do see it.
11:25AM Q. Ms. Olson asked you;
11:25AM "QUESTION: Does it remain your opinion, then, to a reasonable degree of medical certainty, that the cause of this baby's sudden death was due to hypoxia-induced decelerations and acidosis, during prolonged labor induction and delivery?"
11:26AM We will skip over my objection. You answered;
11:26AM "ANSWER: Okay, yes, that remains my opinion."
11:26AM Did I read that correctly?
11:26AM A. Yes, I believe when you stated it previously, though, you only stated part of the length of it. I may have misheard you.
11:26AM Q. It's a good thing we've checked.
11:26AM A. Sounds good.
11:26AM Q. In your opinion, this baby had acidosis in utero, because when you have hypoxic injury, acidosis comes with it; isn't that true?
11:26AM A. Yes, it typically does.
11:26AM Q. With the acidosis to which you attribute the baby's demise in this case did not manifest itself in clinical symptoms, did it?
11:26AM A. No, I disagree with that.

11:26AM Q. Well, again, at your deposition, you told me that it's your opinion that the hypoxic event and the hypoxia, quote, did not manifest itself in clinical symptoms but manifested itself in the delivery process.

11:26AM Do you recall saying that?

11:26AM A. I would need to read that in the context of the other discussion around that.

11:27AM Q. Let's do that. Page 132, Lines 1 through 6.

11:27AM A. Okay.

11:27AM Q. Actually, my question starts two lines on 131, so I'll read that question, the whole question. Let us know when you're ready.

11:27AM A. Okay.

11:28AM Q. All right, so starting with my question on 131, Line 24.

11:28AM "QUESTION: So the severe hypoxia occurred starting at that time and lasting until delivery, is that your opinion?"

11:28AM You answered;

11:28AM "ANSWER: Well, it's my opinion that the baby suffered some hypoxic event during that time period, and that hypoxia, the hypoxia didn't manifest itself in clinical symptoms but manifested itself during the delivery process."

11:28AM Did I read that correctly?

11:28AM A. So you did read it correctly, but it's taken out of context from the broader picture of what we were discussing.

11:28AM Q. Please put it in context for us today.

A. So what I testified to in my deposition, during this line of questioning, was, basically, talking about the time of the prolonged deceleration that was around 7:40ish to 8:00 that night, before the delivery. So earlier in the evening.

And we were talking about the signs and symptoms that occurred around that time, and what I was trying to explain through this was that those periods of deceleration and those events didn't cause the baby to die suddenly at that moment, but it was, basically, part of the process of what was going on that, ultimately, led to his death.

Like I had previously described with the hypoxia, sort of, going lower and lower and lower until it reached a critical point.

Q. You would agree with me that you testified, I heard you and believed you at that time, that you stated that the hypoxic event and hypoxia did not manifest itself in clinical symptoms but manifested itself in the delivery process.

Didn't you actually say that?

A. Well, I mean, you're reading what I have said, but, again, it's being taken out of the context of the questioning and the answers before and after it.

Q. I understand that, and you've given us the context; correct?

A. Yes.

Q. But you, actually, said what I said; correct?

A. I said what you've read, but taken out of context, it means something different than put into context.
Q. Okay, all right. Well, let's talk about acidosis. You defined at your deposition, again, you defined acidosis as signs and symptoms of an acidotic pH level, didn't you?
A. That may have been how I described it or part of how I described it.
Q. Well, on Page 47, Lines 1 through 7, you told me;
Acidosis is when there are signs and symptoms that indicate, either, there is an acidotic pH level or that there are signs and symptoms that indicate that there are clinical signs and symptoms of acidosis that the patient is experiencing."
Didn't you tell me that?
A. I believe that that is a correct reading from the page, yes.
Q. Metabolic acidosis is evaluated based on blood pH; right?
A. From my medical school training, I do believe so.
Q. And the blood pH, by itself, could indicate whether or not there was acidosis; right?
A. So just, in general, you're asking me or in the context of this case?
Q. Well, I took your deposition in the context of this case, and when I asked you that question, that's what you said. So let's check that. Page 42, Line 13.

11:31AM Page 42, Line 13, I asked you;

11:31AM "QUESTION: So is one result more indicative of acidosis than another?"

11:31AM You said;

11:31AM "ANSWER: Well, you know, you could say -- well, the pH could be indicative, in and of itself, from acidosis, but there are other -- but the other findings also can indicate acidosis, as well. So there can be, you know, one level that says, This is acidosis, which would be the pH, but in, you know, in my review, I was looking at all the levels, not just one of them, and not giving more weight to just one versus the other."

11:32AM Did I read that correctly?

11:32AM A. I believe you did.

11:32AM Q. Thank you. Objective measures of acidosis are a group of tests that are run to make that determination; right?

11:32AM A. I would say the group of tests is an objective test for acidosis.

11:32AM Q. I'm sorry, did I mishear you? The group of tests -- could you just say that again, please?

11:32AM A. So the testing that you're referring to, right, the pH levels, the CO2 level, the PCO2 level, that is an objective test for acidosis. I believe you said it was the objective test for acidosis.

11:33AM Q. I don't want to make anything more confusing. On Page 74, which is what I'm looking at, Line 1, I asked you;

"QUESTION: What are the objective measures of whether or not acidosis has occurred?"

A. Which page, again?

Q. Page 74, Line 1.

"QUESTION: What are the objective measures of whether or not acidosis has occurred?"

You answered;

"ANSWER: So, again, I would refer back to the laboratory testing that we spoke about, and looking at that, that group of tests that are run to make that determination."

And, then, let's put it in context. I carried on asking you;

"QUESTION: Are there any other objective measures of whether or not acidosis has occurred?"

You answered;

"ANSWER: Well, you could have clinical signs and symptoms. The patient's heart rate, their breathing rate, it can change, in order to try to correct for any kind of acidosis, and those clinical signs and symptoms can be evaluated and monitored."

Did I read that right?

A. Yes, I believe so.

Q. All right, let's look at Exhibit J-2.138.

A. You're bringing it up on the screen?

Q. Yes, it's on the screen for you. Do you recognize this document?

A. I just need to get closer to it.
Q. You've seen this document before today; correct?
A. Yes, I have.
Q. All right, now, with respect to acidosis, you know that the reference range for life-sustaining pH values is, in your word, ideally, the reference range that's in this medical record that we have right here, isn't it?
A. I assume by, ideally, you're pointing to something in my deposition that I said?
Q. Yes.
A. Can you tell me where I said that?
Q. Page 116, Line 19. We carried on to 117, Line 5. So 116, Line 19, my question was;
"QUESTION: And what's the highest number?
"ANSWER: Well, there are highest numbers and there's life-sustaining highest numbers, right. So really, ideally, you want to be around that, that reference range that's referenced in that report.
"As you can see, it's very small numbers, so, you know, it's not going to be like an 8 and it's not going to be a 6, right, so it's going to be right around in that range, a little higher or a little lower, but it's a very delicate balance."
Did I read that correctly?
A. Yes, you did.
Q. If we look at these results in this record, we see that

11:36AM the level of the baby's pH is within that ideal range, as reflected in this record, don't we?
11:36AM A. Yes, in the testing result, it is.
11:36AM Q. So a pH value of 7.353 is a normal value, in the context of the reference range in this medical record, isn't it?
11:36AM A. It is within the reference range.
11:36AM Q. Dr. Hammers, you prepared two reports in this case, didn't you?
11:37AM A. I did.
11:37AM Q. One is dated August 10, 2020; correct?
11:37AM A. Yes.
11:37AM Q. And you reviewed these lab results, these cord blood gas results on Exhibit J-2.138 before you prepared your first report, didn't you?
11:37AM A. Yes, I did.
11:37AM Q. And in your first report, you stated your opinion that the venous cord blood gas results, after delivery, that we see here in Exhibit J-2.138, revealed acidosis. Isn't that what you stated?
11:37AM A. I would like to read what you're referring to, please.
11:37AM Q. I'm actually referring to when you testified to that, on Page 33 of your deposition.
11:37AM A. Okay.
11:37AM Q. Page 33, Line 17. Are you there?
11:38AM A. Yes, I am.

Q. So my question was;

"QUESTION: Okay, all right. In your August report on Pages 4 and 5 you have your opinion section. And in there, you say, Clinical testing of the venous cord blood gas after delivery revealed acidosis. Can you point to the results that you're referring to for that statement?

ANSWER: So I would say that statement reflects the entirety of the results, not just one of the results, but all of the laboratory results."

Did I read that correctly?

A. Yes, you did.

Q. So even though you agree that the same pH value that's in the results in this record is within the ideal range, you believe that these lab results showed acidosis?

A. Well, what I was trying to explain was that, taken in the context of what I examined, that I believe the baby had acidosis. So when you read it the way that you're reading it, it makes it sound like I'm saying there's acidosis, when it falls within the reference range.

What I was trying to explain is that, in the context of what I reviewed and what my opinion is, that the baby had hypoxia and the baby had acidosis, based off the clinical signs, and not just the laboratory results, in and of themselves.

Q. Right, I understand that's what you're saying over all,

but in your testimony, we were talking, specifically, about this set of results.
A. Right, I see what you're saying, but when I read it in the context of what we were talking about, what I was trying to convey is that I am looking at everything altogether and making a decision, I'm not picking apart one thing out of the context and saying this is the reason that I'm saying that there's acidosis.
Q. Understood. But you also told us, today, even, that the blood pH by itself could indicate whether there was acidosis, didn't you?
A. Not in the specific context of this case but in general.
Q. Understood. So, in this case, we have a pH value in the ideal range, but we also have your opinion that the fetus had acidosis; is that right?
A. So I didn't use, ideal, it's within the reference range is how I would describe it. I wouldn't use the word, ideal.
Q. All right, fair enough. At least, on that page, you didn't use the word, ideal. In your report, opining on results that you believe show acidosis, you based your report, I think you just tried to explain, on all the lab results; correct?
A. Well, not just on the lab results, on the entirety of my review.
Q. Understood. But we were talking about just the lab results, would you agree with that, at least, in that section?

A. We were talking about lab results in that area, from what I recall, from looking over it quickly.
Q. All right, so let's just focus on this page of lab results for now.
A. Okay.
Q. I understand you have other things you want to talk about, but let's just focus, right now, on these lab results for a moment.
So with regard to the other values in this lab report results, these reference ranges that you believe -- you believe they're specific to that specific laboratory, the machinery in that specific laboratory. Didn't you tell me that at your deposition?
A. I believe I did. So what I had described to you is that what I've been trained, as a clinical pathologist, right, is that when you look at results that come from a specific lab, you look at their reference ranges, because they perform their quality assessment, they perform their standards and set those on their machinery, and that every lab, their results may be slightly different, based off their population and their use of the machinery.
So you have to compare, when you interpret the results, you compare it to the reference ranges that the lab provides to you.
Q. But you know nothing about the lab that ran these tests

11:42AM and produced these results, do you?
11:42AM A. You mean, like, specific knowledge of how their lab operates?
11:42AM Q. Right, and their ranges.
11:42AM A. So, I don't. What I was testifying to in my deposition is, you know, the way that reports are put out for hospitals and for laboratories and doctors utilize them from the reports that are put out.
11:43AM Q. If you thought something was incorrect about the values in the lab results, you would have to go back and look at how the lab comes up with their reference ranges, how they calibrated their machines; correct?
11:43AM A. Say the beginning part of your question again.
11:43AM Q. If you thought something was incorrect about the values in a lab result report, such as the one we have here, you would have to go back and look at how the lab came up with their reference ranges and how they calibrated their machines, wouldn't you?
11:43AM A. So I don't think that the lab value, necessarily, indicates anything incorrect about the way the lab does the testing, that's sort of a very bigger picture process. The lab value itself, if I thought something was incorrect about it, just speaking in general, I would look for other reasons that those values could be off before I would assume that the lab was running their testing incorrectly or hadn't validated their

11:44AM machine or that there was some trend in the machine that was off.

11:44AM Q. Well, just to be clear, make sure that I understood you then and I'm understanding you now, on Page 107, at Line 99, I'm asking you;

11:44AM "QUESTION: So the point you're making, I think, is one would have to know how a specific lab had their instruments calibrated and how they perform the testing, is that right?

11:44AM "ANSWER: Well, if you are reviewing this, the lab results, and so when you review this, as part of the medical record, you look at the information that you're given and the reference ranges, right.

11:44AM "If you wanted to pick apart and you thought something was incorrect about the laboratory values, then, you would have to go back and you would have to look at how they came up with their reference ranges, the testing that they did, how they calibrated their machines, all of those things that you pointed out, which is, you know, is something that potentially could be done, but when you're reviewing the medical record, you're looking at the medical record as it was given to you."

11:45AM Did I read that right?

11:45AM A. Yes, you did.

11:45AM Q. You do not know anything about how this particular lab that ran these tests calibrated their machines or ran their tests, do you?

A. No, I didn't review any documentation about their laboratory policies and procedures.
Q. But to be clear, you told me at your deposition that even if you learned that the reference ranges in this hospital medical record, these lab results were not applicable to a neonate or fetus, that would not change your evaluation or your opinion in this case, would it?
A. I believe what I was saying -- and we can go back and read it -- but what I was trying to convey in my deposition was that -- and I believe you followed up with a question with me saying, even if this testing had not been done, would you still hold the same opinion, which is what I had testified to earlier today, that even if this test had never been run, if we went all the way back and said we never had a value to begin with, I still would hold the same opinion, right now, that I did when there was that testing.
Q. That was exactly my next question and you've answered it. Thank you very much.
A. Okay.
Q. All right, let's talk a little bit about your second report, which is dated November 24th, 2020.
A. Okay.
Q. Just to put a little preface here, in your first report, you stated that the venous cord blood gas results revealed acidosis, but, then, in your second report, you said you did

11:46AM not rely on the testing results; right?
11:46AM A. I would have to look at the specific wording of what I said, so can you point out to me, in my report, where I said that?
11:47AM Q. Page 108.
11:47AM A. So we're at the deposition not in my report?
11:47AM Q. I'm sorry, yes, it's just easier. I have the testimony under oath at your deposition.
11:47AM A. That's okay. You just referred to my report and then went back to the deposition, so I was confused.
11:47AM Q. I did not mean to confuse you.
11:47AM A. So 108, you said?
11:47AM Q. Yes, Page 108, Line 16.
11:47AM A. Okay.
11:47AM Q. To Page 109, Line 16. My question was;
11:47AM "QUESTION: All right, and, again, in your reports, both of them, I think, you say the venous cord blood gas revealed acidosis, and we have discussed that, and I just want to make sure that I got it all, that your opinion is based on all of those results that we looked at, plus other information about the fetal heart tracings and the course of the labor and so forth. Is that accurate?
11:48AM "ANSWER: So, first of all, I don't know that in my supplemental report -- and if I did say it, I'm happy to look at it -- that in my supplemental report, I don't believe that I

referred to acidosis or the interpretation of this testing, because of reading Dr. Francis' deposition, when she talks about the timing, the delayed timing of it.

"It didn't change my opinion, at all, but I don't believe -- and I believe you said in both my reports I relied on this testing. So, as I said before, even if this testing had never even existed, my opinion would still remain the same.

"So it -- my opinion doesn't change, based off any of the things we have discussed with this one piece of testing, it's based off of all the information that I reviewed."

Did I read that right?

A. You did.

Q. Okay. In your second report, your supplemental report, you are not including the opinion that the cord blood gas pH value results were in the ideal range, and that they revealed acidosis, you didn't include that in your supplemental report; right?

A. Again, like I testified in the deposition, I would have to look at that. I don't believe that I did, and that's what I testified to, that I did not recall that I did. But we never went back and actually looked at the report.

Q. All right. When you prepared your supplemental report, you considered Dr. Francis' testimony about when the cord blood sample had been collected; right?

A. I did.

11:49AM Q. And based on that testimony, in your supplemental opinion, it was your supplemental opinion that the lab values are not reliable, in formulating opinions about acidosis in this case; correct?
11:49AM A. Yes.
11:49AM Q. Okay, so if we can clarify, despite what we see here in this medical record, in your first report, you opined that these blood gas results did show acidosis, and you still believe they show acidosis, but after you read Dr. Francis' testimony, you wrote a supplemental report and added to your second report your opinion that these results are not reliable to say that there was acidosis; right?
11:50AM A. I would say, in the context of the case, again, looking at everything and formulating my opinion, it was my opinion that the baby had acidosis. That didn't change from the first to the second report.
11:50AM Q. Right. You find these test results after reading Dr. Francis' testimony unreliable in this case because you believe too much time had passed, before the blood was drawn from the cord. Isn't that true?
11:50AM A. So that was the information that she portrayed in her deposition, that there was a prolonged time between the collection and the testing.
11:50AM Q. We will get to that in a second. But in your first report, you saw, as we look at the report -- can we have it up one more

time so everybody can see?
You looked at that report and you relied on it in your first report, and you saw where it notes the time of collection, and you saw that, when you looked at that record and prepared your first report, didn't you?
A. Can you bring up the lab result, again, and show me the time of collection?
Q. J-2.138. There it is. Now, when you prepared your first report, you saw, in these lab results page, where it says, collection and collected on, do you see that?
A. I do.
Q. You saw that, when you looked at these, when you prepared your first report, right?
A. Right, but, also, in the comments, it says, DT 0141, so I don't know if that's draw time, I don't know if that's -- it does say, collected, but I believe, as I described in my deposition, that it's not always completely clear, all of those time frames, and that Dr. Francis' deposition clarified the timing of the -- of when that blood was drawn.
Q. I think what you're saying today is consistent, and tell me if I'm wrong, with what you told me in your deposition, that the records noting time of collection is, as you said, often not always correct, but you never relied on it for your first report; right?
A. What did you say about relying on it from my first report?

11:52AM Q. You relied on these lab results to say that these lab results show acidosis, in your first report; correct?
11:52AM A. Well, I would say I, in part, relied on them for my opinion, it wasn't the sole and only finding for my opinion.
11:52AM Q. I think we understand that. But when you relied on them, in part, you also knew, at that time, in your view, that the time of collection of the sample is often not always correct. You knew that going into it, didn't you?
11:53AM A. Yes, it can be.
11:53AM Q. Okay. Now, in your second supplemental report, we talked about you having read Dr. Francis' testimony. And let's look at what she testified that seemed to impact your evaluation of these results.
11:53AM Do you have Dr. Francis' transcript there in front of you?
11:53AM A. I may, I have four binders. If you tell me where it is, I can look.
11:53AM Q. Let's bring up Francis' transcript at Page 202. We will look at what she said about this particular lab result report.
11:53AM A. Okay.
11:53AM Q. Starting at Line 8. Ms. Olson asked Dr. Francis;
11:54AM "QUESTION: And according to the hospital record, cord blood gas was collected at 2:41; correct?"
11:54AM Dr. Francis replied;
11:54AM ANSWER: If that's the time that they documented, yes."
11:54AM Ms. Olson asked;

"QUESTION: And according to the hospital, the results were available on December 18 at 2:45 a.m. correct?"

Dr. Francis responded;

"ANSWER: If that's what's documented, yes."

Now, Dr. Francis is not offering any information other than what is on the hospital record, is she?

A. Based off of her testimony, like, it sounds like she's looking at the record and giving, not only her record, but also what she has done in her normal process and procedure for the blood draw.

Q. Are you seeing, in this testimony, Dr. Francis describing her normal process and procedure for drawing blood?

A. Well, she says, "Are you aware of who may have drawn it? It would have been one of the nurses." From the way she's answering the question, it doesn't sound like she has an independent recollection of this case, specifically, but that she's testifying to the way that she typically does this procedure.

I may be misinterpreting it from reading it very quickly, but that's the way I'm reading it.

Q. All right, my question is, after reading Dr. Francis' transcript is when you decided that these lab results we have been looking at were unreliable; is that right?

A. So after reading this, from my perspective, it seemed the most fair-handed to say that there's a question about these

results, it's not clear from the record when the draw time was, and does this change my opinion, yes or no, it does not. I wasn't there, I didn't have a part in the draw time, regardless of when it was, and it still didn't change my opinion.

So at that point, it didn't seem to be something that was overly significant, from my point of view, in discussing the cause of death.

Q. Well, ultimately, it really doesn't matter, does it? Because you don't know whether the time of collection of a blood sample -- if it's too long -- you don't know how long is too long to wait to collect a cord blood sample to make it unreliable, do you?

A. What I know is that, in the postmortem setting, testing can be unreliable and is not validated. So from my perspective, as a Forensic Pathologist, we do not run testing or initiate testing on postmortem samples for things, like, electrolytes, blood gases, things like that, because they're not validated.

So from my perspective, if something is done in the postmortem period, then, I don't know how to interpret it.

Q. All right. I think we have established that you don't know when these blood -- this blood sample was drawn; isn't that true?

A. Well, from the testimony of Dr. Francis, and looking at the records, I don't know that she knows when it was done with confidence, so I don't know how I would know that, right, if

11:57AM she was the one who was there.
11:57AM Q. Right. You don't know how the delay or passage of time might affect blood gas results in this setting, do you?
11:57AM A. Specifically, I do not, no.
11:57AM Q. You told me at your deposition that you believe delay could cause this type of testing to make the results go up or go down or even both. Didn't you tell me that?
11:57AM A. I recall telling you that, and, yes, I believe that it's possible.
11:57AM Q. So you don't know what happened in this case, because they may have gone up, down or both; right?
11:57AM A. Correct, I don't know that any of us can know that.
11:58AM Q. But you also told me, as far as you know, you told me at your deposition, that a sample collected an hour and forty minutes after death may be accurate and may not be accurate. Isn't that what you said?
11:58AM A. Again, I think there's no specific way to know that.
11:58AM Q. All right. So just to sum this up, even though you agree blood pH, by itself, could indicate whether there was acidosis, and we have results that show the pH in an ideal -- in the range, your opinion would stay the same, even if we didn't have any of these lab results; correct?
11:58AM A. That is correct.
11:58AM Q. Now, it's your opinion that this baby died in utero; isn't it?

11:58AM A. It is my opinion, yes.
11:58AM Q. If the baby died in utero, you would expect to see abnormal cord gas values; right?
11:58AM A. I don't know that that's necessarily true.
11:59AM Q. Well, let's clarify what my understanding of your testimony was at Page 105, Line 18.
11:59AM "QUESTION: If the baby died in utero, would you expect to see abnormal cord gas values?
11:59AM "ANSWER: Certainly, that is a possibility, and in my opinion, it's likely that that would have happened because of the hypoxia. As I described before, they kind of go hand in hand. But based off the information we have, I can't speak to whether that was present or not."
11:59AM Did I read that correctly?
11:59AM A. Yes, you did.
11:59AM Q. And you don't know what the level or abnormal level of the cord blood gas would be, right, if the baby died in utero?
12:00PM A. You mean, could I predict what it would be? Is that what you mean?
12:00PM Q. Sorry, I didn't hear you.
12:00PM A. Are you asking me would I be able to predict what it would be, if the baby had died in utero?
12:00PM Q. Well, I asked you, Do you know what the level would be, the abnormal level would be, if the baby died in utero, and you didn't know; isn't that right?

A. Well, I don't think anybody can predict what the abnormal level would be, without running a test that actually gave you the level.
Q. Fair enough. Just to clarify, Page 106, my question was;
"QUESTION: What would you expect to see for the cord blood gas pH, if the baby had died in utero?
"ANSWER: I don't know what the specific level would be."
Is that right?
A. Yes, I believe that's what I also just said, right.
Q. Now, you've had training on how to interpret fetal heart rate tracings, and you had that training in medical school; right?
A. I did.
Q. On fetal heart tracings, there's no one specific type of tracing that could only be acidosis. Alterations in the tracing may indicate acidosis but may not be specific only for acidosis. I think we established that; right?
A. I believe you're reading my deposition answer back to me.
Q. Right. And you told me at your deposition that strips that show minimal variability may or may not indicate that there's an issue going on with the fetus. You told me that; correct?
A. You said tracings that show what?
Q. Minimal variability.
A. Yes, I believe I was explaining that may not be the only thing that could cause that.

12:01PM Q. Regarding reading fetal heart rate strips, you would say that you would leave that to the experts who reviewed this and see these patients to be able to describe the specific details of the fetal heart tracings; isn't that right?
12:01PM A. Yes, I believe that's what I said in my deposition. I do not pretend to be an OB-GYN or a neonatologist.
12:02PM Q. Exactly. You have a general understanding of how to read the strips, but as to interpretation of fine detail or if there's a specific question, you would leave that to someone who does that on a day-to-day basis; right?
12:02PM A. Yes, that's true. And I also read through the records where they did make interpretations of those findings.
12:02PM Q. Now, as for low APGAR scores, an APGAR of zero, hypoxic injury is not the only reason a baby can have an APGAR of zero; correct?
12:02PM A. I would say that's not the only reason, hypoxic injury, yes, that's not the only reason.
12:02PM Q. In fact, you are sure that there's a whole host of medical conditions that could cause low APGAR scores, and you would not say that hypoxia is the only cause of a very low APGAR score; right?
12:02PM A. Yes, we're not talking, specifically, about a zero, but low APGAR scores is what we were talking about, I believe.
12:03PM Q. From a scientific perspective, the testing of the cord blood gas values is more objective because APGAR scores are

12:03PM definitely a more subjective test; right?
12:03PM A. APGAR scores are more subjective, blood tests are more
12:03PM objective.
12:03PM Q. Now, you believe this baby died in utero, intrauterine
12:03PM fetal demise, you called it, but you recall that there wasn't
12:03PM an absence of fetal heart rate for the 10 minutes before
12:03PM delivery, you recall that; right?
12:03PM A. Yes.
12:03PM Q. But at your deposition, you told me only that something
12:03PM happened that caused the baby to die in those minutes just
12:03PM before delivery. Do you remember telling me that?
12:03PM A. I believe I do.
12:03PM Q. Now, you told me that, from your perspective, you don't
12:03PM just look at the laboratory values and make a decision about
12:03PM whether or not there's acidosis, I think you've repeated that
12:04PM here today; correct?
12:04PM A. Yes.
12:04PM Q. So let's look at some of those other records that you
12:04PM reviewed. If we could look at Exhibit J-2.175. I believe we can
12:04PM bring that up.
12:04PM Now, if you look towards the lower right, you see the
12:04PM number in bold, 128, and look below that, and you see the
12:04PM notation of Doppler, and just below that, you see 120 beats per
12:04PM minute. Do you see that?
12:04PM A. I don't think that I see that.

12:04PM Q. Look to the lower right, second column, moving to the left, the second column.
12:04PM A. So under the 0406?
12:04PM Q. No, move two columns to your right.
12:04PM A. Under the 0128?
12:04PM Q. Correct.
12:04PM A. Okay.
12:04PM Q. So you reviewed this record, this is a nursing flow sheet?
12:05PM A. Um-hum.
12:05PM Q. So at 1:28 a.m., which is just a few minutes before the 1:41 delivery, as you recall, at 1:28, the baby's heart was auscultated with a Doppler and measured 120 beats per minute. That's what this record reflects, doesn't it?
12:05PM A. Yes, correct.
12:05PM Q. Okay. Now, you also reviewed Exhibit J-2.65. I'm looking for what I want to show you. J-2.65. There should be a note here noting, live birth. I apologize, I'm not seeing it, I will have to come back to this one.
12:06PM Okay, move on to J-2.69. You reviewed this record that says, Assessment and Plan, Caesarean delivery delivered. Post neonatal demise at term. You reviewed that when you prepared your work in this case; right?
12:07PM A. Yes, I did.
12:07PM Q. Moving on to J-2.75. You see a reference here, another reference to neonatal demise; right?

12:07PM A. I do.
12:08PM Q. At J-2.185, we see another reference to neonatal demise.
12:09PM Neonatal bereavement, neonatal demise. Don't we?
12:09PM A. I see it, yes.
12:09PM Q. Let's look now at Exhibit J-4.1. Can you look in your
12:10PM exhibit book in front of you, J-4.1?
12:10PM A. Sure.
12:10PM MS. PARKER: I believe the Court has these in paper, as
12:10PM well. Thank you.
12:10PM BY MS. PARKER:
12:10PM Q. On that page, it notes a single live born infant, doesn't
12:10PM it?
12:10PM A. I'm just looking to try to find it. Yes, I see that on
12:10PM there.
12:10PM Q. All right, if you turn the pages to J-4, 4 and 5.
12:10PM A. Okay.
12:11PM Q. Do you see the note by Nurse Miranda Brandt?
12:11PM A. I do.
12:11PM Q. She records she was present at the delivery, and on Page
12:11PM 5, she records she obtained a heart rate of 30 with her
12:11PM stethoscope. Do you see that?
12:11PM A. What was the last thing you said?
12:11PM Q. She records a heart rate of 30 with her stethoscope.
12:11PM A. I see the description of her being there. I don't know
12:11PM that she's a nurse, but maybe she is. She's an RRT, I don't

know if that's a nurse or not. But I see that she was there, and I see that, further in the note, it says the heart rate of 30 obtained by stethoscope.

Q. Right, okay. And earlier, during your direct, you may recall, at Exhibit J-4.17, Ms. Olson showed you a log of the heart rate of the infant recorded at various times after delivery and before he was pronounced dead. Do you recall that?

A. Yes.

Q. Okay. Now, you reviewed all these records in forming your opinion, didn't you?

A. I did.

Q. You're telling us that it's your opinion that the baby died in utero, before delivery?

A. It is, for the reasons I previously described.

Q. Do you perform an autopsy on a subject who has a 30 beats per minute heart rate?

A. No, we perform autopsies on people who have been pronounced dead.

Q. To be more precise about your opinion, it's your opinion that the hypoxic event and the hypoxia did not manifest itself in clinical symptoms but manifested itself in the delivery process, and we have talked about that a few minutes ago.

So even though you told us that acidosis is an acidotic pH level, and this fetus did not manifest an acidotic pH level or any of those signs and symptoms of an acidotic pH level, an

injury was only apparent to you at delivery, that's what you're saying; correct?
A. So I don't believe I ever said that the baby and the mother did not manifest signs -- did not not manifest signs of acidosis or an acidotic pH level.
Q. Well, I mean, you did say that the baby didn't manifest itself in clinical symptoms, and I thought clinical symptoms, from your direct testimony today, included lab results?
A. So they do include lab results, but I am certain that I outlined other clinical symptoms that did indicate hypoxia in both the mother and the infant.
Q. But at your deposition, you told me the only sign of hypoxia and/or acidosis in utero for the baby that you point to is the baby dying in utero. Isn't that what you told me in your deposition?
A. If that's what's written in there, I think, again, it's probably taken out of the context of what I was talking about in the surrounding context.
Q. Well, we looked at this page a little bit ago, but, again, 132, starting with your answer to my prior question.
"It's my opinion that the baby suffered some hypoxic event during that time period, and that hypoxia, the hypoxia didn't manifest itself in clinical symptoms but manifested itself during the delivery process."
I asked you;

12:14PM "QUESTION: Manifested itself as what? In what way?
12:14PM "ANSWER: In the baby dying. So suffering enough hypoxia that the baby died and was born without any signs of life."
12:15PM A. So, again, in the context of what we're talking about, we're talking about right at the time that the baby is being delivered, not in the -- like, the way that I'm reading this is we're talking about what's going on and what clinical signs are there right at the time that the baby is dying.
12:15PM The baby is not hooked up to a fetal heart monitor, but baby was alive before the fetal heart monitor was taken away, and the baby was dead when it was pulled out of the uterus during C-section, so that's why I said something happened in that time period.
12:15PM But when we're talking about this and you're reading through this, you're neglecting my testimony and the information in my reports that talk about all of the signs prior to this that indicated hypoxia in the infant that I've listed out.
12:15PM Q. Well, you're not relying -- we will get to that. Now, when you considered whether there was acidosis in the fetus or the neonate, you considered all the medical records and results together, and you took them all together; correct?
12:16PM A. Yes.
12:16PM Q. But you told me, with regard to acidosis, in fact, I don't know that I can clearly define for you the definition of

acidosis, because, from your perspective, you don't just look at laboratory values and make a decision, you looked at everything; correct?
A. I looked at everything is correct.
Q. Now, let's look at some of those other records that you considered. Let's start with the autopsy report. And if you need to look at it, it's Exhibit J-7. You reviewed that report in forming your opinions; right?
A. Yes.
Q. And you're here to offer an opinion on cause of death; correct?
A. Correct.
Q. And to be clear, again, you did not perform this autopsy?
A. I did not.
Q. You perform autopsies as part of your current work; correct?
A. I do, yes.
Q. And autopsies -- you're testifying as an expert in the field of Forensic Pathology, autopsies; right?
A. Autopsies, cause of death, mechanism of death, yes.
Q. But acidosis is not something that, typically, can be identified at autopsy, is it?
A. We, typically, do not even try to identify that, as we have been talking about.
Q. Umbilical cord blood gas analysis is not part of an

autopsy; correct? In fact, you testified this morning that you frequently don't have those results.
A. Correct, and I believe, as I testified in the deposition, that's something that would be done at the hospital around the time of delivery, and if I were to have access to those results, it would be through the medical record.
Q. And you do not order cord blood gas testing, as part of your job, do you?
A. I do not.
Q. You do agree that there are genetic disorders that cannot be discerned, simply, by signs and symptoms; right?
A. Well, sometimes, the sign or symptom is sudden death, so I would say that they have signs and symptoms, sometimes, it's just not that they survive the sign or symptom.
Q. In fact, limb contractures, as we have discussed, can be a sign of a genetic disorder syndrome, can't they?
A. It may it may not.
Q. Limb contractures can be caused by some genetic conditions; right?
A. They can be associated with some genetic conditions.
Q. What's the difference?
A. The condition doesn't necessarily cause the contracture, you may just have two clinical signs that are associated with a genetic process.
Q. They indicate that there's a genetic process going on,

12:18PM they're indicators?
12:18PM A. They may, right, so when you look at all of the findings, there may be ones that are very specific for a genetic condition, there may be some that could be, may not be, or may just be a finding, in and of themselves.
12:19PM Q. And limb contractures fall in that category?
12:19PM A. They can be part of a broad spectrum of a finding to associate it with a genetic condition.
12:19PM Q. All right, now, referring to the autopsy report, you agree that the limb contractures are there on the autopsy report, but you don't know why they are there, do you?
12:19PM A. I'm not disagreeing that they're there, I certainly did not evaluate the baby, right, so I didn't make an independent assessment of that, and I have no reason to believe that the Autopsy Pathologist incorrectly assessed limb contractures.
12:19PM Q. But my question is, you don't know why those limb contractures are there, do you?
12:19PM A. You mean, if there's a specific cause that's leading to them? I mean, we discussed earlier that it could be from hypoxia. You know, you can see limb contractures from that, and that there are -- it could just be a finding or it could be associated with other conditions.
12:20PM Q. Okay, let me make sure I understand, because, at your deposition, on Page 70, I asked you;
12:20PM "QUESTION: I think I asked you this, but they're there,

12:20PM but we don't know why they're there, is that right?
12:20PM "ANSWER: Based off of my review, we don't have a specific -- a specific reason for why they're there."
12:20PM Did I read that correctly?
12:20PM A. Yes, I don't believe that's inconsistent with the answer I just gave you.
12:20PM Q. No, I don't, either, but I heard you on direct say those contractures were caused by hypoxia. That was news to me.
12:20PM A. I believe I said that they could be a sign of hypoxia, and we discussed that at some length.
12:20PM Q. We did discuss it at some length, so I definitely want to clarify that I understood you correctly, today, that hypoxia possibly could be -- excuse me -- the contractures could, possibly, be a sign of hypoxia. Is that your testimony?
12:21PM A. Yes, they can.
12:21PM Q. As for the Hirschsprung's Disease, it's caused by a failure of nerve cells to move along the GI tract, during embryonic development; correct?
12:21PM A. Yes.
12:21PM Q. And you believe that it could be caused by a genetic issue, but in most cases, you told me it is -- your word was sporadic. Do you remember that?
12:21PM A. Yes.
12:21PM Q. When you say, sporadic, you told me, what you mean by that is just a mutation or abnormality or lack of correct

12:21PM development that occurs because it occurs. It is an unknown reason why it occurs. Isn't that what you testified to?

A. I believe so, yes.

Q. As for the non-floating lungs that the pathologist noted, the hypoxia that you have talked about, they didn't cause -- the hypoxia did not cause overly significant changes to the baby's lungs, did it?

A. In my opinion and experience, no, it didn't.

Q. Now, you found the autopsy performed in this case to be thorough and complete; right?

A. Yes, I believe that's what I testified to in my deposition.

Q. You disagree, though, with the causes of death on the death certificate, don't you?

A. I do, but that had nothing to do with the autopsy. I mean, the Autopsy Pathologist didn't determine the cause of death.

Q. Understood. So you don't disagree that the pathologist who performed the autopsy found the conditions noted in his report, you just disagree with what the Medical Examiner stated were the causes of death; correct?

A. So I agree with the findings, as outlined in the autopsy report, as findings. I disagree with the opinion that whoever filled out the death certificate generated as the cause of death.

Q. Now, hypoxic injury does not cause Hirschsprung's Disease,

does it?
A. To my knowledge, no, it does not.
Q. Genetic disorders are not caused by hypoxic injury, are they?
A. No.
Q. Since we don't know or you don't know why the limb contractures are there, you can't say that they were caused by hypoxic injury, can you?
A. I can't say that they were certainly caused by hypoxic injury, put into the context of what was going on and the fact that this baby, in my opinion, did experience hypoxic injury. It's my opinion that that is high on the list for a possibility of why the baby had contractures.
Q. Now, in your opinion, the baby's brain was irreversibly damaged by the low amounts of oxygen in utero, you called it hypoxic injury of the brain, in your deposition, that resulted in the baby's heart stopping and his being unable to be resuscitated. Isn't that your opinion?
A. Yes, that is correct.
Q. Okay. For that to happen, the irreversible brain damage, and I think you discussed it this morning, the baby would have to have hypoxic injury or hypoxia, for a prolonged period of time, where the hypoxia was actually causing damage to the nerves in the brain or the neurons in the brain; correct?
A. Yes, that is correct.

Q. You would have to have hypoxia to the point of causing damage, and that would have to last for a period of time, while the baby is still alive or being sufficiently resuscitated; right?
A. Can you repeat that one more time?
Q. You would have to have hypoxia to the point of causing damage to the brain, and that would have to last for a period of time while the baby is still alive or is being sufficiently resuscitated; correct? And I'm getting at, for it to be evident at autopsy?
A. No, and that's what I was wondering if you were getting at, which is why I wanted to understand. So it's not the period of time over which there's the decrease of the oxygen or even the period of time where there's a lack of oxygen to see the changes, it's the resultant resuscitation and re-application of blood to the brain for those changes to be seen.
Q. Well, I misunderstood you this morning. I thought you testified that it was the progressive hypoxia that was going on for hours, for a prolonged period of time, over this prolonged induction and labor that was depleting the fetus that it reached the point of death right at the delivery time. Did I misunderstand you?
A. You did understand what I was saying, that is correct. So what I was testifying to is that, over a period of time, there was decreased levels of oxygen, right, over a prolonged period

of time, which got to a critical level where the baby then stopped breathing and, essentially, died inside the uterus before the baby was pulled out of the uterus during the C-section. So it's during that time that there is that decrease in oxygen, but that does not mean that you will be able to see those results, at the time of autopsy.

Q. So we have irreversible brain damage, but we can't see it on autopsy? Irreversible brain damage caused by hours and hours of induction of labor, couple of days, I think, you mentioned today, and yet we can't see it on autopsy, is that right? Is that what you're saying?

A. Well, first of all, what I had testified to is that beginning at the point of the prolonged deceleration around 7:40 or so in the evening, before the delivery, that is when -- I'm not saying there weren't decelerations and signs of hypoxia before that, but the prolonged period, where there's this step-wise decrease began around that period, so that's not days and days, right, that's hours before the delivery occurred. That's the time period that I was talking about with that.

And that process occurred during that period of time and got to a critical level. And the reason that the baby couldn't be resuscitated is because it had suffered enough damage to its brain, otherwise, with all of the resuscitation efforts, they would have able to revive the baby, but they weren't able to do

it. So there had to have been damage to the baby's brain that kept it from being resuscitated.

Q. Right, but the bottom line is, we can't see it. Right?

A. That is correct. But like I explained, when I perform autopsies, there's a lot of causes of death that you can't physically see, at the time of autopsy, and you have to piece together all of the findings, the witness statements, the behaviors beforehand, the medical records beforehand, in order to generate that cause of death and to explain, mechanistically, what went on inside that person's body that caused them to die.

There's not always something you can see with your eyes and something that you can see under the microscope that tells you this is the exact pathologic process, because the body takes time to develop those changes and to see those changes. And if the baby had lived for hours or days, then, the baby would have manifested changes of hypoxia, and we would have been able to see those.

Q. All right, well, let me just sum up. You found the autopsy done in this case to be thorough and complete; right?

A. I did.

Q. You don't disagree that the Pathologist found the conditions that he noted, limb contractures, possible Hirschsprung's Disease, abnormal cells, non-floating lungs and genetic syndromes that could cause these conditions, you just

disagree with the Medical Examiner's conclusion of the causes of death; correct?

A. So I don't believe that the Autopsy Pathologist was saying that he believed those conditions were caused by those genetic conditions, he was saying that you can see those findings and those conditions, but in his opinion, they were less significant or less pronounced than what he would expect if there had been an underlying condition.

Q. All right. So according to you, we have brain damage that we can't see, we have acidosis that we can't see, because we have to reject those normal pH values from the lab results, and we have fetal heart tracings that are not definitive for acidosis, and we have APGAR scores that could indicate a whole host of conditions that are not acidosis, that pretty well sums it up, doesn't it?

A. Well, you're leaving out the clinical signs and symptoms and the treatment that the medical professionals who were treating Ms. Gharbi had her perform and the actions that they took, with starting her medications to progress her labor, stopping them because of decelerations, giving her fluids, having her move position, so you're taking this stuff out of the context of the other findings that were going on and the other actions that the medical professionals who were treating her felt necessary to undergo, because they saw the fetal tracings as concerning for hypoxia and acidosis, right, so it's

not just me saying that I'm concerned, right, they agreed that these were concerning, they stopped medications, they started medications, they documented in the medical records, they had her change positions, they gave her fluids, they decided to go to a C-section, right, and all of these things that they were identifying, as well, not just me, so I'm not making this up out of nowhere, right.

I'm agreeing with the findings that they have documented in their records that these were significant noted findings that were occurring, during the course of her progress.

Q. So they did all this for her and her baby, the baby ultimately died, could not be resuscitated, and that sums it up, doesn't it?

A. I mean, yes, the baby died, unfortunately, yes.

MS. PARKER: Thank you.

THE COURT: Redirect?

MS. OLSON: Just a few quick questions.

REDIRECT EXAMINATION

BY MS. OLSON:

Q. Dr. Hammers, there's been some discussions about the acidosis and pH values and lab values and stuff. A venous sample, is that an ideal sample for even looking at cord gases?

A. In my understanding, it's best to have an arterial sample and a venous sample to be able to look at those, compare both of those, and to identify the differences in them and what

12:32PM might be going on.

12:32PM Again, the purpose of using those samples is not so much from a postmortem perspective, but it's from a treatment and clinical perspective, so the doctor is trying to understand what might be causing these levels to be abnormal or normal and what do they want to do to try to correct them.

12:32PM Q. In this case, the hospital didn't do an arterial sample, in order to get a better assessment of the gas results, is that right?

12:32PM A. My recollection is that they collected the sample, but for some reason, it wasn't run. That's my recollection, but I'm not 100 percent sure, without going back to the record.

12:32PM Q. If the testimony indicates it's venous only, they didn't do arterial, what's the significance of not having done an arterial?

12:32PM A. I would just say that the results would have been suboptimal for their interpretation and the purposes of actually treating the baby.

12:33PM Q. Now, since the baby died in utero, at some point in time, would any collection of blood, after he was pulled out of the uterus, be considered, essentially, a postmortem sampling?

12:33PM A. I suppose you could sort of consider it that, although, the baby is still connected to the placenta and the mother, so I don't know that I would write it off and say that this is necessarily a postmortem sample.

Q. In this case, the clinical signs and symptoms you talked about, prior to delivery, as you read the records, all the entirety of the records, were there indications by hospital staff people for that six-hour period of time, between the 14-minute deceleration to the delivery six hours later, their interpretation, was that in the record, in terms of minimum variability and decelerations?

A. Yes, my recollection is that it is that they did make interpretations of those fetal tracings.

Q. Was that consistent with your own assessment, as you reviewed the records in the case?

A. Yes.

Q. Did these interpretations by the hospital staff who indicated the minimal deceleration and the decelerations during that six-hour period of time, did that further confirm the fact that the baby was suffering from the effects of hypoxia and acidosis?

A. In my opinion, yes, it did.

MS. OLSON: That's all I have. And were all your opinions, again, to a reasonable degree of medical certainty?

THE WITNESS: Yes.

MS. OLSON: Thank you, Doctor.

THE COURT: Any recross?

MS. PARKER: No, Your Honor.

THE COURT: Thank you, Dr. Hammers. You can step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: It's 12:32. You have someone via video conference?

MS. OLSON: Yes, I do, I have the economist at 1:30. I don't know if the Court intends to proceed, I can put one of the Plaintiffs on, or whether we break?

THE COURT: I think this is an appropriate time to take a break. I think everyone could use one. I know you want to call Mrs. Gharbi. Do you have a sense of how long her testimony would be?

MS. OLSON: For each of the Plaintiffs, perhaps, an hour each.

THE COURT: Let's take our break right now and we will reconvene at 1:30.

(At this time a luncheon recess was taken.)

THE COURT: Ms. Olson, call your next witness.

MS. OLSON: We will call Royal Bunin who will be available via live Zoom testimony.

R O Y A L B U N I N, B. B. A., M. B. A. IS CALLED VIA ZOOM, AND HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MS. OLSON:

Q. Good afternoon, Mr. Bunin. For the record, please, state your name and occupation.

A. Yes, Royal Bunin, I am a Forensic Economist.

Q. What is a Forensic Economist?
A. A Forensic Economist is a person trained in economics, statistics, mathematics, actuarial science and finance, and it would be his or her job to determine the amount of money needed today to provide for things in the future.
One of the things I'm often called upon to do is calculate something called, loss of earning capacity, which would be the amount of money a person could have earned over their lifetime, had they not been killed or injured in an accident.
Q. Did you provide me a copy of your CV, indicating your education and training and so forth?
A. Yes, I did.
Q. We do have copies here that were premarked as Exhibit P-3 of which I'd like to introduce as evidence.
MS. PARKER: I have no objection, Your Honor.
THE COURT: Exhibit P-3 is admitted.
MS. OLSON: Thank you, Your Honor.
(At this time Plaintiff's Exhibit No. 3 was admitted into evidence.)
BY MS. OLSON:
Q. Tell us a little about your educational background.
A. Yes, I have a Bachelor's of Business Administration Cum Laude from Temple University, where I majored in Economics and minored in Mathematical Statistics, obtained that in 1988. Then I continued with my studies at Temple, and I obtained an M.B.A.

in 1990, and since then, I had completed 30 additional credits at Temple, eight courses were in the Graduate Economic Department.

Q. I'm sorry, for the record, your CV was P-23, if I said P-3, I apologize. It was P-23.

THE COURT: Let the record reflect that the exhibit is properly P-23.

MS. OLSON: Thank you.

BY MS. OLSON:

Q. Can you, also, tell us a little about your employment experience, your employment history?

A. Yes. I began working in my father's firm, Bunin Associates, May 1, 1983, and I became a general partner January 1, 1997. My partner retired in 2012.

I also had two teaching positions over the years. I taught at Temple University for 11 years and Rowan University for one semester.

Q. Do you belong to any professional societies?

A. Yes. The American Economics Association, The National Association of Forensic Economics, The American Academy of Economic and Financial Experts, and I'm also a lifetime member of Temple Alumni.

Q. Now, in your, I guess it would be, thirty-some years experience or forty-some years experience as a Forensic Economist, do you have familiarity and expertise in evaluating

earnings capacity?
A. Yes.
Q. Do you have expertise in ascertaining work life expectancy?
A. Yes.
Q. Are you, also, knowledgeable about work loss evaluations?
A. Yes.
Q. Are you familiar with evaluating fringe benefits?
A. Yes.
Q. Are you, also, familiar with future lost earnings capacity and how that's determined?
A. Yes.
Q. Are you familiar with present value future earnings?
A. Yes.
Q. Can you tell us what number of work loss evaluations you have performed over the course of your career, if that's possible?
A. I would say, thousands. Recently, before COVID, it was about 200 cases a year. Back in the '90s, we were doing, maybe, 500 cases a year, but there was myself, another partner and my father.
Q. Have you been qualified as an Expert Forensic Economist and actuary in both State and Federal Courts?
A. Yes, I have.
Q. Have you come to court today prepared to render opinions

as to the loss of earning capacity and fringe benefits that are relative to the deceased Baby Gharbi?

A. Yes.

MS. OLSON: At this time, I'd like to offer Royal Bunin as an Actuarial and Forensic Economic expert.

MS. PARKER: I have no objection, Your Honor.

THE COURT: Mr. Bunin is so admitted.

BY MS. OLSON:

Q. Now, before we discuss your actual opinion, can you tell us what you have to do, in order to make an economic damage evaluation, as you did in this case? What do you consider?

A. Yes, I reviewed background information. For this case, I had the Answers to Interrogatories, the deposition, the complaint. Initially, I had the complaint, and I reviewed Governmental statistics, and I prepared an analysis on different levels of educational attainment, meaning, that educational attainment is a good predictor of earning capacity.

Q. In your effort to come up with what you felt would be a reasonable determination of the losses in this case, did you actually speak with, either, Mr. or Mrs. Gharbi?

A. Yes, I did, I spoke with Mr. Gharbi on the telephone.

Q. What was the purpose of that?

A. In order to get some background information on his education, what he wanted for his son, he wanted his son to go to college, to be, at least, as good as him or better than him,

how his society's religion affects his family, the close-knit family, he anticipated his son would have married, and he would have had children.

Q. Did you present your economic analysis regarding this child's loss of earning capacity and fringe benefits in three separate reports to me?

A. Yes.

Q. Was one of the reports April 8, 2020 that we have marked as P-20, a second one November 27, 2020 we marked as P-21 and a third report dated November 30, 2020 that we marked as P-22?

A. Yes.

MS. OLSON: I'd like to seek admission of those reports.

THE COURT: Ms. Parker?

MS. PARKER: No objection, Your Honor.

THE COURT: Plaintiff's 20, 21, 22 are admitted without objection.

MS. OLSON: Thank you, Your Honor.

(At this time Plaintiff's Exhibit Nos. 20-22 were admitted into evidence.)

BY MS. OLSON:

Q. So in this individual case, can you just lead us through, and if you need to reference your first report and then subsequently your second report, that's fine, but what it was that you actually did in this case, in order to render your actuarial and economic damage evaluation for E.G. in this case?

A. Yes, I had background information on the parents, on Mr. and Mrs. Gharbi, their educational attainment, their dates of birth, their age, and the date of birth and death of their son. From there, I was able to calculate life expectancy, when he would have entered school, the work life expectancy, then I used Governmental statistics to calculate the present value of lifetime earnings.
Q. Okay. Can you tell us how it is that you actually estimate an individual's work life expectancy?
A. Yes, that would be the number of years that a person, potentially, would be in the labor market, measured as the number of years from the entrance into the labor market until a reasonable retirement age.
In this situation, I used age 62, which is the earliest age a person can begin to receive Social Security Retirement. Age 67, the age at which a person can maximize their Social Security Retirement benefits, and age 70, which is the age that you can maximize your benefits, and the age that you, also, have to begin taking individual retirement benefits from an account you may have.
Q. Can you tell us how you actually estimate an individual's future lost earning capacity?
A. Yes, I start with the entry level earnings from Governmental statistics that reflects the entry level earnings for a male with, either, a high school diploma, Associate's

degree, Bachelor's degree or Master's degree. And I looked at two different sets of numbers, one was for all workers, and one would be a subset of that which would be full-time, year-round workers.

So the first set would take into account people who didn't work full time every year and would account for somebody not working continuously from retirement. From there, I allowed for increases, due to inflation and productivity. I used a projected inflation rate of 2.5 percent, and productivity came from the work earnings table -- I'm sorry -- the age earnings table that the Census Bureau puts out. So in other words, each year, the earnings would go up, and so then I'm able to calculate an average productivity factor.

The last step, then, to calculate the present value of that stream of income, using a reasonable risk-related return that an investor could obtain on a secure investment.

Q. In order to arrive at your opinion, did you have to determine the individual's life expectancy?

A. Yes.

Q. Why and how do you do that?

A. I measured the life expectancy, because, in some situations, a calculation is made over a person's lifetime. Also, to show that the statistical analysis shows a person would live longer than they would work. In other words, the life expectancy for this individual, an infant, according to

the 2017 U.S. Life Tables was 76.1 years. That would be the average life expectancy.

Q. Now, what we can do is I'd like to actually get your assessment of the facts and assumptions that you made in this case, when you determined your opinions.

So if we need to put up any portion of your first report, we can actually take a look at the different levels that you determined from high school, ranging up to increased degrees.

Is there any page that you have on your report of April 8, 2020 that would help us ascertain your total findings, your summarized findings in this case?

A. Yes, Page P-20.6.

Q. We're going to put that up on the screen, okay.

A. Right. Go to the lower part, where it just has those -- the education and the numbers, so this is where I'm starting from.

A loss of 25,000 up to 34,000 with high school, at the lower end, 35,000 to 52,000 starting with an Associate's degree. With a Bachelor's degree, doesn't look like it's that much better starting off, but the projection is a lot higher with a Bachelor's degree, and then the last two rows shows starting numbers for a Master's degree.

Now, those numbers would occur in the future, and those numbers are also reduced to present value today. Also, those numbers, when you look at the chart, increase dramatically over

a person's working lifetime.
Q. As we go on to the next page, for this portion here, future lost earning capacity that you put on this page of your report, is that to a reasonable degree of economic certainty, these numbers?
A. Yes.
Q. So let's move on, then, next to what would be, I guess, would you look at -- is it personal maintenance or what would be next in your evaluation?
A. Another would be 20.8, just two more pages. Here, it just shows these are the productivity factors. The increase, with a Bachelor's degree is higher than the increase with the Associate's degree. As in the last chart, it showed that the numbers were pretty much starting out the same, but with a Bachelor's degree, a person's earnings increase a lot more over their working lifetime.
The next page would be -- the next one -- if you went to the next one, this would be the present value of the future lost earnings before the deduction for personal maintenance expenses.
Q. Were these figures to a reasonable degree of economic certainty?
A. Yes. And they are, also, the same numbers as the Defense report that I reviewed, except the Master's degree is not included at age 70, but the total numbers were the same, the

maintenance was different, that's why my numbers were different than the report from the Defense expert.
Q. So tell me about the personal maintenance expenses that you were able to ascertain in this case, how you did that?
A. That's on the next page, if you went to P-20.10. So in the middle where it has the -- yes, in the middle, those would be the percentages of the income or earnings, rather, that I deducted for personal maintenance expenses, the necessary and economic expenses one would spend on themselves for food, clothing, shelter, recreation and health care.
Q. Are those -- go ahead, I'm sorry.
A. They decrease, as a percent of income, because the income is increasing. But the overall dollar amount increases as your income increases.
In other words, a Master's degree is earning a lot more than a high school education, then, likewise, the Bachelor's degree is earning more than a high school education, so it's a smaller percent but still a bigger dollar amount. It's a smaller percent of a bigger number.
Q. Were these personal maintenance expenses that you ascertained in this case to a reasonable degree of economic certainty
A. Yes.
Q. Let's talk a little bit about fringe benefits, which I think is on your next page. Can you tell me about that?

A. Fringe benefits would be those things that a worker would receive besides their take-home pay, and it would include health care and retirement. Governmental statistics indicate that the average value of an employee's fringe benefits ranges from 20 to 30 percent of the gross earnings.

I used the lower end of the scale, 20 percent, to measure the lost fringe benefits.

Q. Was that your opinion to a reasonable degree of economic certainty?

A. Yes.

Q. So next, if we can look at your summary, which we will start with the next page, Page 20.12, tell us what your -- the value of the net future lost earning potential that you arrived at, present value and including lost fringe benefits, what did you arrive at for Baby E.G.'s economic loss, starting with high school?

A. Starting with high school, retirement at age 62, using the statistics for all workers, the total is $825,361, and using the statistics for all workers is $994,507.

Working five additional years to age 67, the losses would range from $946,818 to $1,117,053 using statistics for all workers. And based upon retirement at age 70, using the statistics for all workers, the net loss would be $1,022,825. Using statistics for all workers, the number would be $1,191,437 based upon full-time workers.

Q. Based on the information that you learned about the Gharbis and the family, was it reasonable to conclude that this child -- that a high school diploma was appropriate, in terms of determining that loss economic loss?
A. Yes.
Q. Was this your opinion to a reasonable degree of economic certainty?
A. Yes.
Q. Let's move on to the next page, which is 20.13. Were these numbers, then, with consideration of an Associate's degree?
A. Yes.
Q. Was it reasonable for you to include, based on what you learned in this case, that the child would have advanced with, at least, an Associate's degree?
A. Yes.
Q. Can you tell us what those -- what that economic loss would be for an Associate's degree?
A. Yes, based upon retirement at age 62, the present value of the lost earnings and fringe benefits would range from $1,049,805 to $1,232,773.
To age 67, losses would range from $1,197,067 to $1,370,173.
To age 70, the present value of the lost earnings and fringe benefits would range from $1,287,812 to $1,451,048.
Q. Continuing on the next page, did you also include what the

economic loss would be for an advanced degree, such as a Bachelor's degree?

A. Yes.

Q. Did you feel that, based on the information you learned, that it would be reasonable to include economic loss for this child, using a Bachelor's degree?

A. Yes.

Q. Can you tell us what those results are, then, for a Bachelor's degree?

A. Retirement at age 62, the total loss would be $1,423,149 using statistic for all workers and $1,674,522 for full-time workers.

Based upon retirement at age 67, the range would be $1,687,245 to $1,935,169.

Based upon retirement at age 70, present value of the net losses would range from $1,857,586 to $2,097,640.

Q. Was that your opinion to a reasonable degree of economic certainty?

A. Yes.

Q. Did you, also, then, consider the possibility that, perhaps, this child would have advanced to a Master's degree?

A. Yes.

Q. Was this based on your having discussions with the Gharbi's, Ben Gharbi, concerning a variety of things that led you to that inclusion of that advanced degree?

A. Yes.
Q. Can you tell us, then, what would have been the economic loss with an advanced degree, such as a Master's?
A. Retirement at age 62, the loss would range from $2,084,477 to $2,276,083.
Based upon retirement at age 67, the losses would range from $2,398,148 to $2,632,080.
And based upon retirement at age 70, the losses would range from $2,590,749 to $2,852,325.
Q. Was that your opinion to a reasonable degree of economic certainty?
A. Yes.
Q. Now, you also said you read the Defense report of the economic expert Chad Staller. Is that right?
A. Yes.
Q. You reference certain -- you made certain comments in your supplemental report of November 27, 2020, P-21, regarding Mr. Staller's findings; correct?
A. Yes.
Q. Now, did Mr. Staller include in his economic evaluation the potential for the Gharbi's baby to attain a Master's degree?
A. No, he had the numbers but not the actual projection.
Q. Was it reasonable to include attainment of a Master's degree?

A. Yes.
Q. Did Mr. Staller's report include calculation of losses to include up to the age of 70?
A. No.
Q. Was it reasonable to include losses to age 70, such as you did?
A. Yes.
Q. Why would it be reasonable to include ages up to 70?
A. People are working longer, statistics indicate that the number of people who are working at advanced ages has increased over the years. I was asked at my deposition if I knew the numbers, and I didn't have them readily offhand.
This past summer, I actually did some research, and I noticed that during the pandemic, labor force -- the number of people working decreased, between 2018 and 2020, you know, with COVID, it decreased about five percent, but it increased for people 65 years of age and older. There's actually more people working in those two time periods.
I looked at the rate of increase from 1995 to 2000, and while the labor force increased, maybe, 25 percent, it was close to 150 percent for older people. And, then, when I looked between 1980 and 2000 -- and '80 is a good year, because that's when all the baby boomers would already be working, if you were born in 1946, you would be, at least, 16 and of working age by 1980 -- and the increase in the labor force for people 65 and

over was 247 percent, while it increased for everybody at 55 percent, so it was a big increase, 55 percent working, but a lot bigger increase for older people, from about three million to 10 million individuals.

Q. All right. In Mr. Staller's calculation of economic losses, did he include the value of lost health care coverage and estimating lost fringe benefits?

A. No.

Q. Should that have been? Is it reasonable to include that in estimating loss?

A. My understanding of the damages, as the chart says, that total compensation including fringe benefits less probable cost of maintenance. So it includes the value of the health coverage.

Q. In Mr. Staller's projection of lost fringe benefits, he was 5 percent, you were 20 percent. How did you compare with that percentage in fringe benefits loss?

A. Mine included health coverage and retirement and other benefits that an employee would receive, and I believe Mr. Staller was using the value of health coverage as a percent of total compensation and not as a percent of income. So it kind of skews it down just a smidgen.

Q. In his report, did the Defense economist assume that the Gharbi's child would be single his entire work life, when he estimated personal maintenance expenses?

01:56PM A. Yes, he prepared a chart, and the chart was based upon a person who would be single, and that gave the range of the personal maintenance expenses in his report, on P-35.5, All workers, it says, 77.16 high school to 73.23, and these came from the table reference that was for a single individual.

01:57PM If you take his actual numbers that he presents and just beck out the maintenance, you get the same number I calculated, in terms of the lifetime earnings. So both Mr. Staller and I calculated the same value of lifetime earnings, it's just that he took away a bigger percent to account for an individual being single, where I accounted for the individual being in a typical family, using the maintenance attributed to that particular level of income and education.

01:57PM Q. Was it reasonable to consider that an individual would marry and have a family, particularly, after discussing the circumstances in this case with Mr. Gharbi?

01:58PM A. Yes, and if I'm going to use statistics that's based upon all males, then, I really can't then turn around and say, Here's the maintenance for a person who is single, because the statistics are based upon all males, those who are single and those who are not.

01:58PM And statistics indicate about 18 percent of all families that would have, at least, one male adult were single, the rest, 82, would be in some kind of family unit.

01:58PM Q. In summary, Mr. Bunin, were all the figures that you

01:58PM stated in your reports accurate and based on figures that are published by The U.S. Department of Labor and The Bureau of Labor Statistics?

01:58PM A. Yes, and the Census Bureau.

01:58PM Q. And have you expressed all of these figures in your opinions to a reasonable degree of economic certainty?

01:58PM A. Yes.

01:58PM MS. OLSON: Thank you. That's all I have.

01:58PM THE COURT: Cross-examine?

01:58PM MS. PARKER: Thank you, Your Honor.

01:59PM CROSS EXAMINATION

01:59PM BY MS. PARKER:

01:59PM Q. Good afternoon, Mr. Bunin.

01:59PM A. Good afternoon.

01:59PM Q. Are you ready to proceed?

01:59PM A. Yes.

01:59PM Q. You've given us your opinion on loss of earning capacity and fringe benefits of the baby; correct?

01:59PM A. Yes.

01:59PM Q. You give a few educational scenarios in your report and opinion, and I'd like to explore those a little bit. Let's look at the percentages of people who obtain a high school education in America.

01:59PM Now, at your deposition, you told me that percentage is 89 percent; correct?

A. Yes.
Q. And isn't it true that you told me that 33 percent of Americans attain a Bachelor's degree or higher?
A. I may have, but what one would do is look at that Table 1 that we were talking about and just look at the education of Bachelor's and higher and compare that to the total number of people, and that would give you the percent.
Q. Well, I'm looking at your deposition, and if you don't mind, could we just refer to that, and I'm going to direct your attention to Page 53, Line 24.
A. Okay.
Q. I'm referring to your telling me -- and here's the question;
"QUESTION: How many -- what percentage get a college degree?"
And your answer;
"ANSWER: Any college degree? Associate's, Bachelor's, Master's or --
"QUESTION: Bachelor's.
"ANSWER: A third of the population would have, at least, a Bachelor's degree. Having a Bachelor's degree and nothing more than that would be 21 percent."
So I understood you to say that 33 percent of Americans attain a Bachelor's degree or higher. Did I misunderstand you?
A. I don't have the numbers that I worked out, but I believe

02:01PM that would be correct.
02:01PM Q. So according to your testimony in your report, more people in America attain a high school degree than attain a Bachelor's or more; right?
02:01PM A. Yes, yes.
02:01PM Q. So isn't it true that, according to your report and your figures, in America, less than half the people attain a Bachelor's degree or more; right?
02:01PM A. Right.
02:01PM Q. And according to your figures, the percentage of people who attain a Master's degree and nothing higher is just nine percent; right?
02:01PM A. Correct, just the Master's.
02:01PM Q. Nine percent of the population has a Master's and nothing higher; right?
02:01PM A. Correct.
02:01PM Q. And in your deposition, you told me that, on average, the probability of someone getting a Master's is 10 percent; correct?
02:01PM A. Correct.
02:01PM Q. And in your analysis, you did not factor in the cost of Baby E.G. attaining a Master's, did you?
02:02PM A. No, I did not.
02:02PM Q. All right. Now, we have talked about your deduction for personal maintenance expenses; right?

02:02PM A. Yes.
02:02PM Q. And you presented different percentages of the total earnings for different educational attainment levels to account for the personal maintenance; correct?
02:02PM A. That is correct.
02:02PM Q. You presented percentages for all workers and then just for full-time workers; correct?
02:02PM A. That is correct.
02:02PM Q. You present eight scenarios of personal maintenance percentages that, in your opinion, may apply; right?
02:02PM A. That is correct.
02:02PM Q. All right. Let's look at one of your reports, it's actually your April 8 report on Page 4. So let's look at some of the scenarios that you worked up.
02:03PM In this table, on Page 4, you present a full-time worker with a high school degree earning $33,960 per year; correct?
02:03PM A. 33,962, that is correct.
02:03PM Q. All right. And, then, if we look at Page 8 of the same report, which is the table that reflects personal maintenance expenses, for that person who attains a high school diploma, 40 percent of the $33,962 is personal maintenance expenses. And 40 percent of $33,962 is, approximately, $13,600; right?
02:04PM A. The math is correct, but this is the average percentages, because what's happening is that the earnings are increasing every year, and so because the earnings are increasing every

02:04PM year, the percent of maintenance decreases. So at the earlier age, it's a higher percent when the earnings are lower, and when the earnings are higher, it's a lower percent.

02:04PM And the same is true when you look at Mr. Staller's report, he has high school going to 62 at 77 percent and to 67 at 74 percent. Why that decrease? Well, that's because those last couple years, a person is making more money, and that's what reduces the maintenance.

02:04PM Q. I think I understand what you're saying, but my question is a little bit more narrow than that. I'm looking at your 1, I guess, I'm looking at that year when that person is earning $33,962, and you're deducting 40 percent of that as personal maintenance, which is about $13,600, and that would be the personal maintenance for that person for that year, correct, so that that person -- and that person with a high school degree, at that point, earning $33,962, after deducting for all the personal maintenance, that person has $20,400 left over, which we can call discretionary spending or savings. Would you agree?

02:05PM A. That would be what they didn't spend on themselves.

02:05PM Q. Okay. Let's talk about personal maintenance. It includes a number of expenses, just so we are all clear, it includes housing, which is rent or mortgage; right?

02:05PM A. Right.

02:05PM Q. It includes food; right?

02:05PM A. Right.

02:05PM Q. It includes clothing?
02:06PM A. Right.
02:06PM Q. It includes your transportation, whether it's a car or bus or whatever; right?
02:06PM A. That is correct.
02:06PM Q. And it includes personal health care expenses; right?
02:06PM A. Correct.
02:06PM Q. And it, also, includes things like utilities, your electric bill; right?
02:06PM A. That is correct.
02:06PM Q. The stove and the cell phone and the cable TV; right?
02:06PM A. Exactly.
02:06PM Q. Okay, so, again, I'm just trying to play out and envision this scenario that you've presented. Someone is earning $33,962, they deduct 40 percent of that, $13,600 to pay for all these things we listed, and that means they have $20,400 left over; right?
02:06PM A. It's not exactly that, because this is the average percent. In other words, it will be a higher percent when he starts working out at $33,000, then, it's going to be a lower percent when the earnings are a lot higher, when he's later working in the later years of his life, when it's close to like 80, 90,000. That's why it's the average of 40 over entire working lifetime.
02:07PM Q. I think you include all that in your report. Again, I just

02:07PM wanted to ask you for that one narrow question, I just wanted that example, thank you.

02:07PM Now, in your opinion of personal maintenance expenses, you included a factor for household size; right?

02:07PM A. Right, that's included in the table, correct.

02:07PM Q. All right, and that matters to you, because if someone is sharing expenses, then, the percentage of that person's income spent on maintenance, it goes down; right?

02:07PM A. Correct.

02:07PM Q. So, in your analysis, you assumed that Baby Gharbi, at age 18.5 years, 18 1/2 years old, with a high school degree, would live in household with one other person with whom he shares expenses; isn't that true?

02:08PM A. Correct, because it's the average of that educational unit for that period of time.

02:08PM Q. All right, so it's not particularized here, but you're applying an average to Baby E.G.; is that right?

02:08PM A. That is correct, for each, like, 10-year age grouping that the age earnings profile has statistics, that's the same as how I got the productivity factor, and in each of those groups, the maintenance is higher because the earnings are lower, then, the maintenance goes down.

02:08PM Q. All right, and according to your calculations, a person making about $40,000 then has more than $20,000 left over, after providing for themself and one other person, for all the

items you listed; isn't that correct?
A. On average, over his working lifetime. I didn't do that for each year, I did it for the entire working lifetime, that's why it's the average of 40 percent.
Q. Understood.
A. It's higher in the earlier years and lower in the later years.
Q. All right. Well, let's look at someone with a Bachelor's degree in your analysis. A full-time worker with a Bachelor's degree earns $51,637 according to your table on Page 4 of the report we just looked at; right?
A. Right.
Q. And in your opinion, that person spends 29 percent of that income on personal maintenance, including for others in the household, according to you; right?
A. On average --
Q. On average.
A. -- of your working lifetime.
Q. On average. I understand what you're saying. And when we look at the personal expense percentages, those are on Page 8 of that same report. So for someone earning $51,637 on average, that would be about $14,973 for that one person, plus one other, in personal maintenance expenses; right?
A. It's the average over the working lifetime. When the person first starts out, it's that entry level, but the

02:10PM maintenance is higher, and the maintenance would decrease when the earnings increase.
02:10PM Q. Right.
02:10PM A. I'm giving you an average over the working lifetime.
02:10PM Q. Just looking at some of the numbers that you gave us, just for some examples, okay. So that person, after deducting the $14,973 for personal maintenance for himself and one other person would have $36,664 left over; right?
02:10PM A. Correct.
02:10PM Q. That would be every year; right?
02:10PM A. No, that's what I kept saying. This is a starting salary and the maintenance would be higher. Every year it's increasing at 2.5 percent for inflation, and for the full-time worker's Bachelor's, it's another 2.5, that's 5 percent per year.
02:11PM So at age 67, and the child was 3, you're talking about somebody making, in terms of the productivity, about $150,000 or more. So when you use the percent maintenance that you have, that's a lot that he's spending on maintenance. But it would be -- the percent would be less, the more you have, and certainly a lot higher when the earnings first start out, so it's the average over the working lifetime. It increases every year.
02:11PM Q. I understand your point, Mr. Bunin, but if you could just stick with me and these numbers that we see on your report, I just want to ask some very simple, basic questions. I

understand your point about averages, all your projections are averages, I get it, I think I get it.

But what I'm asking is, I want to apply the numbers that you have displayed in your charts, that's all, so if we can just carry on in that way, that would be helpful. So in this example that I've give you, which I understand is only one moment, not the average of the whole lifetime, in this one example, we have someone, for example, earning about $51,000, spending about $15,000 for two people in the household, and that means over $36,000 left over to do whatever they want with. Is that right?

A. Again, not exactly, because maintenance would actually be higher when the person first starts out and then be lower when the earnings are higher. So it's not going to be that same amount because the earnings are increasing.

Q. So the maintenance that you put in your chart is not accurate?

A. That would change.

Q. I'm sorry, I cut you off. Could you just repeat what you said?

A. Right, the person starting out at $51,000, they're not going to stay at $51,000, so as their earnings go up, the percent of what they're spending on themselves would decrease. So when they're making $51,000, the maintenance is more than the percent I have, but later on in their working lifetime is

02:13PM less than the percent I have, that's why I have the average of 29 percent over the working lifetime.

02:13PM Q. Well, okay, so the 29 percent is an average, but the $51,000 is then an average, as well; right?

02:13PM A. It's the average for people who are starting out, it's the 18 to 25-year-olds, and then it increases every year thereafter, because there's inflation and productivity. So the individual is not making $51,000 the rest of their lifetime, it's increasing every year.

02:13PM Q. I think I see it, now, Mr. Bunin. You've got a more precise earnings number but an average maintenance percentage?

02:14PM A. I don't indicate exactly what the numbers are every year going into the future, I indicate how they're calculated, making allowances and inflation for productivity, five percent per year, then, reducing the present value at four percent, so the total amount is what's given before maintenance.

02:14PM Q. All right, let's shift over to age ranges, all right. You present a range of ages to which the baby may have worked, and in your opinion, you include a work life to age 62 or 67 or 70, right, and that's in your report, in the table at Page 7 of that report.

02:14PM But you don't hold an opinion to a reasonable degree of economic certainty that the baby would have worked until the age of 70, do you?

02:15PM A. I give a range, because a person wouldn't have the

capacity to work until retirement, so to assist the jury, I give a range of reasonable retirement ages, given when Social Security kicks in and when a person would stop working and collect retirement.

Q. Right, and I think that's exactly what you told me during your deposition. You cannot give us, though, a likelihood that this person would have worked until the age of 70; isn't that true?

A. Correct, that's more of a fact question for the jury to decide. What I can do is present how the numbers would change, if a person worked less than to age 70 and the magnitude between working between 62 and age 70.

Q. Right. The opinion that you hold to a reasonable degree of economic certainty is that this person would work to sometime between the age of 62 and 70; correct?

A. Correct, that's what the numbers are based upon, the earning capacity to that range.

Q. All right. Now, with regard to the possibility that he would have worked until age 70, and in your testimony that people, in general, are working longer, and in your opinion as an economist working on this case, you didn't specify a rate or range, just a positive number of people are working longer.

And that was at your deposition, though, you didn't give me a specific rate or range at which people are working longer, but I believe, today, you have come up with a range; is that

right?
A. Yes, because I had done some research in the past and was able to pull that up before my testimony today, and since then, more information has come out for calendar year 2021, and the labor force has increased since 2020 and increased by more by people who are older.
Q. You don't hold your opinion that people are working longer and will continue to work even longer to a reasonable degree of economic certainty, you haven't changed your opinion there, have you?
A. I'm not sure I understand your question. The statistics showed, as the population aged, the average age of working people aged, people were working longer. The number of people that stayed in the labor market increased from prior years. So if that projection is to continue, then, people would continue to work past 67, which is considered full retirement for Social Security.
Q. Well, again, I had the opportunity to depose you, I relied on what you told me at your deposition, and I wonder if something has changed since then, so let me ask you this.
At your deposition, you told me that you do not hold an opinion that people are working longer and will continue to work longer to a reasonable degree of economic certainty. You recall that; right?
A. Yes, I think I said -- you were asking me, Are people who

02:18PM are working longer going to work longer than that or are they going to continue to work longer? And it was the latter part, yeah, people will continue to work beyond what was considered normal retirement age 65. Are they going to continue to be working to 70, 75, 80 after that, I don't know about that. I just know that the current trends, I believe, will continue in the future.

Q. And at your deposition -- and I, again, wonder if your opinion has changed today -- at your deposition, changes to circumstances due to COVID had no impact on your opinion of how long a person like E.G. would work. Has that changed?

A. No, just that the research I did this past summer showed that people who are over 65, actually, increased their labor force participation during COVID, where the entire labor force had decreased.

Q. All right. Now, in your analysis, you also present a range of educational attainment affecting earnings, including high school degree, Associate's degree, Bachelors degree, Master's degree and above, right? And I'm referring to Page 7 of your report.

You have various scenarios of educational attainment; correct?

A. Yes. The fourth one, you said, was Master's degree and above. It wasn't above, it was Master's degree.

Q. I apologize, you're correct. Now, on educational

attainment, in your opinion, there is no one point on the educational spectrum where you hold your opinion to a reasonable degree of economic certainty that Baby Gharbi would have attained, from high school through a Master's degree; correct?

A. Correct.

Q. Your opinion is that there is a statistical range of how long the person would work, full time or part time, and at what educational level; correct?

A. Correct.

Q. And according to you, there is no one point along that range that is more likely than any other; right?

A. Correct.

Q. And as an economist, offering your opinion to a reasonable degree of economic certainty, the entire range is equally likely, according to you; right?

A. Correct. Some of those points would be a fact question for the jury to decide, so I give a range with a reasonable degree of economic certainty.

Q. All right. And, then, looking at your conclusions, you present your opinions of the present value of the loss of earnings, based on statistics for all workers and of full-time workers for each age and for each educational level.

And I'm referring to your report at the table at Pages 10 to 13. That's where you present your -- the present value of

02:21PM lost earnings are reflected; correct?
02:21PM A. Correct.
02:21PM Q. Now, if the Court looks at that chart on those pages or considers your range, there are 24 different scenarios with 24 different totals that you present; right?
02:21PM A. Correct.
02:21PM Q. And you don't hold an opinion to a reasonable degree of economic certainty that any one of those 24 scenarios or totals is more likely than any other; isn't that true?
02:21PM A. That is correct.
02:21PM Q. So the Court has a 1 in 24 chance of making the correct or best determination of which of the scenarios or totals you present in your opinion to go with; right?
02:21PM A. One way of looking at that is to say that or picking any number between that range, you would capture the right number. Because nobody has a crystal ball, looking at the possible scenarios to say, This here would be the range, and here's the range, so by picking a number in that range, the true number would be somewhere in there.
02:22PM Q. Understood. You, also, opine that the total lost earnings and fringe benefits for those scenarios range between the lowest estimate, $825,361, and the highest $2,852,325. That's the spread; correct?
02:22PM A. That is correct. There's a positive -- a definite positive return to education.

02:22PM Q. And the difference between those estimates, the lowest to the highest, is about $2 million; right?
02:23PM A. That is correct.
02:23PM Q. And you testified that you do not have an opinion to a reasonable degree of economic certainty that any one point along that range is more likely than any other; correct?
02:23PM A. Correct.
02:23PM Q. Any point in that range is just as likely as any other point in your opinion; right?
02:23PM A. That is correct.
02:23PM Q. So what you're really saying is that the Court has about a one in two-million chance of making the correct or best determination of total lost earnings and fringe benefits, based on your opinion; right?
02:23PM A. I mean, if the true number is in that range, then, the probability is one, if you pick the number in that range.
02:23PM Q. Right, in that range of 2 million; right?
02:23PM A. Correct.
02:23PM MS. PARKER: Thank you.
02:24PM THE COURT: Ms. Olson, redirect?
02:24PM MS. OLSON: Just a few. If we can pull up 20.12.

02:24PM REDIRECT EXAMINATION

02:24PM BY MS. OLSON:
02:24PM Q. Ms. Parker was just talking about the lowest -- so P-20.12, that was your summary ranging ages 62, 67, 70,

02:24PM starting with high school and going through the ranges of potentials for this child.

02:24PM What I want to ask you is that these numbers that you gave us, for example, when Ms. Parker talked about the lowest number for high school, $825,361 at 62, was this report that you gave -- this was dated in 2020; correct?

02:25PM A. Correct.

02:25PM Q. So now that we're in 2022, would, as a result of the additional time that's gone by, would that number increase or decrease?

02:25PM A. It would increase for two reasons, but the big reason would be the nature of calculating a present value. So the number that was way in the future, the two last numbers that were way in the future gets taken away and replaced with two numbers that would be more current. So just the nature of present value, it would increase.

02:25PM Q. Could you give me an idea of what would be the current, the present value, based on the additional time that's gone by in this case, in terms of what the range would be from the low end to the high end?

02:25PM A. At least, increasing it by eight percent, because the reduction was four percent per year, and it was two years, so an eight percent increase.

02:26PM Q. An eight percent increase of, for example, on the low end, what was originally 825,361 you would increase by 8 percent?

02:26PM A. Correct, it would be about 893,000.
02:26PM Q. Would the number change on the opposite end, on Page 20.15, with the retirement to age 70 at 2,852,325, would that change?
02:26PM A. Yes.
02:26PM Q. How so?
02:26PM A. It would be about 3,080,000, from 2.85 million to 3.08 million.
02:26PM Q. So the low end -- current, as of today -- would be close to 900,000, you said, for the 62 high school diploma, and ranging on the high end with Master's degree full-time age 70, 3,080,000?
02:27PM A. Yes.
02:27PM MS. OLSON: Thank you. That's all I have.
02:27PM MS. PARKER: Nothing further, Your Honor. Thank you.
02:27PM THE COURT: Thank you, sir. You're excused.
02:27PM THE WITNESS: Thank you, Your Honor.
02:27PM MS. OLSON: At this time, I'd like to call Mr. Hattab Ben Gharbi to the stand.
02:27PM H A T T A B B E N G H A R B I IS CALLED, AND HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
02:27PM THE CLERK: Please state your name and spell it for the record.
02:28PM THE WITNESS: My name is Hattab Ben Azouz Gharbi, H-A-T-T-A-B, B-E-N, A-Z-O-U-Z, last name G-H-A-R-B-I.

02:28PM DIRECT EXAMINATION

02:28PM BY MS. OLSON:

02:28PM Q. Can you tell us a little bit about where you were born and
02:28PM raised?
02:28PM A. I was born in Tunisia, raised in Tunisia to the age of 22
02:28PM when I came here.
02:28PM Q. What languages do you speak?
02:28PM A. I speak fluently three languages, French, Arabic and
02:28PM English, and little bit of Italian, too.
02:28PM Q. Is your family still living in Tunisia?
02:28PM A. Yes.
02:28PM Q. What comprises your family at home in Tunisia?
02:28PM A. I'm sorry, say that again.
02:28PM Q. Who is your family in Tunisia?
02:28PM A. Well, my parents, my father and my mother, and I have
02:29PM three sisters and one brother.
02:29PM Q. Are you close with your family?
02:29PM A. Yes.
02:29PM Q. Do you visit often?
02:29PM A. Yes.
02:29PM Q. Can you tell me what sort of work your father did for a
02:29PM living?
02:29PM A. My father was working as an interior engineer for trains,
02:29PM like, whatever concerns trains, from outside, inside.
02:29PM Q. You said you have a brother. What is his occupation?

02:29PM A. He's working the land with my father, like, in the agriculture.
02:29PM Q. How about your sisters, what sort of -- do they work outside the home?
02:29PM A. No, actually, they are married -- only one sister, my little sister, she's working, she's design engineer, like, decor designer engineer.
02:29PM Q. Mr. Gharbi, is everyone in your family -- do they enjoy good health? Are they healthy?
02:29PM A. Yes.
02:29PM Q. Is there any history of any genetic or congenital or inherited problems in your family?
02:30PM A. No.
02:30PM Q. Tell us about your own education, if you would.
02:30PM A. I was -- I got graduated back in '97, I hold a Baccalaureate in Mathematics, specialize in Mathematics. After that, I was at University of Economic Science and Management in Tunis, Tunisia from '97 until March 2000, that's when I came here.
02:30PM Q. You talked about the Baccalaureate. Is that the equivalent in your country of a high school education here?
02:30PM A. Pretty much, that's what you can call it, but physically or technically, if you consider what you study and what you graduate at, that people will take these courses or these
02:31PM credits at a higher education here with like, at least, like

three, four years in college, after high school. If you want, I can give you, like, brief example of what we study.
Q. Sure.
A. Like, specifically, in the last two years, like, the sixth -- we call it the secondary -- the six year and seven year, that's when we go deep in Mathematics and Science studies, like, Physics, Chemistry, Genetic, everything concerns Math, pretty much, it's all like sciences study, and that's why it's called Baccalaureate in Math, because, pretty much, you go in math deeper, because you use the math in everything else, used in Chemistry, used in Physics and Biology, too, whatever concerns all of that.
As an example, I mean, for example, I studied Radioactivity. I don't think people here they do study that at the high school. When I first came here, I wanted to finish my study, I wanted to go for Computer Science, I went to the HACC in Lancaster, PA, and people giving me tests and tests, one test after test, just to evaluate my knowledge. And every time, they keep giving me something higher, higher, I keep telling them, I know this stuff.
So it's just like I can get to the point where they can not decide which credits they are going to attribute to me and which one I'm going use to finish my studies.
Q. Did you go on to University studies?
A. I'm sorry?

Q. Did you attend University?
A. Yes, yes, I did attend three years at University of Economic Science and Management, and I got a Certificate in Management, where, back then, when I studied, I studied two things, Micro Economy and Macro Economy, which is, like, small scale economy and big scale economy, and I got a Certificate in Management.
Otherwise, I mean, it can be used to manage, like, small enterprise, small companies, pretty much like that.
Q. Were you able to continue the third year of your studies or did your plans change?
A. Yes, I was in the third year, actually, it was one year after I got my Certificate in Management when I came here. I think it was, like, back in March 2000.
Q. Did you decide -- what made you decide to come to the United States?
A. Actually, it was, the first thing when I came here was through a program made by Mrs. Hillary Clinton when she used to be Secretary of the State back then, I think it was at the time of President Bill Clinton, and they had, like, kind of -- I won't say agreement, but kind of, like, agreement between Tunisian Government and United States Government, like, granting visa to specific certain people, not everybody can get that.
Like, if you're a student and you prove that you have,

like, specific knowledge or specific -- proven that you're a good student, in general, I mean, they can grant you that visa.

Q. When did you come to the United States?

A. It was March 22, 2000.

Q. What were your intentions, when you arrived here in the United States? What were you hoping to accomplish?

A. Well, first, I wanted to see how things are going here, pretty much, like anybody else, see how life is, compare and see if I can pursue some of the dreams that I couldn't do back home.

When I came here, I kind of found myself, like, very comfortable with the way things are going and all of that, so I decided to stay then.

Q. Now, when you arrived to the U.S., were you able to support yourself, and tell us what started -- how did you start to support yourself?

A. Yes, I did. After a certain period of time, because I visit, like, different states, when I first came in, I was in Miami, Florida, then for, like, about a week, then I went up to Orlando, from that, I came up to Washington, D.C., from Washington, D.C. to New York, then from New York, I came to Pennsylvania, just looking for something that can suit my purpose.

Eventually, it was kind of tough for me back then, so I mean, I consider myself hard worker, so if someone offers me

something, and I think I'm able to do it or I can do it, I will go for it.

Q. So tell us what did you then do, in terms of how you started to -- what was your first jobs that you did to try to support yourself?

A. My first job was I was working for, like, maybe, about like a month as a dishwasher in a restaurant, because I knew a friend who introduced me to the owner, and he offered me the job, I was working there as night shift, well, pretty much, seven days a week. I can take one day off, but I never took it, I would rather be working rather than sitting home.

After that, like I said, I mean, my education is pretty much, like, it's very intensive on the science studies, so I'm not really good at language, even though, I was taking English classes back home for starting the secondary three years until I got my Baccalaureate, and over three years at University.

But, pretty much, the English I was taking back then is pretty much, like, it's more concerning the study what I'm taking. For example, if I'm studying physics, kind of, like, learning the words that we need to use for that. It was kind of hard for me, but when I came here, I mean, if I don't understand something, I'll ask about it, how you pronounce that word, how you spell it, that's how I get to learn the English.

After that, I worked not for too long, for, like, a month in a gas station, and after that, I worked in -- it doesn't

02:38PM exist, this business, anymore, it used to be a business over by Route 30 East called National Christmas Center, which it's pretty much like exhibit for, like, families, when it comes to the Christmastime and all of that, we have Tinsel Town, making like statutes working on electric motors to make things work and music, it's all about Christmas, so I was there for quite a time until I got married and I decided to go for something better.

02:38PM And I went to -- I got my Forklift Certificate, and I went through an agency, they sent me to a company called Dark Container, this goes back to 2003, I work there for three months, just, like, to prove yourself. I mean, because working through a temp, you're not really, actually, physically or legally working for that company, because I get paid through the agency not the company itself

02:39PM So they gave me, like, three months period of time -- I proved myself, they hired me directly, six months after that I got promoted to Assistant Supervisor, and I was there from 2003 until 2006, I decide to get something better, so I went to Mt. Joy Career Link, which is in PA, not really far from Lancaster, and I got my CDL.

02:39PM Q. What's a CDL?

02:39PM A. Commercial Driver's License, meaning, like, driving big trucks, like, 80,000-pound trucks.

02:39PM Q. What did you have to do to get a CDL?

02:39PM A. I went to a school, they teach you everything, pretty much, from A to Z. So you go study, theoretically, then, after that, once you pass the knowledge test, once they think you're ready to do so, they send you to PennDOT, you pass your knowledge test, once you get that learner permit, otherwise, like for Class C driver, once you get that, you get back to the school and they train you how to drive, how to back, whatever concerns, like, driving trucks.

02:40PM Once they schedule date for you, you go there and you drive outside on the streets. If you pass test, then, you get your CDL. Once you get your CDL, there's many, many companies, they're there, I mean, they wait for you to get your CDL, in order to hire you right away.

02:40PM Q. Was this a better opportunity for you, in terms of your financial support?

02:40PM A. Yes, a lot, a lot more better. Other thing, too, it has advantages, too, concerning, like, when I used to work at Dark Container in an office, working on computers, dealing with other workers, managing how to get this work done and all of that, so it's kind of like, I like to be more dependable, meaning, like, see, when you do, like, driving jobs, specifically, when it comes to the trucking business, you have more freedom, you have more choices.

02:41PM At the same time, you can actually earn more money, too. When I say more money, there's a difference, I'm talking, at

02:41PM least, there is like a 10-000 dollar difference.
02:41PM Q. Did you decide, at some point, that since you were doing
02:41PM driving, I guess, you drove for many trucking companies, is
02:41PM that what I understand?
02:41PM A. Yes.
02:41PM Q. Did you, ultimately, decide that you would want to even
02:41PM advance your career even further?
02:41PM A. Yes.
02:42PM Q. How so?
02:42PM A. Well, after a certain time, like I said, I mean, I want to
02:42PM have more freedom, when it comes to me earning wages and money
02:42PM and all of that, so if you work as a company driver, you don't
02:42PM really have a lot of choices. You know, when they give you
02:42PM work, regardless if you can do it or you cannot do it, you have
02:42PM to do it.
02:42PM I mean, you have the choice to say, no, but, I mean, at a
02:42PM certain point, they're going to say, Hey, you cannot do that.
02:42PM Company driver, you have to work, you have to deal with
02:42PM customers, you have to deal with a lot of other stuff, which I
02:42PM wasn't really happy with it. Not at the beginning.
02:42PM But as you go in time, it's, like, you get to a certain
02:42PM point, like, you don't want to do it anymore. So there is
02:42PM another opportunity, since I have my CDL, it comes to a time,
02:43PM going back to 2013, when I decide to get my own truck and
02:43PM establish my own business, which is, that is the one thing I

02:43PM was looking for. You have your own business, you have your own truck, you pay your own expenses, you pick your loads, you pick the work you want to do, basically, on profit and loss perspective.

I mean, like, if you think something that's going to waste your time, gonna waste your fuel, and you don't make enough money, you say, I'm not doing it unless you give me a better rate, you pay me better, otherwise, I will not do it. The other thing, too, about being, like, pretty much business owner, just like dedicated to the trucking business.

02:43PM Q. What's the name of your company?
02:43PM A. HGH Trucking LLC.
02:44PM Q. Ben, are you a U.S. citizen?
02:44PM A. Yes, I am.
02:44PM Q. Are you married?
02:44PM A. Yes.
02:44PM Q. Is your wife Imen Gharbi?
02:44PM A. Yes.
02:44PM Q. Had you been married before?
02:44PM A. Yes, I was.
02:44PM Q. How did that end?
02:44PM A. Pretty much like any marriage, pretty much. We were in love for certain number of years, and it just, like, kind of, like, things are not working out, so we kind of -- we were separated, like, nicely, you know.

Q. That was your first marriage?
A. That was my first marriage.
Q. Did you, then, ultimately, divorce?
A. Yes.
Q. What year was that?
A. 2011.
Q. Did you have any children in that first marriage?
A. No, I did not.
Q. Tell us a little bit about how you met your wife Imen.
A. Well, that's the best thing that ever happened. I mean, since I was divorced, I mean, I want to establish a family, meaning, like, I want to have kids, I want to raise them, I want to see myself through my kids.

In order to do so and be successful, in my opinion, is to get a good wife, someone who can assist you doing that. So one time, I was -- goes back to 2015 -- I was visiting my family back home, like, which I usually do. When it comes to this trucking business, I can take off any time I want.

Like, when it comes to, like, celebration, where I want to get with my family, I can do that any time I want. I don't have to take permission from anybody, I don't have to ask my boss, Hey, can you please give me vacation like two weeks or a month, that's the other thing, like, I can take a week, I can take two, I can take a month, I can take two months, because that's the good thing about it. I can take two months, maybe, you

02:46PM think, Oh, you're not working for two months and spending money, but, yet, when I come back, I work full time, as long as there is work, you know. So it's kind of good.

02:46PM So that goes back to 2015, when I went back there, that was in the summer 2015, beginning of summer, I think it was around May, I was visiting my family member, my uncle, that's when I happened to see my beloved wife, right now. Kind of, like, went through, like, traditional way. When I saw her, I know she's the one, I mean, that's the beginning.

02:46PM So I ask her for her hand through families, I mean, you can't just do that, maybe, here you can do it, but somewhere else, you can't, you have to get permission from her family through my family, too, you can't just like -- and we sat together, and we had, like, so many discussion about so many things about life, like kids, education, working, pretty much everything. That was a right-away connection, pretty much, in everything.

02:47PM Q. When did you and Imen marry?

02:47PM A. We married in August 2, 2015.

02:47PM Q. Was Imen, eventually, able to join you here in the United States?

02:47PM A. Not at the beginning, no, not at the beginning, she has -- we have to go through process, immigration process and all of that, in order to get her over here to the states, and that look, like, about two years, from the time we were

married, actually, from the time we signed the marriage certificate, until she got approved by the USIS, United States Immigration Service, and that goes back to 2017.
Q. In the period of time that Imen was still in Tunisia and you were back here in the United States working, did you go back to visit often?
A. Yes.
Q. Did you and Imen have plans to hope to start a family, but did you delay that until she was here? How did that work?
A. We had plan for that, I mean, and, honestly, if I want to have kids and she want to have kids, I want to see my kids from day one until the last day, meaning, like, from the time she gets pregnant to delivery to raising them up, all of that. I can't be away for that. I have to be there.
Same thing with her, too. So that's why we delayed the pregnancy until she would be able to come to the states.
Q. Is family a very important factor for you and your wife?
A. Yes.
Q. When did Imen first become pregnant then?
A. She became pregnant in beginning of April 2017, pretty much, like, week or two after she came here to the states.
Q. Was this pregnancy something that you and Imen were happily expecting?
A. It just came, like, a week earlier, that's the only thing, we were planning to do that regardless.

02:49PM Q. Where did Imen go for prenatal care?

02:49PM A. Well, first, I mean, when she missed her period, we decide to go to a doctor to check her out to see if she's pregnant, why she's missing it and all that. We went to Hamilton Center, they did a test for her, that's when we find out she was pregnant, but at that time, we didn't have, like, family doctor, I hadn't established that, yet, so we didn't have any of that.

02:50PM So they didn't recommend anything to us, unfortunately, there. It just -- and after that, she was at the Harrisburg -- UPMC Harrisburg, in Harrisburg, actually, she had like a yeast infection, I had to take her over there, and one of the doctors at the emergency there, they offered us to the UPMC OB-GYN, UPMC in Harrisburg, that's where we had been going over there for ultrasound, for check visits, for everything, until the delivery time.

02:50PM Q. Did you end up going to each and every one of Imen's prenatal visits?

02:50PM A. Yes, I was with her in every single visit.

02:51PM Q. When was the baby due? When did you expect the due date?

02:51PM A. Well, we were expecting the baby -- I counted the calculation day and everything, it was supposed to be coming like December 9, 2017.

02:51PM Q. Did you and Imen both know that you were expecting a boy?

02:51PM A. Yes.

02:51PM Q. Was the fact that Imen was pregnant with your first son significant?
02:51PM A. Yes, very much.
02:51PM Q. Can you explain why?
02:51PM A. Well, I mean, a boy, to me, I mean, he's the one who is going to carry my name, he's the one who is going to carry my legacy, and I'm going to see myself through him, and it's my first son, in all my life, so it's very special, it's very special.
02:51PM Q. Did Imen's pregnancy go over the expected due date?
02:52PM A. Yes, it did.
02:52PM Q. Do you remember the last prenatal visit that Imen had, before she was actually admitted to the hospital?
02:52PM A. Yeah, I do remember that was Friday, actually, December the 15, because I was supposed to take her to the hospital for delivery the next day, Saturday, on December the 16th.
02:52PM Q. Do you recall anything about that last prenatal visit?
02:52PM A. Yes, yes, we were seen, I think, by Dr. Lauren -- I'm not quite sure the exact name, but if you look up the record, you're going to find out who I was with -- but, yes, we were there, and the one thing I do remember, specifically, about that visit that, we were in the room, and this doctor came in and she had an ultrasound machine with her, and she was checking her out and she was checking the baby at the same time with the ultrasound machine, and she was going, like, through

everything, like, in general, I mean, kidney, liver, stomach, intestine, everything, until I saw something, like, moving, I thought like -- I couldn't figure out what it was, because she's the doctor, she knows it.

I ask her, I said, What was that movement? She said, That's his lungs. I was so happy, she said, He's ready to come out, get ready to receive him, and that's it. And we left, and the next day I was working, the day I was taking her to the hospital, I was working.

Q. In all the prenatal visits that you went with Imen for the ultrasounds, which I understand were several, what do you recall about the ultrasound results, throughout the course of her care?

A. Well, all of them, every single time we go there, they check for, like, routine checks, like, for his growth or his weight, his organs and all of that, and every single visit, they keep saying, Your baby is healthy, you're doing good, keep up the good job, be ready to receive your baby.

One time, they did mention, one of the doctors, they mentioned that they had like -- she had excessive amniotic fluid, but the way they explained it to us, back then, it wasn't, like, really dangerous or -- they said, Well, we will just keep following up, we will see the next ultrasound and see if it persists or not.

And, eventually, after that, we didn't hear anything, it

was gone. That was the only time we have heard anything from the doctor or nurses that something is wrong. That's the only time, period.
Q. After that one time, did Imen go back for additional ultrasounds?
A. After they mentioned that?
Q. Yes.
A. Yes, we did, I think, like, two or three times.
Q. Was her amniotic fluid okay?
A. Yes, everything was okay. Specifically, the first time after we heard that, we specifically ask about that, they said, no, everything is back to normal.
Q. On Saturday, December -- had to have been the 16th -- is that when Imen was admitted to the hospital?
A. Yes.
Q. Were any other family members invited to this wonderful event to the birth of your son?
A. Yes, well, actually, like I said earlier, because it's my first son and it's very important, I invited my parents to come over to the states, and they were here in the states present at the delivery time, they were both at the hospital with us.
Q. All right. Do you recall the events of that Saturday, in terms of what was happening and what were you being told, what was the situation with the induction of labor, as far as you understood?

02:55PM A. Well, I mean, on Saturday, when I think it was around 1:15, something like that, when we were at the hospital, they give us a room, she laid in bed and all of that, and I was sitting with my parents next to her.

Then, a doctor came in and they also had, like, ultrasound machine to check her and everything. They did check, they say the baby is healthy, everything looks good, except one thing, the baby's head is sitting too high. We asked, What that does mean? They said, Well, that's normal, but it's going to go down, as long as you go in labor, that's only thing pretty much that day.

02:56PM Q. Did you stay with Imen pretty much --

02:56PM A. Yes, I was with her the whole time.

02:56PM Q. Did you drive your parents back, at all, or one of the parents back throughout the day to get rest?

02:56PM A. My mom stayed with us at the hospital, but on Sunday, I had to take my father back to the house.

02:57PM Q. Tell me what you recall about that Sunday, December 17th.

02:57PM A. Well, I mean, my father kind of like felt like, What am I going to do here? When he comes, just come get me. It's only like five minutes from the hospital, so I took him back home and I came back right away.

When I was in the parking lot parking my car to go up to the hospital, she called me and she told me, Where are you? I said, I'm in the parking lot. She said, They broke my water.

She didn't say much on the phone, but when I got up to the room, she told me what happened. She told me one of the doctors came in to check her cervix, and while she was doing that, her water broke.

Q. Before we get to that time when the water broke, which, according to the records, was sometime 3:00 that afternoon, were you with Imen in the morning?

A. Yes, I was, yes.

Q. Was there -- that morning, did you meet Dr. Francis, at all?

A. No, no, Dr. Francis -- I only met her twice, and I didn't even know her name, period, until we filed this suit. And the only time I met her was on Sunday, when I was sitting next to my wife, and, I think, around like 7:30 or so, most likely, between 7 and 8, when everybody rushed into the room, I mean, like, a lot of doctors and nurses, they rushed into the room with, like, a table full of scissors and knives, and I kind of like freaked out, What's going on? They said, Your baby's heartbeat went down, that's all they said, and they started working on her.

They were trying to read the heartbeat, actually, what they were trying to do, they had, like, two metal things, like, maybe, about a foot long, kind of, like, twisted wire, two of them, they were trying to get them through her vagina, in order to read the baby's heartbeat. That was the first doctor.

Second one, third one, and they couldn't succeed to do that. That's when I noticed that there was a person standing by the door, I mean, not even with the doctors, she was by the door -- I'm talking about Dr. Francis -- and she was standing and leaning on the door and just watching. When nobody succeeded to do that, that's when she jumped in and she tried to do that, and she pushed them in a little bit, and they still not reading anything.

That's when she asked her, she asked my wife to flip over on her hands and knees, and that's when they got to read the baby's heartbeat, and after that, they say, Well, now, you can go back to the other position, like, laying on back, and they left the room.

Q. Did Dr. Francis ever introduce herself to you and Imen?
A. No, never.
Q. After this event occurred around 7:30, 8:00 when they said your baby's heart rate went down, did Dr. Francis leave?
A. Yes, she left with everybody else.
Q. For that period of time, did you stay with Imen?
A. Yes, I was with her the whole time.
Q. Was there any type of audible sound that you heard that you knew what was happening? Was there any sound that you heard that made any sense to you?
A. Like, what do you mean by sound?
Q. Were there any monitor sounds that you heard, at all?

03:01PM A. Well, that was happening even before that, like, every single time, they have this machine with the serum, something connected to her arm, pretty much, beeps all the time, all the time, and every time I pick up the phone, I call a nurse or something, I can't tell, like, maybe, four or five rings until they answer the phone, and when they answer the phone, We'll be right there, and it kind of felt kind of longer, by the time I called them and they say they gonna come and they come.

03:01PM They come in, they check the wires, they check the fluid, they fix it, push some button and they leave. That's it.

03:01PM Q. After Dr. Francis left around this 7:30, 8:00 time period, when is the next time you actually saw her?

03:02PM A. That was when she came in, she said, We have to do an emergency C-section.

03:02PM Q. Was she there, at all, while Imen was pushing?

03:02PM A. No.

03:02PM Q. What do you recall about the C-section?

03:02PM A. Well, I told them that I want to be with my wife, they said, Well, it's okay, they give me some protective gear, I guess, or something to wear, they say some nurses is going to come call you after we set your wife up and all of that. And it took them a little bit more than that.

03:03PM I mean, actually, I was walking in the hallway, waiting, asking everybody, When are they going to call me to go in? And, eventually, they took me into the operation room. My wife was

03:03PM on the bed, and I saw Dr. Francis and another doctor facing her from the opposite side, and these two doctors, male and female, behind my wife, and they were operating certain machine, I think, like, reading her heart rate, giving her medication and all of that. Actually, the main doctor gave me the chair, he said, You can sit here next to your wife.

I was sitting, and her head over here, there was a veil between me -- I mean, I couldn't see anything until, I mean, I can see, like, in front of me, like, between my feet and all of that. I can see, like, Dr. Francis standing on a step, box or step something like that, maybe, to get her a little bit higher or something, and when that box started moving, it started really moving until it hit my feet, and the whole bed was shaking. That's when I stood up, and I saw her -- it was my baby, it was completely dark --

THE COURT: Let's take five minutes.

(At this time a brief recess was taken.)

THE COURT: Are you ready to continue?

THE WITNESS: Yes, sir.

THE COURT: Proceed, Ms. Olson.

BY MS. OLSON:

Q. Ben, when you stood up, you said that you actually saw your son. Can you tell us what you saw?

A. Well, because the veil they had between me and her -- my wife's belly, I couldn't see nothing while sitting down. Like I

said, when the whole table started shaking, I mean, shaking really bad, and the box she was standing on hit my foot, that's when I stood up to see what's going on. It didn't seem, like, normal to me.

So at that moment, when I stood up, I saw Dr. Potacia Francis holding my baby, like this(indicating), her left hand, like, on his back, her right hand on his belly. I didn't even see the cord, I didn't see nothing, I didn't see his belly button or anything because of her hand. And I can't tell -- I mean, I even thought that it wasn't my son, because he was too dark, not responsive, I didn't hear him crying, I didn't hear him gasp or didn't see him moving, at all, period.

She was holding him, like, this way(indicating), and she moved away from the table, while moving her hands like this(indicating), I can see her arms going up and down. And his head was, like, falling to the back, his arms and his legs, they were like someone, like, is not conscious, because she was moving them, they were, like, flopping and away from his body. And she went walking like that(indicating).

There was only one nurse in the room standing by the wall, there was a phone hooked to the wall, she waved her hand to her, and that nurse, she started making phone calls. And then Dr. Francis, she just, like, kind of, like, threw him on the table, the table wasn't no lights or no heater, nothing, she just put him on the table and went back. He was like that, God

knows, how long, it felt like eternity to me until someone -- there was nobody to receive the baby, he's laying down, and his eyes, like, halfway opened, I didn't see no pupil, nothing, just the white. And I was covering my wife, I didn't want her to see that. And then one person came in through the room, she stood by the baby, she didn't do nothing until, like, other people came in, that's when they started working on him.

I was watching everything, and he didn't respond, he didn't do nothing, nothing at all. That's when one of them, like, she looked at me in the eyes, she did, like, this with her head, like, he's gone. I didn't know what to do. I didn't know whether to go and hold my baby or comfort my wife, I didn't know what to do. Then, one of them just, like, tap to my shoulder, she said, Do you want to bury him or cremate him? I kind of looked at her, like, I didn't care, I didn't care.

Q. Mr. Gharbi, what did you name your son?

A. Eyad.

Q. Were you able to hold him and say goodbye?

A. Yes, when we went back to the room.

Q. Was that something that you and Imen were able to do together?

A. I'm sorry?

Q. Did you and your wife -- were you able to say goodbye together to your son?

A. Yes, actually, I hold him for a little bit, and I give him to her, she couldn't -- she didn't want to --
Q. Were you, ultimately, provided photographs for yourselves to keep as a memento?
A. Yes, one of the nurses, actually, she's the only one I ever remember, like, or felt like she's really sorry for what happened. Anybody else, they didn't show any appreciation or any condolences or anything, period, and she's the one, she gave the picture to my wife.
Q. Did Dr. Francis say anything to you, once your son was--
A. Never saw her again.
Q. The photographs that we had, you've seen marked as J-9, all those photographs of your son that you have kept and that reminds you of him?
A. Yes.
Q. Where were they taken then?
A. I'm sorry?
Q. Where were they taken?
A. At the hospital.
Q. Was this different than the laboring room?
A. Yes, it is different, yes.
Q. Did they, also, take footprints of your baby that they gave you?
A. Yes, they did, actually, they gave me copies of that, like, original copies.

Q. Were those the copies that we had provided in your deposition that were marked as J-11?
A. Yes.
Q. Were there -- we'll pull up J-15.1. Were there funeral expenses related to the death of your son?
A. Yes.
Q. What did the funeral expenses and interment total?
A. $1,395.
MS. OLSON: We've marked that as J-15.1, and I would like to admit that into evidence.
MS. PARKER: No objection.
(At this time Plaintiff's Exhibit No. J-15.1 was admitted into evidence.)
BY MS. OLSON:
Q. Can you tell us, did you have to console your wife after your son's death, in the operating room, while she was still there? What did you do?
A. Well, after this nurse ask me about if I want to bury or cremate my son, right there in the room, I just went back and sit next to my wife, I didn't want her to see anything happening to the baby. The other thing, too, when this first nurse came in, before anybody else, and she stood by that, when the second one came in, because Dr. Francis, she put him, like, pretty much his head was pretty much really close to the edge of the table, and this nurse, kind of, moved him a little bit

closer to the heater, and when she did that, I saw, like, something dark, like, dark green underneath of him. I guess, he pooped or he passed something, even though not moving.
Q. Can you tell us a little bit about the burial or the funeral of your son?
A. Well, I was there, all my friends, everybody, they were shocked, because every single time I see them, every day, every day, I go to pray before I go to work, they keep asking me about my baby's health, my wife's health, I say, Thank God everything is working out good so far. And everybody was there.
Q. Did you, ultimately, ask for an autopsy?
A. Yes.
Q. Can you tell us why?
A. When we were in the room, a gentleman walked in and he did present himself, he's Coroner or Deputy Coroner or something like that, his name is Gregory Bowser, I think, and he said, I'm here because of your son's death. I told him, after he represent himself, I said, Well, I want to do an autopsy, I want to find out why my son died.
Now, all this time, we have been going to the doctor, to the ultrasound, every single time they say my baby is healthy, there's nothing wrong with my baby, everything is good, and all of a sudden, I mean, at one specific time, he died? And he refused, literally, he refused to let me do an autopsy. He was, kind of, like, making it, like, so hard for me to do the

03:25PM autopsy.

03:25PM Even when he saw me, like, insisting on doing it, he said, It's going to cost you a lot of money. I said, How much? He said, Like 10,000. I said, I don't care, I still want to do it, I want to find out the reason why my son died. And that's when the other nurse, the one she gave us the picture that day, stepped in, she said, Well, I can help you with names and places where you can take your son for autopsy. That's when he stopped her and he just like flipped out on her, and he said, Well, you cannot do that, you have to do it through this hospital.

03:26PM I said, I told him, Well, I have to do it, I want to find out the reason why my son died. Then they went back into the small room next to the room we were sitting at, and I can hear him, like, yelling at her. I couldn't understand what he was saying, exactly, but his voice was very, very loud, I think, he was pissed off at her because she offered to help us.

03:26PM Because when I was discussing the autopsy with him, when I was insisting on doing the autopsy, at certain point, when I went, like, Well, what's it going to cost -- yeah, well, I'm going to do it. I thought, I don't care, I'm going to do the autopsy. He looked at me, he said, You're not going to do that through me. I said, Why? And he kept quiet. I don't care, if you don't want to do it, I'll have somebody else do it.

03:27PM That's when he looked at the nurse, and he asked her to

03:27PM bring the baby inside, like, smaller room, and he took his bag with him, and he started, like, doing his job or something. He closed the door completely, so we can't see nothing, we pretty much can't hear nothing, like, just mumbling voices, that's it.
03:27PM Q. Were you, ultimately, given a copy of the autopsy report?
03:27PM A. Well, actually, this same Coroner called me few months later, actually, I was at work, my wife was with me, because I couldn't leave her at home by herself, so I had to take her with me to work. She was riding with me in my truck.
03:27PM That's when he called me, he said, We got the results and all of that, and that's when he said, Well, your son had Hirschsprung's Disease, and that's what killed him. I said, Can you provide me with a copy of the autopsy? He said, No, I cannot do that, but you can go to the hospital and ask them for a copy. And, eventually, I think it was, like, a Friday afternoon or something, and they weren't open, like, that administration ward wasn't open Saturday and Sunday, so the next Monday we went and we got the autopsy.
03:28PM Q. Why weren't you able to leave Imen alone? Why did you take her with you?
03:28PM A. I don't feel comfortable leaving her alone at home. I mean, I know she would be, like, crying -- I'm afraid she's -- I don't want her to do anything to herself, I don't want nothing happen to her. I lost my son, I don't want to lose her, even though, I could have lost her in this process.

03:28PM Q. Did you, also, understand that genetic tests were done on your son?
03:28PM A. Yes, actually, when we got the copy of the autopsy, that was the first thing on the first page, there was the DNA test they did to my son.
03:29PM Q. Given the results, did anyone suggest any further testing for your son for genetics?
03:29PM A. No.
03:29PM Q. Did you and your wife, also, get genetic testing at some point later?
03:29PM A. Yes, we did.
03:29PM Q. What were your results?
03:29PM A. They were normal karyotype for me and my wife, for both of us.
03:29PM Q. Now, in the time period between when you were told -- when all the people came rushing into the room around 7:30, 8:00, and they talked about the heart rate was going down, what was your sensory awareness after that? What were you -- what was the process -- did you feel reassured or what was your sense of -- what was your reaction after everyone left, after that incident?
03:29PM A. I was still in shock because of what happened, because we didn't know anything. Even when the nurse comes in, she checks, like, the wires, checks the machine, she types some stuff in the computer, and she leaves, that's it. I mean, they haven't

03:30PM mentioned anything, like, something is wrong with the baby or anything like that, period.

03:30PM Because when I saw them rush in -- my first thought was, like, Are they going to operate her right then in the room? Because when they came in, they came with, like, big table, like, on wheels, and has, like, all kind of scissors and knives and, like, I assumed they were tools, like, to operate someone. But they didn't do that.

03:30PM Then, after that -- so we ask them, Why did that happen? Actually, my wife, she's the one who asked Potacia why this happened. She just looked at her and left.

03:30PM Q. Now, can you tell us how your son's death has impacted you? How has it impacted you in your life?

03:31PM A. I'm different, I'm different. I'm afraid of anything. We don't eat like we used to, we don't enjoy life like we used to, I don't sleep like I used to. I mean, sometimes, I have to take off work because I'll be driving, and I remember this, and --

03:31PM Q. For the first several months after your son's death, how did that impact you, physically, in terms of your ability to sleep or anything else?

03:31PM A. Until now, I don't sleep like I used to, I keep having nightmares.

03:32PM Q. What aspirations did you have for your son? What was the goal that you wanted for your son?

03:32PM A. I want to make sure he has better life than the one I

have, I want to make sure he goes to college, I want to make sure he gets a better job, I want to teach him everything, like, the same thing my father did to me I'm going do to him.

When he used to sit with me after school and go over everything I studied that day, that's what I'm going do to my son. I want to make sure he knows everything.

Q. Does your son's loss still impact you to date?

A. Yes.

Q. Is there anything else that you'd like to add for us to know about the loss of your son?

A. When she got pregnant after that, every time, we would be, like, so scared to go to the hospital, because we were afraid same thing is going to happen. When we delivered two kids with C-section, I've seen, like, many, many people that were in the room ready to receive the baby in case of something happen. With my first son, there was nobody there, nobody, and he was thrown on the table like that.

I even asked them, Do you guys -- do you do this, like, with every single baby delivered C-section? They say, Yes, by law, we have to do that. That wasn't done with my first son. She took him and she threw him on the table, and it's, like, nothing happened.

MS. OLSON: Thank you, Mr. Gharbi. I think that's all I have.

THE COURT: Ms. Parker?

03:34PM MS. PARKER: Mr. Gharbi, I'm so sorry that you've had to endure this agony and this grief. I don't have any questions for you.

03:34PM THE COURT: You can step down, sir. Ms. Olson, do you have another witness?

03:35PM MS. OLSON: Yes, Imen Gharbi is my last witness.

03:35PM I M E N G H A R B I IS CALLED, AND HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

03:35PM THE CLERK: Please state and spell your name for the record.

03:35PM THE WITNESS: My name is Imen Gharbi, I-M-E-N, G-H-A-R-B-I.

03:35PM DIRECT EXAMINATION

03:35PM BY MS. OLSON:

03:35PM Q. Mrs. Gharbi, can you tell us a little about where you were born and raised?

03:35PM A. I was born and raised in Tunisia, I was born October 19, 1995.

03:35PM Q. Do you speak several languages, yourself?

03:35PM A. Yes, I do, I speak Arabic, French, English and a little bit of Italian.

03:35PM Q. Was that a little bit Italian, you said?

03:35PM A. Yes.

03:36PM Q. Is your family, also, still living in Tunisia?

03:36PM A. Yes.

03:36PM Q. Is everyone in your family, do they enjoy good health?

03:36PM A. Yes, they do.
03:36PM Q. Any history of any genetic or inherited problems in your family?
03:36PM A. No.
03:36PM Q. Can you tell us about your education?
03:36PM A. I have my Art Baccalaureate, back in 2014, and I studied one year at University of Commercial International in Italy, by using the language Italian, and try to co-merge everything by using the language Italy.
03:36PM Q. Was this commercial, you said, Commercial and Italian language?
03:36PM A. Yes, I choose that.
03:36PM Q. I take it your husband is Ben Gharbi?
03:36PM A. Yes.
03:36PM Q. Did he share with you that he had been married prior?
03:37PM A. Yes, he did.
03:37PM Q. When you and he were courting, did you discuss, potentially, having a family of your own?
03:37PM A. Yes, we did, and he told me, I want to be a part of it, and I don't want to miss any single visit that you go to the doctor, I want to see every single part of my son, how he's going to grow up and all of that.
03:37PM That's why we decide I'm not going to get pregnant right away and I wait until I come here.
03:37PM Q. When you arrived to the United States, was Ben able to

03:37PM financially support you?

03:37PM A. Yes, he did.

03:37PM Q. When you arrived to the United States, did you, ultimately, become a U.S. citizen, yourself?

03:37PM A. Yes, I did.

03:37PM Q. Can you tell us about the -- how you learned about your first pregnancy with your baby?

03:38PM A. Actually, I missed my period, and that's when we went to Hamilton Center to do a test, and it came back positive, and we were so humbled, I mean, we were so happy to hear that I am pregnant and all of that.

03:38PM Q. Did Ben accompany you to all the prenatal visits that you had?

03:38PM A. Yes, he didn't miss any one of them.

03:38PM Q. Was he much hands-on involved in your pregnancy?

03:38PM A. Yes.

03:38PM Q. Did you have ultrasounds in your prenatal care?

03:38PM A. Yes, I did.

03:38PM Q. Can you tell me about what your understanding was about your ultrasound results?

03:38PM A. All the doctor that I went with, they keep saying that you have a healthy baby, and even you, you look so healthy, you're doing so good. I mean, they were even proud of the result that they have back then.

03:39PM Q. On the one instance, Ben told us there might have been an

03:39PM elevation of the amniotic fluid. Did any doctor diagnose you or treat you for anything like polyhydramnios?
03:39PM A. No, even though, they said there's still in the normal limits, that's what they said back then.
03:39PM Q. After that one visit where it was increased, were your ultrasounds afterwards normal, in terms of fluid?
03:39PM A. Yes, all of them.
03:39PM Q. So the last prenatal visit, would that have been the day before you were admitted to the hospital?
03:39PM A. Yes, we even saw his lungs.
03:39PM Q. Okay, and tell me about Saturday, when you were admitted to the hospital, that would have been the 16th, what do you recall about that day?
03:39PM A. As soon as I get there, they put me on the bed and they give me a pill to induce my labor, and that's all, and they checked me with an ultrasound, and that's what happened. And they checked my cervix, too, and they told me it's three centimeters back then, and that's all that happened that day.
03:40PM Q. How about that Sunday morning. Do you recall anything about a new -- some doctors that you saw the day before that were not there anymore that day?
03:40PM A. They came around 7, and they told me that it's going to be soon with you, it's the end of our shift, and I didn't see the doctor they've been talking about.
03:40PM Q. So some doctor was going to be taking over the shift that

03:40PM morning?
03:40PM A. Yes, and they told me, She's going to be soon here with you, and she didn't show up.
03:40PM Q. Can you tell me when the first time -- well, did Dr. Francis ever introduce herself to you?
03:40PM A. No, the first time that I saw Dr. Francis was around 3 p.m. Sunday, and she didn't introduce herself, at all. When she came in to my room, she told me, I'm going to check your cervix, that's what she said, she didn't say that she's the head doctor and she didn't say anything.
03:41PM And she told me, I'm going to check your cervix. I said, Yes, you can do it. When she was trying to try to see how long my cervix was, and when she was trying to put her hand, I broke my water back then.
03:41PM Q. When this happened, did you end up letting Ben know what was going on?
03:41PM A. I'm sorry?
03:41PM Q. Did you let your husband know what was happening?
03:41PM A. Yes, I called him because he took his dad back to home, and he told me, I'm in the parking lot, I'll be there soon. And, I mean, pretty much, I lost all my fluid back then, and all they do, they left me -- I thought, I mean, I thought they were gonna tell me you can start pushing and all of that, none of that happened.
03:42PM Q. Was your abdomen or your tummy significantly changed,

after the rupture?
A. Yes, even my husband, when he first show up to my room, he looked at me, he told me, Whoa, where is your belly? It looks like I'm not pregnant anymore.
Q. Did something happen about a half hour later -- excuse me -- between 3:00 and 7:30, when a lot of people came rushing into the room, I'm going to get to that point, did Dr. Francis -- did you see her any time after she did that check?
A. No, there is two training doctors, I think, there was Resident there, and she introduced herself, and she told me this is a training doctor, and the training doctor introduced herself, and that's when I knew that Potacia Francis, she was head doctor, they told me that, I know she's the head doctor through those training doctors.
Q. Now, did something happen around 7:30 that evening with a change in what was going on with you?
A. They came all of a sudden, I mean, all I can see all these people coming to my room. I ask them, What's going on? And they told me, Your baby's heart rate is going down, and I freaked out. What's the cause of my baby's heart rate going down? And I remember the training doctor was trying to put these wires through my vagina, they didn't succeed, and that's when the training doctor looked at Potacia Francis, while she was standing outside the room, she was looking -- just looking at

them.

I mean, my baby's heart rate are going down, and they're performing on me, and they did not succeed. That's when she stepped into the room, and she told me -- they let her do the job, and she told me -- she tried to put it in while I was laying on my back, and she didn't succeed, too, that's when she asked me to flip on my knee and my hands, and she was trying really hard, and that's when she succeeded to do it.

Q. And did she -- how many other people were in the room at the time and what were they doing?

A. There was nurses, I mean, maybe, four of them, and there was table full of, I mean, I don't know, there's tools. When you saw this image, you thought they're going to operate you on this specific bed, and they didn't.

Q. Were you told to turn or were you given oxygen? What was happening during that time period, as well?

A. They gave me the oxygen, and I think they kept it for a while, and they just left the room. I asked her, What's the cause of my baby's heart rate going down? She just looked at me like that(indicating), and she left the room.

Q. Did you see her, again, after she left the room?

A. No, she didn't tell me, You can start pushing or -- she didn't tell me anything, she didn't show me the care that I'm supposed to see that time.

Q. When was the next time you saw Dr. Francis?

03:46PM A. Around 1:30. She came into my room, like, the same way she did with the nurse, I think, there was two nurses, and she told me, like, We need to do an emergency C-section, that's all she said. That's when I looked at my husband, and she told me, We need the permission of your husband. I told her -- I told him that we need to do, so, and we agreed to do the C-section.
03:47PM Q. What do you recall about the C-section?
03:47PM A. Like, they took me there, and I was waiting to hear -- I'm sorry -- I was there, I mean, I wait for my husband, they put me on the table for the C-section, and they start operating on me. I mean, I was waiting to hear the sound of my baby. He didn't cry or gasp or anything.
03:48PM And I was telling my husband, I want to see the baby. I can tell he was trying -- I mean, I was laying down just like that, and he came behind me, and I knew that he was trying to cover up, that way, I don't see anything. Not only that, I mean, I keep asking my husband, I want to see the baby, they told me the first thing that I'm supposed to see is my baby, and I didn't see anything.
03:49PM Q. Did you, ultimately, comprehend what was going on, that you're baby had passed?
03:49PM A. No, it took me a while to pass through my mind. I didn't hear my baby crying -- pretty much, I mean, I was so shocked -- I'm sorry.
03:49PM Q. That's all right. After all this happened, were you -- did

03:49PM you, ultimately, learn that your son had passed?
03:49PM A. I'm sorry?
03:49PM Q. Did you, ultimately, find out that your baby, in fact, had
03:49PM passed on?
03:49PM A. Yes, the nurse told me that.
03:49PM Q. Okay. Were you able to, ultimately, you know, hold your
03:50PM son and say goodbye to him?
03:50PM A. That's the first thing I asked for. I mean, they told me,
03:50PM We have to take you to the recovery room, because they was
03:50PM pushing on my belly and I was in a lot of pain, and when I went
03:50PM to the recovery room, they put him on my chest, and I told
03:50PM them, even when the Coroner came into my room and he told me, I
03:50PM need to take a picture of him, it was the hardest thing that I
03:50PM felt back then.
03:50PM Q. Did you and your husband, ultimately, ask for an autopsy?
03:50PM A. Yes, we did.
03:50PM Q. And why was that? Why did you want an autopsy?
03:50PM A. Because nothing make sense to us. I mean, all the nine
03:51PM months that I've been going to prenatal, and, I mean, in all of
03:51PM the visits, all the test results that they told us, I mean,
03:51PM they keep saying, You're baby looks healthy, you look healthy,
03:51PM you're almost there, and --
03:51PM Q. Did you and your husband, ultimately, get a copy of the
03:51PM autopsy report and find out what the findings were?
03:51PM A. No -- we went -- I mean, the Coroner called us and he told

us, I mean, he was arguing that my son passed away by Hirschsprung's Disease, and we went to the hospital, we can't get it because the service there was closed, and we go back, again, we get it the other day.
Q. Did you, also, learn your son had genetic testing done?
A. Yes.
Q. What did you understand was his results?
A. Normal karyotype.
Q. Did you and your husband, also, get genetic testing?
A. I'm sorry?
Q. Did you and your husband, also, get genetic testing?
A. Yes, we did.
Q. And what were your results?
A. Normal karyotype.
Q. Where is your son buried?
A. At the cemetery in Harrisburg.
Q. Can you tell me, do you go to the cemetery often?
A. I visit him every Friday. I mean, I took my other son there, I named him Eyad, too, and I told him about his baby brother, he keep asking me, Who is this? I told him he's your baby brother who passed away, that's why we named you Eyad, too, I want his soul to be with me the whole time because I didn't understand what happened that day, even though, he's my second son, I always mention my first son, how he would be at his age, what he's going to do. I missed all of that, because

03:53PM of her.

03:53PM Q. Can you tell us how your son's death has impacted you?

03:53PM A. Like my husband say, he told me many, many times, I will come, because I keep seeing her on my nightmares, I mean, sometimes, all I can do at night, I mean, I just cry the whole night, and my husband told me, I can feel you crying, and I know that comforts you.

03:54PM He started taking with him to work, because every single time he get back home, he can tell my eyes were swollen, and he knew that I'm passing the whole day crying, that's what I do after I lost my son.

03:54PM Q. Do you still grieve your son to this day?

03:54PM A. Yes.

03:54PM MS. OLSON: Thank you. That's all I have, Mrs. Gharbi.

03:54PM THE WITNESS: Thank you.

03:54PM MS. PARKER: Mrs. Gharbi, I'm so sorry your baby died and for your shock and your grief. I have no questions for you.

03:55PM THE WITNESS: Thank you.

03:55PM THE COURT: Thank you, Mrs. Gharbi. You can step down. Ms. Olson, do you rest?

03:55PM MS. OLSON: I do. Plaintiffs rest.

03:55PM MS. PARKER: Your Honor, may I make a motion under Federal Rule of Civil Procedure 52(c) for a Verdict on Partial Findings?

03:55PM THE COURT: Certainly. Do you wish to make an argument?

03:55PM MS. PARKER: Sure, if you will allow it.

03:55PM THE COURT: I'll be happy to hear what it is that you believe supports your motion.

03:55PM MS. PARKER: My motion is based on, mostly, the Plaintiff's expert's testimony not being based on the facts and the data that we know about in this case.

03:55PM Starting, for example, with Dr. Mauldin who testified about the standard of care. And everything she testified about that was the right thing to do is what Dr. Francis did. She arrived at decision points that Dr. Mauldin identified when there was variability and late decelerations, and she evaluated the situation and made a determination about whether the labor could proceed or not.

03:56PM She communicated with the nursing staff, with her Residents, with Dr. Maenner and Dr. Klamerus, the prior team, none of the team expressed any concern that this baby was having anything other than a normal fetal heart rate pattern, which includes periods of minimal variability and late decelerations.

03:56PM All that Dr. Mauldin could really point to is her opinion that there was an arrest of labor at a certain time in the evening of December 17, and that Dr. Francis should have delivered the baby at that time. But Mrs. Gharbi became fully dilated later on in the evening and pushed for two hours. Ultimately, the decision was made to do a C-section.

So I don't think Dr. Mauldin's expert testimony has established a breach of the standard of care on the part of Dr. Francis.

Secondly, Dr. Mauldin nor Dr. Hammers have established causation. Dr. Mauldin, for the first time yesterday, opined that the fetal heart rate tracings were more concerning that she had ever stated in the past. So she came before your court, before this Court, to tell you about Category III tracings that we had never heard of before. Okay, but most startling is that the Category III tracings that she identified for you yesterday were the period where there were no tracings. The monitor was not connected to anybody except, possibly, the mother, as she testified.

So not only is Dr. Mauldin relying for her causation testimony on fetal heart rate tracings, which she concedes are not definitive for acidosis, the condition that both experts blame the demise of the baby on, but her sentinel event, the key moments that she relies on for the purported harm to this baby is fetal heart tracings that simply don't exist. That's pretty striking.

She even backed off of her 100 percent certitude in her opinions before Your Honor yesterday. I think, what we're seeing here is expert testimony that correlates evidence but doesn't show causation. This expert, Dr. Mauldin, and Dr. Hammers, too, what they're seeing is a labor course,

03:59PM they're seeing some fetal heart tracings, which completely normally show periods of decelerations, accelerations, minimal variability, absent variability and so forth. And they are correlating that with the fact this poor baby died. There's a gap there. That's correlation, not causation.

03:59PM What's missing is an analysis of all the other evidence in this case that indicates that there was something more going on than a normal labor, a period of concerning fetal heart rate tracings. They have no explanation for all that other evidence.

03:59PM And if I could just make an analogy. If I invite you to take a ride in my car, I might be putting you at greater risk of dying in a car accident, but I am not putting you at greater risk of dying from a brain aneurysm, for example. So there's a disconnect that these experts have not bridged, and they have not bridged it, obviously, because there's evidence they should be addressing and explaining to Your Honor, but they haven't done so.

04:00PM Now, Dr. Hammers talked to us today, and she is a pathologist. So she comes in here and tells us that the labor course, a specialty that she does not work in, she's a pathologist not an OB-GYN, and tells us it's the labor course that caused acidosis that killed this baby in utero. So she is the only one who says that. But, okay, let's go with that.

04:00PM She excludes the autopsy -- she acknowledges the autopsy was thorough and complete, but she excludes the findings as any

kind of indication that there might be something going on, in addition to or that could explain this baby's sudden death.

For the first time today, she told us that hypoxia causes contractures. She didn't really say that in her deposition, we hadn't heard that before, she didn't provide any references for that, it's convenient.

She told me in her deposition, so that's her testimony, too, that, quote, Something happened right about the time of delivery. She told me the baby had irreversible brain damage, but we can't see it on the autopsy. The baby has acidosis, but we can't look at the lab results that say, No, the baby doesn't have acidosis. There's just no rigor to her opinions, they're not based, again, on the facts and the data in the case.

These experts reject any evidence that doesn't fit their theory, they rely on fetal heart tracings that they both acknowledge are not definitive for acidosis, which is the cause of death for both of them.

And, finally, Mr. Bunin. Your Honor might as well throw a dart at the two million points that he says are no more likely than any other points for arriving at a damages value in this case.

Now, this is a very important -- as I said -- a very important case, it's an extremely sad case, nobody wants to be standing here talking about this. But as I said at my opening statement, also, it's important to Dr. Francis, too. It's

important for all of us to look at all the evidence and not select some of it that fits what you want the outcome to be in a lawsuit.

So my motion is based on the expert testimony in this case not being based upon the facts and the data, and, therefore, despite the expert's competence in their respective fields, and, particularly, because they know full well that the fetal heart tracings they rely on to the exclusion of everything else are non-definitive, they don't tell you if the baby has acidosis, and, particularly, when we have lab results that they have found a way to reject, even though, Dr. Mauldin told you, even if the blood was drawn an hour later, it's okay, she still rejected that.

So, Your Honor, with all respect to these competent experts, their work in this case is, at best, speculative, and, at worst, it's completely self-serving. It is not adequate to meet the Plaintiff's burden of proof of a breach of standard of care and causation in this case.

THE COURT: Do you want to respond before I say anything else?

MS. OLSON: I just simply want to say there is a lot of disconnect, but it's not on the part of the experts. They were extremely clear and looked at all of the evidence, and the expert opinions were stated in terms of the breach of standard of care, the causation, it couldn't get clearer.

04:04PM So it's -- I'm actually quite astonished at the narrow scope that Defense counsel is representing here, but there was more than adequate testimony that met the standard of care for not only breaching standard but, also, increased risk of harm that resulted in this death.

04:04PM THE COURT: All right, well, as I think counsel understands, when a motion is made for judgment at the close of the Plaintiff's case, it's not my province to weigh the evidence or assess credibility, but, instead, I need to be able to say, There's only -- based on the evidence -- There's only one possible outcome, and that is that there is no evidence whatsoever to support the Plaintiff's claim. That is what I view the standard, it is akin to 50(a), whether a jury, it's intended to be applied in the same way, I can't say there's no evidence here to support their claim.

04:05PM There's clearly evidence that discusses the relationship between the tracings, the fetal tracings, the decelerations, the variations and the changes of the fetus' heartbeat, and there's, also, issues of fact as to whether or not those signs that clearly were assessed were handled and responded to properly.

04:06PM At the very outset, we have an issue of fact as to whether Dr. Francis is credible when she said no one told her that Pitocin had been stopped. Other people said, Yes, we did tell her. The deposition that you read the other day indicated that.

04:06PM There are issues of fact, in the case, that will absolutely prevent me from saying, as a matter of law, there's only one outcome that's possible on these facts, and that is that judgment must be entered in favor of the Government.

04:06PM In fact, I will tell you -- I'm not going to prolong this -- but your own statement of comprehensive undisputed facts, by itself, raises enough issues that I want to hear your case. So your motion is denied.

04:07PM MS. PARKER: Thank you, Your Honor.

04:07PM MS. OLSON: Thank you, Your Honor.

04:07PM THE COURT: Is there anything else before we close for today? You weren't intending to call anyone today, am I correct?

04:07PM MS. PARKER: You are correct, Your Honor. What I have lined up for tomorrow is our economist in the morning and the lab witness, the declaration, at 1:30.

04:07PM THE COURT: That's by --

04:07PM MS. PARKER: She's going to be remote. And, then, Dr. Chung, the Geneticist at 3 p.m.

04:07PM THE COURT: So you plan on three tomorrow?

04:07PM MS. PARKER: Yes. I don't know if you want to start at 9:30 with our economist or do you want to save it? I don't think it will be that long, so we can adjust that. But I do have the lab person at 1:30 and Dr. Chung at 3, and those are both remote.

04:07PM THE COURT: Do you think that's enough time for them or do

04:08PM you expect them to continue into Friday?

04:08PM MS. PARKER: Well, Friday, I have Dr. Pettker coming all the way from New Haven. So he will be here in the morning. And that's all I have for Friday, because, as you know --

04:08PM THE COURT: All right, well, I see no reason not to start at 9:30, and if there's time after your initial witness, that's fine, we will wait for the remote witness at 1:30.

04:08PM MS. PARKER: Okay. So we will probably take a break then after?

04:08PM THE COURT: Sure.

04:08PM MS. OLSON: Thank you, that's fine.

04:08PM THE COURT: All right, then, we have an early adjournment today. See you tomorrow.

04:08PM (At this time the proceedings were adjourned.)

C E R T I F I C A T E

I, KRISTIN L. YEAGER, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings, a portion of which was taken live and a portion of which was taken via *Zoom*, in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

S/Kristin L. Yeager
KRISTIN L. YEAGER, RMR,CRR
Official Court Reporter

REPORTED BY:

KRISTIN L. YEAGER, RMR,CRR
Official Court Reporter
United States District Court
Middle District of Pennsylvania
P.O. Box 5
Scranton, Pennsylvania 18501

(The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

## $

**$1,022,825** [1] - 115:23
**$1,049,805** [1] - 116:20
**$1,117,053** [1] - 115:21
**$1,191,437** [1] - 115:25
**$1,197,067** [1] - 116:21
**$1,232,773** [1] - 116:20
**$1,287,812** [1] - 116:24
**$1,370,173** [1] - 116:22
**$1,395** [1] - 166:8
**$1,423,149** [1] - 117:10
**$1,451,048** [1] - 116:24
**$1,674,522** [1] - 117:11
**$1,687,245** [1] - 117:14
**$1,857,586** [1] - 117:16
**$1,935,169** [1] - 117:14
**$13,600** [3] - 125:22, 126:13, 127:15
**$14,973** [2] - 129:22, 130:7
**$15,000** [1] - 131:9
**$150,000** [1] - 130:16
**$2,084,477** [1] - 118:4
**$2,097,640** [1] - 117:16
**$2,276,083** [1] - 118:5
**$2,398,148** [1] - 118:7
**$2,590,749** [1] - 118:9
**$2,632,080** [1] - 118:7
**$2,852,325** [2] - 118:9, 137:22
**$20,000** [1] - 128:24
**$20,400** [2] - 126:17, 127:16
**$33,000** [1] - 127:20
**$33,960** [1] - 125:16
**$33,962** [5] - 125:21, 125:22, 126:12, 126:16, 127:15
**$36,000** [1] - 131:10
**$36,664** [1] - 130:8
**$40,000** [1] - 128:24
**$51,000** [6] - 131:8, 131:21, 131:22, 131:24, 132:4, 132:8
**$51,637** [2] - 129:10, 129:21
**$825,361** [3] - 115:18, 137:22, 139:5
**$946,818** [1] - 115:21
**$994,507** [1] - 115:19

## '

**'80** [1] - 119:22
**'90s** [1] - 107:19
**'97** [2] - 142:15, 142:18

## 0

**0128** [1] - 86:5
**0141** [1] - 77:14
**0406** [1] - 86:3

## 1

**1** [15] - 28:13, 28:17, 28:20, 28:21, 28:23, 61:8, 63:8, 64:25, 65:4, 106:13, 106:14, 123:4, 126:10, 137:11
**1&2** [1] - 2:15
**1/2** [1] - 128:11
**10** [8] - 15:14, 28:14, 52:12, 67:10, 85:6, 120:4, 124:18, 136:24
**10,000** [1] - 168:4
**10-000** [1] - 149:1
**10-year** [1] - 128:18
**100** [2] - 102:12, 185:21
**101** [1] - 2:3
**104** [1] - 2:4
**105** [3] - 2:9, 82:6
**106** [1] - 83:4
**107** [1] - 72:4
**108** [3] - 74:5, 74:12, 74:13
**109** [3] - 2:10, 74:15
**11** [2] - 3:18, 106:16
**112** [1] - 2:10
**113** [1] - 2:11
**115** [1] - 2:11
**116** [3] - 2:12, 66:12
**117** [1] - 66:12
**12** [2] - 2:15, 3:18
**120** [2] - 85:23, 86:12
**121** [1] - 2:13
**122** [1] - 2:4
**1250** [1] - 1:19
**128** [1] - 85:22
**12:32** [1] - 104:2
**13** [4] - 2:8, 63:25, 64:1, 136:25
**13,165,166** [1] - 2:16
**13,51,91** [1] - 2:15
**131** [2] - 61:10, 61:14
**132** [2] - 61:8, 89:20
**138** [2] - 2:4, 2:13
**14** [3] - 2:8, 2:15, 2:15
**14-minute** [3] - 20:2, 29:5, 103:5
**140** [1] - 2:14
**141** [1] - 2:5
**15** [3] - 2:9, 28:14, 155:15
**15.1** [1] - 2:22
**150** [1] - 119:21
**152** [1] - 25:22
**155** [1] - 60:1
**16** [4] - 2:9, 74:13, 74:15, 119:24
**166** [2] - 2:22
**16th** [3] - 155:16, 157:13, 176:12
**17** [2] - 67:24, 184:22
**17&18** [2] - 2:9, 16:1
**17110** [1] - 1:16
**173** [1] - 2:5
**17th** [1] - 158:18
**18** [7] - 60:1, 60:3, 79:2, 82:6, 121:22, 128:11, 132:6
**18.5** [1] - 128:11
**18501** [1] - 192:19
**18503** [1] - 1:25
**188** [1] - 2:12
**19** [4] - 5:15, 66:12, 66:13, 173:16
**19106** [1] - 1:19
**1946** [1] - 119:24
**1980** [2] - 119:22, 119:25
**1983** [1] - 106:13
**1988** [1] - 105:24
**1990** [1] - 106:1
**1995** [2] - 119:19, 173:17
**1997** [1] - 106:14
**19cv1943** [1] - 1:7
**1:15** [1] - 158:2
**1:28** [2] - 86:10, 86:11
**1:30** [6] - 104:4, 104:14, 180:1, 190:16, 190:24, 191:7
**1:41** [3] - 25:16, 29:6, 86:11
**1:44** [1] - 25:18
**1:45** [1] - 25:19
**1:47** [2] - 25:19, 25:24

## 2

**2** [4] - 14:6, 138:2, 138:17, 152:19
**2,75** [1] - 2:21
**2,852,325** [1] - 140:3
**2.138** [1] - 2:20
**2.175** [1] - 2:20
**2.185,4.1** [1] - 2:21
**2.5** [3] - 111:9, 130:13, 130:14
**2.65** [1] - 2:21
**2.69** [1] - 2:21
**2.85** [1] - 140:7
**20** [7] - 28:14, 29:25, 32:13, 109:15, 115:5, 115:6, 120:16
**20-22** [2] - 2:10, 109:18
**20.12** [4] - 2:11, 2:13, 115:12, 138:21
**20.13** [2] - 2:12, 116:9
**20.15** [2] - 2:14, 140:3
**20.6** [1] - 2:10
**20.8** [2] - 2:11, 113:10
**200** [1] - 107:19
**2000** [5] - 119:19, 119:22, 142:18, 144:14, 145:4
**2003** [2] - 147:11, 147:18
**2006** [1] - 147:19
**2011** [1] - 151:6
**2012** [1] - 106:14
**2013** [1] - 149:24
**2014** [1] - 174:6
**2015** [4] - 151:16, 152:4, 152:5, 152:19
**2017** [4] - 112:1, 153:3, 153:20, 154:23
**2018** [1] - 119:15
**202** [1] - 78:17
**2020** [12] - 15:14, 15:15, 67:10, 73:21, 109:8, 109:9, 109:10, 112:10, 118:17, 119:15, 134:5, 139:6
**2021** [2] - 9:4, 134:4
**2022** [2] - 1:13, 139:8
**2040** [1] - 1:16
**21** [3] - 2:12, 109:15, 123:22
**22** [3] - 109:15, 141:5, 145:4
**23** [2] - 1:13, 2:9
**235** [1] - 1:24
**24** [8] - 2:16, 15:15, 61:14, 123:10, 137:4, 137:8, 137:11
**247** [1] - 120:1
**24th** [1] - 73:21
**25** [1] - 119:20
**25,000** [1] - 112:17
**25,88** [1] - 2:17
**25-year-olds** [1] - 132:6
**27** [2] - 109:9, 118:17
**28** [1] - 192:6
**29** [3] - 129:13, 132:2, 132:3
**2:00** [1] - 30:1
**2:41** [1] - 78:22
**2:45** [1] - 79:2

## 3

**3** [8] - 2:3, 14:6, 28:21, 105:18, 130:15, 177:6, 190:19, 190:24
**3,080,000** [2] - 140:7, 140:12
**3-8** [1] - 2:15
**3.08** [1] - 140:7
**30** [10] - 24:22, 32:13, 87:20, 87:23, 88:3, 88:15, 106:1, 109:10, 115:5, 147:2
**303** [1] - 1:16
**33** [4] - 67:22, 67:24, 123:2, 123:23
**33,962** [1] - 125:17
**34,000** [1] - 112:17
**35** [1] - 2:17
**35,000** [1] - 112:18
**35.5** [1] - 2:13
**37** [1] - 2:18
**38,48** [1] - 2:18
**3:00** [2] - 159:6, 178:6

## 4

**4** [6] - 14:6, 68:3, 87:15, 125:13, 125:15, 129:10
**4,000** [1] - 10:14
**4.17** [1] - 2:17
**40** [9] - 8:7, 24:22, 25:22, 125:20, 125:21, 126:12, 127:15, 127:23, 129:4
**42** [2] - 63:25, 64:1
**44** [1] - 2:16
**46** [1] - 2:19
**47** [1] - 63:8
**48** [1] - 25:21

## 5

**5** [10] - 2:8, 14:6, 28:13, 66:12, 68:3, 87:15, 87:20, 120:16, 130:14, 192:18
**50** [1] - 25:22
**50(a** [1] - 189:13
**500** [1] - 107:20
**52** [1] - 2:19
**52(c** [1] - 183:23
**52,000** [1] - 112:18
**53** [1] - 123:10
**55** [2] - 120:1, 120:2
**56** [1] - 2:3

## 6

**6** [6] - 14:6, 57:21, 57:24, 58:8, 61:8, 66:20
**615** [1] - 1:19
**62** [12] - 110:14, 115:17, 116:18, 117:10, 118:4, 126:5, 132:19, 133:12, 133:15, 138:25, 139:5, 140:10
**65** [4] - 119:17, 119:25, 135:4, 135:13
**65,77** [1] - 2:20
**67** [10] - 110:16, 115:20, 116:21, 117:13, 118:6, 126:5, 130:15, 132:19, 134:16, 138:25

## 7

**7** [6] - 14:6, 63:8, 132:20, 135:19, 159:15, 176:22
**7.2** [1] - 2:19
**7.353** [1] - 67:4
**70** [21] - 93:24, 110:17, 113:25, 115:22, 116:23, 117:15, 118:8, 119:3, 119:5, 119:8, 132:19, 132:24, 133:7, 133:11, 133:12, 133:15, 133:19, 135:5, 138:25, 140:3, 140:11
**72** [1] - 2:18
**73.23** [1] - 121:4
**74** [4] - 2:18, 64:24, 65:4, 126:6
**75** [2] - 2:17, 135:5
**753** [1] - 192:6
**76.1** [1] - 112:1
**77** [4] - 57:21, 57:24, 58:8, 126:5
**77.16** [1] - 121:4
**7:30** [7] - 29:5, 159:14, 160:16, 161:11, 170:16, 178:6, 178:16
**7:40** [1] - 98:14
**7:40ish** [1] - 62:3

## 8

**8** [11] - 14:6, 29:5, 66:20, 78:20, 109:8, 112:9, 125:13, 125:18, 129:20, 139:25, 159:15
**80** [2] - 127:23, 135:5
**80,000-pound** [1] - 147:24
**82** [1] - 121:24
**825,361** [1] - 139:25
**85** [1] - 2:20
**86** [1] - 2:21
**87** [1] - 2:21
**89** [1] - 122:24
**893,000** [1] - 140:1
**8:00** [4] - 62:3, 160:16, 161:11, 170:16

## 9

**9** [1] - 154:23
**9-11** [1] - 2:16
**9.12** [1] - 2:19
**90,000** [1] - 127:23
**900,000** [1] - 140:10
**99** [2] - 2:19, 72:4
**9:30** [3] - 1:13, 190:21, 191:6

## A

**a.m** [4] - 25:16, 29:6, 79:2, 86:10
**A.M** [1] - 1:13
**abdomen** [2] - 46:15, 177:25
**ability** [2] - 29:6, 171:19
**able** [42] - 25:2, 26:17, 28:2, 28:10, 29:17, 29:20, 30:21, 31:2, 31:5, 32:10, 32:24, 36:16, 38:11, 38:21, 38:23, 39:7, 42:18, 53:7, 56:9, 82:21, 84:3, 98:5, 98:25, 99:18, 101:24, 110:4, 111:12, 114:4, 134:3, 144:10, 145:14, 146:1, 152:20, 153:16, 164:19, 164:21, 164:24, 169:19, 174:25, 181:6, 189:9
**abnormal** [18] - 17:13, 26:13, 38:25, 43:19, 47:16, 47:17, 48:12, 50:25, 52:5, 52:20, 52:22, 82:3, 82:8, 82:16, 82:24, 83:1, 99:24, 102:5
**abnormalities** [6] - 35:11, 36:1, 36:5, 44:13, 45:8, 51:10
**abnormality** [5] - 47:6, 47:25, 48:23, 48:24, 94:25
**abnormally** [1] - 48:11
**above-mentioned** [2] - 14:10, 192:8
**absence** [5] - 39:7, 40:4, 52:13, 54:2, 85:6
**absent** [3] - 24:18, 36:13, 186:3
**absolute** [1] - 56:1
**absolutely** [3] - 57:21, 58:1, 190:2
**abstracts** [3] - 9:6, 10:8, 10:9
**academic** [1] - 6:19
**Academy** [2] - 9:16, 106:20
**accelerations** [1] - 186:2
**accepted** [1] - 8:15
**access** [1] - 92:5
**accident** [2] - 105:9, 186:12
**accompany** [1] - 175:12
**accomplish** [1] - 145:6
**according** [17] - 25:13, 29:24, 30:2, 35:15, 78:21, 79:1, 100:9, 111:25, 124:2, 124:6, 124:10, 128:23, 129:10, 129:15, 136:11, 136:16, 159:6
**account** [7] - 16:12, 18:20, 110:20, 111:5, 111:6, 121:10, 125:3
**accounted** [1] - 121:11
**accurate** [7] - 5:6, 39:13, 74:22, 81:15, 122:1, 131:17
**acidemia** [2] - 31:19, 58:10
**acidosis** [80] - 11:18, 11:21, 16:10, 20:10, 57:15, 57:16, 57:17, 58:11, 58:14, 58:16, 58:17, 59:22, 60:10, 60:18, 60:19, 60:22, 63:3, 63:4, 63:9, 63:12, 63:17, 63:20, 64:2, 64:6, 64:7, 64:9, 64:14, 64:17, 64:22, 64:23, 65:2, 65:6, 65:14, 65:18, 66:4, 67:18, 68:5, 68:14, 68:17, 68:18, 68:22, 69:8, 69:10, 69:15, 69:20, 73:25, 74:18, 75:1, 75:16, 76:3, 76:8, 76:9, 76:12, 76:15, 78:2, 81:19, 83:15, 83:16, 83:17, 85:15, 88:23, 89:5, 89:13, 90:20, 90:24, 91:1, 91:21, 100:10, 100:13, 100:14, 100:25, 101:21, 103:17, 185:16, 186:22, 187:10, 187:12, 187:16, 188:10
**acidotic** [14] - 22:14, 26:6, 26:23, 32:6, 32:17, 33:19, 34:3, 55:25, 63:5, 63:10, 88:23, 88:24, 88:25, 89:5
**acknowledge** [1] - 187:16
**acknowledges** [1] - 186:24
**actions** [3] - 19:13, 100:18, 100:23
**activities** [3] - 9:17, 9:20, 9:25
**activity** [1] - 10:4
**actual** [3] - 108:9, 118:23, 121:6
**actuarial** [2] - 105:3, 109:25
**Actuarial** [1] - 108:5
**actuary** [1] - 107:23
**add** [2] - 24:9, 172:9
**added** [1] - 76:10
**addition** [3] - 9:18, 25:1, 187:2
**additional** [7] - 52:25, 54:19, 106:1, 115:20, 139:9, 139:18, 157:4
**addressing** [1] - 186:16
**adequate** [3] - 21:10, 188:16, 189:3
**adjourned** [1] - 191:14
**adjournment** [1] - 191:12
**adjust** [1] - 190:23
**administration** [1] - 169:17
**Administration** [1] - 105:22
**administrative** [1] - 8:11
**administrators** [1] - 1:3
**admission** [3] - 12:25, 14:2, 109:12
**admit** [2] - 15:18, 166:10
**admitted** [18] - 5:13, 5:15, 12:12, 14:9, 14:10, 15:24, 16:1, 19:24, 105:16, 105:18, 108:7, 109:15, 109:18, 155:13, 157:14, 166:12, 176:9, 176:11
**Admitted** [1] - 2:8
**admitting** [1] - 15:22
**adopts** [1] - 15:23
**adult** [1] - 121:23
**adults** [1] - 45:18
**advance** [1] - 149:7
**advanced** [6] - 116:13, 117:1, 117:21, 117:25, 118:3, 119:10
**advantages** [1] - 148:17
**affect** [3] - 32:23, 42:7, 81:3
**affected** [5] - 30:17, 32:16, 32:20, 32:21, 39:11
**affecting** [1] - 135:17
**affects** [2] - 42:7, 109:1
**affiliation** [2] - 7:2, 7:4
**afraid** [3] - 169:22,

171:14, 172:12
**afternoon** [5] - 104:23, 122:13, 122:14, 159:6, 169:16
**afterwards** [1] - 176:6
**age** [47] - 110:3, 110:13, 110:14, 110:15, 110:16, 110:17, 110:18, 111:10, 113:25, 115:17, 115:20, 115:22, 116:18, 116:21, 116:23, 117:10, 117:13, 117:15, 118:4, 118:6, 118:8, 119:3, 119:5, 119:17, 119:24, 126:2, 128:10, 128:18, 128:19, 130:15, 132:17, 132:19, 132:24, 133:7, 133:11, 133:12, 133:15, 133:19, 134:12, 135:4, 136:23, 140:3, 140:11, 141:5, 182:25
**aged** [2] - 134:12, 134:13
**agency** [2] - 147:10, 147:15
**ages** [5] - 119:8, 119:10, 132:18, 133:2, 138:25
**ago** [3] - 11:16, 88:22, 89:19
**agony** [1] - 173:2
**agree** [8] - 62:14, 68:12, 69:25, 81:18, 92:10, 93:9, 95:21, 126:18
**agreed** [2] - 101:1, 180:6
**agreeing** [1] - 101:8
**agreement** [2] - 144:21
**agriculture** [1] - 142:2
**ahead** [1] - 114:11
**aided** [1] - 1:22
**air** [7] - 49:10, 49:19, 49:23, 50:2, 50:10, 50:11, 50:16
**airways** [2] - 48:1, 49:18
**akin** [1] - 189:13
**alive** [8] - 27:4, 29:22, 32:4, 35:13, 50:4, 90:10, 97:3, 97:8
**Allegheny** [1] - 5:23
**alleviate** [2] - 19:13, 38:1
**allow** [2] - 30:25, 184:1
**allowances** [1] - 132:14
**allowed** [1] - 111:7
**almost** [1] - 181:22
**alone** [4] - 34:23, 46:21, 169:19, 169:21
**aloud** [1] - 58:1
**alterations** [4] - 19:23, 57:16, 58:15, 83:15
**altogether** [1] - 69:5
**Alumni** [1] - 106:22
**alveolar** [2] - 49:11, 50:1
**America** [3] - 122:23, 124:3, 124:7
**AMERICA** [1] - 1:8
**American** [7] - 9:1, 9:13, 9:14, 9:16, 9:21, 106:19, 106:20
**Americans** [2] - 123:3, 123:23
**amniotic** [5] - 18:4, 42:14, 156:20, 157:9, 176:1
**amount** [9] - 20:6, 52:22, 53:4, 105:4, 105:8, 114:13, 114:18, 131:15, 132:16
**amounts** [2] - 42:14, 96:15
**amyoplasia** [3] - 36:4, 44:3, 44:7
**analogy** [1] - 186:10
**analysis** [9] - 91:25, 108:15, 109:4, 111:23, 124:21, 128:10, 129:9, 135:16, 186:6
**Anatomic** [6] - 3:22, 4:1, 5:22, 6:1, 11:1, 12:8
**Anatomical** [2] - 3:24, 5:2
**anatomy** [5] - 44:6, 44:10, 44:12, 44:13, 44:16
**AND** [4] - 3:6, 104:20, 140:20, 173:7
**aneurysm** [1] - 186:13
**ANSWER** [16] - 58:13, 60:12, 61:18, 64:5, 65:8, 65:16, 68:7, 72:9, 74:23, 78:24, 79:4, 82:9, 83:7, 90:2, 123:17, 123:20
**answer** [10] - 12:16, 58:12, 66:15, 83:18, 89:20, 94:2, 94:5, 123:16, 161:6
**answered** [5] - 60:11, 61:17, 65:7, 65:15, 73:17
**answering** [1] - 79:15
**Answers** [1] - 108:13
**answers** [1] - 62:21
**Anthropology** [1] - 7:3
**anticipated** [1] - 109:2
**anus** [2] - 36:17, 37:19
**apart** [2] - 69:6, 72:13
**APGAR** [18] - 27:11, 27:13, 28:13, 28:17, 28:23, 29:2, 56:9, 84:13, 84:14, 84:19, 84:20, 84:23, 84:25, 85:2, 100:13
**apologize** [3] - 86:17, 106:5, 135:25
**apparent** [3] - 32:7, 42:22, 89:1
**appear** [1] - 42:1
**appearance** [8] - 45:24, 46:18, 51:6, 51:22, 52:11, 52:20, 53:8, 54:1
**appeared** [1] - 23:3
**applicable** [1] - 73:5
**application** [1] - 97:15
**applied** [1] - 189:14
**apply** [3] - 125:10, 131:3, 192:22
**applying** [1] - 128:17
**appointed** [4] - 8:3, 8:22, 9:22, 192:5
**appointment** [2] - 6:24, 7:1
**appointments** [2] - 6:19, 7:9
**appreciation** [1] - 165:7
**appropriate** [2] - 104:7, 116:3
**appropriately** [1] - 36:16
**approved** [1] - 153:2
**April** [4] - 109:8, 112:9, 125:13, 153:20
**Arabic** [2] - 141:8, 173:19
**area** [6] - 8:15, 16:4, 37:22, 38:4, 39:1, 70:1
**areas** [19] - 3:19, 6:1, 6:15, 36:23, 36:25, 37:2, 37:3, 37:7, 38:4, 38:6, 38:7, 38:10, 38:11, 38:22, 38:24, 39:2, 39:7, 39:15, 40:4
**arguing** [1] - 182:1
**argument** [1] - 183:25
**arm** [1] - 161:3
**arms** [4] - 45:13, 46:17, 163:15, 163:16
**arrest** [1] - 184:21
**arrive** [2] - 111:17, 115:15
**arrived** [7] - 23:2, 115:13, 145:5, 145:14, 174:25, 175:3, 184:10
**arriving** [1] - 187:20
**Art** [1] - 174:6
**arterial** [6] - 33:10, 101:23, 102:7, 102:14, 102:15
**arteries** [1] - 30:16
**arthrogryposis** [1] - 45:9
**AS** [4] - 3:7, 104:20, 140:21, 173:8
**ascertain** [5] - 11:9, 22:12, 33:17, 112:10, 114:4
**ascertained** [1] - 114:21
**ascertaining** [1] - 107:3
**asphyxia** [6] - 11:17, 11:20, 20:16, 20:17, 20:19, 20:22
**aspirations** [1] - 171:23
**assess** [1] - 189:9
**assessed** [2] - 93:15, 189:20
**assessment** [5] - 70:18, 93:14, 102:8, 103:10, 112:4
**Assessment** [1] - 86:20
**assist** [3] - 22:23, 133:1, 151:15
**assistance** [1] - 44:21
**Assistant** [1] - 147:18
**associate** [1] - 93:8
**associate's** [1] - 123:17
**Associate's** [7] - 110:25, 112:18, 113:13, 116:10, 116:14, 116:17, 135:18
**associated** [7] - 34:22, 40:25, 42:13, 45:8, 92:20, 92:23, 93:22
**Associates** [1] - 106:13
**Association** [5] - 8:25, 9:3, 9:15, 106:19, 106:20
**assume** [3] - 66:8, 71:24, 120:23
**assumed** [2] - 128:10, 171:7
**assumptions** [1] - 112:4
**astonished** [1] - 189:1
**atlas** [1] - 44:9
**atlases** [1] - 44:6
**atresia** [1] - 38:5
**attaches** [1] - 37:22
**attack** [3] - 30:12, 30:15, 31:10
**attain** [7] - 118:21, 123:3, 123:24, 124:3, 124:7, 124:11
**attained** [1] - 136:4
**attaining** [1] - 124:22
**attainment** [8] - 108:16, 108:17, 110:2, 118:24, 125:3, 135:17, 135:21, 136:1
**attains** [1] - 125:20
**attend** [2] - 144:1, 144:2
**Attending** [1] - 6:24
**attention** [1] - 123:10
**Attorney's** [1] - 1:18
**attribute** [2] - 60:22, 143:22
**attributed** [1] - 121:12
**audible** [1] - 160:21
**August** [4] - 15:14, 67:10, 68:2, 152:19
**auscultated** [1] - 86:12
**authoritative** [1] - 44:17
**autopsies** [15] - 4:17, 4:22, 6:6, 8:10, 8:20, 8:21, 10:11, 10:14, 11:11, 88:17, 91:15, 91:18, 91:19, 91:20, 99:5
**autopsy** [73] - 11:8, 11:14, 11:24, 12:2, 13:7, 18:12, 29:16, 30:5, 30:13, 34:16, 34:17, 34:19, 34:23,

34:25, 35:14, 36:3, 37:14, 42:17, 43:11, 43:15, 43:17, 47:8, 48:10, 48:16, 49:2, 49:4, 50:6, 50:21, 50:24, 53:15, 55:1, 59:2, 59:5, 59:6, 59:8, 59:12, 59:15, 88:15, 91:6, 91:13, 91:22, 92:1, 93:9, 93:10, 95:9, 95:15, 95:18, 95:21, 97:10, 98:6, 98:8, 98:10, 99:6, 99:19, 167:11, 167:18, 167:24, 168:1, 168:8, 168:18, 168:19, 168:22, 169:5, 169:13, 169:18, 170:3, 181:15, 181:17, 181:24, 186:24, 187:10
**Autopsy** [11] - 34:19, 35:15, 37:17, 39:20, 40:11, 41:15, 47:13, 52:1, 93:15, 95:16, 100:3
**available** [4] - 47:7, 47:10, 79:2, 104:17
**AVENUE** [1] - 1:24
**average** [25] - 111:13, 112:2, 115:4, 124:17, 125:23, 127:18, 127:23, 128:14, 128:17, 129:2, 129:4, 129:16, 129:17, 129:19, 129:21, 129:24, 130:4, 130:21, 131:7, 132:1, 132:3, 132:4, 132:5, 132:11, 134:12
**averages** [2] - 131:1, 131:2
**aware** [2] - 44:10, 79:13
**awareness** [1] - 170:18
**Azouz** [1] - 140:24
**AZOUZ** [1] - 140:25

**B**

**babies** [4] - 11:11, 37:6, 42:16, 57:5
**babies'** [1] - 52:17
**Baby** [25] - 13:9, 13:15, 15:7, 16:9, 18:11, 22:23, 23:6, 23:13, 29:19, 32:11, 35:11, 36:18, 41:17, 44:1, 45:23, 46:4, 47:12, 55:24, 56:6, 108:2, 115:15, 124:22, 128:10, 128:17, 136:3
**baby** [174] - 11:14, 13:4, 13:25, 16:25, 17:22, 20:3, 20:5, 20:7, 20:15, 21:6, 21:10, 22:2, 22:16, 23:1, 23:2, 23:5, 23:24, 24:6, 24:10, 24:11, 24:12, 25:2, 25:7, 25:16, 26:1, 26:13, 26:15, 26:16, 26:19, 27:2, 27:3, 27:4, 27:6, 27:11, 27:13, 27:16, 27:18, 27:19, 27:21, 28:1, 28:24, 29:7, 31:4, 31:11, 31:14, 31:19, 32:16, 33:18, 35:8, 35:9, 38:15, 41:7, 41:15, 41:23, 42:1, 42:5, 42:11, 43:1, 43:19, 45:23, 47:5, 49:7, 49:10, 49:15, 49:17, 49:25, 50:4, 50:7, 50:13, 50:19, 51:4, 53:13, 53:20, 54:18, 55:14, 59:21, 60:18, 61:18, 62:8, 68:16, 68:21, 68:22, 76:15, 81:24, 82:2, 82:7, 82:17, 82:22, 82:24, 83:6, 84:14, 85:4, 85:10, 88:12, 89:3, 89:6, 89:13, 89:14, 89:21, 90:2, 90:3, 90:5, 90:8, 90:9, 90:10, 90:11, 93:13, 96:11, 96:13, 96:21, 97:3, 97:8, 98:1, 98:3, 98:22, 98:25, 99:16, 101:11, 101:14, 102:18, 102:19, 102:23, 103:16, 118:21, 119:23, 122:18, 132:18, 132:23, 154:20, 154:21, 155:24, 156:17, 156:18, 158:7, 162:15, 163:6, 164:2, 164:6, 164:13, 165:22, 166:21, 167:21, 167:22, 169:1, 171:1, 172:15, 172:19, 175:7, 175:22, 180:11, 180:13, 180:17, 180:18, 180:21, 180:23, 181:3, 181:21, 182:19, 182:21, 183:16, 184:16, 184:23, 185:17, 185:19, 186:4, 186:22, 187:9, 187:10, 187:11, 188:9
**baby's** [54] - 13:18, 13:21, 15:10, 16:7, 18:7, 18:15, 20:12, 22:14, 24:5, 25:3, 25:8, 25:14, 27:2, 29:13, 31:12, 35:21, 36:21, 43:2, 43:18, 46:23, 47:15, 47:16, 50:11, 50:12, 51:13, 51:22, 52:2, 52:8, 52:11, 52:20, 52:23, 53:2, 53:8, 55:22, 56:2, 60:9, 60:22, 67:1, 86:11, 95:7, 96:14, 96:17, 99:1, 158:8, 159:18, 159:25, 160:11, 160:17, 167:9, 178:20, 178:21, 179:2, 179:19, 187:2
**Baccalaureate** [5] - 142:16, 142:20, 143:9, 146:16, 174:6
**bachelor's** [1] - 123:19
**Bachelor's** [21] - 105:22, 111:1, 112:19, 112:21, 113:12, 113:15, 114:16, 117:2, 117:6, 117:9, 123:3, 123:6, 123:17, 123:21, 123:24, 124:3, 124:8, 129:8, 129:9, 130:14
**Bachelors** [1] - 135:18
**backed** [1] - 185:21
**background** [4] - 105:21, 108:12, 108:23, 110:1
**backwards** [1] - 54:25
**bacteria** [1] - 6:6
**bad** [1] - 163:2
**bag** [1] - 169:1
**balance** [2] - 20:11, 66:22
**ball** [1] - 137:16
**balloons** [1] - 49:19
**base** [1] - 33:22
**based** [48] - 31:8, 33:15, 45:14, 47:7, 52:19, 53:13, 53:15, 53:25, 54:25, 55:10, 56:3, 59:13, 63:17, 68:22, 69:20, 70:20, 74:19, 75:8, 75:10, 76:1, 79:7, 82:12, 94:2, 115:22, 115:25, 116:1, 116:12, 116:18, 117:4, 117:13, 117:15, 117:23, 118:6, 118:8, 121:1, 121:17, 121:20, 122:1, 133:16, 136:22, 138:13, 139:18, 184:4, 184:5, 187:13, 188:4, 188:5, 189:10
**basic** [1] - 130:25
**basis** [3] - 34:2, 53:12, 84:10
**beat** [4] - 24:5, 28:7, 32:22
**beating** [3] - 25:14, 28:8, 32:25
**beats** [4] - 24:22, 85:23, 86:12, 88:15
**became** [3] - 106:13, 153:20, 184:23
**beck** [1] - 121:7
**become** [7] - 15:7, 25:12, 31:4, 32:8, 49:19, 153:19, 175:4
**becomes** [1] - 32:21
**bed** [5] - 158:3, 162:1, 162:13, 176:14, 179:14
**BEEN** [4] - 3:7, 104:20, 140:20, 173:7
**beeps** [1] - 161:3
**BEFORE** [1] - 1:12
**beforehand** [2] - 99:8
**began** [3] - 47:2, 98:17, 106:12
**begin** [5] - 19:4, 28:7, 73:14, 110:15, 110:19
**beginning** [10] - 23:23, 37:19, 71:13, 98:13, 149:20, 152:5, 152:9, 152:22, 153:20
**begins** [2] - 21:20, 40:8
**behalf** [1] - 58:25
**behaviors** [1] - 99:8
**behind** [2] - 162:3, 180:15
**belly** [5] - 162:25, 163:7, 163:8, 178:3, 181:10
**belong** [4] - 9:10, 9:12, 9:14, 106:18
**beloved** [1] - 152:7
**below** [3] - 21:24, 85:22, 85:23
**BEN** [1] - 140:25
**Ben** [14] - 1:3, 1:5, 2:5, 14:19, 117:24, 140:18, 140:24, 150:13, 162:22, 174:13, 174:25, 175:12, 175:25, 177:15
**beneficial** [1] - 55:18
**benefits** [21] - 107:8, 108:1, 109:5, 110:17, 110:18, 110:19, 114:24, 115:1, 115:4, 115:7, 115:14, 116:19, 116:24, 120:7, 120:12, 120:15, 120:17, 120:19, 122:18, 137:21, 138:13
**bereavement** [1] - 87:3
**best** [5] - 101:23, 137:12, 138:12, 151:10, 188:15
**better** [11] - 102:8, 108:25, 112:20, 147:8, 147:19, 148:14, 148:16, 150:7, 150:8, 171:25, 172:2
**between** [22] - 10:16, 29:4, 45:24, 46:4, 76:22, 103:4, 119:15, 119:22, 133:12, 133:15, 137:15, 137:21, 138:1, 144:21, 159:15, 162:8, 162:9, 162:24, 170:15, 178:6, 189:17
**beyond** [1] - 135:3
**big** [5] - 120:2, 139:11, 144:6, 147:23, 171:5
**bigger** [7] - 17:21, 35:2, 71:21, 114:18, 114:19, 120:3, 121:10
**Bill** [1] - 144:20

**bill** [1] - 127:9
**binder** [2] - 57:22, 57:23
**binders** [1] - 78:15
**Biology** [1] - 143:11
**birth** [9] - 11:15, 25:19, 27:22, 37:6, 41:23, 86:17, 110:3, 157:17
**bit** [20] - 4:25, 7:11, 7:17, 41:4, 73:20, 89:19, 114:24, 122:21, 126:10, 141:3, 141:9, 151:9, 160:7, 161:22, 162:11, 165:1, 166:25, 167:4, 173:20, 173:21
**blame** [1] - 185:17
**blockages** [1] - 30:15
**blood** [42] - 4:10, 21:1, 21:15, 25:7, 27:8, 28:10, 33:1, 33:3, 33:16, 47:18, 63:17, 63:19, 67:12, 67:17, 68:4, 69:10, 73:24, 74:17, 75:14, 75:23, 76:8, 76:19, 77:19, 78:22, 79:10, 79:12, 80:10, 80:11, 80:17, 80:21, 81:3, 81:19, 82:17, 83:5, 84:25, 85:2, 91:25, 92:7, 97:16, 102:20, 188:12
**Board** [5] - 3:19, 3:21, 3:22, 57:9, 58:22
**body** [28] - 20:7, 20:12, 20:17, 20:24, 21:2, 21:16, 21:19, 21:23, 27:5, 28:10, 30:7, 30:8, 30:21, 30:25, 31:2, 31:5, 32:1, 32:3, 32:15, 35:7, 36:15, 50:22, 51:19, 54:24, 99:10, 99:14, 163:18
**bold** [1] - 85:22
**book** [2] - 44:11, 87:6
**boomers** [1] - 119:23
**born** [22] - 25:16, 26:14, 26:17, 28:2, 29:21, 35:13, 36:11, 49:7, 49:17, 50:15, 51:4, 55:2, 56:8, 87:11, 90:3, 119:24, 141:3, 141:5, 173:15, 173:16
**boss** [2] - 8:3, 151:21
**Boston** [2] - 7:2, 7:20
**bottom** [3] - 50:2, 52:14, 99:3
**bowel** [3] - 38:5, 38:17, 40:7
**Bowser** [1] - 167:16
**box** [3] - 162:10, 162:12, 163:2
**Box** [1] - 192:18
**boy** [2] - 154:24, 155:5
**bradycardic** [1] - 24:23
**brain** [39] - 6:14, 7:13, 20:18, 20:19, 21:3, 21:4, 25:8, 26:10, 30:24, 31:9, 31:17, 32:11, 32:18, 32:19, 32:20, 32:21, 32:23, 32:24, 42:7, 42:25, 43:17, 43:20, 96:14, 96:16, 96:20, 96:24, 97:7, 97:16, 98:7, 98:8, 98:24, 99:1, 100:9, 186:13, 187:9
**Brain** [1] - 7:13
**Brandt** [1] - 87:17
**breach** [3] - 185:2, 188:17, 188:24
**breaching** [1] - 189:4
**break** [7] - 27:8, 46:21, 56:15, 104:6, 104:8, 104:13, 191:8
**breakdown** [1] - 51:15
**breathe** [2] - 49:10, 50:19
**breathed** [1] - 50:15
**breathing** [6] - 27:14, 49:8, 49:25, 50:14, 65:17, 98:2
**breathing-in** [1] - 49:8
**breaths** [2] - 49:18, 50:7
**bridged** [2] - 186:14, 186:15
**brief** [2] - 143:2, 162:17
**briefly** [1] - 36:9
**bring** [5] - 46:14, 77:6, 78:17, 85:20, 169:1
**bringing** [2] - 23:1, 65:23
**broad** [1] - 93:7
**broader** [1] - 61:24
**broke** [4] - 158:25, 159:4, 159:5, 177:13
**Brooklyn** [3] - 6:25, 8:4, 8:8
**brother** [4] - 141:16, 141:25, 182:20, 182:21
**budget** [1] - 8:13
**bulk** [1] - 42:18
**Bunin** [12] - 2:4, 104:17, 104:23, 104:25, 106:12, 108:4, 108:7, 121:25, 122:13, 130:23, 132:10, 187:18
**burden** [1] - 188:17
**Bureau** [3] - 111:11, 122:2, 122:4
**burial** [1] - 167:4
**buried** [1] - 182:15
**bury** [2] - 164:15, 166:18
**bus** [1] - 127:3
**Business** [1] - 105:22
**business** [8] - 147:1, 148:22, 149:25, 150:1, 150:9, 150:10, 151:18
**button** [2] - 161:10, 163:9
**BY** [21] - 3:13, 5:17, 12:13, 14:12, 16:3, 45:5, 56:21, 87:10, 101:19, 104:22, 105:20, 106:9, 108:8, 109:20, 122:12, 138:23, 141:2, 162:21, 166:14, 173:13, 192:15

## C

**C-section** [13] - 23:15, 90:12, 98:4, 101:5, 161:14, 161:17, 172:14, 172:19, 180:3, 180:6, 180:7, 180:10, 184:25
**cable** [1] - 127:11
**Caesarean** [1] - 86:20
**calculate** [5] - 105:6, 110:4, 110:6, 111:13, 111:14
**calculated** [3] - 121:7, 121:9, 132:13
**calculating** [1] - 139:12
**calculation** [4] - 111:22, 119:2, 120:5, 154:22
**calculations** [1] - 128:23
**calendar** [1] - 134:4
**calibrated** [5] - 71:11, 71:17, 72:8, 72:17, 72:24
**CALLED** [4] - 3:6, 104:19, 140:20, 173:7
**Calretinin** [1] - 39:5
**cannot** [6] - 92:10, 133:6, 149:14, 149:17, 168:10, 169:14
**capacity** [11] - 105:7, 107:1, 107:10, 108:1, 108:17, 109:5, 110:22, 113:3, 122:17, 133:1, 133:17
**capture** [1] - 137:15
**car** [4] - 127:3, 158:23, 186:11, 186:12
**carbon** [3] - 20:12, 49:9, 49:15
**Cardiac** [1] - 6:14
**cardiopulmonary** [1] - 12:2
**care** [20] - 56:24, 57:3, 114:10, 115:3, 120:6, 127:6, 154:1, 156:13, 164:16, 168:4, 168:21, 168:23, 175:17, 179:23, 184:8, 185:2, 188:18, 188:25, 189:3
**Career** [1] - 147:20
**career** [5] - 6:20, 8:23, 10:13, 107:16, 149:7
**carried** [2] - 65:11, 66:12
**carry** [3] - 131:5, 155:6
**Case** [2] - 9:22, 9:23
**case** [63] - 12:22, 14:25, 16:5, 18:24, 22:1, 22:12, 23:12, 30:23, 33:11, 35:21, 42:9, 45:23, 50:9, 52:25, 55:12, 55:20, 58:24, 59:2, 60:23, 63:22, 63:23, 67:7, 69:12, 69:13, 73:7, 76:3, 76:13, 76:18, 79:16, 81:10, 86:22, 95:9, 99:20, 102:7, 103:1, 103:11, 108:11, 108:12, 108:19, 109:21, 109:24, 109:25, 112:5, 112:11, 114:4, 114:21, 116:13, 121:16, 133:21, 139:19, 172:15, 184:6, 186:7, 187:13, 187:21, 187:23, 188:4, 188:15, 188:18, 189:8, 190:1, 190:7
**cases** [4] - 10:18, 94:21, 107:19, 107:20
**Category** [2] - 185:8, 185:10
**category** [1] - 93:6
**causation** [6] - 185:5, 185:14, 185:24, 186:5, 188:18, 188:25
**caused** [16] - 15:7, 29:21, 35:7, 41:19, 85:10, 92:18, 94:8, 94:16, 94:20, 96:3, 96:7, 96:9, 98:8, 99:11, 100:4, 186:22
**causes** [15] - 4:19, 4:21, 4:23, 4:24, 20:23, 23:9, 31:12, 34:12, 59:4, 59:18, 95:13, 95:20, 99:5, 100:1, 187:3
**causing** [12] - 18:1, 20:24, 27:8, 31:4, 36:21, 47:6, 50:12, 53:10, 96:23, 97:1, 97:6, 102:5
**CDL** [7] - 147:21, 147:22, 147:25, 148:11, 148:12, 149:23
**celebration** [1] - 151:19
**cell** [1] - 127:11
**cells** [11] - 30:21, 36:11, 37:2, 39:1, 39:6, 39:7, 40:3, 40:5, 41:13, 94:17, 99:24
**cemetery** [2] - 182:16, 182:17
**Census** [2] - 111:11, 122:4
**Center** [3] - 147:2, 154:4, 175:9
**centimeters** [1] - 176:18
**certain** [14] - 54:4, 54:22, 89:9, 118:16, 144:23, 145:17, 149:10, 149:17, 149:21, 150:23, 162:3, 168:19, 184:21
**certainly** [11] - 23:5,

28:23, 32:11, 42:17, 42:22, 45:2, 82:9, 93:12, 96:9, 130:20, 183:25
**certainty** [30] - 12:17, 15:11, 16:6, 16:9, 18:17, 21:9, 29:11, 46:24, 47:5, 53:18, 56:12, 60:8, 103:20, 113:4, 113:22, 114:22, 115:9, 116:7, 117:18, 118:11, 122:6, 132:23, 133:14, 134:9, 134:23, 136:3, 136:15, 136:19, 137:8, 138:5
**Certificate** [4] - 144:3, 144:6, 144:13, 147:9
**certificate** [11] - 13:6, 34:5, 34:13, 34:14, 35:4, 59:6, 59:10, 95:14, 95:23, 153:2, 192:22
**certifications** [1] - 3:21
**CERTIFIED** [1] - 1:24
**certified** [4] - 3:19, 3:22, 57:9, 58:22
**certify** [2] - 192:6, 192:10
**certifying** [1] - 192:23
**certitude** [1] - 185:21
**cervix** [5] - 159:3, 176:17, 177:9, 177:11, 177:13
**Chad** [1] - 118:14
**chain** [6] - 23:10, 23:12, 24:9, 46:21, 47:2, 56:6
**Chair** [1] - 9:2
**chair** [1] - 162:5
**chance** [2] - 137:11, 138:12
**change** [19] - 19:14, 28:18, 29:1, 33:15, 43:15, 65:17, 73:6, 75:4, 75:8, 76:15, 80:2, 80:4, 101:4, 131:18, 133:10, 140:2, 140:4, 144:11, 178:17
**changed** [5] - 134:9, 134:20, 135:9, 135:11, 177:25
**changes** [33] - 19:9, 19:15, 19:22, 20:1, 20:10, 20:13, 21:3, 21:5, 30:6, 30:8, 30:24, 31:7, 31:9, 31:18, 31:24, 31:25, 32:5, 32:8, 32:10, 32:19, 32:23, 40:2, 40:19, 40:22, 43:10, 95:6, 97:15, 97:16, 99:15, 99:17, 135:9, 189:18
**characteristics** [1] - 58:10
**charge** [4] - 4:9, 4:12, 7:25, 8:1
**chart** [7] - 112:25, 113:13, 120:11, 121:1, 131:16, 137:3
**charts** [1] - 131:4
**Check** [1] - 9:23
**check** [13] - 59:25, 63:25, 154:3, 154:15, 156:15, 158:6, 159:3, 161:9, 177:8, 177:11, 178:9
**checked** [4] - 24:22, 60:16, 176:16, 176:17
**checking** [2] - 155:24
**checks** [3] - 156:15, 170:23, 170:24
**Chemistry** [2] - 143:7, 143:11
**chest** [3] - 24:24, 25:1, 181:11
**Chestnut** [1] - 1:19
**Chief** [1] - 8:4
**child** [7] - 116:3, 116:13, 117:6, 117:21, 120:24, 130:15, 139:2
**child's** [1] - 109:5
**childhood** [1] - 45:21
**children** [4] - 37:8, 45:17, 109:3, 151:7
**choice** [1] - 149:16
**choices** [2] - 148:23, 149:13
**choose** [1] - 174:12
**Christmas** [2] - 147:2, 147:6
**Christmastime** [1] - 147:4
**chromosomes** [6] - 53:23, 53:24, 54:2, 54:3, 54:5, 54:16
**chronic** [1] - 7:14
**Chung** [5] - 14:23, 43:18, 48:10, 190:19, 190:24
**circulation** [1] - 24:11
**circumstances** [4] - 29:19, 35:9, 121:16, 135:10
**citizen** [2] - 150:13, 175:4
**City** [3] - 6:10, 7:18, 7:22
**Civil** [1] - 183:23
**claim** [2] - 189:12, 189:15
**clarified** [1] - 77:18
**clarify** [4] - 76:6, 82:5, 83:4, 94:12
**Class** [1] - 148:6
**classes** [1] - 146:15
**classic** [1] - 45:15
**clear** [8] - 23:14, 72:3, 73:3, 77:17, 80:1, 91:13, 126:21, 188:23
**clearer** [1] - 188:25
**clearly** [3] - 90:25, 189:16, 189:20
**CLERK** [3] - 3:8, 140:22, 173:9
**Clinical** [11] - 3:22, 3:24, 5:2, 5:22, 6:1, 9:1, 9:13, 9:21, 11:1, 12:8, 68:4
**clinical** [31] - 4:8, 4:9, 11:17, 16:13, 16:17, 20:13, 31:10, 33:25, 37:13, 54:22, 55:2, 60:23, 61:3, 61:20, 62:16, 63:11, 65:16, 65:19, 68:22, 70:15, 88:21, 89:7, 89:10, 89:23, 90:7, 92:23, 100:16, 102:4, 103:1
**clinician** [1] - 4:6
**clinicians** [2] - 33:21, 55:8
**Clinton** [2] - 144:18, 144:20
**close** [8] - 109:1, 119:21, 127:22, 140:9, 141:17, 166:24, 189:7, 190:11
**close-knit** [1] - 109:1
**closed** [2] - 169:3, 182:3
**closer** [2] - 66:1, 167:1
**clothing** [2] - 114:10, 127:1
**Co** [1] - 1:3
**co** [1] - 174:8
**Co-administrators** [1] - 1:3
**co-merge** [1] - 174:8
**CO2** [1] - 64:21
**Code** [1] - 192:6
**code** [3] - 25:10, 25:13, 29:24
**collapsed** [1] - 49:13
**collect** [3] - 33:10, 80:11, 133:4
**collected** [8] - 33:5, 33:9, 75:24, 77:10, 77:16, 78:22, 81:14, 102:10
**collection** [8] - 76:23, 77:4, 77:7, 77:10, 77:22, 78:7, 80:9, 102:20
**College** [2] - 5:19, 9:14
**college** [5] - 108:25, 123:14, 123:17, 143:1, 172:1
**color** [2] - 24:12, 26:14
**coloration** [3] - 26:11, 26:13, 27:5
**column** [4] - 25:18, 25:21, 86:1, 86:2
**columns** [1] - 86:4
**comfort** [1] - 164:13
**comfortable** [2] - 145:12, 169:21
**comforts** [1] - 183:7
**coming** [7] - 4:13, 8:2, 47:18, 48:2, 154:22, 178:19, 191:2
**comment** [1] - 48:5
**comments** [3] - 48:5, 77:14, 118:16
**Commercial** [2] - 174:7, 174:10
**commercial** [2] - 147:23, 174:10
**committee** [1] - 9:22
**committees** [1] - 8:24
**common** [2] - 6:15, 47:21
**communicated** [1] - 184:14
**companies** [3] - 144:9, 148:11, 149:3
**company** [6] - 147:10, 147:14, 147:15, 149:12, 149:18, 150:11
**compare** [6] - 70:22, 70:23, 101:24, 120:16, 123:6, 145:8
**compensation** [2] - 120:12, 120:21
**competence** [1] - 188:6
**competent** [1] - 188:14
**complaint** [2] - 108:14
**complete** [5] - 21:22, 59:9, 95:10, 99:20, 186:25
**completed** [4] - 34:5, 34:8, 59:11, 106:1
**completely** [10] - 4:7, 21:15, 30:18, 33:11, 47:20, 77:17, 162:15, 169:3, 186:1, 188:16
**complicated** [1] - 17:16
**complications** [1] - 34:6
**comprehend** [1] - 180:20
**comprehensive** [1] - 190:6
**compressions** [2] - 24:24, 25:1
**comprises** [1] - 141:12
**computer** [2] - 1:22, 170:25
**Computer** [1] - 143:16
**computer-aided** [1] - 1:22
**computers** [1] - 148:18
**concedes** [1] - 185:15
**concern** [1] - 184:16
**concerned** [1] - 101:1
**concerning** [11] - 18:3, 19:11, 38:14, 100:25, 101:2, 117:24, 146:18, 148:17, 185:6, 186:8
**concerns** [4] - 141:24, 143:7, 143:12, 148:8
**conclude** [1] - 116:2
**conclusion** [1] - 100:1
**conclusions** [1] - 136:20
**condition** [16] - 36:10, 37:5, 37:25, 38:2, 40:24, 40:25, 41:1, 41:2, 43:4, 44:22, 47:24, 92:22, 93:4, 93:8, 100:8, 185:16
**conditions** [16] - 11:24, 35:20, 45:16, 54:4, 54:8, 84:19, 92:19, 92:20, 93:22, 95:18, 99:23, 99:25, 100:4, 100:5, 100:6, 100:14
**condolences** [1] - 165:8
**conference** [1] - 104:3

**conferences** [1] - 10:9
**confidence** [1] - 80:25
**confirm** [1] - 103:15
**confuse** [1] - 74:11
**confused** [1] - 74:10
**confusing** [1] - 64:24
**congenita** [4] - 36:4, 44:4, 44:7, 45:9
**congenita-type** [1] - 44:4
**congenital** [19] - 11:23, 17:11, 18:6, 18:10, 34:22, 35:10, 35:20, 35:25, 36:8, 36:10, 44:22, 46:5, 47:6, 47:21, 52:13, 53:13, 55:21, 142:11
**connected** [3] - 102:23, 161:3, 185:12
**connection** [1] - 152:16
**conscious** [1] - 163:17
**consent** [1] - 55:5
**consequences** [1] - 21:17
**consider** [6] - 102:22, 108:11, 117:20, 121:14, 142:23, 145:25
**consideration** [1] - 116:10
**considered** [9] - 24:23, 44:17, 75:23, 90:20, 90:21, 91:6, 102:21, 134:16, 135:3
**considers** [1] - 137:4
**consistency** [1] - 51:25
**consistent** [7] - 22:13, 25:10, 26:5, 26:22, 53:6, 77:20, 103:10
**console** [1] - 166:15
**constricted** [1] - 36:24
**constriction** [1] - 39:3
**Container** [2] - 147:11, 148:18
**contents** [3] - 36:15, 36:17, 37:23
**context** [25] - 35:2, 56:4, 58:4, 61:6, 61:24, 61:25, 62:20, 62:22, 63:1, 63:2, 63:21, 63:23, 65:11, 67:4, 68:16, 68:20, 69:4, 69:6, 69:12, 76:13, 89:17, 89:18, 90:4, 96:10, 100:22
**continual** [2] - 17:8
**continually** [1] - 18:3
**continue** [12] - 45:18, 134:8, 134:15, 134:22, 135:2, 135:3, 135:4, 135:6, 144:10, 162:18, 191:1
**continued** [1] - 105:25
**continuing** [2] - 10:3, 116:25
**continuously** [1] - 111:7
**contract** [1] - 36:16
**contracts** [1] - 8:19
**contracture** [1] - 92:22
**contractures** [44] - 35:18, 35:19, 36:1, 36:2, 36:6, 41:5, 41:16, 41:17, 41:22, 42:1, 42:2, 42:6, 42:11, 42:13, 42:16, 42:21, 42:24, 43:3, 43:10, 43:19, 44:3, 44:7, 44:22, 45:1, 45:8, 45:10, 45:11, 45:12, 45:19, 46:21, 54:6, 92:15, 92:18, 93:6, 93:10, 93:15, 93:17, 93:20, 94:8, 94:13, 96:7, 96:13, 99:23, 187:4
**contributed** [1] - 41:20
**control** [1] - 192:23
**convenient** [1] - 187:6
**convey** [2] - 69:5, 73:9
**cooling** [1] - 27:5
**copies** [4] - 105:13, 165:24, 165:25, 166:1
**copy** [7] - 5:3, 105:10, 169:5, 169:13, 169:15, 170:3, 181:23
**cord** [22] - 33:1, 33:7, 33:15, 67:12, 67:17, 68:4, 73:24, 74:17, 75:14, 75:23, 76:20, 78:21, 80:11, 82:3, 82:8, 82:17, 83:5, 84:24, 91:25, 92:7, 101:22, 163:8
**coroner** [1] - 8:19
**Coroner** [7] - 8:4, 34:6, 167:15, 169:6, 181:12, 181:25
**Coroner's** [4] - 34:14, 34:24, 59:13, 59:18
**coroners** [1] - 8:20
**correct** [114] - 4:13, 28:9, 51:11, 53:19, 56:25, 57:1, 57:4, 57:5, 57:8, 57:9, 57:10, 57:17, 58:20, 58:25, 59:3, 59:18, 62:23, 62:25, 63:15, 65:18, 66:2, 67:10, 69:21, 71:12, 76:4, 77:23, 78:2, 78:7, 78:22, 79:2, 81:12, 81:22, 81:23, 83:21, 84:15, 85:16, 86:6, 86:14, 89:2, 90:22, 91:3, 91:4, 91:11, 91:12, 91:16, 92:1, 92:3, 94:18, 94:25, 95:20, 96:19, 96:24, 96:25, 97:9, 97:23, 99:4, 100:2, 102:6, 118:18, 122:18, 122:25, 124:1, 124:13, 124:16, 124:19, 124:20, 125:4, 125:5, 125:7, 125:8, 125:11, 125:16, 125:17, 125:23, 126:14, 127:5, 127:7, 127:10, 128:5, 128:9, 128:14, 128:18, 129:1, 130:9, 133:9, 133:15, 133:16, 135:22, 135:25, 136:5, 136:6, 136:9, 136:10, 136:13, 136:17, 137:1, 137:2, 137:6, 137:10, 137:11, 137:23, 137:24, 138:3, 138:6, 138:7, 138:10, 138:12, 138:18, 139:6, 139:7, 140:1, 190:13, 190:14, 192:7
**correctly** [13] - 4:12, 55:5, 58:2, 58:18, 60:13, 61:22, 61:23, 64:12, 66:23, 68:10, 82:14, 94:4, 94:12
**correlates** [1] - 185:23
**correlating** [1] - 186:4
**correlation** [1] - 186:5
**cost** [4] - 120:12, 124:21, 168:3, 168:20
**counsel** [2] - 189:2, 189:6
**counted** [1] - 154:21
**counties** [1] - 8:19
**country** [1] - 142:21
**couple** [4] - 9:12, 34:8, 98:9, 126:7
**course** [31] - 6:19, 7:6, 7:7, 8:23, 10:12, 16:13, 16:21, 16:23, 17:13, 18:9, 18:21, 18:24, 19:5, 19:7, 19:24, 21:14, 22:7, 22:25, 31:11, 34:1, 34:2, 43:25, 44:2, 55:25, 74:21, 101:10, 107:16, 156:12, 185:25, 186:20, 186:21
**courses** [2] - 106:2, 142:24
**court** [3] - 10:22, 107:25, 185:7
**Court** [11] - 87:8, 104:5, 137:3, 137:11, 138:11, 185:8, 192:3, 192:4, 192:14, 192:17, 192:17
**COURT** [45] - 1:1, 3:1, 3:5, 5:13, 12:11, 14:3, 14:5, 14:8, 15:24, 45:3, 56:15, 56:17, 56:19, 101:16, 103:23, 103:25, 104:2, 104:7, 104:13, 104:16, 105:16, 106:6, 108:7, 109:13, 109:15, 122:9, 138:20, 140:16, 162:16, 162:18, 162:20, 172:25, 173:4, 183:19, 183:25, 184:2, 188:19, 189:6, 190:11, 190:17, 190:20, 190:25, 191:5, 191:10, 191:12
**Court's** [1] - 44:24
**courting** [1] - 174:17
**Courts** [1] - 107:23
**cover** [1] - 180:16
**coverage** [4] - 120:6, 120:14, 120:18, 120:20
**covered** [1] - 8:7
**covering** [1] - 164:4
**COVID** [4] - 107:18, 119:16, 135:10, 135:14
**CPR** [7] - 24:2, 24:4, 24:5, 27:19, 28:6, 29:25, 32:12
**creases** [8] - 52:15, 52:20, 52:22, 52:24, 53:2, 53:3, 53:4, 53:5
**credibility** [1] - 189:9
**credible** [1] - 189:23
**credits** [4] - 10:3, 106:1, 142:25, 143:22
**cremate** [2] - 164:15, 166:19
**criteria** [1] - 17:2
**critical** [11] - 20:24, 21:6, 21:20, 21:23, 22:3, 31:3, 31:4, 62:12, 98:1, 98:22
**Cross** [1] - 2:2
**cross** [2] - 56:19, 122:9
**CROSS** [2] - 56:20, 122:11
**cross-examine** [2] - 56:19, 122:9
**CRR** [1] - 1:23
**cry** [3] - 26:2, 180:12, 183:5
**crying** [5] - 163:11, 169:22, 180:23, 183:6, 183:10
**crystal** [1] - 137:16
**Cum** [1] - 105:22
**current** [5] - 91:15, 135:6, 139:15, 139:17, 140:9
**customers** [1] - 149:19
**cut** [2] - 21:15, 131:19
**CV** [5] - 5:3, 5:6, 5:10, 105:10, 106:4
**Cyril** [1] - 8:15

## D

**D.C** [2] - 145:20, 145:21
**dad** [1] - 177:19
**daily** [1] - 57:12
**damage** [18] - 21:20, 30:8, 30:9, 30:22, 31:1, 32:2, 96:20, 96:23, 97:2, 97:7, 98:7, 98:8, 98:23, 99:1, 100:9, 108:10, 109:25, 187:9
**damaged** [1] - 96:15
**damages** [3] - 32:6,

120:11, 187:20
**dangerous** [1] - 156:22
**dark** [4] - 162:15, 163:11, 167:2
**Dark** [2] - 147:10, 148:17
**dart** [1] - 187:19
**data** [3] - 184:5, 187:13, 188:5
**date** [7] - 16:21, 110:3, 148:9, 154:20, 155:10, 172:7, 192:9
**dated** [6] - 15:14, 15:15, 67:10, 73:21, 109:10, 139:6
**dates** [2] - 110:2, 192:9
**DAY** [1] - 1:12
**day-to-day** [2] - 8:5, 84:10
**days** [5] - 98:9, 98:18, 99:16, 146:10
**dead** [5] - 30:1, 30:12, 88:7, 88:18, 90:11
**deal** [2] - 149:18, 149:19
**dealing** [1] - 148:18
**death** [102] - 6:16, 10:19, 11:5, 11:9, 13:6, 15:7, 15:10, 16:7, 18:7, 18:11, 18:15, 21:7, 21:11, 21:12, 21:13, 22:4, 22:14, 23:9, 23:11, 23:13, 24:8, 26:5, 26:6, 26:22, 29:14, 30:4, 31:13, 31:20, 33:19, 34:5, 34:7, 34:8, 34:12, 34:13, 34:14, 34:17, 35:1, 35:3, 35:6, 35:13, 36:18, 36:21, 37:5, 37:10, 37:12, 41:3, 41:17, 41:19, 41:20, 41:21, 41:25, 42:6, 46:23, 47:6, 47:12, 51:2, 53:10, 54:9, 55:22, 55:24, 56:2, 56:6, 57:2, 59:4, 59:6, 59:9, 59:12, 59:13, 59:15, 59:18, 59:19, 59:24, 60:9, 62:10, 80:7, 81:15, 91:10, 91:20, 92:12, 95:13, 95:14, 95:16, 95:20, 95:23, 95:24, 97:21, 99:5, 99:9, 100:2, 110:3, 166:5, 166:16, 167:17, 171:12, 171:18, 183:2, 187:2, 187:17, 189:5
**deaths** [4] - 4:21, 8:8, 33:13, 47:22
**deceased** [5] - 23:3, 23:17, 26:16, 27:4, 108:2
**Deceased** [1] - 1:4
**deceleration** [7] - 20:2, 29:5, 62:3, 62:7, 98:13, 103:5, 103:14
**deceleration/ decelerations** [1] - 19:18
**decelerations** [15] - 19:10, 19:16, 20:4, 22:2, 22:19, 59:22, 60:9, 98:15, 100:20, 103:7, 103:14, 184:11, 184:19, 186:2, 189:17
**December** [7] - 79:2, 154:23, 155:14, 155:16, 157:13, 158:18, 184:22
**decide** [11] - 133:10, 136:18, 143:22, 144:15, 147:19, 149:2, 149:6, 149:24, 154:2, 174:23
**decided** [4] - 79:22, 101:4, 145:13, 147:7
**decision** [5] - 69:6, 85:14, 91:2, 184:10, 184:25
**decisions** [1] - 8:12
**declaration** [1] - 190:16
**decor** [1] - 142:7
**decrease** [14] - 20:22, 21:4, 21:13, 31:1, 42:13, 43:9, 97:13, 98:4, 98:17, 114:12, 126:6, 130:1, 131:23, 139:10
**decreased** [10] - 17:12, 21:2, 21:6, 21:18, 42:12, 53:5, 97:25, 119:15, 119:16, 135:15
**decreases** [5] - 20:9, 31:3, 42:17, 126:1
**dedicated** [1] - 150:10
**deduct** [1] - 127:15
**deducted** [1] - 114:8
**deducting** [3] - 126:12, 126:16, 130:6
**deduction** [2] - 113:19, 124:24
**deep** [1] - 143:6
**deeper** [1] - 143:10
**defect** [1] - 18:10
**Defendant** [1] - 1:9
**DEFENDANTS** [1] - 1:17
**Defense** [10] - 17:15, 18:5, 27:20, 31:16, 49:1, 113:23, 114:2, 118:13, 120:23, 189:2
**define** [1] - 90:25
**defined** [2] - 63:4
**definite** [1] - 137:24
**definitely** [3] - 42:2, 85:1, 94:11
**definition** [1] - 90:25
**definitive** [4] - 100:12, 185:16, 187:16, 188:9
**definitively** [2] - 58:10, 58:13
**degree** [77] - 12:17, 15:10, 16:6, 16:8, 18:16, 21:8, 29:10, 46:24, 47:4, 53:18, 56:12, 60:8, 103:20, 111:1, 112:19, 112:21, 112:22, 113:4, 113:12, 113:13, 113:15, 113:21, 113:24, 114:15, 114:17, 114:21, 115:8, 116:6, 116:10, 116:14, 116:17, 117:1, 117:2, 117:6, 117:9, 117:17, 117:21, 117:25, 118:3, 118:10, 118:22, 118:25, 122:6, 123:3, 123:15, 123:17, 123:21, 123:24, 124:3, 124:8, 124:11, 125:16, 126:15, 128:11, 129:9, 129:10, 132:22, 133:13, 134:8, 134:23, 135:18, 135:19, 135:23, 135:24, 136:3, 136:4, 136:15, 136:18, 137:7, 138:5, 140:11
**degrees** [1] - 112:8
**delay** [3] - 81:2, 81:5, 153:9
**delayed** [2] - 75:3, 153:15
**deleted** [1] - 54:16
**deletions** [1] - 54:15
**delicate** [1] - 66:22
**deliver** [1] - 57:5
**delivered** [14] - 22:16, 23:15, 25:16, 25:25, 26:18, 27:17, 29:22, 43:1, 50:14, 86:20, 90:6, 172:13, 172:19, 184:23
**delivery** [48] - 16:11, 19:6, 19:17, 19:25, 22:11, 22:18, 22:25, 27:10, 29:6, 29:24, 31:15, 33:2, 33:5, 34:2, 46:22, 51:7, 56:1, 56:8, 60:10, 61:4, 61:16, 61:21, 62:4, 62:17, 67:17, 68:4, 85:7, 85:11, 86:11, 86:20, 87:19, 88:7, 88:13, 88:21, 89:1, 89:24, 92:5, 97:21, 98:14, 98:18, 103:2, 103:5, 153:13, 154:16, 155:16, 157:21, 187:9
**demise** [11] - 16:10, 23:6, 27:22, 27:25, 60:22, 85:5, 86:21, 86:25, 87:2, 87:3, 185:17
**demonstrated** [1] - 45:17
**demonstrative** [1] - 44:25
**denied** [1] - 190:8
**dense** [1] - 49:23
**Department** [2] - 106:3, 122:2
**dependable** [1] - 148:20
**depict** [1] - 44:6
**depleted** [1] - 21:23
**depletes** [1] - 21:19
**depleting** [1] - 97:20
**depose** [1] - 134:18
**deposition** [52] - 14:13, 14:16, 33:4, 57:19, 57:23, 60:1, 61:1, 62:1, 63:4, 63:23, 66:9, 67:22, 70:13, 71:5, 73:3, 73:9, 74:6, 74:8, 74:10, 75:2, 75:18, 76:22, 77:17, 77:18, 77:21, 81:5, 81:14, 83:18, 83:19, 84:5, 85:9, 89:12, 89:15, 92:3, 93:24, 95:12, 96:16, 108:13, 119:11, 122:24, 123:8, 124:17, 133:6, 133:23, 134:19, 134:21, 135:8, 135:9, 166:2, 187:4, 187:7, 189:25
**depositions** [1] - 14:19
**Deputy** [3] - 8:4, 34:6, 167:15
**describe** [5] - 26:5, 47:14, 51:24, 69:17, 84:3
**described** [22] - 6:3, 26:1, 26:11, 26:12, 26:20, 31:2, 38:10, 39:3, 39:16, 39:17, 42:15, 42:20, 42:22, 51:14, 62:11, 63:6, 63:7, 70:14, 77:16, 82:11, 88:14
**describes** [1] - 38:5
**describing** [2] - 44:21, 79:11
**description** [3] - 39:19, 53:15, 87:24
**design** [1] - 142:6
**designer** [1] - 142:7
**despite** [3] - 50:10, 76:6, 188:6
**detail** [1] - 84:8
**details** [1] - 84:3
**determination** [8] - 51:1, 59:19, 64:15, 65:10, 108:19, 137:12, 138:13, 184:12
**determinations** [1] - 11:5
**determine** [7] - 49:7, 50:25, 59:9, 59:14, 95:16, 105:4, 111:18
**determined** [5] - 59:4, 59:13, 107:11, 112:5, 112:8
**determining** [1] - 116:4
**develop** [2] - 55:2, 99:15
**developed** [1] - 50:16
**development** [6] - 43:20, 47:17, 48:1, 48:22, 94:18, 95:1
**developmental** [1] - 48:24

**diagnose** [2] - 58:10, 176:1
**diagnosis** [1] - 4:5
**diagram** [2] - 45:6, 45:25
**die** [9] - 29:21, 30:11, 31:4, 35:8, 35:9, 38:1, 62:8, 85:10, 99:11
**died** [32] - 11:15, 16:9, 24:6, 29:19, 29:20, 30:19, 33:18, 34:3, 35:11, 56:7, 59:21, 81:24, 82:2, 82:7, 82:17, 82:22, 82:24, 83:6, 85:4, 88:13, 90:3, 98:2, 101:12, 101:14, 102:19, 167:19, 167:23, 168:5, 168:13, 183:16, 186:4
**dies** [1] - 30:6
**difference** [6] - 33:18, 46:4, 92:21, 138:1, 148:25, 149:1
**differences** [1] - 101:25
**different** [27] - 6:1, 6:5, 8:19, 8:24, 9:8, 9:19, 19:12, 19:15, 23:19, 24:10, 44:13, 63:2, 70:20, 108:16, 111:2, 112:7, 114:1, 125:2, 125:3, 137:4, 137:5, 145:18, 165:20, 165:21, 171:14
**differentiate** [1] - 46:3
**diffuse** [1] - 40:5
**dilated** [5] - 36:25, 37:21, 38:22, 47:20, 184:24
**dilation** [1] - 39:3
**dioxide** [3] - 20:12, 49:9, 49:15
**diploma** [4] - 110:25, 116:3, 125:20, 140:10
**DIRECT** [4] - 3:12, 104:21, 141:1, 173:12
**Direct** [1] - 2:2
**direct** [5] - 88:4, 89:8, 94:7, 123:9, 192:23
**directly** [3] - 8:18, 32:23, 147:17
**disagree** [12] - 31:22, 43:13, 59:4, 59:17, 59:19, 60:25, 95:13, 95:17, 95:19, 95:22, 99:22, 100:1
**disagreeing** [1] - 93:12
**discerned** [1] - 92:11
**discolored** [1] - 23:16
**disconnect** [2] - 186:14, 188:22
**discretionary** [1] - 126:18
**discuss** [3] - 94:11, 108:9, 174:17
**discussed** [6] - 74:18, 75:9, 92:15, 93:19, 94:10, 96:21
**discusses** [1] - 189:16
**discussing** [4] - 61:24, 80:6, 121:15, 168:18
**discussion** [2] - 61:7, 152:14
**discussions** [2] - 101:20, 117:23
**disease** [3] - 6:5, 29:18, 47:1
**Disease** [18] - 12:4, 34:7, 35:8, 35:17, 36:9, 36:10, 37:3, 37:4, 39:9, 39:10, 40:18, 46:20, 54:6, 94:16, 95:25, 99:24, 169:12, 182:2
**dishwasher** [1] - 146:7
**disorder** [2] - 34:7, 92:16
**disorders** [2] - 92:10, 96:3
**displayed** [1] - 131:4
**distinct** [1] - 44:4
**distinguish** [1] - 35:19
**distinguished** [1] - 45:24
**distress** [2] - 22:17, 22:19
**distribution** [3] - 42:18, 45:14, 46:19
**DISTRICT** [2] - 1:1, 1:1
**District** [4] - 192:4, 192:17, 192:18
**divided** [1] - 48:4
**divorce** [1] - 151:3
**divorced** [1] - 151:11
**DNA** [1] - 170:4
**Doctor** [6] - 5:18, 22:6, 23:19, 44:25, 56:14, 103:22
**doctor** [26] - 18:1, 33:17, 59:8, 102:4, 154:3, 154:7, 155:22, 156:4, 157:2, 158:5, 159:25, 162:1, 162:5, 167:20, 174:21, 175:21, 176:1, 176:24, 176:25, 177:10, 178:12, 178:14, 178:22, 178:24
**Doctor's** [1] - 15:19
**doctors** [11] - 19:22, 71:7, 154:12, 156:19, 159:2, 159:16, 160:3, 162:2, 176:20, 178:10, 178:15
**document** [2] - 65:25, 66:2
**documentation** [1] - 73:1
**documented** [11] - 19:9, 25:11, 25:20, 25:21, 25:23, 27:11, 48:11, 78:24, 79:4, 101:3, 101:8
**documents** [1] - 14:8
**dollar** [3] - 114:13, 114:18, 149:1
**done** [22] - 4:12, 6:18, 7:8, 9:20, 33:14, 43:25, 44:1, 49:4, 72:19, 73:11, 79:9, 80:18, 80:24, 92:4, 99:20, 102:14, 134:2, 148:19, 170:1, 172:20, 182:5, 186:17
**door** [4] - 160:3, 160:4, 160:5, 169:3
**Doppler** [2] - 85:23, 86:12
**dough** [2] - 51:6, 51:22
**dough-like** [2] - 51:6, 51:22
**down** [21] - 27:5, 81:7, 81:11, 103:25, 120:22, 128:8, 128:22, 158:10, 159:19, 160:17, 162:25, 163:15, 164:3, 170:17, 173:4, 178:20, 178:21, 179:2, 179:19, 180:14, 183:19
**Downstate** [1] - 7:1
**Dr** [100] - 2:3, 3:4, 3:14, 5:10, 8:15, 10:25, 12:8, 12:11, 12:14, 14:13, 14:14, 14:22, 14:23, 14:25, 16:4, 17:15, 18:19, 20:1, 21:10, 22:1, 22:17, 23:6, 27:20, 29:4, 29:23, 31:16, 33:4, 39:11, 39:18, 43:2, 43:18, 44:3, 47:4, 48:9, 48:10, 51:7, 54:10, 55:12, 55:19, 56:22, 57:5, 67:7, 75:2, 75:23, 76:9, 76:18, 77:18, 78:11, 78:14, 78:20, 78:23, 79:3, 79:5, 79:11, 79:21, 80:23, 101:20, 103:25, 155:18, 159:9, 159:11, 160:4, 160:14, 160:17, 161:11, 162:1, 162:10, 163:5, 163:23, 165:10, 166:23, 177:5, 177:6, 178:8, 179:25, 184:7, 184:9, 184:10, 184:15, 184:20, 184:22, 185:1, 185:3, 185:4, 185:5, 185:14, 185:24, 185:25, 186:18, 187:25, 188:11, 189:23, 190:19, 190:24, 191:2
**dramatically** [1] - 112:25
**draw** [4] - 77:15, 79:10, 80:1, 80:3
**drawing** [1] - 79:12
**drawn** [6] - 4:10, 76:19, 77:19, 79:13, 80:21, 188:12
**dreams** [1] - 145:9
**drive** [3] - 148:7, 148:10, 158:14
**driver** [3] - 148:6, 149:12, 149:18
**Driver's** [1] - 147:23
**driving** [5] - 147:23, 148:8, 148:21, 149:3, 171:17
**drop** [1] - 30:12
**drove** [1] - 149:3
**Drs** [1] - 14:16
**DT** [1] - 77:14
**DU** [1] - 7:7
**due** [8] - 16:10, 16:21, 60:9, 111:8, 135:10, 154:20, 155:10
**DULY** [4] - 3:7, 104:20, 140:21, 173:7
**duodenum** [5] - 39:21, 40:3, 40:7, 40:8, 41:9
**Duquesne** [1] - 7:4
**during** [32] - 11:18, 11:21, 16:23, 18:8, 18:20, 19:5, 22:9, 24:24, 25:15, 29:14, 29:25, 30:4, 46:22, 56:7, 60:10, 61:19, 61:21, 62:1, 88:4, 89:22, 89:24, 90:12, 94:17, 98:3, 98:4, 98:21, 101:10, 103:14, 119:14, 133:5, 135:14, 179:16
**dying** [6] - 4:23, 89:14, 90:2, 90:8, 186:12, 186:13
**dysfunction** [1] - 31:20


## E


**E.G** [5] - 1:4, 109:25, 124:22, 128:17, 135:11
**E.G.'s** [1] - 115:15
**earliest** [1] - 110:14
**early** [1] - 191:12
**earn** [1] - 148:24
**earned** [1] - 105:8
**earning** [18] - 105:7, 108:1, 108:17, 109:5, 110:22, 113:3, 114:15, 114:17, 115:13, 122:17, 125:16, 126:11, 126:16, 127:14, 129:21, 131:8, 133:17, 149:11
**earnings** [36] - 107:1, 107:10, 107:13, 110:7, 110:23, 110:24, 111:10, 111:12, 113:15, 113:19, 114:7, 115:5, 116:19, 116:23, 121:8, 121:9, 125:3, 125:24, 125:25, 126:2, 126:3, 127:21, 128:19, 128:21, 130:2, 130:20, 131:14, 131:15, 131:22,

132:11, 135:17, 136:22, 137:1, 137:20, 138:13
**earns** [1] - 129:10
**easier** [2] - 39:6, 74:7
**East** [1] - 147:2
**eat** [1] - 171:15
**economic** [30] - 108:10, 109:4, 109:25, 113:4, 113:21, 114:9, 114:21, 115:8, 115:15, 116:4, 116:6, 116:16, 117:1, 117:5, 117:17, 118:2, 118:10, 118:14, 118:20, 120:5, 122:6, 132:23, 133:14, 134:9, 134:23, 136:3, 136:15, 136:19, 137:8, 138:5
**Economic** [5] - 106:2, 106:21, 108:5, 142:17, 144:3
**economics** [1] - 105:2
**Economics** [3] - 105:23, 106:19, 106:20
**economist** [6] - 104:4, 120:23, 133:21, 136:14, 190:15, 190:22
**Economist** [5] - 104:25, 105:1, 105:2, 106:25, 107:22
**Economy** [2] - 144:5
**economy** [2] - 144:6
**edematous** [1] - 51:16
**edge** [1] - 166:24
**education** [17] - 5:1, 10:25, 105:11, 108:24, 112:15, 114:16, 114:17, 121:13, 122:22, 123:5, 137:25, 142:14, 142:21, 142:25, 146:12, 152:15, 174:5
**Educational** [1] - 9:2
**educational** [18] - 9:6, 9:20, 9:25, 10:1, 10:3, 105:21, 108:16, 108:17, 110:2, 122:20, 125:3, 128:14, 135:17, 135:21, 135:25, 136:2, 136:9, 136:23
**effect** [1] - 42:25
**effected** [1] - 37:8
**effective** [2] - 25:4, 28:9
**effectively** [1] - 32:25
**effects** [2] - 20:18, 103:16
**effort** [5] - 26:2, 49:8, 50:1, 50:14, 108:18
**efforts** [4] - 25:15, 28:12, 50:10, 98:24
**eight** [7] - 13:24, 52:24, 106:2, 125:9, 139:21, 139:23, 139:24
**either** [11] - 21:14, 34:20, 40:12, 43:12, 46:21, 54:22, 55:1, 63:10, 94:7, 108:20, 110:25
**elected** [1] - 8:22
**electric** [2] - 127:9, 147:5
**electrolytes** [1] - 80:16
**elevation** [1] - 176:1
**embryonic** [1] - 94:18
**emergency** [3] - 154:13, 161:14, 180:3
**emergent** [1] - 40:24
**employee** [1] - 120:19
**employee's** [1] - 115:4
**employment** [3] - 7:17, 106:10, 106:11
**encephalopathy** [1] - 7:15
**encompasses** [2] - 3:25, 4:14
**end** [14] - 37:20, 45:11, 112:18, 115:6, 139:20, 139:24, 140:2, 140:9, 140:11, 150:21, 154:17, 176:23, 177:15
**endure** [1] - 173:2
**engaged** [1] - 58:24
**engineer** [3] - 141:23, 142:6, 142:7
**English** [5] - 141:9, 146:14, 146:17, 146:23, 173:19
**enjoy** [3] - 142:8, 171:15, 173:25
**enlarged** [1] - 36:25
**entered** [2] - 110:5, 190:4
**enterocolitis** [4] - 40:12, 40:14, 40:16, 40:20
**enterprise** [1] - 144:9
**entire** [10] - 37:17, 38:8, 39:12, 39:13, 40:6, 120:24, 127:23, 129:3, 135:14, 136:15
**entirety** [4] - 59:23, 68:8, 69:22, 103:3
**entrance** [1] - 110:12
**entry** [4] - 25:18, 110:23, 110:24, 129:25
**environment** [1] - 32:17
**envision** [1] - 127:13
**episode** [1] - 19:18
**episodes** [2] - 19:9, 19:15
**equally** [1] - 136:15
**equivalent** [1] - 142:20
**Erie** [2] - 5:19, 5:20
**esophagus** [3] - 37:15, 37:18, 37:20
**Esq** [2] - 1:15, 1:18
**essentially** [12] - 17:5, 25:6, 25:24, 27:16, 37:7, 47:20, 49:18, 50:22, 51:18, 54:17, 98:2, 102:21
**establish** [2] - 149:25, 151:11
**established** [5] - 80:20, 83:17, 154:7, 185:2, 185:4
**Estate** [1] - 1:4
**estimate** [3] - 110:8, 110:21, 137:22
**estimated** [1] - 120:25
**estimates** [1] - 138:1
**estimating** [2] - 120:7, 120:10
**eternity** [1] - 164:1
**evaluate** [4] - 23:1, 27:18, 93:13, 143:18
**evaluated** [4] - 23:18, 63:17, 65:19, 184:11
**evaluating** [5] - 12:1, 16:5, 28:18, 106:25, 107:8
**evaluation** [7] - 26:10, 73:6, 78:12, 108:11, 109:25, 113:9, 118:20
**evaluations** [4] - 33:13, 44:1, 107:6, 107:15
**evening** [6] - 19:17, 62:4, 98:14, 178:16, 184:22, 184:24
**event** [17] - 23:10, 23:12, 24:8, 30:10, 30:11, 30:17, 42:23, 47:1, 56:5, 61:2, 61:19, 62:16, 88:20, 89:21, 157:17, 160:16, 185:17
**events** [9] - 23:10, 23:13, 24:9, 41:20, 46:22, 47:2, 56:6, 62:8, 157:22
**eventually** [5] - 145:24, 152:20, 156:25, 161:25, 169:15
**evidence** [34] - 5:12, 5:16, 7:14, 14:11, 15:18, 15:19, 16:2, 18:8, 18:9, 33:8, 34:1, 40:12, 40:13, 42:10, 43:7, 53:12, 55:19, 105:14, 105:19, 109:19, 166:10, 166:13, 185:23, 186:6, 186:9, 186:15, 187:14, 188:1, 188:23, 189:9, 189:10, 189:11, 189:15, 189:16
**evidenced** [1] - 29:2
**evident** [2] - 25:12, 97:9
**exact** [2] - 99:14, 155:19
**exactly** [9] - 59:14, 73:17, 84:7, 127:12, 127:18, 131:12, 132:12, 133:5, 168:16
**exam** [3] - 31:18, 39:20, 47:20
**EXAMINATION** [8] - 3:12, 56:20, 101:18, 104:21, 122:11, 138:22, 141:1, 173:12
**examination** [5] - 37:15, 38:14, 43:17, 47:24, 51:18
**examinations** [3] - 42:11, 47:14, 50:21
**examine** [4] - 4:3, 7:13, 56:19, 122:9
**examined** [4] - 24:18, 37:1, 40:1, 68:16
**Examiner** [1] - 95:19
**Examiner's** [6] - 6:10, 7:19, 8:12, 9:3, 59:17, 100:1
**Examiners** [2] - 9:1, 9:15
**examiners** [2] - 8:6, 9:9
**examining** [1] - 38:23
**example** [16] - 4:2, 30:11, 31:10, 53:1, 128:2, 131:6, 131:8, 139:4, 139:24, 143:2, 143:13, 146:19, 184:7, 186:13
**examples** [1] - 130:6
**except** [3] - 113:24, 158:7, 185:12
**exception** [1] - 16:24
**excessive** [1] - 156:20
**exchange** [1] - 49:11
**exchanged** [1] - 49:9
**exchanging** [1] - 49:15
**excludes** [2] - 186:24, 186:25
**exclusion** [1] - 188:8
**excuse** [2] - 94:13, 178:5
**excused** [1] - 140:16
**executive** [1] - 8:11
**Exhibit** [28] - 2:8, 2:9, 2:9, 2:10, 2:10, 2:11, 2:11, 2:12, 2:12, 2:13, 2:13, 2:14, 5:15, 13:22, 16:1, 46:10, 65:22, 67:13, 67:18, 85:19, 86:15, 87:5, 88:5, 91:7, 105:13, 105:18, 109:18, 166:12
**exhibit** [4] - 87:6, 105:16, 106:6, 147:3
**exhibits** [2] - 14:2, 14:10
**Exhibits** [1] - 2:14
**exist** [2] - 147:1, 185:19
**existed** [1] - 75:7
**existent** [1] - 33:12
**expect** [10] - 31:8, 31:25, 34:21, 36:5, 82:2, 82:7, 83:5, 100:7, 154:20, 191:1
**expectancy** [8] - 107:4, 110:4, 110:5, 110:9, 111:18, 111:21, 111:25, 112:2
**expectation** [1] - 50:18

**expected** [3] - 37:8, 53:25, 155:10
**expecting** [3] - 153:23, 154:21, 154:24
**expense** [1] - 129:20
**expenses** [19] - 113:20, 114:3, 114:8, 114:9, 114:20, 120:25, 121:3, 124:25, 125:20, 125:21, 126:21, 127:6, 128:3, 128:7, 128:13, 129:23, 150:2, 166:5, 166:7
**experience** [12] - 5:7, 11:1, 29:17, 52:21, 54:21, 55:9, 58:16, 95:8, 96:11, 106:11, 106:24
**experienced** [4] - 19:17, 19:18, 24:10, 42:4
**experiences** [2] - 5:1, 7:17
**experiencing** [2] - 20:5, 63:13
**Expert** [1] - 107:22
**expert** [15] - 10:23, 12:8, 12:12, 15:19, 43:18, 58:25, 91:18, 108:5, 114:2, 118:14, 185:1, 185:23, 185:24, 188:4, 188:24
**expert's** [2] - 184:5, 188:6
**expertise** [2] - 106:25, 107:3
**experts** [15] - 18:5, 27:20, 31:16, 39:10, 43:2, 48:9, 49:1, 52:23, 84:2, 185:16, 186:14, 187:14, 188:15, 188:22
**Experts** [1] - 106:21
**explain** [15] - 23:8, 28:15, 35:8, 35:23, 36:20, 42:5, 45:1, 49:4, 62:6, 68:15, 68:20, 69:21, 99:9, 155:4, 187:2
**explained** [5] - 29:18, 35:11, 43:6, 99:4, 156:21
**explaining** [2] - 83:24, 186:16
**explanation** [2] - 31:23, 186:9
**explore** [1] - 122:21
**exposed** [2] - 32:16, 42:4
**expressed** [2] - 122:5, 184:16
**extra** [3] - 53:4, 54:2, 54:16
**extremely** [2] - 187:23, 188:23
**extremities** [2] - 41:16, 46:16
**Eyad** [3] - 164:18, 182:19, 182:21
**eyes** [7] - 4:4, 36:22, 38:22, 99:12, 164:3, 164:11, 183:9

**F**

**face** [3] - 26:20, 27:15, 46:16
**facing** [1] - 162:1
**fact** [23] - 22:21, 22:22, 23:2, 26:9, 31:18, 33:4, 40:1, 40:23, 84:18, 90:24, 92:1, 92:15, 96:10, 103:15, 133:9, 136:17, 155:1, 181:3, 186:4, 189:19, 189:22, 190:1, 190:5
**factor** [5] - 111:13, 124:21, 128:4, 128:20, 153:17
**factors** [1] - 113:11
**facts** [6] - 112:4, 184:5, 187:13, 188:5, 190:3, 190:6
**factual** [1] - 55:19
**failure** [1] - 94:17
**fair** [3] - 69:18, 79:25, 83:4
**fair-handed** [1] - 79:25
**fall** [1] - 93:6
**falling** [1] - 163:16
**falls** [1] - 68:19
**familiar** [15] - 11:2, 11:5, 11:7, 11:11, 11:17, 11:20, 11:23, 12:1, 12:4, 22:6, 44:9, 107:8, 107:10, 107:13
**familiarity** [1] - 106:25
**families** [3] - 121:22, 147:3, 152:10
**family** [26] - 109:1, 109:2, 116:2, 121:12, 121:15, 121:24, 141:10, 141:12, 141:14, 141:17, 142:8, 142:12, 151:11, 151:16, 151:20, 152:6, 152:12, 152:13, 153:8, 153:17, 154:6, 157:16, 173:23, 173:25, 174:3, 174:18
**far** [7] - 45:11, 52:17, 58:13, 81:13, 147:20, 157:24, 167:10
**fashion** [1] - 42:9
**fatal** [1] - 45:20
**father** [8] - 107:21, 141:15, 141:21, 141:23, 142:1, 158:17, 158:19, 172:3
**father's** [1] - 106:12
**favor** [1] - 190:4
**features** [1] - 45:24
**FEBRUARY** [1] - 1:13
**feces** [1] - 37:6
**Federal** [2] - 107:23, 183:22
**feeds** [1] - 32:19
**feet** [13] - 52:4, 52:6, 52:8, 52:11, 52:14, 52:15, 52:17, 52:20, 52:24, 53:7, 53:9, 162:9, 162:13
**Fellow** [1] - 6:23
**fellows** [1] - 10:17
**Fellows** [1] - 8:1
**Fellowship** [5] - 6:7, 6:11, 6:13, 6:17, 7:25
**fellowship** [1] - 6:12
**felt** [11] - 24:11, 44:21, 55:8, 55:9, 100:24, 108:18, 158:19, 161:7, 164:1, 165:6, 181:14
**female** [3] - 54:14, 54:17, 162:2
**fetal** [42] - 13:2, 16:9, 17:10, 17:12, 19:9, 19:16, 19:19, 20:4, 22:7, 22:13, 22:17, 22:18, 23:6, 27:25, 33:13, 45:20, 47:22, 57:11, 57:14, 58:9, 58:10, 74:21, 83:10, 83:14, 84:1, 84:4, 85:5, 85:6, 90:9, 90:10, 100:12, 100:24, 103:9, 184:17, 185:6, 185:15, 185:19, 186:1, 186:8, 187:15, 188:7, 189:17
**fetus** [8] - 20:3, 42:3, 69:14, 73:6, 83:21, 88:24, 90:20, 97:20
**fetus'** [1] - 189:18
**few** [9] - 9:20, 30:24, 36:23, 86:10, 88:22, 101:17, 122:20, 138:21, 169:6
**field** [1] - 91:19
**fields** [2] - 12:8, 188:6
**fifteen** [1] - 56:17
**fifth** [1] - 24:21
**figure** [1] - 156:3
**figures** [6] - 113:21, 121:25, 122:1, 122:5, 124:7, 124:10
**filed** [1] - 159:12
**fill** [2] - 49:19, 50:2
**filled** [1] - 95:23
**final** [1] - 13:7
**finally** [1] - 187:18
**finance** [1] - 105:3
**Financial** [1] - 106:21
**financial** [1] - 148:15
**financially** [1] - 175:1
**findings** [41] - 11:8, 18:14, 26:3, 26:8, 26:15, 26:22, 28:18, 34:15, 34:18, 34:20, 34:24, 35:16, 37:16, 38:10, 38:19, 42:3, 43:11, 45:7, 47:8, 47:9, 47:21, 48:17, 51:13, 52:5, 54:7, 64:7, 84:12, 93:2, 95:21, 95:22, 99:7, 100:5, 100:22, 101:8, 101:9, 112:10, 112:11, 118:18, 181:24, 186:25
**Findings** [1] - 183:24
**fine** [4] - 84:8, 109:23, 191:7, 191:11
**finish** [3] - 37:19, 143:15, 143:23
**finished** [2] - 6:18, 7:18
**firm** [3] - 48:6, 48:13, 106:12
**first** [64] - 7:19, 7:23, 20:18, 21:4, 22:21, 23:21, 25:14, 25:18, 25:20, 25:23, 49:17, 67:13, 67:16, 73:23, 74:23, 76:7, 76:15, 76:24, 77:3, 77:5, 77:8, 77:13, 77:23, 77:25, 78:2, 98:12, 109:22, 111:5, 112:6, 129:25, 130:20, 131:13, 143:15, 144:17, 145:7, 145:18, 146:4, 146:6, 151:1, 151:2, 151:7, 153:19, 154:2, 155:1, 155:8, 157:10, 157:19, 159:25, 166:21, 170:4, 171:3, 171:18, 172:16, 172:20, 175:7, 177:4, 177:6, 178:2, 180:18, 181:8, 182:24, 185:5, 187:3
**fit** [2] - 51:1, 187:14
**fits** [1] - 188:2
**five** [7] - 28:17, 115:20, 119:16, 132:14, 158:21, 161:5, 162:16
**fix** [3] - 30:9, 31:1, 161:10
**fixed** [1] - 38:3
**flip** [2] - 160:9, 179:7
**flipped** [1] - 168:9
**float** [9] - 48:7, 48:8, 49:2, 49:5, 49:6, 49:21, 49:24, 50:2, 50:17
**floated** [1] - 50:20
**floating** [2] - 95:4, 99:24
**flopping** [1] - 163:18
**Florida** [1] - 145:19
**flow** [1] - 86:8
**fluently** [1] - 141:8
**fluid** [13] - 16:25, 17:18, 18:4, 19:14, 42:14, 43:9, 51:17, 156:21, 157:9, 161:9, 176:1, 176:6, 177:21
**fluids** [2] - 100:20, 101:4
**focal** [7] - 34:20, 36:23, 38:10, 39:2, 39:15, 39:16, 40:5
**focus** [3] - 4:20, 70:3, 70:7
**focuses** [1] - 4:8
**focusing** [1] - 6:13
**folks** [1] - 59:5

**follow** [1] - 6:7
**followed** [2] - 16:23, 73:10
**following** [2] - 16:10, 156:23
**FOLLOWS** [4] - 3:7, 104:20, 140:21, 173:8
**food** [2] - 114:9, 126:24
**foot** [7] - 13:19, 52:2, 53:4, 53:6, 53:14, 159:23, 163:2
**footprint** [2] - 13:21, 53:2
**footprints** [3] - 13:24, 53:14, 165:22
**FOR** [3] - 1:1, 1:14, 1:17
**force** [6] - 119:14, 119:20, 119:25, 134:5, 135:14
**foregoing** [3] - 192:7, 192:10, 192:22
**forensic** [3] - 4:14, 4:20, 9:14
**Forensic** [21] - 3:16, 3:23, 4:15, 5:2, 6:11, 7:5, 9:16, 11:1, 12:9, 24:7, 58:24, 80:15, 91:19, 104:25, 105:1, 105:2, 106:20, 106:24, 107:22, 108:5
**forensics** [1] - 50:3
**forgot** [1] - 4:16
**Forklift** [1] - 147:9
**forming** [5] - 16:12, 18:19, 32:10, 88:9, 91:8
**formulating** [2] - 76:3, 76:14
**forth** [4] - 74:22, 105:11, 186:3, 192:9
**forty** [2] - 81:14, 106:24
**forty-some** [1] - 106:24
**four** [10] - 5:25, 8:14, 8:16, 8:21, 78:15, 132:15, 139:22, 143:1, 161:5, 179:11
**four-year** [1] - 5:25
**fourth** [1] - 135:23
**frame** [1] - 33:9
**frames** [1] - 77:18
**Francis** [32] - 14:14, 33:4, 55:12, 78:20, 78:23, 79:3, 79:5, 79:11, 80:23, 159:9, 159:11, 160:4, 160:14, 160:17, 161:11, 162:1, 162:10, 163:6, 163:23, 165:10, 166:23, 177:5, 177:6, 178:8, 178:13, 178:24, 179:25, 184:9, 184:22, 185:3, 187:25, 189:23
**Francis'** [9] - 75:2, 75:23, 76:9, 76:18, 77:18, 78:11, 78:14, 78:17, 79:21
**freaked** [2] - 159:18, 178:20
**freedom** [2] - 148:23, 149:11
**French** [2] - 141:8, 173:19
**frequently** [1] - 92:2
**Friday** [6] - 155:14, 169:15, 182:18, 191:1, 191:2, 191:4
**friend** [1] - 146:8
**friends** [1] - 167:6
**fringe** [17] - 107:8, 108:1, 109:5, 114:24, 115:1, 115:4, 115:7, 115:14, 116:19, 116:24, 120:7, 120:12, 120:15, 120:17, 122:18, 137:21, 138:13
**front** [3] - 78:14, 87:6, 162:9
**fuel** [1] - 150:6
**full** [16] - 111:3, 111:6, 115:25, 117:11, 125:7, 125:15, 129:9, 130:13, 134:16, 136:8, 136:22, 140:11, 152:2, 159:17, 179:12, 188:7
**full-time** [9] - 111:3, 115:25, 117:11, 125:7, 125:15, 129:9, 130:13, 136:22, 140:11
**fully** [1] - 184:23
**function** [1] - 43:20
**functions** [1] - 8:11
**funeral** [3] - 166:4, 166:7, 167:5
**future** [12] - 105:5, 107:10, 107:13, 110:22, 112:23, 113:3, 113:18, 115:13, 132:13, 135:7, 139:13, 139:14

**G**

**G-H-A-R-B-I** [2] - 140:25, 173:11
**gallbladder** [2] - 4:2, 6:3
**gap** [1] - 186:5
**gas** [22] - 33:1, 33:3, 33:7, 33:16, 67:12, 67:17, 68:4, 73:24, 74:17, 75:14, 76:8, 78:22, 81:3, 82:3, 82:8, 82:17, 83:6, 84:25, 91:25, 92:7, 102:8, 146:25
**gases** [2] - 80:17, 101:22
**gasp** [2] - 163:12, 180:12
**gastric** [1] - 37:23
**gastrointestinal** [1] - 37:18
**gathered** [1] - 34:15
**gear** [1] - 161:19
**gene** [1] - 54:24
**general** [10] - 9:12, 12:19, 63:21, 69:12, 71:23, 84:7, 106:13, 133:20, 145:2, 156:1
**General** [1] - 5:23
**generate** [2] - 10:1, 99:9
**generated** [3] - 9:19, 15:2, 95:23
**Genetic** [1] - 143:7
**genetic** [40] - 11:23, 13:9, 13:12, 34:7, 47:6, 47:11, 49:3, 53:13, 53:20, 53:24, 54:10, 54:19, 54:21, 54:25, 55:4, 55:7, 55:13, 55:17, 55:21, 92:10, 92:16, 92:18, 92:20, 92:24, 92:25, 93:3, 93:8, 94:20, 96:3, 99:25, 100:4, 142:11, 170:1, 170:9, 174:2, 182:5, 182:9, 182:11
**Geneticist** [2] - 58:20, 190:19
**genetics** [1] - 170:7
**Genetics** [1] - 58:22
**genitalia** [1] - 54:1
**gentleman** [1] - 167:14
**Gharbi** [43] - 2:5, 2:5, 13:10, 13:15, 14:20, 16:9, 16:20, 19:3, 19:12, 22:23, 29:19, 32:11, 35:11, 35:21, 44:1, 45:23, 46:4, 53:8, 100:18, 104:9, 108:2, 108:20, 108:21, 110:2, 117:24, 121:16, 128:10, 136:3, 140:19, 140:24, 142:8, 150:17, 164:17, 172:23, 173:1, 173:6, 173:11, 173:14, 174:13, 183:14, 183:16, 183:19, 184:23
**GHARBI** [4] - 1:2, 1:3, 1:4, 1:5
**Gharbi's** [18] - 15:7, 16:13, 16:16, 17:16, 18:11, 18:20, 23:6, 23:13, 26:1, 36:18, 41:17, 47:5, 47:12, 55:24, 56:6, 117:24, 118:21, 120:24
**Gharbis** [1] - 116:2
**GI** [8] - 39:12, 39:13, 39:14, 39:15, 39:18, 39:21, 40:6, 94:17
**given** [14] - 10:19, 15:20, 19:14, 32:1, 55:5, 62:22, 72:11, 72:20, 122:17, 132:16, 133:2, 169:5, 170:6, 179:15
**goal** [1] - 171:24
**God** [2] - 163:25, 167:9
**Golen** [1] - 14:23
**gonna** [3] - 150:6, 161:8, 177:23
**goodbye** [3] - 164:19, 164:24, 181:7
**Government** [5] - 2:2, 8:18, 144:22, 190:4
**Governmental** [3] - 108:15, 110:6, 110:24
**governmental** [1] - 115:3
**graduate** [1] - 142:24
**Graduate** [1] - 106:2
**graduated** [1] - 142:15
**grant** [1] - 145:2
**granting** [1] - 144:23
**greater** [2] - 186:11, 186:12
**green** [1] - 167:2
**Gregory** [1] - 167:16
**grief** [2] - 173:2, 183:17
**grieve** [1] - 183:12
**grimacing** [1] - 27:14
**gross** [6] - 6:2, 37:15, 40:12, 47:14, 47:23, 115:5
**grossly** [4] - 4:4, 6:4, 36:22, 47:16
**group** [4] - 64:14, 64:16, 64:18, 65:9
**grouping** [1] - 128:18
**groups** [1] - 128:20
**grow** [3] - 45:17, 45:18, 174:22
**growth** [1] - 156:15
**guess** [6] - 106:23, 113:7, 126:11, 149:3, 161:20, 167:2
**guys** [1] - 172:18
**GYN** [6] - 22:7, 22:10, 57:7, 84:6, 154:13, 186:21

**H**

**H-A-M-M-E-R-S** [1] - 3:11
**HACC** [1] - 143:16
**half** [4] - 8:16, 8:21, 124:7, 178:5
**halfway** [1] - 164:3
**hallway** [1] - 161:23
**Hamilton** [2] - 154:4, 175:9
**Hammers** [31] - 2:3, 3:4, 3:10, 3:14, 5:10, 10:25, 12:8, 12:11, 12:14, 14:13, 14:25, 16:4, 18:19, 20:1, 21:10, 22:1, 23:6, 29:4, 29:23, 44:3, 47:4, 54:10, 55:19, 56:22, 57:5, 67:7, 101:20, 103:25, 185:4, 185:25, 186:18
**hand** [9] - 25:17, 82:11, 82:12, 152:10, 163:6, 163:7, 163:9, 163:21, 177:13
**handed** [1] - 79:25
**handful** [1] - 23:21
**handle** [1] - 31:2
**handled** [1] - 189:20
**hands** [5] - 46:16,

160:10, 163:14, 175:15, 179:7
**hands-on** [1] - 175:15
**happily** [1] - 153:23
**happy** [5] - 74:24, 149:20, 156:6, 175:10, 184:2
**hard** [4] - 145:25, 146:21, 167:25, 179:8
**hardest** [1] - 181:13
**harm** [2] - 185:18, 189:4
**Harrisburg** [6] - 1:16, 154:10, 154:11, 154:14, 182:16
**Hattab** [3] - 2:5, 140:18, 140:24
**HATTAB** [3] - 1:2, 1:4, 140:25
**Haven** [1] - 191:3
**HAVING** [4] - 3:6, 104:20, 140:20, 173:7
**head** [11] - 7:15, 26:21, 50:22, 158:8, 162:7, 163:16, 164:12, 166:24, 177:10, 178:14
**health** [11] - 114:10, 115:3, 120:6, 120:13, 120:18, 120:20, 127:6, 142:9, 167:9, 173:25
**healthy** [10] - 28:7, 37:9, 142:9, 156:17, 158:7, 167:21, 175:22, 181:21
**hear** [13] - 13:20, 82:20, 156:25, 163:11, 168:14, 169:4, 175:10, 180:8, 180:11, 180:23, 184:2, 190:7
**heard** [9] - 62:14, 94:7, 157:1, 157:11, 160:21, 160:22, 160:25, 185:9, 187:5
**heart** [70] - 6:15, 19:10, 20:4, 20:13, 22:13, 23:20, 24:4, 24:5, 24:17, 24:20, 24:21, 25:3, 25:14, 25:21, 28:6, 28:7, 28:8, 28:22, 30:12, 30:13, 30:15, 30:16, 30:20, 31:10, 32:20, 32:22, 32:24, 47:15, 47:16, 47:19, 48:18, 48:22, 57:11, 57:14, 58:9, 65:17, 74:21, 83:10, 83:14, 84:1, 84:4, 85:6, 86:11, 87:20, 87:23, 88:2, 88:6, 88:16, 90:9, 90:10, 96:17, 100:12, 160:17, 162:4, 170:17, 178:20, 178:21, 179:2, 179:19, 184:17, 185:6, 185:15, 185:19, 186:1, 186:8, 187:15, 188:8
**heartbeat** [17] - 23:23, 24:1, 24:14, 25:11, 27:15, 27:21, 28:1, 28:3, 28:11, 28:19, 29:24, 32:13, 159:19, 159:21, 159:25, 160:11, 189:18
**heater** [2] - 163:24, 167:1
**held** [3] - 6:19, 7:9, 8:22
**help** [5] - 19:5, 46:3, 112:10, 168:7, 168:17
**helpful** [1] - 131:5
**hemorrhages** [1] - 27:6
**hereby** [1] - 192:6
**hereinbefore** [1] - 192:9
**herself** [7] - 160:14, 169:8, 169:23, 177:5, 177:7, 178:11, 178:13
**HGH** [1] - 150:12
**high** [28] - 96:12, 110:25, 112:8, 112:17, 114:16, 114:17, 115:15, 115:17, 116:3, 121:4, 122:22, 124:3, 125:16, 125:20, 126:5, 126:15, 128:11, 135:17, 136:4, 139:1, 139:5, 139:20, 140:10, 140:11, 142:21, 143:1, 143:15, 158:8
**higher** [23] - 66:22, 112:20, 113:12, 123:3, 123:6, 123:24, 124:11, 124:15, 126:2, 126:3, 127:19, 127:21, 128:21, 129:6, 130:1, 130:12, 130:20, 131:13, 131:14, 142:25, 143:19, 162:11
**highest** [5] - 66:14, 66:15, 66:16, 137:22, 138:2
**highlights** [1] - 39:5
**hilary** [1] - 144:18
**himself** [3] - 130:7, 167:15, 167:18
**hire** [1] - 148:13
**hired** [1] - 147:17
**Hirschsprung's** [28] - 12:4, 34:6, 35:8, 35:17, 35:25, 36:9, 36:10, 36:18, 36:20, 37:3, 37:4, 37:10, 37:11, 38:19, 39:9, 39:10, 39:11, 40:18, 40:19, 40:25, 46:20, 54:5, 94:16, 95:25, 99:24, 169:12, 182:2
**histologically** [3] - 39:24, 41:7, 48:20
**history** [6] - 16:13, 16:17, 54:22, 106:11, 142:11, 174:2
**hit** [2] - 162:13, 163:2
**hold** [13] - 73:12, 73:15, 132:22, 133:13, 134:7, 134:21, 136:2, 137:7, 142:15, 164:13, 164:19, 165:1, 181:6
**holding** [2] - 163:6, 163:13
**home** [12] - 115:2, 141:12, 142:4, 145:10, 146:11, 146:15, 151:17, 158:21, 169:8, 169:21, 177:19, 183:9
**honestly** [1] - 153:10
**Honor** [25] - 3:3, 5:11, 12:7, 12:10, 14:4, 15:20, 56:16, 103:24, 104:1, 105:15, 105:17, 108:6, 109:14, 109:17, 122:10, 140:15, 140:17, 183:22, 185:22, 186:16, 187:18, 188:14, 190:9, 190:10, 190:14
**HONORABLE** [1] - 1:12
**honorary** [1] - 9:10
**hooked** [2] - 90:9, 163:21
**hope** [1] - 153:8
**hopefully** [1] - 9:9
**hoping** [1] - 145:6
**hospital** [31] - 4:3, 4:17, 4:19, 16:22, 47:9, 50:6, 59:11, 73:4, 78:21, 79:1, 79:6, 92:4, 102:7, 103:3, 103:13, 155:13, 155:15, 156:9, 157:14, 157:21, 158:2, 158:16, 158:21, 158:24, 165:19, 168:11, 169:14, 172:12, 176:9, 176:12, 182:2
**Hospital** [1] - 5:23
**hospitals** [1] - 71:6
**host** [2] - 84:18, 100:14
**hour** [7] - 29:4, 81:14, 103:4, 103:15, 104:11, 178:5, 188:12
**hours** [10] - 30:25, 32:4, 32:9, 97:19, 98:8, 98:18, 99:16, 103:5, 184:24
**house** [1] - 158:17
**household** [4] - 128:4, 128:12, 129:15, 131:9
**housing** [1] - 126:22
**hum** [1] - 86:9
**human** [2] - 44:6, 44:10
**humbled** [1] - 175:10
**husband** [14] - 174:13, 177:18, 178:2, 180:4, 180:5, 180:9, 180:13, 180:17, 181:15, 181:23, 182:9, 182:11, 183:3, 183:6
**hydrogen** [1] - 20:11
**hypothermic** [2] - 26:21, 27:2
**hypoxia** [50] - 11:18, 11:21, 16:10, 20:21, 20:22, 21:2, 31:14, 31:19, 41:25, 42:2, 42:4, 42:7, 42:23, 42:25, 56:7, 59:22, 60:9, 61:2, 61:15, 61:19, 61:20, 62:11, 62:16, 68:22, 82:11, 84:20, 88:20, 89:10, 89:13, 89:22, 90:2, 90:17, 93:20, 94:8, 94:9, 94:12, 94:14, 95:5, 95:6, 96:22, 96:23, 97:1, 97:6, 97:18, 98:16, 99:17, 100:25, 103:16, 187:3
**hypoxia-induced** [2] - 59:22, 60:9
**hypoxic** [29] - 22:13, 26:5, 26:22, 29:7, 29:14, 30:4, 32:6, 32:16, 33:19, 34:3, 37:12, 42:5, 47:2, 55:25, 60:19, 61:2, 61:19, 62:15, 84:13, 84:16, 88:20, 89:21, 95:25, 96:3, 96:8, 96:9, 96:11, 96:16, 96:22
**hypoxic-induced** [1] - 29:14

## I

**idea** [1] - 139:17
**ideal** [10] - 33:10, 67:1, 68:13, 69:14, 69:16, 69:17, 69:19, 75:15, 81:20, 101:22
**ideally** [3] - 66:6, 66:8, 66:16
**identified** [25] - 14:8, 17:11, 17:13, 18:11, 27:6, 30:23, 34:18, 36:3, 36:22, 37:6, 38:12, 42:19, 42:22, 43:11, 43:15, 43:16, 51:25, 52:15, 54:1, 54:6, 55:10, 91:22, 184:10, 185:10
**Identified** [1] - 2:8
**identify** [7] - 14:5, 29:17, 29:20, 30:7, 50:7, 91:23, 101:25
**identifying** [3] - 35:5, 56:5, 101:6
**Ill** [2] - 185:8, 185:10
**illustrates** [3] - 31:18, 45:6, 45:7
**illustration** [1] - 44:20
**image** [1] - 179:13
**Imen** [26] - 2:5, 14:19, 150:17, 151:9, 152:18, 152:20,

153:4, 153:8, 153:19, 153:22, 154:1, 154:24, 155:1, 155:12, 156:10, 157:4, 157:14, 158:12, 159:7, 160:14, 160:19, 161:15, 164:21, 169:19, 173:6, 173:11
**IMEN** [3] - 1:2, 1:4, 173:11
**Imen's** [2] - 154:17, 155:10
**immediate** [3] - 33:6, 40:21, 42:9
**immediately** [1] - 32:15
**immigration** [1] - 152:23
**Immigration** [1] - 153:3
**impact** [8] - 20:3, 21:11, 29:6, 33:2, 78:12, 135:10, 171:19, 172:7
**impacted** [5] - 16:17, 18:24, 171:12, 171:13, 183:2
**important** [7] - 27:21, 153:17, 157:19, 187:22, 187:23, 187:25, 188:1
**IN** [1] - 1:1
**inaccurate** [1] - 39:19
**incident** [1] - 170:21
**include** [16] - 75:16, 89:9, 115:2, 116:12, 116:25, 117:5, 118:20, 118:24, 119:2, 119:3, 119:5, 119:8, 120:6, 120:9, 127:25, 132:19
**included** [5] - 89:8, 113:25, 120:18, 128:4, 128:5
**includes** [9] - 120:13, 126:20, 126:21, 126:24, 127:1, 127:3, 127:6, 127:8, 184:18
**including** [9] - 12:15, 14:14, 19:10, 25:8, 75:14, 115:14, 120:12, 129:14, 135:17
**inclusion** [1] - 117:25
**income** [9] - 111:15, 114:7, 114:12, 114:14, 120:21, 121:13, 128:7, 129:14
**inconsistency** [1] - 48:6
**inconsistent** [1] - 94:5
**incorrect** [5] - 71:9, 71:14, 71:20, 71:22, 72:14
**incorrectly** [2] - 71:25, 93:15
**increase** [16] - 21:11, 112:25, 113:11, 113:12, 113:15, 119:19, 119:25, 120:2, 120:3, 130:2, 139:9, 139:11, 139:16, 139:23, 139:24, 139:25
**increased** [14] - 16:25, 17:2, 27:7, 112:8, 119:10, 119:16, 119:20, 120:1, 134:5, 134:14, 135:13, 176:5, 189:4
**increases** [5] - 111:8, 114:13, 114:14, 130:21, 132:6
**increasing** [7] - 114:13, 125:24, 125:25, 130:12, 131:15, 132:9, 139:21
**independent** [2] - 79:16, 93:13
**indicate** [26] - 17:21, 20:9, 23:25, 27:7, 38:8, 53:12, 54:7, 57:16, 58:15, 58:16, 63:10, 63:11, 63:19, 64:7, 69:10, 81:19, 83:16, 83:20, 89:10, 92:25, 100:13, 115:3, 119:9, 121:22, 132:12, 132:13
**indicated** [15] - 18:6, 22:17, 23:22, 24:2, 24:3, 26:19, 31:16, 34:19, 35:15, 39:8, 39:10, 48:23, 90:17, 103:14, 189:25
**indicates** [11] - 20:14, 22:23, 23:24, 26:9, 28:5, 40:24, 41:1, 50:9, 71:20, 102:13, 186:7
**indicating** [4] - 23:16, 40:3, 51:5, 105:10
**indication** [8] - 20:5, 40:11, 47:11, 51:5, 51:21, 52:19, 55:17, 187:1
**indications** [1] - 103:3
**indicative** [2] - 64:2, 64:6
**indicators** [1] - 93:1
**individual** [9] - 13:18, 109:21, 110:19, 111:25, 121:5, 121:10, 121:11, 121:14, 132:8
**individual's** [3] - 110:9, 110:21, 111:18
**Individually** [1] - 1:5
**individuals** [1] - 120:4
**induce** [1] - 176:15
**induced** [4] - 19:3, 29:14, 59:22, 60:9
**induction** [6] - 16:22, 22:1, 60:10, 97:20, 98:9, 157:24
**ineffective** [3] - 25:7, 28:3, 32:13
**infant** [11] - 34:14, 35:3, 42:3, 45:20, 47:22, 87:11, 88:6, 89:11, 90:17, 111:25
**infants** [1] - 45:17
**infection** [3] - 40:16, 40:20, 154:12
**infectious** [3] - 6:5, 40:25, 48:23
**inflation** [5] - 111:8, 111:9, 130:13, 132:7, 132:14
**inform** [1] - 15:9
**information** [17] - 11:7, 33:13, 47:7, 56:4, 72:11, 74:20, 75:10, 76:21, 79:5, 82:12, 90:16, 108:12, 108:23, 110:1, 116:1, 117:4, 134:4
**informed** [1] - 55:5
**inherited** [2] - 142:12, 174:2
**initial** [1] - 191:6
**initiate** [1] - 80:15
**injured** [1] - 105:9
**injuries** [1] - 7:16
**Injury** [1] - 7:13
**injury** [24] - 7:14, 26:6, 26:23, 29:8, 29:14, 30:20, 31:17, 33:19, 34:3, 37:12, 42:5, 47:3, 55:25, 60:19, 84:14, 84:16, 89:1, 95:25, 96:3, 96:8, 96:10, 96:11, 96:16, 96:22
**ink** [3] - 52:25, 53:6, 53:14
**inked** [1] - 13:24
**inside** [4] - 98:2, 99:10, 141:24, 169:1
**insisting** [2] - 168:2, 168:19
**inspiratory** [3] - 49:8, 50:1, 50:14
**instance** [1] - 175:25
**instead** [2] - 33:5, 189:9
**Institute** [1] - 7:13
**instruments** [1] - 72:7
**intended** [1] - 189:14
**intending** [1] - 190:12
**intends** [1] - 104:5
**intensive** [1] - 146:13
**intentions** [1] - 145:5
**interior** [1] - 141:23
**interment** [1] - 166:7
**International** [1] - 174:7
**interpret** [3] - 70:22, 80:19, 83:10
**interpretation** [5] - 39:18, 75:1, 84:8, 102:17, 103:6
**interpretations** [3] - 84:12, 103:9, 103:13
**interpreted** [1] - 55:5
**Interrogatories** [1] - 108:13
**interrupted** [1] - 47:2
**intervening** [2] - 29:13, 47:1
**interventions** [1] - 23:4
**intestinal** [2] - 17:17, 36:15
**intestine** [7] - 36:12, 36:13, 36:23, 38:9, 38:23, 39:2, 156:2
**intestines** [6] - 17:18, 36:25, 37:15, 37:22, 40:9, 40:17
**intrauterine** [5] - 16:9, 23:6, 27:22, 27:25, 85:4
**introduce** [5] - 15:18, 105:14, 160:14, 177:5, 177:7
**introduced** [3] - 146:8, 178:11, 178:12
**intubating** [1] - 50:11
**invalid** [1] - 33:16
**investigations** [1] - 11:3
**investment** [1] - 111:16
**investor** [1] - 111:16
**invite** [1] - 186:10
**invited** [4] - 7:7, 9:17, 157:16, 157:19
**involve** [1] - 5:24
**involved** [8] - 6:16, 7:12, 10:12, 10:15, 38:9, 39:14, 39:16, 175:15
**involves** [1] - 20:6
**irregular** [1] - 24:21
**irreversible** [4] - 96:20, 98:7, 98:8, 187:9
**irreversibly** [1] - 96:14
**IS** [4] - 3:6, 104:19, 140:20, 173:7
**Island** [1] - 8:8
**issue** [8] - 17:22, 17:25, 46:5, 49:3, 83:21, 94:21, 189:22
**issues** [7] - 17:11, 17:19, 19:13, 35:21, 189:19, 190:1, 190:7
**Italian** [5] - 141:9, 173:20, 173:21, 174:8, 174:10
**Italy** [2] - 174:7, 174:9
**items** [2] - 12:20, 129:1
**itself** [21] - 28:6, 60:23, 61:3, 61:20, 61:21, 62:16, 62:17, 63:19, 64:6, 69:10, 71:22, 81:19, 88:20, 88:21, 89:7, 89:23, 90:1, 147:15, 190:7

## J

**J-1** [2] - 12:23, 14:6
**J-10** [3] - 13:19, 13:22, 14:6
**J-11** [3] - 13:24, 14:7, 166:2
**J-11.1** [1] - 52:25
**J-15.1** [3] - 166:4, 166:9, 166:12
**J-2** [1] - 12:25
**J-2.138** [4] - 65:22, 67:13, 67:18, 77:8
**J-2.175** [1] - 85:19
**J-2.185** [1] - 87:2
**J-2.65** [2] - 86:15, 86:16
**J-2.69** [1] - 86:19
**J-2.75** [1] - 86:24

**J-3** [1] - 13:2
**J-4** [2] - 13:4, 87:15
**J-4.1** [2] - 87:5, 87:6
**J-4.17** [1] - 88:5
**J-417** [1] - 25:9
**J-44** [1] - 24:15
**J-5** [1] - 13:6
**J-6** [1] - 13:7
**J-7** [3] - 13:7, 51:12, 91:7
**J-72** [2] - 37:14, 47:13
**J-74** [2] - 38:13, 48:17
**J-75** [1] - 35:14
**J-8** [1] - 13:10
**J-9** [4] - 13:16, 14:6, 46:10, 165:12
**J-9.12** [1] - 46:14
**J-99** [2] - 52:10
**January** [2] - 7:6, 106:13
**JENNIFER** [1] - 3:10
**Jennifer** [3] - 2:3, 3:4, 3:10
**job** [9] - 7:19, 92:8, 105:4, 146:6, 146:9, 156:18, 169:2, 172:2, 179:5
**jobs** [2] - 146:4, 148:21
**join** [1] - 152:20
**Joint** [1] - 2:14
**joint** [1] - 46:12
**joints** [1] - 42:8
**journals** [2] - 10:5, 10:6
**Joy** [1] - 147:20
**judgment** [2] - 189:7, 190:4
**jumped** [1] - 160:6
**JURY** [1] - 1:12
**jury** [4] - 133:1, 133:9, 136:18, 189:13

## K

**karyotype** [13] - 47:8, 47:9, 53:22, 53:25, 54:13, 54:15, 54:17, 54:18, 54:20, 55:14, 170:13, 182:8, 182:14
**keep** [14] - 32:25, 143:19, 156:17, 156:23, 165:4, 167:8, 171:21, 175:21, 180:17, 181:21, 182:20, 183:4
**kept** [6] - 32:3, 99:2, 130:11, 165:13, 168:23, 179:17
**key** [1] - 185:18
**kicks** [1] - 133:3
**kidney** [1] - 156:1
**kids** [9] - 35:20, 46:5, 151:12, 151:13, 152:15, 153:11, 172:13
**killed** [3] - 105:9, 169:12, 186:22
**kind** [36] - 27:7, 27:14, 31:20, 32:18, 38:6, 40:21, 43:14, 45:13, 53:3, 54:15, 65:18, 82:11, 120:21, 121:24, 144:20, 144:21, 145:11, 145:24, 146:19, 146:20, 148:20, 150:23, 150:24, 152:3, 152:7, 158:19, 159:17, 159:23, 161:7, 163:23, 164:16, 166:25, 167:25, 171:6, 187:1
**Klamerus** [2] - 14:17, 184:15
**knee** [1] - 179:7
**knees** [1] - 160:10
**knit** [1] - 109:1
**knives** [2] - 159:17, 171:6
**knowing** [2] - 42:23, 50:19
**knowledge** [7] - 44:15, 71:2, 96:2, 143:18, 145:1, 148:3, 148:5
**knowledgeable** [2] - 15:7, 107:6
**known** [3] - 4:19, 20:10, 35:24
**knows** [4] - 80:24, 156:4, 164:1, 172:6
**KRISTIN** [4] - 1:23, 192:3, 192:13, 192:16

## L

**lab** [43] - 11:8, 67:12, 68:14, 69:21, 69:22, 69:24, 70:1, 70:3, 70:7, 70:9, 70:16, 70:19, 70:23, 70:25, 71:2, 71:10, 71:11, 71:15, 71:16, 71:19, 71:20, 71:21, 71:24, 72:7, 72:9, 72:23, 73:5, 76:2, 77:6, 77:9, 78:1, 78:18, 79:22, 81:22, 89:8, 89:9, 100:11, 101:21, 187:11, 188:10, 190:15, 190:23
**labor** [42] - 11:18, 11:21, 16:10, 18:20, 18:24, 19:4, 19:24, 22:7, 22:11, 22:25, 27:10, 29:15, 31:15, 34:2, 43:3, 46:22, 56:1, 56:8, 60:10, 74:21, 97:20, 98:9, 100:19, 110:11, 110:12, 119:14, 119:20, 119:25, 134:5, 134:14, 135:13, 135:14, 157:24, 158:10, 176:15, 184:12, 184:21, 185:25, 186:8, 186:19, 186:21
**Labor** [2] - 122:2, 122:3
**laboratories** [2] - 4:10, 71:7
**laboratory** [12] - 4:8, 4:11, 6:4, 65:8, 68:9, 68:23, 70:11, 70:12, 72:14, 73:2, 85:14, 91:2
**laboring** [1] - 165:20
**lack** [6] - 20:17, 20:20, 45:14, 52:20, 94:25, 97:14
**lacking** [1] - 52:24
**laid** [1] - 158:3
**Lake** [1] - 5:19
**Lancaster** [2] - 143:17, 147:20
**land** [1] - 142:1
**language** [4] - 146:14, 174:8, 174:9, 174:11
**languages** [3] - 141:7, 141:8, 173:18
**large** [6] - 36:12, 36:23, 38:5, 38:8, 39:2, 39:17
**last** [17] - 11:14, 40:9, 87:22, 97:2, 97:7, 111:14, 112:21, 113:13, 126:7, 139:13, 140:25, 143:4, 153:12, 155:12, 155:17, 173:6, 176:8
**lasting** [1] - 61:16
**late** [2] - 184:11, 184:18
**latter** [1] - 135:2
**Laude** [1] - 105:23
**Lauren** [1] - 155:18
**law** [2] - 172:20, 190:2
**Law** [1] - 7:5
**lawsuit** [1] - 188:3
**laying** [4] - 160:12, 164:2, 179:6, 180:14
**lead** [5] - 20:9, 20:22, 41:21, 56:6, 109:21
**leadership** [1] - 8:23
**leading** [1] - 93:18
**leaning** [1] - 160:5
**learn** [6] - 44:12, 44:14, 146:23, 181:1, 182:5
**learned** [5] - 73:4, 116:1, 116:13, 117:4, 175:6
**learner** [1] - 148:5
**learning** [2] - 6:5, 146:20
**least** [13] - 18:3, 32:9, 39:8, 69:18, 69:25, 108:25, 116:14, 119:24, 121:23, 123:20, 139:21, 142:25, 149:1
**leave** [6] - 84:2, 84:9, 160:17, 161:10, 169:8, 169:19
**leaves** [1] - 170:25
**leaving** [2] - 100:16, 169:21
**lecture** [1] - 7:7
**led** [4] - 18:15, 23:10, 62:10, 117:24
**left** [19] - 25:17, 31:13, 86:2, 126:17, 127:16, 128:24, 130:8, 131:10, 156:7, 160:13, 160:18, 161:11, 163:6, 170:20, 171:11, 177:22, 179:18, 179:20, 179:21
**left-hand** [1] - 25:17
**legacy** [1] - 155:7
**legally** [1] - 147:14
**legs** [4] - 45:13, 46:15, 46:17, 163:16
**length** [5] - 37:17, 40:6, 60:15, 94:10, 94:11
**less** [9] - 25:22, 32:14, 100:6, 100:7, 120:12, 124:7, 130:19, 132:1, 133:11
**letting** [1] - 177:15
**level** [35] - 20:25, 21:6, 21:20, 21:23, 21:25, 22:3, 31:3, 31:4, 33:22, 63:5, 63:10, 64:8, 64:21, 67:1, 82:16, 82:23, 82:24, 83:2, 83:3, 83:7, 88:24, 88:25, 89:5, 98:1, 98:22, 110:23, 110:24, 121:13, 129:25, 136:9, 136:23
**levels** [11] - 18:3, 21:18, 21:23, 33:3, 64:10, 64:21, 97:25, 102:5, 108:16, 112:7, 125:3
**License** [1] - 147:23
**Life** [1] - 112:1
**life** [29] - 21:24, 24:12, 24:13, 28:4, 28:8, 28:24, 31:6, 40:21, 41:1, 66:5, 66:16, 90:3, 107:3, 110:4, 110:5, 110:9, 111:18, 111:21, 111:25, 112:2, 120:24, 127:22, 132:19, 145:8, 152:15, 155:8, 171:13, 171:15, 171:25
**life-sustaining** [2] - 66:5, 66:16
**life-threatening** [2] - 40:21, 41:1
**lifetime** [20] - 9:9, 105:8, 106:21, 110:7, 111:22, 113:1, 113:16, 121:8, 121:9, 127:24, 129:2, 129:3, 129:18, 129:24, 130:4, 130:21, 131:7, 131:25, 132:2, 132:8
**lights** [1] - 163:24
**likelihood** [1] - 133:6
**likely** [10] - 20:14, 44:18, 82:10, 136:12, 136:16, 137:9, 138:6, 138:8, 159:14, 187:19
**likewise** [1] - 114:16
**limb** [25] - 35:18, 35:19, 35:25, 36:2, 36:6, 42:16, 42:21,

42:24, 43:2, 43:19, 45:7, 45:10, 45:11, 45:12, 46:20, 54:6, 92:15, 92:18, 93:6, 93:10, 93:15, 93:16, 93:20, 96:6, 99:23
**limits** [1] - 176:4
**Line** [19] - 57:21, 57:24, 58:8, 60:1, 61:14, 63:25, 64:1, 64:25, 65:4, 66:12, 66:13, 67:24, 72:4, 74:13, 74:15, 78:20, 82:6, 123:10
**line** [4] - 60:2, 60:3, 62:1, 99:3
**lined** [1] - 190:14
**Lines** [2] - 61:8, 63:8
**lines** [2] - 53:23, 61:10
**Linglestown** [1] - 1:16
**Link** [1] - 147:20
**list** [2] - 34:17, 96:12
**listed** [6] - 34:6, 34:16, 34:18, 90:18, 127:16, 129:1
**listing** [1] - 59:18
**literally** [1] - 167:24
**live** [8] - 31:5, 37:8, 38:3, 86:17, 87:11, 104:18, 111:24, 128:12
**lived** [1] - 99:16
**liver** [1] - 156:1
**lives** [2] - 37:9, 38:3
**living** [3] - 141:10, 141:22, 173:23
**LLC** [1] - 150:12
**LLP** [1] - 1:15
**loads** [1] - 150:2
**lobes** [1] - 48:4
**located** [1] - 40:7
**log** [1] - 88:5
**long-standing** [2] - 43:14, 43:15
**look** [74] - 12:22, 12:25, 13:4, 13:6, 13:9, 14:22, 23:9, 24:8, 25:9, 26:14, 30:13, 30:14, 30:16, 44:7, 45:1, 45:22, 45:23, 50:24, 52:7, 52:10, 52:16, 53:5, 53:6, 54:19, 65:22, 66:25, 70:16, 70:17, 71:10, 71:16, 71:23, 72:11, 72:15, 74:2, 74:24, 75:19, 76:25, 78:11, 78:16, 78:18, 85:14, 85:18, 85:19, 85:21, 85:22, 86:1, 87:5, 91:1, 91:5, 91:7, 93:2, 101:24, 112:7, 112:19, 112:25, 113:8, 115:11, 122:21, 123:4, 123:5, 125:12, 125:13, 125:18, 126:4, 129:8, 129:20, 152:25, 155:19, 175:22, 181:21, 187:11, 188:1
**looked** [31] - 6:2, 28:1, 37:17, 39:4, 39:21, 46:4, 48:19, 51:8, 52:17, 74:20, 75:21, 77:2, 77:4, 77:12, 89:19, 91:2, 91:4, 111:1, 119:19, 119:21, 129:11, 164:11, 164:16, 168:22, 168:25, 171:11, 178:3, 178:24, 179:19, 180:4, 188:23
**looking** [33] - 4:23, 31:10, 35:14, 38:17, 41:12, 47:23, 48:17, 52:10, 60:1, 64:10, 64:25, 65:9, 69:5, 70:2, 72:20, 76:13, 79:8, 79:23, 80:23, 86:15, 87:13, 101:22, 123:8, 126:10, 126:11, 130:5, 136:20, 137:14, 137:16, 145:22, 150:1, 178:25
**looks** [7] - 30:18, 44:12, 53:23, 137:3, 158:7, 178:3, 181:21
**lose** [1] - 169:24
**loss** [28] - 21:21, 21:22, 22:3, 37:2, 40:2, 105:7, 107:6, 107:15, 108:1, 109:5, 112:17, 115:15, 115:23, 116:4, 116:16, 117:1, 117:5, 117:10, 118:3, 118:4, 120:10, 120:17, 122:17, 136:21, 150:3, 172:7, 172:10
**losses** [9] - 108:19, 115:20, 116:21, 117:16, 118:6, 118:8, 119:2, 119:5, 120:6
**lost** [19] - 107:10, 110:22, 113:3, 113:19, 115:7, 115:13, 115:14, 116:19, 116:23, 120:6, 120:7, 120:15, 137:1, 137:20, 138:13, 169:24, 169:25, 177:21, 183:11
**loud** [1] - 168:16
**love** [1] - 150:23
**low** [11] - 20:25, 27:3, 28:22, 84:13, 84:19, 84:20, 84:23, 96:15, 139:19, 139:24, 140:9
**lower** [17] - 21:10, 41:16, 62:12, 66:22, 85:21, 86:1, 112:14, 112:18, 115:6, 126:2, 126:3, 127:20, 128:21, 129:6, 131:13
**lowest** [4] - 137:22, 138:1, 138:24, 139:4
**luncheon** [1] - 104:15
**lung** [2] - 48:18, 49:12
**lungs** [27] - 47:25, 48:1, 48:2, 48:4, 48:6, 48:10, 48:14, 48:18, 48:21, 48:22, 49:2, 49:5, 49:6, 49:9, 49:20, 50:2, 50:8, 50:11, 50:12, 50:15, 50:20, 95:4, 95:7, 99:24, 156:6, 176:10

## M

**M.B.A** [1] - 105:25
**machine** [9] - 1:21, 72:1, 155:23, 155:25, 158:6, 161:2, 162:3, 170:24
**machinery** [3] - 70:11, 70:19, 70:21
**machines** [5] - 4:13, 71:12, 71:17, 72:17, 72:24
**Macro** [1] - 144:5
**Maenner** [2] - 14:16, 184:15
**magnitude** [1] - 133:11
**main** [1] - 162:5
**maintenance** [40] - 113:8, 113:19, 114:1, 114:3, 114:8, 114:20, 120:13, 120:25, 121:3, 121:7, 121:12, 121:19, 124:25, 125:4, 125:9, 125:19, 125:21, 126:1, 126:8, 126:13, 126:14, 126:17, 126:20, 128:3, 128:8, 128:21, 128:22, 129:14, 129:23, 130:1, 130:7, 130:12, 130:17, 130:18, 131:12, 131:16, 131:24, 132:11, 132:16
**majored** [1] - 105:23
**majority** [1] - 39:17
**male** [6] - 53:25, 54:14, 54:17, 110:25, 121:23, 162:2
**males** [2] - 121:18, 121:20
**manage** [1] - 144:8
**Management** [5] - 142:17, 144:3, 144:4, 144:7, 144:13
**managing** [1] - 148:19
**Manhattan** [1] - 7:24
**manifest** [10] - 60:23, 61:3, 61:20, 62:16, 88:20, 88:24, 89:4, 89:6, 89:23
**manifested** [7] - 61:3, 61:21, 62:17, 88:21, 89:23, 90:1, 99:17
**manifests** [1] - 42:6
**manner** [1] - 15:1
**March** [3] - 142:18, 144:14, 145:4
**MARIANI** [1] - 1:12
**marked** [16] - 5:3, 12:23, 12:25, 13:4, 13:16, 13:19, 13:21, 15:14, 15:15, 109:8, 109:9, 109:10, 165:12, 166:2, 166:9
**market** [3] - 110:11, 110:12, 134:14
**marriage** [5] - 150:22, 151:1, 151:2, 151:7, 153:1
**married** [8] - 109:2, 142:5, 147:7, 150:15, 150:19, 152:19, 153:1, 174:15
**marry** [2] - 121:15, 152:18
**Massachusetts** [2] - 7:2, 7:20
**massive** [2] - 30:12, 30:17
**Master's** [19] - 111:1, 112:22, 113:24, 114:15, 117:21, 118:3, 118:21, 118:24, 123:18, 124:11, 124:13, 124:14, 124:18, 124:22, 135:18, 135:23, 135:24, 136:4, 140:11
**material** [1] - 53:24
**materials** [6] - 12:19, 15:2, 15:6, 15:9, 55:15, 56:4
**Math** [2] - 143:8, 143:9
**math** [3] - 125:23, 143:10
**Mathematical** [1] - 105:24
**Mathematics** [3] - 142:16, 143:6
**mathematics** [1] - 105:3
**matter** [2] - 80:8, 190:2
**matters** [1] - 128:6
**Mauldin** [9] - 14:22, 184:7, 184:10, 184:20, 185:4, 185:5, 185:14, 185:24, 188:11
**Mauldin's** [1] - 185:1
**maximize** [2] - 110:16, 110:18
**mean** [78] - 24:19, 28:24, 33:20, 33:21, 34:1, 44:18, 48:14, 62:19, 71:2, 74:11, 82:18, 82:19, 89:6, 93:18, 93:19, 94:24, 95:15, 98:5, 101:14, 138:15, 143:13, 144:8, 145:2, 145:25, 146:12, 146:21, 147:12, 148:12, 149:10, 149:16, 150:5, 151:10, 151:11, 152:9, 152:10, 153:10, 154:2, 155:5, 156:1, 158:1, 158:9, 158:19, 159:15, 160:3, 160:24, 161:23,

162:8, 163:1, 163:10, 167:23, 169:22, 170:25, 171:16, 175:10, 175:23, 177:21, 177:22, 178:18, 179:2, 179:11, 179:12, 180:9, 180:11, 180:14, 180:17, 180:23, 181:8, 181:18, 181:19, 181:20, 181:25, 182:1, 182:18, 183:4, 183:5
**meaning** [12] - 15:2, 19:3, 36:4, 36:11, 48:6, 51:15, 52:14, 108:16, 147:23, 148:21, 151:12, 153:12
**means** [13] - 24:20, 24:25, 27:2, 27:13, 27:16, 28:16, 28:17, 38:5, 53:22, 63:2, 127:16, 131:10, 192:22
**meant** [3] - 8:5, 9:5, 28:25
**measure** [1] - 115:6
**measured** [3] - 86:12, 110:11, 111:21
**measures** [4] - 64:14, 65:1, 65:5, 65:13
**mechanism** [2] - 35:6, 91:20
**mechanistically** [1] - 99:10
**Medical** [10] - 6:10, 7:3, 7:19, 8:12, 9:1, 9:3, 9:15, 59:17, 95:19, 100:1
**medical** [48] - 5:18, 5:19, 5:21, 6:24, 8:6, 9:8, 10:2, 10:8, 10:18, 11:8, 12:17, 15:11, 16:6, 16:8, 18:16, 21:8, 22:9, 22:16, 23:4, 23:14, 26:12, 29:10, 43:7, 43:24, 44:12, 44:14, 46:24, 47:5, 53:18, 56:12, 60:8, 63:18, 66:6, 67:5, 72:10, 72:19, 72:20, 73:5, 76:7, 83:11, 84:18, 90:21, 92:6, 99:8, 100:17, 100:23, 101:3, 103:20
**medical/legal** [1] - 4:22
**medication** [2] - 28:5, 162:4
**medications** [6] - 19:5, 19:7, 25:2, 100:19, 101:2, 101:3
**medicine** [1] - 4:9
**Medicine** [1] - 5:20
**meet** [3] - 17:2, 159:9, 188:17
**Meeting** [1] - 9:3
**meeting** [1] - 9:8
**member** [2] - 106:21, 152:6
**members** [1] - 157:16
**memento** [1] - 165:4
**mention** [4] - 4:16, 52:1, 156:19, 182:24
**mentioned** [11] - 14:10, 24:17, 25:9, 31:24, 35:16, 98:9, 156:20, 157:6, 171:1, 192:8
**merge** [1] - 174:8
**met** [4] - 151:9, 159:11, 159:13, 189:3
**metabolic** [1] - 63:17
**metal** [1] - 159:22
**Miami** [1] - 145:19
**Micro** [1] - 144:5
**microscope** [12] - 4:5, 30:14, 31:7, 31:9, 31:25, 37:1, 38:7, 38:14, 38:21, 39:4, 48:19, 99:13
**microscopic** [5] - 38:13, 39:20, 40:12, 48:17, 49:12
**microscopically** [4] - 4:4, 6:4, 40:2, 48:21
**middle** [2] - 114:6
**MIDDLE** [1] - 1:1
**Middle** [2] - 192:4, 192:18
**might** [8] - 51:6, 81:3, 102:1, 102:5, 175:25, 186:11, 187:1, 187:18
**million** [8] - 120:3, 120:4, 138:2, 138:12, 138:17, 140:7, 140:8, 187:19
**millions** [1] - 49:13
**mind** [2] - 123:9, 180:22
**mine** [1] - 120:18
**minimal** [7] - 19:19, 22:2, 83:20, 83:23, 103:14, 184:18, 186:2
**minimize** [1] - 33:20
**minimum** [1] - 103:6
**minored** [1] - 105:24
**minute** [7] - 24:21, 24:22, 25:22, 27:12, 85:24, 86:12, 88:16
**minutes** [17] - 23:21, 25:19, 25:24, 28:13, 28:14, 28:15, 29:25, 32:13, 56:17, 81:15, 85:6, 85:10, 86:10, 88:22, 158:21, 162:16
**Miranda** [1] - 87:17
**mishear** [1] - 64:18
**misheard** [1] - 60:15
**misinterpreting** [1] - 79:19
**miss** [2] - 174:20, 175:14
**missed** [3] - 154:2, 175:8, 182:25
**missing** [2] - 154:4, 186:6
**misunderstand** [2] - 97:22, 123:24
**misunderstood** [1] - 97:17
**mom** [1] - 158:16
**moment** [4] - 62:8, 70:8, 131:7, 163:5
**moments** [1] - 185:18
**Monday** [1] - 169:18
**money** [9] - 105:4, 105:8, 126:7, 148:24, 148:25, 149:11, 150:7, 152:2, 168:3
**monitor** [4] - 90:9, 90:10, 160:25, 185:11
**monitored** [1] - 65:19
**monitoring** [2] - 19:10, 57:11
**month** [4] - 146:7, 146:24, 151:22, 151:24
**months** [10] - 34:8, 147:12, 147:16, 147:17, 151:24, 151:25, 152:1, 169:6, 171:18, 181:19
**morning** [14] - 3:1, 3:14, 30:2, 56:22, 56:23, 92:1, 96:21, 97:17, 159:7, 159:9, 176:19, 177:1, 190:15, 191:3
**mortgage** [1] - 126:22
**most** [10] - 6:15, 20:19, 21:3, 32:15, 32:18, 33:12, 79:25, 94:21, 159:14, 185:9
**mostly** [2] - 36:12, 184:4
**mother** [6] - 49:16, 89:4, 89:11, 102:23, 141:15, 185:12
**motion** [6] - 183:22, 184:3, 184:4, 188:4, 189:7, 190:8
**motors** [1] - 147:5
**mount** [4] - 30:9, 30:20, 30:21, 31:6
**mouth** [1] - 36:17
**move** [10] - 5:12, 14:2, 36:17, 41:4, 86:4, 86:19, 94:17, 100:21, 113:7, 116:9
**moved** [2] - 163:14, 166:25
**movement** [6] - 17:11, 17:12, 36:15, 42:12, 43:8, 156:5
**movements** [2] - 27:15, 43:4
**moving** [9] - 86:1, 86:24, 156:2, 162:12, 162:13, 163:12, 163:14, 163:18, 167:3
**MS** [82] - 3:3, 3:13, 5:9, 5:11, 5:12, 5:14, 5:17, 12:7, 12:10, 12:13, 14:2, 14:4, 14:6, 14:12, 15:18, 15:20, 15:25, 16:3, 44:24, 45:2, 45:4, 45:5, 56:14, 56:16, 56:21, 87:8, 87:10, 101:15, 101:17, 101:19, 103:19, 103:22, 103:24, 104:4, 104:11, 104:17, 104:22, 105:15, 105:17, 105:20, 106:8, 106:9, 108:4, 108:6, 108:8, 109:12, 109:14, 109:17, 109:20, 122:8, 122:10, 122:12, 138:19, 138:21, 138:23, 140:14, 140:15, 140:18, 141:2, 162:21, 166:9, 166:11, 166:14, 172:23, 173:1, 173:6, 173:13, 183:14, 183:16, 183:21, 183:22, 184:1, 184:4, 188:21, 190:9, 190:10, 190:14, 190:18, 190:21, 191:2, 191:8, 191:11
**Mt** [1] - 147:19
**multiplex** [1] - 45:9
**mumbling** [1] - 169:4
**muscle** [6] - 30:17, 30:18, 42:18, 43:10, 45:8, 45:14
**muscles** [1] - 46:19
**musculature** [5] - 41:6, 41:8, 41:9, 42:8, 42:15
**music** [1] - 147:6
**must** [1] - 190:4
**mutation** [1] - 94:25

## N

**name** [14] - 3:8, 3:10, 104:24, 140:22, 140:24, 140:25, 150:11, 155:6, 155:19, 159:12, 164:17, 167:16, 173:9, 173:11
**named** [2] - 182:19, 182:21
**names** [1] - 168:7
**narrow** [3] - 126:10, 128:1, 189:1
**narrowed** [4] - 36:24, 37:24, 38:6, 38:22
**national** [1] - 8:25
**National** [5] - 8:25, 9:3, 9:15, 106:19, 147:2
**nationally** [1] - 8:22
**nationally-elected** [1] - 8:22
**natural** [2] - 4:19, 4:24
**nature** [2] - 139:12, 139:15
**Navitsky** [1] - 1:15
**necessarily** [6] - 45:20, 48:14, 71:19, 82:4, 92:22, 102:25
**necessary** [4] - 55:9, 55:10, 100:24, 114:8
**neck** [1] - 26:20
**necrosis** [1] - 51:15
**need** [13] - 32:9, 49:14, 61:6, 66:1, 91:7, 109:22, 112:6, 146:20, 180:3,

180:5, 180:6, 181:13, 189:9
**needed** [2] - 23:4, 105:4
**needs** [4] - 30:8, 32:3, 40:21, 55:4
**negative** [4] - 54:18, 54:20, 55:6, 55:14
**neglecting** [1] - 90:15
**neonatal** [5] - 86:21, 86:25, 87:2, 87:3
**neonate** [2] - 73:6, 90:21
**neonates** [1] - 11:12
**Neonatologist** [2] - 23:20, 24:2
**neonatologist** [5] - 22:17, 24:18, 27:18, 51:6, 84:6
**neonatologist's** [1] - 24:16
**nerve** [9] - 36:11, 37:2, 38:25, 39:5, 39:6, 40:3, 40:5, 41:13, 94:17
**nerves** [2] - 36:16, 96:24
**net** [3] - 115:13, 115:23, 117:15
**Netter's** [6] - 44:9, 44:11, 44:20, 44:25, 45:6, 45:25
**neurologic** [3] - 12:2, 43:14, 55:21
**neurological** [2] - 43:4, 43:20
**neurons** [3] - 36:11, 37:2, 96:24
**Neuropathology** [1] - 6:13
**never** [23] - 24:13, 25:3, 25:4, 25:5, 30:19, 42:10, 42:12, 42:19, 49:25, 50:1, 50:2, 50:15, 50:16, 73:13, 73:14, 75:7, 75:20, 77:23, 146:10, 160:15, 165:11, 185:9
**new** [1] - 176:20
**New** [7] - 6:10, 6:23, 7:18, 7:21, 145:21, 191:3
**newborn** [1] - 11:11
**news** [1] - 94:8
**next** [27] - 3:2, 25:22, 73:17, 104:16, 113:2, 113:7, 113:9, 113:17, 113:18, 114:5, 114:25, 115:11, 115:12, 116:9, 116:25, 155:16, 156:8, 156:23, 158:4, 159:13, 161:12, 162:6, 166:20, 168:14, 169:18, 179:25
**nicely** [1] - 150:25
**night** [4] - 62:4, 146:9, 183:5, 183:6
**nightmares** [2] - 171:22, 183:4
**Nijole** [1] - 1:15
**nine** [3] - 124:11, 124:14, 181:18
**nobody** [6] - 137:16, 160:5, 164:2, 172:16, 187:23
**non** [7] - 23:3, 26:3, 29:25, 33:12, 95:4, 99:24, 188:9
**NON** [1] - 1:12
**non-definitive** [1] - 188:9
**non-existent** [1] - 33:12
**non-floating** [2] - 95:4, 99:24
**NON-JURY** [1] - 1:12
**non-responsive** [3] - 23:3, 26:3, 29:25
**none** [5] - 42:14, 43:11, 55:23, 177:23, 184:16
**normal** [40] - 16:23, 22:25, 25:4, 30:18, 37:20, 41:8, 42:15, 42:20, 47:18, 47:19, 47:20, 48:1, 48:2, 48:3, 48:4, 51:20, 53:6, 53:21, 53:25, 54:11, 54:14, 54:17, 67:4, 79:9, 79:12, 100:11, 102:5, 135:4, 157:12, 158:9, 163:4, 170:13, 176:3, 176:6, 182:8, 182:14, 184:17, 186:8
**normally** [3] - 32:22, 32:25, 186:2
**Nos** [10] - 2:9, 2:10, 2:15, 2:15, 2:16, 2:19, 2:21, 2:21, 16:1, 109:18
**notation** [1] - 85:23
**notations** [1] - 17:10
**note** [6] - 33:3, 41:15, 52:5, 86:16, 87:17, 88:2
**noted** [12] - 29:5, 35:17, 37:23, 38:3, 42:12, 42:15, 43:8, 43:10, 95:4, 95:18, 99:23, 101:9
**notes** [2] - 77:3, 87:11
**nothing** [25] - 17:12, 36:20, 38:25, 47:17, 48:22, 52:21, 70:25, 95:15, 123:21, 124:11, 124:14, 140:15, 162:25, 163:8, 163:24, 164:4, 164:6, 164:10, 167:22, 169:3, 169:4, 169:24, 172:22, 181:18
**notice** [1] - 21:3
**noticeable** [1] - 19:22
**noticed** [2] - 119:14, 160:2
**noting** [2] - 77:22, 86:17
**November** [6] - 15:15, 16:24, 73:21, 109:9, 109:10, 118:17
**nowhere** [1] - 101:7
**number** [28] - 10:11, 53:5, 66:14, 85:22, 107:15, 110:10, 110:12, 114:19, 115:24, 119:10, 119:14, 121:7, 123:6, 126:21, 132:11, 133:22, 134:13, 137:15, 137:18, 138:15, 138:16, 139:4, 139:9, 139:13, 140:2, 150:23
**numbered** [1] - 192:9
**numbers** [28] - 66:15, 66:16, 66:19, 111:2, 112:15, 112:22, 112:23, 112:24, 112:25, 113:5, 113:14, 113:23, 113:25, 114:1, 116:10, 118:23, 119:12, 121:6, 123:25, 130:5, 130:24, 131:3, 132:12, 133:10, 133:16, 139:3, 139:13, 139:15
**Nurse** [1] - 87:17
**nurse** [13] - 87:25, 88:1, 161:4, 163:20, 163:22, 166:18, 166:22, 166:25, 168:6, 168:25, 170:23, 180:2, 181:5
**nurses** [7] - 79:14, 157:2, 159:16, 161:20, 165:5, 179:11, 180:2
**nursing** [2] - 86:8, 184:14
**NYU** [1] - 6:24

## O

**oath** [1] - 74:8
**OB** [6] - 22:7, 22:10, 57:7, 84:6, 154:13, 186:21
**OB-GYN** [6] - 22:7, 22:10, 57:7, 84:6, 154:13, 186:21
**objection** [13] - 5:13, 12:10, 12:11, 14:3, 14:4, 15:20, 45:2, 60:11, 105:15, 108:6, 109:14, 109:16, 166:11
**objective** [10] - 55:19, 64:14, 64:16, 64:21, 64:22, 65:1, 65:5, 65:13, 84:25, 85:3
**observations** [1] - 26:25
**Obstetrics** [1] - 57:9
**obtain** [3] - 10:3, 111:16, 122:22
**obtained** [5] - 33:1, 87:20, 88:3, 105:24, 105:25
**obviously** [1] - 186:15
**occasion** [1] - 10:18
**occasionally** [2] - 9:18, 36:12
**occupation** [3] - 3:15, 104:24, 141:25
**occur** [5] - 21:18, 21:20, 27:3, 40:17, 112:23
**occurred** [14] - 9:4, 30:22, 31:1, 41:21, 42:23, 46:22, 61:15, 62:6, 65:2, 65:6, 65:14, 98:19, 98:21, 160:16
**occurring** [2] - 24:24, 101:10
**occurs** [3] - 95:1, 95:2
**October** [2] - 9:4, 173:16
**OF** [3] - 1:1, 1:8, 1:11
**offer** [5] - 12:7, 57:2, 58:25, 91:10, 108:4
**offered** [4] - 8:14, 146:8, 154:13, 168:17
**offering** [2] - 79:5, 136:14
**offers** [1] - 145:25
**offhand** [1] - 119:12
**Office** [8] - 1:18, 6:11, 6:25, 7:19, 8:12, 34:15, 34:24, 59:13
**office** [9] - 7:20, 7:22, 7:24, 8:4, 8:6, 8:7, 8:9, 8:13, 148:18
**Office's** [1] - 59:18
**Official** [3] - 192:3, 192:14, 192:17
**officially** [1] - 30:1
**often** [8] - 33:14, 37:9, 77:22, 78:7, 105:6, 141:19, 153:6, 182:17
**old** [1] - 128:11
**older** [4] - 119:17, 119:21, 120:3, 134:6
**Olson** [14] - 1:15, 1:15, 3:1, 14:8, 60:3, 60:6, 78:20, 78:25, 88:5, 104:16, 138:20, 162:20, 173:4, 183:20
**OLSON** [52] - 3:3, 3:13, 5:9, 5:12, 5:14, 5:17, 12:7, 12:13, 14:2, 14:6, 14:12, 15:18, 15:25, 16:3, 44:24, 45:4, 45:5, 56:14, 101:17, 101:19, 103:19, 103:22, 104:4, 104:11, 104:17, 104:22, 105:17, 105:20, 106:8, 106:9, 108:4, 108:8, 109:12, 109:17, 109:20, 122:8, 138:21, 138:23, 140:14, 140:18, 141:2, 162:21, 166:9, 166:14, 172:23, 173:6, 173:13, 183:14, 183:21, 188:21, 190:10, 191:11
**once** [12] - 6:18, 9:9, 21:24, 24:3, 31:3, 148:3, 148:5, 148:6, 148:9, 148:11,

165:10
**one** [114] - 6:11, 9:20, 15:13, 15:14, 15:15, 16:24, 17:1, 17:3, 17:6, 17:14, 17:15, 17:21, 17:23, 18:5, 22:21, 26:15, 27:12, 27:20, 28:17, 31:16, 39:10, 42:3, 43:2, 57:15, 58:14, 64:2, 64:8, 64:10, 64:11, 67:10, 68:8, 69:6, 71:15, 72:6, 75:9, 76:25, 79:14, 81:1, 83:14, 86:18, 97:5, 104:5, 104:8, 105:6, 106:16, 109:8, 109:9, 111:2, 113:17, 113:18, 114:9, 121:23, 123:4, 125:12, 128:1, 128:12, 128:25, 129:22, 130:7, 131:6, 131:7, 135:23, 136:1, 136:11, 137:8, 137:14, 138:5, 138:12, 138:16, 141:16, 142:5, 143:17, 143:23, 144:12, 146:10, 149:25, 151:15, 152:9, 153:12, 154:12, 154:17, 155:5, 155:6, 155:21, 156:19, 157:4, 158:7, 158:14, 159:2, 160:1, 163:20, 164:5, 164:10, 164:14, 165:5, 165:8, 166:23, 167:23, 168:6, 171:10, 171:25, 174:7, 175:14, 175:25, 176:5, 186:23, 189:11, 189:23, 190:3
**one-year** [1] - 6:11
**ones** [2] - 46:9, 93:3
**ongoing** [1] - 27:10
**open** [6] - 49:8, 49:14, 50:1, 50:12, 169:16, 169:17
**opened** [3] - 50:8, 50:16, 164:3
**opening** [1] - 187:24
**openings** [1] - 49:22
**opens** [1] - 49:18
**operate** [3] - 171:4, 171:7, 179:13
**operates** [1] - 71:3
**operating** [3] - 162:3, 166:16, 180:10
**operation** [1] - 161:25
**operations** [1] - 8:5
**opine** [1] - 137:20
**opined** [2] - 76:7, 185:5
**opining** [1] - 69:19
**opinion** [125] - 10:19, 12:15, 16:5, 16:8, 16:12, 16:17, 17:5, 17:20, 17:25, 18:13, 18:16, 18:19, 18:25, 21:8, 22:5, 23:7, 25:10, 27:1, 27:24, 29:9, 29:10, 33:2, 33:7, 33:8, 33:14, 33:15, 33:18, 33:22, 33:23, 34:3, 34:9, 41:18, 43:13, 46:24, 47:4, 48:15, 52:21, 53:16, 55:23, 56:3, 56:7, 57:2, 58:25, 59:12, 59:21, 59:23, 60:4, 60:7, 60:12, 60:18, 61:2, 61:16, 61:18, 67:16, 68:3, 68:21, 69:14, 73:7, 73:12, 73:15, 74:19, 75:4, 75:7, 75:8, 75:14, 76:1, 76:2, 76:11, 76:14, 78:4, 80:2, 80:4, 81:21, 81:24, 82:1, 82:10, 88:10, 88:12, 88:19, 89:21, 91:10, 95:8, 95:22, 96:11, 96:12, 96:14, 96:18, 100:6, 103:18, 108:9, 111:17, 115:8, 116:6, 117:17, 118:10, 122:17, 122:21, 125:10, 128:3, 129:13, 132:19, 132:22, 133:13, 133:20, 134:7, 134:9, 134:22, 135:9, 135:10, 136:1, 136:2, 136:7, 136:14, 137:7, 137:13, 138:4, 138:9, 138:14, 151:14, 184:20
**opinions** [17] - 12:16, 12:20, 15:3, 15:13, 15:22, 53:17, 56:11, 76:3, 91:8, 103:19, 107:25, 112:5, 122:6, 136:21, 185:22, 187:12, 188:24
**opportunity** [5] - 45:22, 52:7, 134:18, 148:14, 149:23
**opposed** [4] - 35:21, 40:5, 54:7, 54:23
**opposite** [2] - 140:2, 162:2
**order** [16] - 11:9, 28:8, 31:6, 32:4, 65:18, 92:7, 99:8, 102:8, 108:10, 108:23, 109:24, 111:17, 148:13, 151:14, 152:24, 159:24
**ordinary** [1] - 48:25
**organ** [2] - 21:3, 31:17
**organization** [1] - 7:12
**organizations** [2] - 8:25, 9:15
**organs** [3] - 21:5, 32:15, 156:16
**original** [1] - 165:25
**originally** [1] - 139:25
**Orlando** [1] - 145:20
**Osteopathic** [1] - 5:20
**otherwise** [8] - 17:9, 38:24, 39:24, 41:10, 98:24, 144:8, 148:5, 150:8
**outcome** [3] - 188:2, 189:11, 190:3
**outlined** [2] - 89:10, 95:21
**outlook** [1] - 40:22
**outset** [1] - 189:22
**outside** [8] - 17:13, 24:13, 48:25, 51:19, 141:24, 142:4, 148:10, 178:25
**overall** [1] - 114:13
**overly** [2] - 80:6, 95:6
**own** [10] - 1:5, 103:10, 142:14, 149:24, 149:25, 150:1, 150:2, 174:18, 190:6
**owner** [2] - 146:8, 150:9
**owns** [2] - 8:17, 8:18
**oxygen** [34] - 20:6, 20:8, 20:9, 20:11, 20:15, 20:17, 20:20, 20:22, 20:25, 21:6, 21:10, 21:14, 21:15, 21:16, 21:17, 21:21, 21:22, 21:25, 22:3, 22:4, 23:16, 31:1, 49:9, 49:12, 49:14, 49:15, 96:15, 97:13, 97:14, 97:25, 98:5, 179:15, 179:17
**oxygenation** [3] - 21:2, 21:18, 32:19


## P


**P-17** [3] - 15:14, 15:19, 15:24
**P-18** [3] - 15:16, 15:19, 15:24
**P-19** [4] - 5:4, 5:9, 5:12, 5:13
**P-20** [1] - 109:9
**P-20.10** [1] - 114:5
**P-20.12** [1] - 138:25
**P-20.6** [1] - 112:12
**P-21** [2] - 109:9, 118:17
**P-22** [1] - 109:10
**P-23** [3] - 106:4, 106:5, 106:7
**P-3** [3] - 105:13, 105:16, 106:5
**P-35.5** [1] - 121:3
**P-5** [2] - 13:13, 14:6
**p.m** [3] - 29:6, 177:7, 190:19
**P.O** [1] - 192:18
**PA** [2] - 143:17, 147:20
**Page** [27] - 57:21, 60:1, 63:8, 63:25, 64:1, 64:24, 65:4, 67:22, 72:4, 74:13, 74:15, 78:17, 82:6, 83:4, 87:19, 93:24, 112:12, 115:12, 123:10, 125:13, 125:15, 125:18, 129:10, 129:20, 132:20, 135:19, 140:2
**page** [21] - 61:8, 63:15, 65:3, 66:12, 67:24, 69:18, 70:3, 74:5, 77:9, 87:11, 89:19, 112:9, 113:2, 113:3, 113:17, 114:5, 114:25, 115:12, 116:9, 116:25, 170:4
**Pages** [2] - 68:2, 136:24
**pages** [3] - 87:15, 113:10, 137:3
**paid** [1] - 147:14
**pain** [1] - 181:10
**paired** [1] - 53:23
**pale** [3] - 26:1, 26:11, 26:20
**palms** [1] - 52:5
**pandemic** [1] - 119:14
**paper** [1] - 87:8
**parents** [11] - 13:13, 26:12, 47:10, 54:11, 54:13, 110:1, 141:15, 157:19, 158:4, 158:14, 158:15
**PARKER** [30] - 5:11, 12:10, 14:4, 15:20, 45:2, 56:16, 56:21, 87:8, 87:10, 101:15, 103:24, 105:15, 108:6, 109:14, 122:10, 122:12, 138:19, 140:15, 166:11, 173:1, 183:16, 183:22, 184:1, 184:4, 190:9, 190:14, 190:18, 190:21, 191:2, 191:8
**Parker** [6] - 1:18, 56:19, 109:13, 138:24, 139:4, 172:25
**parking** [4] - 158:23, 158:25, 177:20
**part** [27] - 4:17, 8:11, 22:6, 22:10, 39:21, 40:9, 57:12, 59:15, 60:15, 62:9, 63:6, 71:13, 72:10, 78:3, 78:6, 80:3, 91:15, 91:25, 92:7, 93:7, 112:14, 135:2, 136:8, 174:19, 174:21, 185:2, 188:22
**Partial** [1] - 183:23
**participate** [1] - 9:19
**participating** [1] - 10:3
**participation** [1] - 135:14
**particular** [5] - 26:25, 46:7, 72:23, 78:18, 121:13
**particularized** [1] - 128:16
**particularly** [6] - 19:16, 20:6, 20:8, 121:15, 188:7, 188:10
**partner** [3] - 106:13, 106:14, 107:20
**pass** [7] - 4:18, 4:21,

37:6, 148:3, 148:4, 148:10, 180:22
**passage** [1] - 81:2
**passed** [7] - 76:19, 167:3, 180:21, 181:1, 181:4, 182:1, 182:21
**passing** [2] - 17:18, 183:10
**past** [7] - 16:21, 40:8, 119:13, 134:2, 134:16, 135:12, 185:7
**pathologic** [4] - 31:17, 41:13, 55:20, 99:14
**pathologically** [3] - 30:7, 32:7, 32:8
**Pathologist** [16] - 3:16, 5:2, 24:7, 34:19, 35:15, 37:17, 40:11, 41:15, 47:13, 52:1, 58:24, 80:15, 93:15, 95:16, 99:22, 100:3
**pathologist** [17] - 4:3, 4:11, 36:22, 38:14, 47:24, 48:5, 48:11, 48:12, 51:8, 51:10, 51:21, 59:11, 70:15, 95:4, 95:17, 186:19, 186:21
**pathologist's** [2] - 41:6, 51:13
**Pathologist's** [1] - 39:20
**Pathologists** [1] - 9:14
**pathologists** [8] - 4:9, 4:16, 4:20, 10:2, 10:16, 50:21, 50:24, 55:13
**Pathology** [16] - 3:23, 3:24, 4:1, 4:15, 5:22, 6:1, 6:11, 6:14, 7:6, 9:2, 9:13, 9:21, 11:2, 12:9, 91:19
**pathology** [4] - 4:8, 4:14, 4:16, 9:12
**patient** [2] - 4:7, 63:12
**patient's** [2] - 11:8, 65:17
**patients** [1] - 84:3
**pattern** [1] - 184:17
**patterns** [1] - 22:13
**pay** [4] - 115:2, 127:15, 150:2, 150:8
**PCO2** [1] - 64:21
**Pediatric** [2] - 58:20, 58:22
**peer** [1] - 10:5
**peer-reviewed** [1] - 10:5
**PennDOT** [1] - 148:4
**PENNSYLVANIA** [3] - 1:1, 1:13, 1:25
**Pennsylvania** [8] - 1:16, 1:19, 5:20, 5:23, 145:22, 192:5, 192:18, 192:19
**people** [48] - 4:18, 4:21, 4:23, 7:15, 8:7, 38:1, 88:17, 103:4, 111:5, 119:9, 119:10, 119:15, 119:17, 119:21, 119:25, 120:3, 122:22, 123:7, 124:2, 124:7, 124:10, 131:9, 132:5, 133:20, 133:22, 133:24, 134:6, 134:7, 134:13, 134:15, 134:22, 134:25, 135:3, 135:13, 142:24, 143:14, 143:17, 144:23, 164:7, 170:16, 172:14, 178:6, 178:19, 179:9, 189:24
**people's** [1] - 48:16
**per** [8] - 24:22, 85:23, 86:12, 88:16, 125:16, 130:14, 132:15, 139:22
**percent** [58] - 102:12, 111:9, 114:12, 114:18, 114:19, 115:5, 115:6, 119:16, 119:20, 119:21, 120:1, 120:2, 120:16, 120:20, 120:21, 121:10, 121:22, 122:25, 123:2, 123:7, 123:22, 123:23, 124:12, 124:14, 124:18, 125:21, 125:22, 126:1, 126:2, 126:3, 126:5, 126:6, 126:12, 127:15, 127:19, 127:21, 129:4, 129:13, 130:13, 130:14, 130:17, 130:19, 131:23, 131:25, 132:1, 132:2, 132:3, 132:14, 132:15, 139:21, 139:22, 139:23, 139:24, 139:25, 185:21
**percentage** [6] - 120:17, 122:24, 123:14, 124:10, 128:7, 132:11
**percentages** [7] - 114:7, 122:22, 125:2, 125:6, 125:10, 125:23, 129:20
**perform** [18] - 4:17, 4:18, 8:19, 19:12, 30:13, 33:12, 49:6, 59:2, 59:5, 70:17, 70:18, 72:8, 88:15, 88:17, 91:13, 91:15, 99:4, 100:18
**performed** [8] - 8:10, 10:12, 10:14, 11:14, 95:9, 95:18, 107:16
**performing** [3] - 6:6, 8:21, 179:3
**perfusion** [1] - 26:21
**perhaps** [2] - 104:11, 117:21
**period** [47] - 20:23, 20:24, 21:11, 21:14, 27:9, 28:12, 29:4, 31:14, 32:4, 32:7, 33:5, 33:6, 61:19, 80:19, 89:22, 90:13, 96:22, 97:2, 97:7, 97:12, 97:14, 97:19, 97:24, 97:25, 98:16, 98:17, 98:19, 98:21, 103:4, 103:15, 128:15, 145:17, 147:16, 153:4, 154:2, 157:3, 159:12, 160:19, 161:11, 163:12, 165:8, 170:15, 171:2, 175:8, 179:16, 185:11, 186:8
**periods** [4] - 62:7, 119:18, 184:18, 186:2
**permission** [4] - 44:24, 151:21, 152:12, 180:5
**permit** [1] - 148:5
**persist** [1] - 29:3
**persistent** [2] - 17:22, 18:2
**persists** [1] - 156:24
**person** [39] - 4:10, 30:19, 36:11, 59:8, 105:2, 105:8, 110:10, 110:15, 110:16, 111:23, 121:2, 121:19, 125:20, 126:7, 126:11, 126:14, 126:15, 126:17, 128:12, 128:23, 128:25, 129:13, 129:22, 129:25, 130:6, 130:8, 131:13, 131:21, 132:25, 133:3, 133:7, 133:11, 133:14, 135:11, 136:8, 160:2, 164:5, 190:24
**person's** [6] - 23:11, 99:10, 111:22, 113:1, 113:15, 128:7
**personal** [22] - 113:8, 113:19, 114:3, 114:8, 114:20, 120:25, 121:3, 124:25, 125:4, 125:9, 125:19, 125:21, 126:12, 126:14, 126:17, 126:20, 127:6, 128:3, 129:14, 129:20, 129:23, 130:7
**perspective** [10] - 35:5, 79:24, 80:14, 80:18, 84:24, 85:13, 91:1, 102:3, 102:4, 150:4
**petechiae** [1] - 26:20
**petechial** [1] - 27:6
**Pettker** [5] - 14:23, 17:15, 27:20, 31:16, 191:2
**pH** [26] - 33:17, 33:20, 33:22, 63:5, 63:10, 63:17, 63:19, 64:5, 64:9, 64:20, 66:5, 67:1, 67:4, 68:12, 69:10, 69:13, 75:14, 81:19, 81:20, 83:6, 88:23, 88:24, 88:25, 89:5, 100:11, 101:21
**Philadelphia** [1] - 1:19
**phone** [7] - 127:11, 159:1, 161:4, 161:6, 163:21, 163:22
**photograph** [2] - 46:14, 52:19
**photographs** [10] - 13:15, 13:18, 45:22, 46:3, 52:8, 53:7, 53:14, 165:3, 165:12, 165:13
**physical** [2] - 45:23, 54:1
**physically** [4] - 99:6, 142:22, 147:13, 171:19
**physicians** [2] - 19:11, 44:19
**physics** [1] - 146:19
**Physics** [2] - 143:7, 143:11
**physiologic** [2] - 20:10, 35:7
**pick** [5] - 72:13, 138:16, 150:2, 161:4
**picking** [3] - 69:6, 137:14, 137:18
**picture** [8] - 31:13, 35:2, 37:13, 61:24, 71:21, 165:9, 168:6, 181:13
**pictures** [1] - 52:4
**piece** [2] - 75:9, 99:6
**piled** [1] - 52:14
**pill** [1] - 176:15
**pissed** [1] - 168:17
**Pitocin** [1] - 189:24
**Pittsburgh** [3] - 5:23, 7:4, 8:15
**placed** [1] - 59:6
**placenta** [1] - 102:23
**places** [1] - 168:8
**Plaintiff** [1] - 2:8
**Plaintiff's** [10] - 5:15, 16:1, 105:18, 109:15, 109:18, 166:12, 184:4, 188:17, 189:8, 189:12
**Plaintiffs** [5] - 1:6, 58:25, 104:6, 104:11, 183:21
**PLAINTIFFS** [1] - 1:14
**Plaintiffs'** [1] - 14:19
**Plan** [1] - 86:20
**plan** [2] - 153:10, 190:20
**planned** [1] - 16:22
**planning** [1] - 153:25
**plans** [2] - 144:11, 153:8
**play** [4] - 41:17, 41:18, 42:23, 127:13
**played** [1] - 42:24
**plus** [2] - 74:20, 129:22
**point** [33] - 19:21, 25:5, 27:21, 38:10, 46:2, 62:13, 68:5,

72:6, 74:3, 80:5, 80:6, 89:13, 97:1, 97:6, 97:21, 98:13, 102:19, 126:16, 130:23, 131:1, 136:1, 136:11, 138:5, 138:8, 138:9, 143:21, 149:2, 149:17, 149:22, 168:19, 170:10, 178:7, 184:20
**pointed** [2] - 27:22, 72:17
**pointing** [1] - 66:8
**points** [4] - 136:17, 184:10, 187:19, 187:20
**policies** [1] - 73:2
**Polin** [4] - 14:23, 39:11, 43:2, 48:9
**Polin's** [1] - 39:18
**polyhydramnios** [10] - 16:25, 17:3, 17:4, 17:6, 17:14, 17:16, 17:20, 18:1, 18:5, 176:2
**pooped** [1] - 167:3
**poor** [2] - 26:21, 186:4
**pop** [1] - 50:1
**population** [4] - 70:20, 123:20, 124:14, 134:12
**portion** [3] - 38:9, 112:6, 113:2
**portrayed** [1] - 76:21
**position** [4] - 8:14, 24:7, 100:21, 160:12
**positioning** [1] - 48:3
**positions** [4] - 8:23, 19:14, 101:4, 106:15
**positive** [5] - 55:6, 133:22, 137:24, 175:9
**possibility** [4] - 82:9, 96:12, 117:20, 133:18
**possible** [10] - 35:17, 36:18, 36:20, 46:20, 81:9, 99:23, 107:17, 137:16, 189:11, 190:3
**possibly** [3] - 94:13, 94:14, 185:12
**post** [1] - 86:20
**postmortem** [7] - 11:2, 80:13, 80:16, 80:19, 102:3, 102:21, 102:25
**Potacia** [4] - 163:5, 171:10, 178:13, 178:24
**potential** [3] - 51:1, 115:13, 118:21
**potentially** [4] - 41:25, 72:18, 110:11, 174:18
**potentials** [1] - 139:2
**pounds** [1] - 50:5
**practice** [8] - 3:17, 4:18, 8:17, 8:18, 8:20, 10:20, 15:20, 54:19
**practitioner** [1] - 57:7
**pray** [1] - 167:8
**pre** [1] - 43:3
**pre-labor** [1] - 43:3
**precise** [2] - 88:19, 132:11
**predict** [3] - 82:18, 82:21, 83:1
**predictor** [1] - 108:17
**preface** [1] - 73:23
**pregnancy** [7] - 17:16, 17:23, 153:16, 153:22, 155:10, 175:7, 175:15
**pregnant** [10] - 153:13, 153:19, 153:20, 154:3, 154:6, 155:1, 172:11, 174:23, 175:11, 178:4
**preliminary** [1] - 13:7
**premarked** [1] - 105:13
**prenatal** [19] - 12:22, 16:13, 16:21, 16:23, 17:13, 18:8, 34:1, 42:11, 44:1, 47:8, 154:1, 154:18, 155:12, 155:17, 156:10, 175:12, 175:17, 176:8, 181:19
**prenatally** [1] - 16:17
**preparation** [1] - 12:20
**prepare** [1] - 55:6
**prepared** [11] - 67:7, 67:13, 75:22, 77:5, 77:8, 77:12, 86:21, 107:25, 108:15, 121:1, 192:11
**presence** [1] - 53:1
**present** [37] - 9:25, 17:1, 17:7, 17:22, 38:2, 40:23, 43:16, 52:12, 82:13, 87:19, 107:13, 109:4, 110:6, 111:14, 112:24, 113:18, 115:14, 116:18, 116:23, 117:15, 125:9, 125:15, 132:15, 132:18, 133:10, 135:16, 136:21, 136:25, 137:5, 137:13, 139:12, 139:16, 139:18, 157:20, 167:15
**presentation** [1] - 37:10
**presentations** [2] - 10:9, 11:24
**presented** [4] - 10:8, 125:2, 125:6, 127:14
**presents** [1] - 121:6
**President** [1] - 144:20
**pressure** [2] - 27:7, 27:9
**presume** [1] - 59:15
**pretend** [1] - 84:6
**pretty** [35] - 44:4, 44:11, 44:14, 44:19, 45:15, 52:16, 53:6, 100:14, 113:14, 142:22, 143:8, 143:9, 144:9, 145:8, 146:9, 146:12, 146:17, 146:18, 147:3, 148:1, 150:9, 150:22, 152:15, 152:16, 153:20, 158:10, 158:12, 161:3, 166:24, 169:3, 177:21, 180:23, 185:20
**prevent** [1] - 190:2
**preventing** [1] - 17:18
**previously** [7] - 7:8, 10:22, 31:23, 39:3, 60:14, 62:11, 88:14
**primarily** [2] - 20:18, 21:13
**prints** [2] - 52:25, 53:6
**private** [2] - 8:17, 8:18
**probability** [2] - 124:18, 138:16
**probable** [2] - 34:7, 120:12
**problem** [4] - 5:11, 15:22, 17:8, 43:14
**problems** [5] - 12:2, 17:17, 36:14, 142:12, 174:2
**Procedure** [1] - 183:23
**procedure** [4] - 37:25, 79:9, 79:12, 79:18
**procedures** [1] - 73:2
**proceed** [4] - 104:5, 122:15, 162:20, 184:13
**PROCEEDINGS** [1] - 1:11
**proceedings** [2] - 191:14, 192:8
**Proceedings** [1] - 1:21
**process** [27] - 20:14, 29:18, 29:20, 30:24, 35:7, 41:13, 47:1, 48:23, 55:21, 56:5, 61:4, 61:21, 62:9, 62:17, 71:21, 79:9, 79:12, 88:22, 89:24, 92:24, 92:25, 98:21, 99:14, 152:23, 169:25, 170:19
**processes** [1] - 6:14
**produced** [2] - 1:22, 71:1
**productivity** [8] - 111:8, 111:9, 111:13, 113:11, 128:20, 130:16, 132:7, 132:14
**professional** [2] - 9:10, 106:18
**professionals** [4] - 10:2, 26:12, 100:17, 100:23
**profile** [1] - 128:19
**profit** [1] - 150:3
**prognosis** [1] - 40:22
**program** [2] - 9:7, 144:18
**Program** [4] - 7:3, 7:5, 7:25, 9:2
**programs** [1] - 8:1
**progress** [5] - 19:6, 19:23, 100:19, 101:10
**progression** [1] - 21:22
**progressive** [1] - 97:18
**projected** [1] - 111:9
**projection** [4] - 112:20, 118:23, 120:15, 134:15
**projections** [1] - 131:1
**prolong** [1] - 190:5
**prolonged** [18] - 16:10, 19:18, 19:20, 20:23, 22:1, 27:9, 31:14, 46:22, 56:8, 60:10, 62:3, 76:22, 96:22, 97:19, 97:25, 98:13, 98:16
**promoted** [1] - 147:18
**pronounce** [1] - 146:22
**pronounced** [6] - 30:1, 36:2, 36:7, 88:7, 88:18, 100:7
**proof** [1] - 188:17
**properly** [2] - 106:7, 189:21
**prospective** [1] - 15:1
**protective** [1] - 161:19
**protracted** [2] - 29:15, 56:1
**proud** [1] - 175:23
**prove** [2] - 144:25, 147:12
**proved** [1] - 147:17
**proven** [1] - 145:1
**provide** [5] - 5:3, 105:5, 105:10, 169:13, 187:5
**provided** [2] - 165:3, 166:1
**provides** [1] - 70:23
**providing** [1] - 128:25
**province** [1] - 189:8
**provisions** [1] - 192:5
**publication** [1] - 9:17
**published** [2] - 10:5, 122:2
**pull** [7] - 24:15, 37:14, 47:13, 52:25, 134:3, 138:21, 166:4
**pulled** [4] - 46:15, 90:11, 98:3, 102:20
**pulses** [2] - 24:11, 25:5
**pump** [1] - 28:10
**pumping** [2] - 25:5, 25:7
**pupil** [1] - 164:4
**pupils** [2] - 26:3, 26:9
**purported** [1] - 185:18
**purpose** [3] - 102:2, 108:22, 145:23
**purposes** [1] - 102:17
**pursuant** [1] - 192:5
**pursue** [1] - 145:9
**push** [1] - 161:10
**pushed** [2] - 160:7, 184:24
**pushing** [6] - 50:10, 50:11, 161:15, 177:23, 179:22, 181:10
**put** [26] - 9:6, 31:13, 35:14, 46:11, 49:20, 51:12, 61:25, 63:2, 65:11, 71:6, 71:8,

73:23, 96:10, 104:5, 112:6, 112:13, 113:3, 131:16, 163:25, 166:23, 176:14, 177:13, 178:22, 179:5, 180:9, 181:11
**puts** [1] - 111:11
**putting** [2] - 186:11, 186:12
**pyloric** [2] - 37:21, 40:8

## Q

**qualified** [2] - 10:22, 107:22
**quality** [1] - 70:18
**QUESTION** [19] - 58:9, 60:7, 61:15, 64:2, 65:1, 65:5, 65:13, 66:14, 68:2, 72:6, 74:16, 78:21, 79:1, 82:7, 83:5, 90:1, 93:25, 123:14, 123:19
**questioning** [3] - 58:4, 62:2, 62:20
**questions** [7] - 10:1, 12:14, 12:15, 101:17, 130:25, 173:2, 183:17
**quick** [1] - 101:17
**quickly** [3] - 30:19, 70:2, 79:19
**quiet** [1] - 168:23
**quite** [3] - 147:6, 155:19, 189:1
**quote** [2] - 61:2, 187:8

## R

**Radioactivity** [1] - 143:14
**raise** [1] - 151:12
**raised** [4] - 141:4, 141:5, 173:15, 173:16
**raises** [1] - 190:7
**raising** [1] - 153:13
**ran** [5] - 8:5, 9:7, 70:25, 72:24
**range** [47] - 66:5, 66:6, 66:17, 66:21, 67:1, 67:5, 67:6, 68:13, 68:19, 69:14, 69:16, 75:15, 81:21, 115:21, 116:19, 116:21, 116:24, 117:13, 117:16, 118:4, 118:6, 118:9, 121:2, 132:18, 132:25, 133:2, 133:17, 133:22, 133:24, 133:25, 135:16, 136:7, 136:12, 136:15, 136:18, 137:4, 137:15, 137:17, 137:18, 137:21, 138:6, 138:8, 138:15, 138:16, 138:17, 139:19
**ranges** [12] - 70:10, 70:17, 70:23, 71:4, 71:11, 71:17, 72:12, 72:16, 73:4, 115:4, 132:17, 139:1
**ranging** [3] - 112:8, 138:25, 140:11
**rate** [33] - 22:13, 23:20, 24:20, 24:21, 25:21, 28:22, 65:17, 83:11, 84:1, 85:6, 87:20, 87:23, 88:2, 88:6, 88:16, 111:9, 119:19, 133:21, 133:24, 150:8, 160:17, 162:4, 170:17, 178:20, 178:21, 179:2, 179:19, 184:17, 185:6, 185:15, 186:8
**rather** [3] - 114:7, 146:11
**re** [1] - 97:15
**re-application** [1] - 97:15
**reach** [1] - 20:24
**reached** [4] - 31:3, 31:4, 62:12, 97:21
**reaches** [1] - 21:19
**reaction** [4] - 30:20, 30:22, 31:6, 170:20
**read** [39] - 10:2, 24:25, 41:11, 50:18, 57:11, 57:20, 57:25, 58:1, 58:2, 58:3, 58:18, 60:13, 61:6, 61:11, 61:22, 61:23, 63:1, 64:12, 65:20, 66:23, 67:20, 68:10, 68:17, 69:3, 72:21, 73:8, 75:11, 76:9, 78:11, 82:14, 84:7, 84:11, 94:4, 103:2, 118:13, 159:21, 159:25, 160:10, 189:25
**readily** [1] - 119:12
**reading** [18] - 34:23, 48:15, 50:18, 62:19, 63:15, 68:17, 75:2, 76:17, 79:19, 79:20, 79:21, 79:24, 83:18, 84:1, 90:6, 90:14, 160:8, 162:4
**ready** [9] - 60:4, 61:12, 122:15, 148:4, 156:6, 156:7, 156:18, 162:18, 172:15
**real** [1] - 57:11
**really** [20] - 32:10, 39:13, 53:5, 66:16, 80:8, 121:18, 138:11, 146:14, 147:13, 147:20, 149:13, 149:20, 156:22, 162:13, 163:2, 165:6, 166:24, 179:8, 184:20, 187:4
**REALTIME** [1] - 1:24
**rearrangement** [1] - 20:11
**rearrangements** [1] - 54:2
**reason** [19] - 28:11, 28:19, 28:22, 40:17, 49:6, 56:8, 69:7, 84:14, 84:16, 84:17, 93:14, 94:3, 95:2, 98:22, 102:11, 139:11, 168:5, 168:13, 191:5
**reasonable** [42] - 12:17, 15:10, 16:6, 16:8, 18:16, 21:8, 29:10, 46:24, 47:4, 53:18, 56:11, 60:8, 103:20, 108:19, 110:13, 111:15, 113:4, 113:21, 114:21, 115:8, 116:2, 116:6, 116:12, 117:5, 117:17, 118:10, 118:24, 119:5, 119:8, 120:9, 121:14, 122:6, 132:22, 133:2, 133:13, 134:8, 134:23, 136:3, 136:14, 136:18, 137:7, 138:5
**reasons** [7] - 27:24, 31:22, 41:23, 43:6, 71:23, 88:14, 139:11
**reassured** [1] - 170:19
**reassuring** [1] - 28:24
**receive** [7] - 110:15, 115:2, 120:19, 156:7, 156:18, 164:2, 172:15
**received** [1] - 19:5
**receiving** [1] - 23:16
**recently** [3] - 9:2, 9:21, 107:18
**recess** [3] - 56:18, 104:15, 162:17
**recognize** [1] - 65:24
**recollection** [4] - 79:16, 102:10, 102:11, 103:8
**recommend** [1] - 154:9
**recommended** [1] - 55:13
**reconvene** [1] - 104:14
**record** [41] - 3:8, 12:25, 23:18, 23:21, 24:3, 24:16, 25:13, 25:17, 26:1, 26:19, 43:7, 51:4, 55:16, 66:7, 66:25, 67:2, 67:5, 68:13, 72:10, 72:19, 72:20, 73:5, 76:7, 77:4, 78:21, 79:6, 79:8, 80:1, 86:8, 86:13, 86:19, 92:6, 102:12, 103:6, 104:23, 106:4, 106:6, 140:23, 155:19, 173:10
**recorded** [2] - 1:21, 88:6
**records** [35] - 11:8, 12:23, 13:4, 22:7, 22:16, 23:14, 23:19, 23:24, 25:10, 27:11, 27:25, 29:16, 29:24, 30:2, 31:10, 43:24, 47:9, 50:19, 77:22, 80:24, 84:11, 85:18, 87:19, 87:20, 87:23, 88:9, 90:21, 91:5, 99:8, 101:3, 101:9, 103:2, 103:3, 103:11, 159:6
**recover** [1] - 28:25
**recovery** [3] - 24:1, 181:9, 181:11
**recreation** [1] - 114:10
**recross** [1] - 103:23
**Recross** [1] - 2:2
**redirect** [2] - 101:16, 138:20
**Redirect** [1] - 2:2
**REDIRECT** [2] - 101:18, 138:22
**reduced** [1] - 112:24
**reduces** [1] - 126:8
**reducing** [1] - 132:15
**reduction** [1] - 139:22
**refer** [3] - 52:23, 65:8, 123:9
**reference** [25] - 5:9, 24:16, 46:7, 52:3, 66:5, 66:6, 66:17, 67:5, 67:6, 68:19, 69:16, 70:10, 70:17, 70:23, 71:11, 71:17, 72:11, 72:16, 73:4, 86:24, 86:25, 87:2, 109:22, 118:16, 121:5
**referenced** [1] - 66:17
**references** [1] - 187:5
**referencing** [1] - 24:17
**referred** [3] - 4:22, 74:9, 75:1
**referring** [11] - 20:2, 41:9, 59:25, 64:20, 67:20, 67:21, 68:6, 93:9, 123:12, 135:19, 136:24
**reflect** [1] - 106:6
**reflected** [2] - 67:2, 137:1
**reflection** [1] - 5:6
**reflective** [1] - 27:9
**reflects** [4] - 68:7, 86:13, 110:24, 125:19
**refreshing** [1] - 44:15
**refused** [2] - 167:24
**regained** [1] - 24:12
**regard** [4] - 20:2, 70:9, 90:24, 133:18
**regarding** [7] - 10:19, 18:24, 36:1, 36:5, 84:1, 109:4, 118:17
**regardless** [4] - 33:23, 80:3, 149:14, 153:25
**region** [1] - 37:21
**reject** [3] - 100:11, 187:14, 188:11
**rejected** [1] - 188:13
**related** [7] - 20:15, 21:13, 31:14, 36:7, 54:5, 111:15, 166:5
**relation** [3] - 20:8, 40:7, 49:5
**relationship** [1] - 189:16
**relative** [1] - 108:2
**reliable** [2] - 76:3, 76:11
**relied** [7] - 75:5, 77:2,

77:23, 78:1, 78:3, 78:5, 134:18
**relies** [1] - 185:18
**religion** [1] - 109:1
**rely** [3] - 74:1, 187:15, 188:8
**relying** [3] - 77:25, 90:19, 185:14
**remain** [2] - 60:7, 75:7
**remains** [1] - 60:12
**remarkable** [1] - 50:25
**remember** [8] - 85:11, 94:22, 155:12, 155:14, 155:21, 165:6, 171:17, 178:22
**reminds** [1] - 165:14
**remote** [3] - 190:18, 190:24, 191:7
**removed** [1] - 4:2
**render** [4] - 4:5, 59:12, 107:25, 109:24
**rendering** [1] - 27:1
**rent** [1] - 126:22
**repair** [1] - 30:22
**repairing** [1] - 32:2
**repeat** [2] - 97:5, 131:19
**repeated** [1] - 85:15
**repetitive** [1] - 7:15
**replaced** [1] - 139:14
**replied** [1] - 78:23
**report** [81] - 34:16, 34:17, 34:20, 34:23, 35:14, 37:14, 59:6, 59:16, 66:18, 67:14, 67:16, 68:2, 69:19, 69:20, 70:9, 71:15, 73:21, 73:23, 73:25, 74:3, 74:6, 74:9, 74:24, 74:25, 75:13, 75:16, 75:21, 75:22, 76:7, 76:10, 76:11, 76:16, 76:24, 76:25, 77:2, 77:3, 77:5, 77:9, 77:13, 77:24, 77:25, 78:2, 78:10, 78:18, 91:6, 91:7, 93:9, 93:10, 95:18, 95:22, 109:10, 109:22, 109:23, 112:6, 112:9, 113:4, 113:24, 114:2, 118:13, 118:17, 119:2, 120:23, 121:3, 122:20, 124:2, 124:6, 125:13, 125:19, 126:5, 127:25, 129:11, 129:21, 130:24, 132:20, 132:21, 135:20, 136:24, 139:5, 169:5, 181:24
**REPORTED** [1] - 192:15
**reported** [1] - 59:5
**REPORTER** [1] - 1:24
**Reporter** [3] - 192:3, 192:14, 192:17
**reporter** [1] - 192:23
**Reports** [2] - 9:22, 9:24
**reports** [17] - 14:22, 15:13, 15:19, 15:22, 17:15, 48:16, 67:7, 71:6, 71:7, 74:16, 75:5, 90:16, 109:6, 109:8, 109:12, 122:1, 125:12
**represent** [3] - 49:3, 53:24, 167:18
**representing** [1] - 189:2
**reproduction** [1] - 192:22
**require** [1] - 54:19
**research** [5] - 7:9, 9:19, 119:13, 134:2, 135:12
**Research** [1] - 7:13
**reserves** [1] - 21:16
**residency** [2] - 5:22, 5:25
**Resident** [1] - 178:11
**residents** [1] - 10:17
**Residents** [1] - 184:15
**resolved** [1] - 17:23
**resources** [1] - 21:19
**respect** [2] - 66:4, 188:14
**respective** [1] - 188:6
**respectively** [1] - 54:15
**respiratory** [3] - 23:22, 26:2, 47:23
**respond** [10] - 27:23, 30:8, 30:21, 30:25, 31:20, 39:12, 43:5, 43:21, 164:9, 188:19
**responded** [2] - 79:3, 189:20
**responding** [1] - 26:10
**response** [4] - 17:19, 18:7, 30:9, 43:23
**responsive** [7] - 23:3, 23:15, 26:3, 26:9, 26:16, 29:25, 163:11
**rest** [5] - 121:24, 132:8, 158:15, 183:20, 183:21
**restart** [2] - 25:3, 28:6
**restaurant** [1] - 146:7
**restricted** [1] - 43:4
**restrictions** [2] - 17:10, 17:12
**restrictive** [1] - 43:8
**result** [11] - 22:3, 35:12, 53:20, 55:6, 64:2, 67:3, 71:15, 77:6, 78:18, 139:8, 175:23
**resultant** [1] - 97:15
**resulted** [7] - 19:19, 23:13, 46:23, 55:21, 55:24, 96:16, 189:5
**resulting** [2] - 21:7, 22:4
**results** [71] - 4:13, 11:8, 13:9, 13:12, 33:24, 54:10, 66:25, 67:12, 67:13, 67:17, 68:5, 68:8, 68:9, 68:13, 68:14, 68:23, 69:2, 69:19, 69:21, 69:22, 69:25, 70:1, 70:3, 70:7, 70:10, 70:16, 70:19, 70:22, 71:1, 71:10, 72:9, 73:5, 73:24, 74:1, 74:20, 75:15, 76:8, 76:11, 76:17, 77:9, 78:1, 78:2, 78:13, 79:1, 79:22, 80:1, 81:3, 81:6, 81:20, 81:22, 89:8, 89:9, 90:21, 92:2, 92:6, 98:6, 100:11, 102:8, 102:16, 117:8, 156:12, 169:10, 170:6, 170:12, 175:20, 181:20, 182:7, 182:13, 187:11, 188:10
**resuscitate** [1] - 23:4
**resuscitated** [12] - 23:25, 26:18, 29:7, 31:6, 32:3, 56:10, 96:18, 97:3, 97:9, 98:23, 99:2, 101:12
**resuscitation** [8] - 23:21, 24:3, 24:9, 25:15, 28:2, 28:12, 97:15, 98:24
**resuscitative** [1] - 50:10
**retired** [1] - 106:14
**retirement** [20] - 110:13, 110:19, 111:7, 115:3, 115:17, 115:22, 116:18, 117:10, 117:13, 117:15, 118:4, 118:6, 118:8, 120:18, 133:1, 133:2, 133:4, 134:16, 135:4, 140:3
**Retirement** [2] - 110:15, 110:17
**return** [3] - 24:10, 111:15, 137:25
**revealed** [5] - 67:18, 68:5, 73:24, 74:17, 75:15
**review** [22] - 10:18, 13:2, 13:12, 13:15, 13:18, 13:21, 13:24, 14:13, 14:16, 14:19, 14:25, 23:24, 29:16, 43:23, 53:7, 55:20, 56:3, 64:10, 69:23, 72:10, 73:1, 94:2
**reviewed** [27] - 9:5, 10:5, 12:20, 12:22, 14:25, 15:2, 15:6, 15:9, 22:12, 23:14, 54:10, 55:15, 67:12, 68:21, 75:10, 84:2, 85:19, 86:8, 86:15, 86:19, 86:21, 88:9, 91:7, 103:11, 108:12, 108:14, 113:24
**reviewing** [3] - 18:23, 72:9, 72:19
**revive** [2] - 27:19, 98:25
**rhythm** [2] - 24:4, 25:6
**ride** [1] - 186:11
**riding** [1] - 169:9
**right-away** [1] - 152:16
**rigor** [1] - 187:12
**rings** [1] - 161:5
**risk** [5] - 21:11, 111:15, 186:11, 186:13, 189:4
**risk-related** [1] - 111:15
**RMR** [1] - 1:23
**RMR,CRR** [2] - 192:13, 192:16
**Road** [1] - 1:16
**ROBERT** [1] - 1:12
**role** [4] - 41:17, 41:19, 42:23, 42:25
**room** [35] - 6:2, 155:22, 158:3, 159:2, 159:15, 159:16, 160:13, 161:25, 163:20, 164:6, 164:20, 165:20, 166:16, 166:19, 167:14, 168:14, 169:1, 170:16, 171:4, 172:15, 177:8, 178:2, 178:7, 178:19, 178:25, 179:4, 179:9, 179:18, 179:20, 179:21, 180:1, 181:9, 181:11, 181:12
**rotated** [1] - 5:25
**rotations** [1] - 22:10
**round** [1] - 111:3
**Route** [1] - 147:2
**routine** [1] - 156:15
**routinely** [1] - 44:15
**Rowan** [1] - 106:16
**rows** [1] - 112:21
**Royal** [4] - 2:4, 104:17, 104:25, 108:4
**RRT** [1] - 87:25
**Rule** [1] - 183:23
**ruling** [1] - 31:11
**run** [7] - 4:11, 33:11, 64:15, 65:10, 73:13, 80:15, 102:11
**running** [3] - 4:9, 71:25, 83:2
**rupture** [1] - 178:1
**rush** [1] - 171:3
**rushed** [2] - 159:15, 159:16
**rushing** [2] - 170:16, 178:6

## S

**s/Kristin** [1] - 192:13
**sacks** [3] - 49:12, 49:20, 50:16
**sad** [1] - 187:23
**salary** [1] - 130:11
**sample** [13] - 75:24, 78:7, 80:10, 80:11, 80:21, 81:14, 101:22, 101:23, 101:24, 102:7, 102:10, 102:25
**Sample** [1] - 9:23
**sampled** [1] - 38:7
**samples** [3] - 6:3, 80:16, 102:2
**sampling** [1] - 102:21
**Sartina** [2] - 22:17,

51:7
**sat** [1] - 152:13
**Saturday** [6] - 155:16, 157:13, 157:22, 158:1, 169:17, 176:11
**save** [1] - 190:22
**savings** [1] - 126:18
**saw** [26] - 18:23, 35:21, 38:22, 76:25, 77:3, 77:4, 77:9, 77:12, 100:24, 152:8, 156:2, 161:12, 162:1, 162:14, 162:22, 162:23, 163:5, 165:11, 167:1, 168:2, 171:3, 176:10, 176:20, 177:6, 179:13, 179:25
**scale** [3] - 115:6, 144:6
**scaled** [1] - 28:21
**scared** [1] - 172:12
**scenario** [1] - 127:14
**scenarios** [9] - 122:20, 125:9, 125:14, 135:21, 137:4, 137:8, 137:12, 137:17, 137:21
**schedule** [1] - 148:9
**school** [36] - 5:18, 5:19, 5:21, 6:25, 22:9, 44:14, 63:18, 83:11, 110:5, 110:25, 112:8, 112:17, 114:16, 114:17, 115:16, 115:17, 116:3, 121:4, 122:22, 124:3, 125:16, 125:20, 126:5, 126:15, 128:11, 135:18, 136:4, 139:1, 139:5, 140:10, 142:21, 143:1, 143:15, 148:1, 148:7, 172:4
**School** [1] - 7:3
**science** [2] - 105:3, 146:13
**Science** [5] - 7:5, 142:17, 143:6, 143:16, 144:3
**sciences** [1] - 143:8
**scientific** [1] - 84:24
**Scientists** [1] - 9:16
**scissors** [2] - 159:17, 171:6
**scope** [1] - 189:2
**score** [3] - 27:12, 29:2, 84:20
**scores** [7] - 29:2, 84:13, 84:19, 84:23, 84:25, 85:2, 100:13
**Scranton** [1] - 192:19
**SCRANTON** [2] - 1:13, 1:25
**screen** [4] - 41:5, 65:23, 65:24, 112:13
**second** [18] - 6:12, 6:17, 25:20, 57:25, 73:20, 73:25, 75:13, 76:11, 76:16, 76:24, 78:10, 86:1, 86:2, 109:9, 109:23, 160:1, 166:23, 182:24
**secondary** [2] - 143:5, 146:15
**secondly** [1] - 185:4
**Secretary** [1] - 144:19
**Section** [1] - 192:6
**section** [15] - 23:15, 68:3, 69:25, 90:12, 98:4, 101:5, 161:14, 161:17, 172:14, 172:19, 180:3, 180:6, 180:7, 180:10, 184:25
**sections** [3] - 38:11, 39:23, 48:19
**secure** [1] - 111:16
**Security** [4] - 110:15, 110:17, 133:3, 134:17
**see** [111] - 6:15, 20:18, 21:4, 25:18, 25:21, 27:19, 30:5, 30:14, 31:9, 31:24, 31:25, 32:4, 32:10, 38:21, 38:23, 39:6, 39:7, 40:2, 40:4, 42:3, 43:7, 43:24, 45:12, 45:16, 46:15, 47:22, 52:24, 60:4, 60:5, 66:19, 66:25, 67:17, 69:3, 76:6, 77:1, 77:10, 82:2, 82:8, 83:5, 84:3, 85:21, 85:22, 85:23, 85:24, 85:25, 86:24, 87:2, 87:4, 87:13, 87:17, 87:21, 87:24, 88:1, 88:2, 93:20, 97:14, 98:5, 98:7, 98:10, 99:3, 99:6, 99:12, 99:13, 99:15, 99:18, 100:5, 100:10, 130:24, 132:10, 145:7, 145:8, 145:9, 148:21, 151:13, 152:7, 153:11, 154:3, 155:7, 156:23, 162:8, 162:9, 162:10, 162:25, 163:3, 163:8, 163:12, 163:15, 164:3, 164:5, 166:20, 167:7, 169:3, 174:21, 176:23, 177:12, 178:8, 178:18, 179:21, 179:24, 180:13, 180:16, 180:17, 180:18, 180:19, 187:10, 191:5, 191:13
**seeing** [6] - 79:11, 86:17, 183:4, 185:23, 185:25, 186:1
**seek** [1] - 109:12
**seem** [2] - 80:5, 163:3
**segments** [1] - 39:14
**select** [1] - 188:2
**self** [2] - 9:19, 188:16
**self-generated** [1] - 9:19
**self-serving** [1] - 188:16
**semester** [1] - 106:17
**send** [2] - 32:24, 148:4
**sense** [4] - 104:9, 160:23, 170:19, 181:18
**sensitive** [3] - 20:19, 21:3, 32:18
**sensory** [1] - 170:18
**sent** [1] - 147:10
**sentinel** [1] - 185:17
**separate** [1] - 109:6
**separated** [1] - 150:25
**serum** [1] - 161:2
**Service** [1] - 153:3
**service** [1] - 182:3
**serving** [1] - 188:16
**set** [5] - 69:2, 70:18, 111:5, 161:21, 192:9
**sets** [1] - 111:2
**setting** [2] - 80:13, 81:3
**seven** [3] - 8:6, 143:5, 146:10
**several** [6] - 32:9, 48:9, 49:1, 156:11, 171:18, 173:18
**severe** [1] - 61:15
**shaking** [3] - 162:14, 163:1
**share** [1] - 174:15
**shares** [1] - 128:12
**sharing** [1] - 128:7
**sheet** [1] - 86:8
**shelter** [1] - 114:10
**shift** [4] - 132:17, 146:9, 176:23, 176:25
**shock** [2] - 170:22, 183:17
**shocked** [2] - 167:7, 180:24
**short** [2] - 20:24, 56:15
**shorthand** [1] - 1:21
**shoulder** [1] - 164:15
**show** [19] - 17:4, 31:7, 44:24, 69:20, 76:8, 76:9, 77:6, 78:2, 81:20, 83:20, 83:22, 86:16, 111:23, 165:7, 177:3, 178:2, 179:23, 185:24, 186:2
**showed** [11] - 16:24, 23:20, 24:12, 24:13, 37:2, 48:21, 68:14, 88:5, 113:13, 134:12, 135:12
**shown** [1] - 18:3
**shows** [4] - 28:1, 111:23, 112:21, 113:11
**side** [4] - 4:8, 25:17, 49:1, 162:2
**sign** [6] - 89:12, 92:12, 92:14, 92:16, 94:9, 94:14
**signals** [1] - 32:24
**signed** [2] - 34:14, 153:1
**significance** [14] - 18:14, 23:5, 24:19, 34:21, 34:25, 35:1, 36:8, 41:14, 52:12, 53:21, 54:11, 54:23, 55:11, 102:14
**significant** [49] - 16:16, 18:10, 18:23, 22:20, 22:21, 22:24, 23:4, 26:3, 26:8, 27:1, 27:12, 28:15, 29:13, 29:18, 31:12, 31:19, 33:25, 34:22, 35:10, 35:12, 36:6, 37:16, 38:9, 38:20, 39:23, 40:1, 40:15, 40:17, 40:20, 41:8, 41:19, 42:16, 42:25, 45:10, 47:11, 48:18, 49:7, 49:25, 50:13, 52:11, 53:1, 54:4, 54:8, 80:6, 95:6, 100:7, 101:9, 155:2
**significantly** [1] - 177:25
**signing** [1] - 34:13
**signs** [29] - 11:17, 11:20, 20:13, 23:25, 24:12, 24:13, 28:3, 33:25, 62:5, 63:5, 63:9, 63:11, 63:12, 65:16, 65:19, 68:23, 88:25, 89:4, 90:3, 90:7, 90:16, 92:11, 92:13, 92:23, 98:15, 100:16, 103:1, 189:19
**similar** [2] - 43:21, 54:13
**similarly** [2] - 30:23, 43:18
**simple** [1] - 130:25
**simply** [3] - 92:11, 185:19, 188:21
**single** [20] - 7:15, 33:17, 87:11, 120:24, 121:2, 121:5, 121:11, 121:19, 121:20, 121:23, 154:19, 156:14, 156:16, 161:2, 167:7, 167:21, 172:19, 174:20, 174:21, 183:8
**sink** [1] - 50:3
**sister** [2] - 142:5, 142:6
**sisters** [2] - 141:16, 142:3
**sit** [3] - 162:6, 166:20, 172:4
**sitting** [7] - 146:11, 158:4, 158:8, 159:13, 162:7, 162:25, 168:14
**situation** [4] - 35:2, 110:14, 157:24, 184:12
**situations** [1] - 111:22
**six** [8] - 22:10, 25:24, 29:4, 103:4, 103:5, 103:15, 143:5, 147:17
**six-hour** [3] - 29:4, 103:4, 103:15

**six-week** [1] - 22:10
**sixth** [1] - 143:5
**size** [2] - 47:18, 128:4
**skews** [1] - 120:22
**skin** [21] - 23:15, 26:11, 27:6, 27:8, 50:25, 51:1, 51:8, 51:9, 51:13, 51:14, 51:16, 51:19, 51:22, 51:24, 51:25, 52:13, 52:15, 53:8, 53:9, 53:15
**skip** [1] - 60:11
**sleep** [3] - 171:16, 171:20, 171:21
**slide** [1] - 4:4
**slight** [1] - 29:1
**slightly** [5] - 17:2, 37:21, 48:6, 48:13, 70:20
**slipping** [1] - 51:15
**slow** [7] - 23:23, 24:4, 24:13, 24:23, 25:6, 28:3, 28:19
**slower** [1] - 21:22
**small** [15] - 27:8, 36:13, 36:23, 37:22, 38:5, 38:8, 38:17, 38:23, 40:9, 49:8, 66:19, 144:5, 144:8, 144:9, 168:14
**smaller** [3] - 114:18, 114:19, 169:1
**smidgen** [1] - 120:22
**smooth** [1] - 52:13
**smoothly** [1] - 9:7
**smoothness** [1] - 52:2
**Social** [4] - 110:15, 110:16, 133:2, 134:16
**societies** [4] - 9:10, 9:11, 9:13, 106:18
**Society** [3] - 9:1, 9:13, 9:21
**society's** [1] - 109:1
**sole** [1] - 78:4
**solely** [1] - 33:22
**soles** [2] - 52:6, 52:17
**someone** [17] - 4:2, 28:8, 51:5, 55:2, 84:9, 104:2, 124:18, 127:14, 128:6, 129:8, 129:21, 131:8, 145:25, 151:15, 163:17, 164:2, 171:7
**sometime** [3] - 29:5, 133:14, 159:6
**sometimes** [6] - 4:17, 4:22, 92:12, 92:13, 171:16, 183:5
**somewhat** [3] - 23:18, 36:25, 41:10
**somewhere** [2] - 137:19, 152:11
**son** [43] - 108:24, 109:2, 110:3, 155:1, 155:8, 157:17, 157:19, 162:23, 163:10, 164:17, 164:25, 165:10, 165:13, 166:5, 166:19, 167:5, 167:19, 168:5, 168:8, 168:13, 169:11, 169:24, 170:2, 170:5, 170:7, 171:23, 171:24, 172:6, 172:10, 172:16, 172:20, 174:21, 181:1, 181:7, 182:1, 182:5, 182:15, 182:18, 182:24, 183:11, 183:12
**son's** [6] - 166:16, 167:17, 171:12, 171:18, 172:7, 183:2
**soon** [4] - 176:14, 176:23, 177:2, 177:20
**sorry** [21] - 13:20, 32:14, 64:18, 74:7, 82:20, 106:4, 111:10, 114:11, 131:19, 141:13, 143:25, 164:23, 165:6, 165:17, 173:1, 177:17, 180:9, 180:24, 181:2, 182:10, 183:16
**sort** [8] - 40:24, 45:9, 46:17, 62:11, 71:21, 102:22, 141:21, 142:3
**soul** [1] - 182:22
**sound** [6] - 68:18, 79:15, 160:21, 160:22, 160:24, 180:11
**sounds** [3] - 60:17, 79:7, 160:25
**spaces** [4] - 49:8, 49:11, 50:1
**speaking** [1] - 71:23
**special** [4] - 3:19, 39:4, 155:8, 155:9
**specialist** [2] - 23:1, 27:18
**specialize** [1] - 142:16
**specialized** [1] - 16:4
**specialty** [2] - 10:19, 186:20
**specific** [29] - 55:17, 57:15, 57:17, 58:14, 58:17, 69:12, 70:11, 70:12, 70:16, 71:2, 72:7, 74:2, 81:17, 83:7, 83:14, 83:16, 84:3, 84:9, 93:3, 93:18, 94:3, 133:24, 144:23, 145:1, 167:23, 179:14
**specifically** [18] - 6:13, 7:14, 12:15, 20:1, 42:9, 47:14, 48:13, 50:24, 51:9, 69:1, 79:16, 81:4, 84:22, 143:4, 148:22, 155:21, 157:10, 157:11
**specify** [1] - 133:21
**spectrum** [3] - 45:10, 93:7, 136:2
**speculative** [1] - 188:15
**speed** [3] - 25:3, 25:4, 28:9
**spell** [4] - 3:8, 140:22, 146:23, 173:9
**spend** [2] - 114:9, 126:19
**spending** [5] - 126:18, 130:18, 131:9, 131:23, 152:1
**spends** [1] - 129:13
**spent** [7] - 6:2, 6:4, 6:6, 6:25, 7:23, 22:9, 128:8
**sphincter** [1] - 40:8
**sponge** [1] - 49:21
**sporadic** [2] - 94:22, 94:24
**spread** [1] - 137:23
**staff** [4] - 8:7, 103:4, 103:13, 184:14
**staffing** [1] - 8:13
**stage** [1] - 45:21
**stain** [1] - 39:5
**Staller** [4] - 118:14, 118:20, 120:20, 121:8
**Staller's** [5] - 118:18, 119:2, 120:5, 120:15, 126:4
**stand** [1] - 140:19
**standard** [9] - 56:24, 57:3, 184:8, 185:2, 188:17, 188:24, 189:3, 189:4, 189:13
**standards** [1] - 70:18
**standing** [10] - 43:3, 43:14, 43:15, 160:2, 160:4, 162:10, 163:2, 163:20, 178:25, 187:24
**start** [20] - 12:19, 19:4, 27:5, 27:18, 30:22, 30:25, 32:2, 37:19, 47:15, 91:6, 110:23, 115:12, 130:20, 145:15, 153:8, 177:23, 179:22, 180:10, 190:21, 191:5
**started** [18] - 19:7, 23:10, 23:12, 24:1, 24:4, 24:5, 56:5, 101:2, 145:15, 146:4, 159:19, 162:12, 163:1, 163:22, 164:7, 169:2, 183:8
**starting** [19] - 38:17, 61:14, 61:15, 78:20, 89:20, 100:19, 112:16, 112:18, 112:20, 112:22, 113:14, 115:15, 115:17, 130:11, 131:21, 132:5, 139:1, 146:15, 184:7
**startling** [1] - 185:9
**starts** [5] - 24:8, 61:10, 127:20, 129:25, 131:13
**state** [5] - 3:8, 15:13, 104:23, 140:22, 173:9
**State** [2] - 107:23, 144:19
**statement** [4] - 68:6, 68:7, 187:25, 190:6
**statements** [1] - 99:7
**Staten** [1] - 8:8
**states** [6] - 145:18, 152:24, 153:16, 153:21, 157:20
**STATES** [2] - 1:1, 1:8
**States** [13] - 1:18, 144:16, 144:22, 145:3, 145:6, 152:21, 153:2, 153:5, 174:25, 175:3, 192:4, 192:6, 192:17
**station** [1] - 146:25
**statistic** [1] - 117:11
**statistical** [2] - 111:23, 136:7
**statistics** [17] - 105:3, 108:15, 110:6, 110:24, 115:3, 115:18, 115:19, 115:21, 115:23, 115:24, 119:9, 121:17, 121:20, 121:22, 128:19, 134:11, 136:22
**Statistics** [2] - 105:24, 122:3
**statutes** [1] - 147:5
**stay** [5] - 81:21, 131:22, 145:13, 158:12, 160:19
**stayed** [4] - 6:12, 6:17, 134:14, 158:16
**stem** [3] - 32:20, 32:21
**stenosis** [2] - 38:1, 38:4
**stenotic** [1] - 37:24
**step** [7] - 98:17, 103:25, 111:14, 162:10, 162:11, 173:4, 183:19
**step-wise** [1] - 98:17
**stepped** [2] - 168:7, 179:4
**stethoscope** [3] - 87:21, 87:23, 88:3
**stick** [1] - 130:24
**stiff** [3] - 48:11, 48:13, 48:14
**still** [22] - 33:14, 33:23, 73:11, 73:15, 75:7, 76:8, 80:4, 97:3, 97:8, 102:23, 114:18, 141:10, 153:4, 160:7, 166:16, 168:4, 170:22, 172:7, 173:23, 176:3, 183:12, 188:12
**stomach** [5] - 37:20, 37:21, 37:22, 40:10, 156:1
**stood** [6] - 162:14, 162:22, 163:3, 163:5, 164:6, 166:22
**stop** [1] - 133:3
**stopped** [5] - 19:7, 98:2, 101:2, 168:9, 189:24
**stopping** [2] - 96:17, 100:20
**stops** [1] - 20:25
**stove** [1] - 127:11
**stream** [1] - 111:15
**Street** [1] - 1:19

**streets** [1] - 148:10
**stress** [2] - 20:5, 20:6
**stretched** [2] - 45:13, 46:17
**striking** [1] - 185:20
**strips** [8] - 13:2, 19:10, 19:16, 22:7, 57:11, 83:19, 84:1, 84:8
**student** [3] - 44:12, 144:25, 145:2
**studied** [5] - 143:13, 144:4, 172:5, 174:6
**studies** [6] - 105:25, 143:7, 143:23, 143:24, 144:10, 146:13
**study** [8] - 4:1, 142:23, 143:2, 143:8, 143:14, 143:16, 146:18, 148:2
**studying** [1] - 146:19
**stuff** [5] - 100:21, 101:21, 143:20, 149:19, 170:24
**subject** [1] - 88:15
**subjective** [2] - 85:1, 85:2
**submitted** [1] - 9:6
**suboptimal** [1] - 102:17
**subsequently** [1] - 109:23
**subset** [1] - 111:3
**subspecialty** [1] - 4:15
**substantiated** [1] - 34:2
**succeed** [4] - 160:1, 178:23, 179:3, 179:6
**succeeded** [2] - 160:6, 179:8
**successful** [1] - 151:14
**successfully** [2] - 29:7, 56:9
**sudden** [16] - 4:20, 4:24, 6:16, 21:21, 34:25, 35:1, 37:4, 37:11, 41:2, 41:20, 54:8, 60:9, 92:12, 167:23, 178:18, 187:2
**suddenly** [4] - 21:14, 30:11, 30:13, 62:8
**suffered** [4] - 29:8, 61:18, 89:21, 98:23
**suffering** [3] - 21:17, 90:2, 103:16
**sufficient** [1] - 46:25
**sufficiently** [2] - 97:3, 97:8
**suggest** [2] - 51:24, 170:6
**suggested** [5] - 17:17, 18:1, 43:3, 43:19, 55:8
**suggestion** [1] - 55:16
**suggestive** [3] - 37:3, 38:18, 39:8
**suit** [2] - 145:22, 159:12
**Suite** [2] - 1:16, 1:19
**sum** [2] - 81:18, 99:19
**summarized** [1] - 112:11
**summary** [3] - 115:11, 121:25, 138:25
**summer** [4] - 119:13, 135:12, 152:5
**sums** [2] - 100:14, 101:12
**Sunday** [6] - 158:16, 158:18, 159:13, 169:17, 176:19, 177:7
**sunk** [1] - 50:20
**SUNY** [1] - 7:1
**supervision** [2] - 192:11, 192:23
**Supervisor** [1] - 147:18
**supplemental** [10] - 74:24, 74:25, 75:13, 75:16, 75:22, 76:1, 76:2, 76:10, 78:10, 118:17
**supply** [1] - 21:1
**support** [8] - 43:24, 145:15, 145:16, 146:5, 148:15, 175:1, 189:12, 189:15
**supported** [1] - 18:13
**supporting** [1] - 33:8
**supportive** [1] - 26:15
**supports** [2] - 23:22, 184:3
**suppose** [1] - 102:22
**supposed** [4] - 154:22, 155:15, 179:24, 180:18
**surgical** [1] - 37:25
**surrounding** [1] - 89:18
**survive** [1] - 92:14
**sustain** [3] - 21:24, 28:8, 31:6
**sustained** [1] - 24:14
**sustaining** [2] - 66:5, 66:16
**swallowing** [1] - 17:19
**swollen** [2] - 51:17, 183:9
**SWORN** [4] - 3:7, 104:20, 140:21, 173:7
**symptom** [3] - 55:3, 92:12, 92:14
**symptoms** [24] - 22:19, 33:25, 38:2, 60:23, 61:3, 61:20, 62:5, 62:16, 63:5, 63:9, 63:11, 63:12, 65:16, 65:19, 88:21, 88:25, 89:7, 89:10, 89:23, 92:11, 92:13, 100:16, 103:1
**syndrome** [6] - 18:6, 34:22, 36:4, 36:8, 54:22, 92:16
**syndromes** [5] - 35:25, 36:5, 44:4, 44:7, 99:25

## T

**Table** [1] - 123:4
**table** [21] - 111:10, 111:11, 121:5, 125:15, 125:19, 128:5, 129:10, 132:20, 136:24, 159:17, 163:1, 163:14, 163:24, 163:25, 166:25, 171:5, 172:17, 172:21, 179:12, 180:10
**Tables** [1] - 112:1
**take-home** [1] - 115:2
**talks** [2] - 38:18, 75:2
**tap** [1] - 164:14
**targeted** [2] - 54:21, 55:4
**taught** [1] - 106:15
**teach** [3] - 7:5, 148:1, 172:2
**teaching** [1] - 106:15
**team** [3] - 8:11, 184:15, 184:16
**technically** [1] - 142:23
**telephone** [1] - 108:21
**temp** [1] - 147:13
**temperature** [2] - 27:3, 27:4
**Temple** [5] - 105:23, 105:25, 106:2, 106:16, 106:22
**tend** [3] - 6:15, 36:2, 45:12
**term** [4] - 42:8, 48:13, 51:23, 86:21
**terms** [17] - 16:4, 33:18, 47:23, 51:9, 51:13, 53:1, 103:6, 116:3, 121:8, 130:16, 139:19, 146:3, 148:14, 157:23, 171:19, 176:6, 188:24
**test** [28] - 6:5, 13:9, 13:12, 33:24, 48:8, 49:4, 49:6, 50:3, 53:20, 53:22, 54:10, 54:24, 64:16, 64:22, 73:13, 76:17, 83:2, 85:1, 143:18, 148:3, 148:5, 148:10, 154:5, 170:4, 175:9, 181:20
**testified** [19] - 29:23, 33:4, 62:1, 62:14, 67:21, 73:12, 75:18, 75:20, 78:12, 92:1, 92:3, 95:2, 95:11, 97:18, 98:12, 138:4, 184:7, 184:8, 185:13
**TESTIFIED** [4] - 3:7, 104:20, 140:21, 173:8
**testify** [1] - 10:22
**testifying** [5] - 15:21, 71:5, 79:17, 91:18, 97:24
**testimonies** [1] - 14:14
**testimony** [28] - 12:21, 69:1, 74:7, 75:23, 76:1, 76:10, 76:18, 78:11, 79:7, 79:11, 80:23, 82:6, 89:8, 90:15, 94:14, 102:13, 104:9, 104:18, 124:2, 133:19, 134:3, 184:5, 185:1, 185:15, 185:23, 187:7, 188:4, 189:3
**testing** [44] - 4:11, 4:12, 33:14, 43:25, 47:8, 47:10, 54:13, 54:14, 54:17, 54:18, 54:19, 54:21, 54:25, 55:4, 55:7, 55:13, 55:17, 64:20, 65:9, 67:3, 68:4, 71:21, 71:25, 72:8, 72:16, 73:11, 73:16, 74:1, 75:1, 75:6, 75:9, 76:23, 80:13, 80:15, 80:16, 81:6, 84:24, 92:7, 170:6, 170:9, 182:5, 182:9, 182:11
**tests** [11] - 64:15, 64:16, 64:18, 65:10, 70:25, 72:24, 72:25, 85:2, 143:17, 170:1
**text** [1] - 44:17
**texture** [2] - 52:2, 53:9
**that(indicating** [1] - 179:20
**that(indicating)** [1] - 163:19
**THE** [62] - 1:1, 1:1, 1:8, 1:12, 1:14, 1:17, 3:1, 3:5, 3:8, 3:10, 5:13, 12:11, 14:3, 14:5, 14:8, 15:24, 45:3, 56:15, 56:17, 56:19, 101:16, 103:21, 103:23, 103:25, 104:1, 104:2, 104:7, 104:13, 104:16, 105:16, 106:6, 108:7, 109:13, 109:15, 122:9, 138:20, 140:16, 140:17, 140:22, 140:24, 162:16, 162:18, 162:19, 162:20, 172:25, 173:4, 173:9, 173:11, 183:15, 183:18, 183:19, 183:25, 184:2, 188:19, 189:6, 190:11, 190:17, 190:20, 190:25, 191:5, 191:10, 191:12
**themself** [1] - 128:25
**themselves** [5] - 68:24, 93:5, 114:9, 126:19, 131:23
**theoretically** [1] - 148:2
**theory** [1] - 187:15
**therapist** [1] - 23:22
**thereafter** [1] - 132:7
**therefore** [1] - 188:5
**they've** [1] - 176:24
**thick** [1] - 38:24
**thickened** [4] - 38:6, 41:10, 47:19, 52:14
**thickening** [1] - 39:25
**third** [5] - 109:10, 123:20, 144:10,

144:12, 160:1
**thirty** [1] - 106:23
**thirty-some** [1] - 106:23
**this(indicating** [2] - 163:6, 163:15
**thorough** [4] - 50:21, 95:10, 99:20, 186:25
**thousands** [1] - 107:18
**threatening** [2] - 40:21, 41:1
**three** [18] - 7:21, 10:15, 11:16, 17:3, 25:19, 109:5, 120:3, 141:8, 141:16, 143:1, 144:2, 146:15, 146:16, 147:11, 147:16, 157:8, 176:17, 190:20
**threw** [2] - 163:23, 172:21
**throughout** [7] - 17:23, 26:20, 34:1, 40:6, 156:12, 158:15
**throw** [1] - 187:18
**thrown** [1] - 172:17
**timing** [6] - 31:8, 32:1, 32:11, 75:3, 77:19
**Tinsel** [1] - 147:4
**tissue** [2] - 4:3, 6:3
**tissues** [4] - 4:1, 7:13, 39:5, 51:16
**Title** [1] - 192:6
**today** [23] - 12:14, 12:21, 61:25, 66:2, 69:9, 73:13, 77:20, 85:16, 89:8, 94:12, 98:10, 105:5, 107:25, 112:24, 133:25, 134:3, 135:9, 140:9, 186:18, 187:3, 190:12, 191:13
**toe** [1] - 50:22
**toes** [3] - 52:12, 52:13, 53:4
**together** [9] - 9:6, 31:13, 46:21, 90:22, 99:7, 152:14, 164:22, 164:25
**tomorrow** [3] - 190:15, 190:20, 191:13
**tone** [1] - 42:18
**took** [18] - 24:3, 25:11, 34:24, 57:19, 63:23, 90:22, 100:19, 121:10, 146:10, 158:21, 161:22, 161:25, 169:1, 172:21, 177:19, 180:8, 180:22, 182:18
**tools** [2] - 171:7, 179:12
**top** [1] - 49:21
**topic** [1] - 10:1
**torso** [1] - 26:21
**total** [12] - 112:10, 113:25, 115:18, 117:10, 120:12, 120:21, 123:6, 125:2, 132:16, 137:20, 138:13, 166:7
**totals** [3] - 137:5, 137:8, 137:12
**tough** [1] - 145:24
**toward** [6] - 36:17, 46:15, 46:16, 53:4, 54:21, 54:25
**towards** [1] - 85:21
**Town** [1] - 147:4
**trachea** [1] - 48:2
**tracing** [6] - 57:15, 57:16, 58:9, 58:14, 83:15
**tracings** [25] - 19:20, 20:4, 20:14, 57:14, 58:15, 74:21, 83:11, 83:14, 83:22, 84:4, 100:12, 100:25, 103:9, 185:6, 185:8, 185:10, 185:11, 185:15, 185:19, 186:1, 186:9, 187:15, 188:8, 189:17
**tract** [10] - 37:18, 39:12, 39:13, 39:14, 39:15, 39:18, 39:21, 40:6, 47:23, 94:17
**traditional** [1] - 152:8
**train** [1] - 148:7
**trained** [4] - 7:22, 7:24, 70:15, 105:2
**training** [19] - 5:1, 5:7, 6:18, 7:19, 10:25, 22:6, 22:8, 22:9, 29:17, 63:18, 83:10, 83:11, 105:11, 178:10, 178:12, 178:15, 178:22, 178:24
**Training** [1] - 7:25
**trains** [2] - 141:23, 141:24
**TRANSCRIPT** [1] - 1:11
**transcript** [8] - 1:21, 57:24, 78:14, 78:17, 79:22, 192:7, 192:10, 192:22
**transcription** [1] - 1:22
**transportation** [1] - 127:3
**traumatic** [2] - 7:14
**treat** [3] - 19:12, 23:1, 176:2
**treatable** [1] - 37:5
**treated** [2] - 4:7, 37:7
**treating** [3] - 100:18, 100:23, 102:18
**treatment** [8] - 4:7, 12:5, 19:5, 19:8, 19:23, 40:21, 100:17, 102:3
**treatments** [1] - 19:13
**trend** [1] - 72:1
**trends** [1] - 135:6
**TRIAL** [1] - 1:12
**trial** [1] - 46:12
**tried** [3] - 69:21, 160:6, 179:5
**truck** [3] - 149:24, 150:2, 169:9
**trucking** [4] - 148:22, 149:3, 150:10, 151:18
**Trucking** [1] - 150:12
**trucks** [3] - 147:24, 148:8
**true** [14] - 60:20, 76:20, 80:22, 82:4, 84:11, 123:2, 124:6, 126:4, 128:13, 133:8, 137:9, 137:18, 138:15, 192:7
**try** [9] - 23:4, 30:9, 65:18, 87:13, 91:23, 102:6, 146:4, 174:8, 177:12
**trying** [16] - 62:6, 68:15, 68:20, 69:4, 73:9, 102:4, 127:13, 159:21, 159:22, 159:24, 177:12, 177:13, 178:22, 179:7, 180:14, 180:15
**tummy** [1] - 177:25
**Tunis** [1] - 142:18
**Tunisia** [9] - 141:5, 141:10, 141:12, 141:14, 142:18, 153:4, 173:16, 173:23
**Tunisian** [1] - 144:22
**turn** [4] - 38:13, 87:15, 121:18, 179:15
**turned** [1] - 45:14
**TV** [1] - 127:11
**twice** [1] - 159:11
**twisted** [1] - 159:23
**two** [45] - 7:23, 8:3, 9:14, 11:16, 15:13, 22:10, 23:19, 27:25, 32:10, 35:16, 35:20, 48:5, 61:10, 67:7, 86:4, 92:23, 106:15, 111:2, 112:21, 113:10, 119:18, 131:9, 138:12, 139:11, 139:13, 139:14, 139:22, 143:4, 144:4, 151:22, 151:24, 151:25, 152:1, 152:25, 153:21, 157:8, 159:22, 159:23, 162:2, 172:13, 178:10, 180:2, 184:24, 187:19
**TWO** [1] - 1:12
**two-million** [1] - 138:12
**type** [8] - 44:4, 50:6, 54:13, 57:15, 58:14, 81:6, 83:14, 160:21
**types** [2] - 44:21, 170:24
**typical** [1] - 121:12
**typically** [10] - 28:21, 32:9, 37:5, 38:2, 42:16, 58:15, 60:21, 79:17, 91:21, 91:23


## U


**U.S** [5] - 112:1, 122:2, 145:14, 150:13, 175:4
**ultimately** [17] - 24:14, 62:10, 80:8, 101:12, 149:6, 151:3, 165:3, 167:11, 169:5, 175:4, 180:20, 181:1, 181:3, 181:6, 181:15, 181:23, 184:25
**ultrasound** [11] - 17:21, 42:17, 154:15, 155:23, 155:25, 156:12, 156:23, 158:5, 167:21, 175:20, 176:16
**ultrasounds** [11] - 16:24, 17:5, 17:7, 17:9, 18:9, 42:10, 43:9, 156:11, 157:5, 175:17, 176:6
**um-hum** [1] - 86:9
**umbilical** [1] - 91:25
**unable** [1] - 96:17
**unborn** [2] - 20:3, 32:16
**uncle** [1] - 152:6
**under** [22] - 4:5, 29:19, 29:20, 30:14, 31:7, 31:9, 31:25, 35:9, 37:1, 37:14, 38:7, 38:14, 38:21, 39:4, 48:19, 74:8, 86:3, 86:5, 99:13, 183:22, 192:11, 192:23
**undergo** [1] - 100:24
**underlying** [4] - 17:25, 35:6, 47:11, 100:8
**underneath** [3] - 25:17, 51:16, 167:2
**understood** [10] - 69:9, 69:13, 69:24, 72:3, 94:12, 95:17, 123:23, 129:5, 137:20, 157:25
**Understood** [1] - 58:5
**undisputed** [1] - 190:6
**uneven** [1] - 46:18
**uneventful** [1] - 16:20
**unexpected** [10] - 4:20, 4:24, 6:16, 35:1, 37:4, 37:11, 41:2, 41:20, 48:25, 54:8
**unfortunately** [3] - 30:6, 101:14, 154:9
**unit** [2] - 121:24, 128:14
**UNITED** [2] - 1:1, 1:8
**United** [13] - 1:18, 144:16, 144:22, 145:3, 145:6, 152:20, 153:2, 153:5, 174:25, 175:3, 192:4, 192:6, 192:17
**University** [10] - 7:4, 105:23, 106:16, 142:17, 143:24, 144:1, 144:2, 146:16, 174:7
**University's** [1] - 7:2
**unknown** [1] - 95:1
**unless** [2] - 150:7,

192:23
**unnatural** [2] - 4:21, 4:23
**unreliable** [4] - 76:18, 79:23, 80:12, 80:14
**unremarkable** [9] - 17:9, 38:25, 39:24, 41:7, 41:11, 48:21, 51:14, 51:19
**unresponsive** [2] - 26:2, 27:16
**up** [71] - 6:7, 23:20, 24:15, 35:15, 37:14, 38:18, 46:11, 46:14, 46:16, 47:13, 49:8, 49:18, 50:8, 50:12, 50:16, 51:12, 52:14, 52:25, 65:23, 71:11, 71:16, 72:15, 73:10, 76:25, 77:6, 78:17, 81:6, 81:11, 81:18, 85:20, 90:9, 99:19, 100:15, 101:6, 101:13, 108:18, 111:12, 112:6, 112:8, 112:13, 112:17, 119:3, 119:8, 125:14, 131:22, 133:25, 134:3, 138:21, 145:19, 145:20, 153:13, 154:17, 155:19, 156:18, 156:23, 158:23, 159:1, 161:4, 161:21, 162:14, 162:22, 163:3, 163:5, 163:15, 166:4, 174:22, 177:3, 177:15, 178:2, 180:16, 190:15
**UPMC** [3] - 154:11, 154:13, 154:14
**upper** [2] - 26:21, 41:16
**USIS** [1] - 153:2
**usual** [2] - 52:16, 54:18
**utero** [22] - 21:11, 26:16, 32:17, 37:5, 42:11, 43:16, 49:10, 60:18, 81:24, 82:2, 82:7, 82:17, 82:22, 82:24, 83:6, 85:4, 88:13, 89:13, 89:14, 96:15, 102:19, 186:22
**uterus** [4] - 90:11, 98:2, 98:3, 102:21
**utilities** [1] - 127:8
**utilize** [4] - 21:16, 35:3, 50:3, 71:7
**utilized** [1] - 59:14
**utilizing** [1] - 11:7

## V

**vacation** [1] - 151:22
**vagina** [2] - 159:24, 178:23
**valid** [3] - 33:7, 33:8, 33:16
**validated** [4] - 4:13, 71:25, 80:14, 80:17
**validity** [1] - 33:24
**value** [33] - 33:17, 33:20, 33:21, 67:4, 68:12, 69:13, 71:19, 71:22, 73:14, 75:14, 107:13, 110:6, 111:14, 112:24, 113:18, 115:4, 115:13, 115:14, 116:18, 116:23, 117:15, 120:6, 120:13, 120:20, 121:9, 132:15, 136:21, 136:25, 139:12, 139:16, 139:18, 187:20
**values** [16] - 33:7, 66:5, 70:9, 71:9, 71:14, 71:24, 72:14, 76:2, 82:3, 82:8, 84:25, 85:14, 91:2, 100:11, 101:21
**variability** [9] - 19:19, 22:2, 83:20, 83:23, 103:7, 184:11, 184:18, 186:3
**variable** [1] - 22:19
**variations** [1] - 189:18
**variety** [2] - 41:23, 117:24
**various** [9] - 10:8, 10:9, 11:23, 14:13, 14:22, 44:6, 47:14, 88:6, 135:21
**veil** [2] - 162:7, 162:24
**venous** [10] - 33:1, 33:3, 33:10, 67:17, 68:4, 73:24, 74:17, 101:21, 101:24, 102:13
**Verdict** [1] - 183:23
**versus** [2] - 46:4, 64:11
**vessels** [2] - 27:8, 47:18
**Via** [1] - 2:4
**via** [2] - 104:2, 104:18
**VIA** [1] - 104:19
**video** [1] - 104:2
**view** [3] - 78:6, 80:6, 189:13
**viruses** [1] - 6:6
**visa** [2] - 144:23, 145:2
**visible** [3] - 32:7, 41:22, 53:3
**visibly** [1] - 30:5
**visit** [12] - 141:19, 145:18, 153:6, 154:19, 155:12, 155:17, 155:22, 156:16, 174:20, 176:5, 176:8, 182:18
**visiting** [2] - 151:16, 152:6
**visits** [5] - 154:15, 154:18, 156:10, 175:12, 181:20
**Viveca** [1] - 1:18
**voice** [1] - 168:16
**voices** [1] - 169:4
**vs** [1] - 1:7

## W

**wages** [1] - 149:11
**wait** [5] - 80:11, 148:12, 174:24, 180:9, 191:7
**waiting** [3] - 161:23, 180:8, 180:11
**walked** [1] - 167:14
**walking** [2] - 161:23, 163:19
**wall** [3] - 38:24, 163:20, 163:21
**wants** [1] - 187:23
**ward** [1] - 169:17
**warning** [1] - 11:20
**WASHINGTON** [1] - 1:24
**Washington** [2] - 145:20, 145:21
**waste** [2] - 150:5, 150:6
**watching** [2] - 160:5, 164:9
**water** [8] - 48:7, 48:8, 49:20, 49:22, 158:25, 159:4, 159:5, 177:14
**waved** [1] - 163:21
**way(indicating** [1] - 163:13
**wear** [1] - 161:20
**Wecht** [1] - 8:15
**WEDNESDAY** [1] - 1:13
**week** [6] - 22:10, 145:19, 146:10, 151:23, 153:21, 153:24
**weeks** [2] - 11:16, 151:22
**weigh** [1] - 189:8
**weight** [3] - 48:3, 64:11, 156:16
**whatsoever** [1] - 189:12
**wheels** [1] - 171:6
**white** [2] - 57:23, 164:4
**Whoa** [1] - 178:3
**whole** [14] - 8:13, 31:13, 54:16, 61:11, 84:18, 100:13, 131:7, 158:13, 160:20, 162:13, 163:1, 182:22, 183:5, 183:10
**wife** [22] - 150:17, 151:9, 151:15, 152:7, 153:17, 159:14, 160:9, 161:18, 161:21, 161:25, 162:3, 162:6, 164:4, 164:13, 164:24, 165:9, 166:15, 166:20, 169:7, 170:9, 170:13, 171:10
**wife's** [2] - 162:25, 167:9
**wire** [1] - 159:23
**wires** [3] - 161:9, 170:24, 178:22
**wise** [1] - 98:17
**wish** [2] - 14:5, 183:25
**Wisneski** [1] - 1:15
**within-mentioned** [1] - 192:8
**witness** [9] - 3:2, 15:21, 99:7, 104:16, 173:5, 173:6, 190:16, 191:6, 191:7
**WITNESS** [9] - 3:10, 103:21, 104:1, 140:17, 140:24, 162:19, 173:11, 183:15, 183:18
**Witnesses** [1] - 2:2
**wonder** [2] - 134:19, 135:8
**wonderful** [1] - 157:16
**wondering** [1] - 97:11
**word** [6] - 48:15, 66:6, 69:17, 69:19, 94:21, 146:23
**wording** [1] - 74:2
**words** [8] - 48:12, 57:17, 57:18, 111:11, 111:24, 114:15, 127:19, 146:20
**worker** [4] - 115:1, 125:15, 129:9, 145:25
**worker's** [1] - 130:13
**workers** [16] - 111:2, 111:4, 115:18, 115:19, 115:22, 115:23, 115:24, 115:25, 117:11, 117:12, 121:4, 125:6, 125:7, 136:22, 136:23, 148:19
**worst** [1] - 188:16
**write** [1] - 102:24
**written** [1] - 89:16
**wrote** [1] - 76:10

## Y

**YEAGER** [4] - 1:23, 192:3, 192:13, 192:16
**Yeager** [1] - 192:13
**year** [34] - 5:25, 6:11, 6:12, 6:17, 7:6, 107:19, 107:20, 111:3, 111:6, 111:12, 119:22, 125:16, 125:25, 126:1, 126:11, 126:14, 129:3, 130:10, 130:12, 130:14, 130:22, 132:6, 132:9, 132:12, 132:15, 134:4, 139:22, 143:5, 143:6, 144:10, 144:12, 151:5, 174:7
**year-round** [1] - 111:3
**years** [33] - 3:18, 5:7, 7:21, 7:23, 8:3, 8:14, 8:16, 8:21, 106:15, 106:16, 106:23, 106:24, 110:10, 110:12, 112:1, 115:20, 119:11, 119:17, 126:7, 127:22, 128:11,

129:6, 129:7, 134:14, 139:22, 143:1, 143:4, 144:2, 146:15, 146:16, 150:23, 152:25
**yeast** [1] - 154:11
**yelling** [1] - 168:15
**yesterday** [4] - 15:21, 185:5, 185:10, 185:22
**York** [6] - 6:10, 6:23, 7:18, 7:22, 145:21
**young** [1] - 28:7
**yourself** [6] - 145:15, 145:16, 146:5, 147:12, 173:18, 175:4
**yourselves** [1] - 165:3

**Z**

**zero** [8] - 27:12, 27:13, 28:14, 28:15, 56:9, 84:13, 84:14, 84:22
**ZOOM** [1] - 104:20
**Zoom** [2] - 2:4, 104:18